UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TENARIS S.A. SECURITIES LITIGATION | Master File No. 1:18-CV-07059-RJD-SJB<br><br>CONSOLIDATED CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF THE ACTION ................................................................................ 1

JURISDICTION AND VENUE ......................................................................... 7

PARTIES ........................................................................................................... 8

ADDITIONAL KEY NON-PARTIES .............................................................. 12

BACKGROUND ............................................................................................... 14

    Organization of Tenaris ............................................................................ 14

    The Close Relationship Between Tenaris and Ternium/SIDOR ................... 16

    Tenaris's History of Corruption................................................................. 18

SUBSTANTIVE ALLEGATIONS ................................................................... 22

    The Notebooks Case .................................................................................. 22

    Defendants' Participation in Undisclosed Bribery in Argentina to Further Their
        Interests,Including as Detailed in the Notebooks Case......................... 23

    Tenaris's Code of Ethics and Code of Conduct.................................... 32

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE
    DURING THE CLASS PERIOD ...................................................... 33

    Defendants' Core Material Omissions.................................................. 33

    False and Misleading Statements and Omissions in Tenaris's

    Class Period Form 20-Fs........................................................................ 34

    Disclosure of Defendants' Participation in Bribery, and the Risks and Uncertainties
        Associated Therewith, Was Required By Item 303............................... 43

THE TRUTH IS REVEALED; LOSS CAUSATION.................................... 45

ADDITIONAL SCIENTER ALLEGATIONS.............................................. 46

PLAINTIFFS' CLASS ACTION ALLEGATIONS ..................................... 48

APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE*
    PRESUMPTIONS OF RELIANCE....................................................... 50

INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
    DOCTRINE .............................................................................................. 51

COUNT I - Violation of Section 10(b) of The Exchange Act and  Rule 10b-5 Promulgated
    Thereunder Against All Defendants ........................................................ 52

COUNT II - Violation of Section 20(a) of The Exchange Act Against the Individual Defendants,
    San Faustin and Techint Holdings S.á r.l............................................... 54

PRAYER FOR RELIEF .................................................................................. 56

DEMAND FOR TRIAL BY JURY .................................................................. 56

i

Lead Plaintiffs Jeffrey Lynn Sanders and Starr Sanders ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys. Lead Counsel's investigation of this matter has included, among other things, a review of: Defendants' public documents, conference calls, statements, and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Tenaris S.A. ("Tenaris" or the "Company"); news articles and analysts' reports about the Company; Argentine court documents in Case 9608/2018/18 before the Argentine National Court for Criminal and Correctional Matters (the "Notebooks Case");[1] and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a putative class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Tenaris S.A. ("Tenaris") American Depositary Shares ("ADS") during the period May 1, 2014 through and including December 5, 2018 (the "Class Period"), and who were damaged thereby, seeking to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

---

[1] Exhibits A through E attached hereto are copies, with certified English translations, of documents filed in the Notebooks Case.

2.     Argentina-based Tenaris is a manufacturer of steel pipe, casing, tubing, line pipe, and mechanical and structural pipes, primarily for the oil and gas industry.  Tenaris touts itself as having been "an important player in the oil and gas market in Argentina" for more than 60 years.[2]

3.     Tenaris is one of six companies operating under the umbrella of Techint Holdings S.ár.l. (a/k/a the "Techint Group"), a multinational conglomerate of steel, oil and gas, engineering, construction, and service companies.  Originally founded by the grandfather of Defendant Paolo Rocca ("Rocca") and currently led by Defendant Rocca, Techint Group has headquarters in Italy and Argentina.

4.     Beginning in 2005, the relationship between then-Venezuelan President, Hugo Chávez ("Chávez"), and Rocca's Techint Group became strained over the prospects of nationalization of Siderurgica de Orinoco C.A. ("SIDOR"), an important subsidiary majority owned by another Techint Group company, Ternium S.A. ("Ternium"), a leading producer of steel in Latin America.  At the time, SIDOR was Venezuela's largest producer of high-quality steel.  Rocca and Techint Group then asked Argentine government officials, including then-Argentine president Néstor Kirchner and his successor wife, Cristina Fernandez de Kirchner (together, the "Kirchners"), to intervene and negotiate with Chávez in an attempt to prevent the nationalization of Techint Group's interests by the Venezuelan government, or to at least help to achieve favorable terms.  As detailed herein, the Kirchners did intervene with Chávez on Defendants' behalf—for a price.

5.     Tenaris and Ternium are Techint Group's two largest companies.  The business and operations of Tenaris and Ternium are closely intertwined, with Ternium, through SIDOR,

---

[2] http://www.tenaris.com/en/tenarisworldwide/southamerica/argentina.aspx

providing much of the steel used to manufacture Tenaris's products in South America (including for a Tenaris subsidiary housed within the same manufacturing plant as SIDOR).  Tenaris also owns 11.5% of Ternium, which controls SIDOR.  SIDOR thus was of critical importance to Tenaris not only because of Tenaris's indirect ownership/financial interest in the company, but because SIDOR provided Tenaris with extremely efficient production of high-quality steel in a prime location.  Without SIDOR, Tenaris would be forced to buy steel from Techint Group competitors in China and Korea.  Thus, Tenaris had a particular interest in the operations and contemplated nationalization of SIDOR by Venezuela.

6.    In April 2008, the Venezuelan government announced its intention to move forward with the plans to nationalize SIDOR.  At that time, Techint Group estimated its interest in SIDOR was valued at as much as $3 billion, and media outlets reported that Techint Group asked the Venezuelan government to pay at least $2.4 billion for a 50% stake in SIDOR, leaving Ternium with a minority stake of approximately 10%.  Venezuela publicly stated that it valued the stake in SIDOR controlled by Techint Group to be worth only $800 million.

7.    In May 2009, the sale of Ternium's stake in SIDOR to the Venezuelan government was announced to the public with a staggering sale price of $1.97 billion.  In an analyst report dated May 7, 2009, Deutsche Bank analysts commented that they "were surprised by the timing and value realized."  Both Deutsche Bank and UBS analysts had previously assigned a zero value to Ternium's stake in SIDOR due to an expectation that Ternium's stake would have been sold at a discount after Chávez decided to nationalize the asset.

8.    Also in May 2009, Chávez publicly announced that Venezuela would move forward with plans to nationalize certain other of Tenaris's holdings in three other steel product firms based in Venezuela, including majority-owned Tenaris subsidiaries Matesi Materiales

Siderurgicos S.A. ("Matesi") and Tubos de Acero de Venezuela S.A. ("Tavsa"), a pipe manufacturing plant located inside the same building as SIDOR, along with Tenaris's minority interest in a third facility.  Chávez reportedly discussed his plans to nationalize these additional Venezuelan-based Tenaris holdings with then-Argentine President Cristina Kirchner at a meeting between the leaders in Caracas, Venezuela, on or around August 11, 2009.

9.     The Kirchners took a particular interest and played an important role in the negotiations between Chávez/Venezuela and Rocca/Techint Group over the nationalization of Techint Group's interests in Venezuela during the period of at least 2005 through at least 2009. Venezuela did not complete payment for SIDOR until 2012.

10.     What investors did not know at the time, or during the Class Period, was that starting from at least 2006 and continuing into 2007, and again from at least April 2008 through December 2008, Techint Group allegedly made a series of substantial—and illegal—cash payments at regular intervals to Argentine government officials, as detailed herein, in order to garner favor from the Kirchners and other high-ranking government officials.  Approximately $600,000 to $700,000 was reportedly paid in $100,000 installments during the 2006 to mid-2007 timeframe, and an additional $1,000,000 was reportedly paid in 2008.  Among other reasons, as detailed in the Notebooks Case, the bribery payments were made to induce the Kirchners and other Argentine officials to intervene on behalf of Defendant Rocca and Techint Group with Chávez and the Venezuelan government, specifically to influence Chávez to lend favor to Techint Group's financial and commercial interests in connection with Chávez's contemplated nationalization of the conglomerate's interest in its Venezuela-based subsidiaries.

11.     Then, on August 1, 2018, major Argentinian newspaper La Nación published an investigation detailing a massive corruption scandal spanning over a decade of illicit payments

made by various prominent businesses and business leaders, primarily in the construction and energy (*i.e.*, oil and gas) industries, to Argentine government officials.  Dubbed the "Notebook scandal," the scheme was revealed when notebooks written by Oscar Centeno ("Centeno")—the driver of former Argentine Ministry of Planning official Roberto Baratta ("Baratta") under the presidencies of Néstor and Cristina Kirchner—meticulously cataloguing millions of dollars in bribery payments made by major Argentine corporations and business leaders to the Kirchners and other high-ranking Argentine officials were obtained by La Nación, which in turn handed the materials over to Argentine authorities.  Centeno was detained by Argentine law enforcement and subsequently turned state's evidence, confirming the notebooks were his and that they indeed documented years of corruption and graft by major business leaders, including Defendants, and top Argentine officials, including the Kirchners and officials in the Kirchners' inner circle.

12.     The Notebook scandal is widely regarded as one of the greatest corruption scandals ever to hit Argentina and thus far has resulted in charges filed against approximately seventy (70) business leaders and government officials.  Ex-President Cristina Kirchner was charged in connection with the corruption scandal on September 17, 2018.  (Néstor Kirchner died on October 27, 2010, before the scandal was exposed.)

13.     Also in early August 2018, the Argentine Federal Police raided Techint Group's headquarters in Buenos Aires, removing numerous boxes of documents from the premises, including from the 27th floor of the building, the same floor where Tenaris's offices are located.

14.     On November 27, 2018, media outlets reported that Argentine Federal Judge Claudio Bonadio, who is presiding over the Notebooks Case, formally charged Rocca in connection with the corruption scandal.  Reuters reported that Rocca was charged with "graft"

and "illicit association and payment of bribes" in the Notebook scandal, and that Argentine authorities had frozen approximately US $104 million of Rocca's assets.

15.     In response to this news, Tenaris's stock fell $2.64 per share or nearly 10% to close at $24.36 per share on November 27, 2018, damaging investors.

16.     On December 5, 2018, when the market was closed, Tenaris published a press release announcing that the Argentine prosecutors involved in the Notebooks Case had requested that Defendant Paolo Rocca be subject to preventive detention.

17.     In response to this news, Tenaris's stock fell an additional $0.95 per share to close at $23.43 per share on December 6, 2018, damaging investors.

18.     Defendants' participation in the Notebook scandal is prominent.  Documents in the Notebooks Case detail six to seven payments, in the amount of $100,000 each, allegedly made by Luis Betnaza (Techint Group's Corporate Director, who, along with Rocca, negotiated directly with Chávez and other top Venezuelan officials regarding Chávez's planned nationalization of Techint Group's interests), to Argentine official Claudio Uberti during the 2006 to mid-2007 time period for the benefit of Techint Group and its companies.  The Notebooks also allegedly record Argentine official Roberto Baratta visiting Techint Group's main office building in Buenos Aires—also home to Tenaris—on at least eight (8) occasions between April and December 2008 alone, where Baratta would reportedly obtain packages of cash from Hector Zabaleta (Techint Group's Director of Administration) to pay to the Kirchners. Finally, documents in the Notebooks Case *also* allege that Techint Group made illicit bribery payments to Argentine officials to obtain contracts for a construction project called "Caminos del Oeste" in Argentina between 2003 and 2007.

19.     High-ranking executives of Techint Group who were extremely close to Defendant Rocca, including Zabaleta and Betnaza, testified as to Techint Group's participation in the Notebooks scandal, confirming that they paid at least $1 million in cash bribes in 2008 for the benefit of Techint Group and its companies.  For example, Betnaza admitted that he gave instructions to Zabaleta to make the payments to Baratta in 2008.  Zabaleta similarly confirmed that he personally arranged or made multiple deliveries of cash payments to Baratta at the Techint Group building in Buenos Aires.  Moreover, prior to the payment of these bribes, Defendant Rocca was present on at least one occasion in February 2007 where Argentine Planning Ministry official Claudio Uberti requested the payment of bribe money by Rocca in order to garner the Argentine government's favor for Techint Group and its companies.

20.     For his part, while Defendant Rocca has (unsurprisingly) denied in the context of the criminal charges against him in the Notebooks Case having had actual knowledge of the bribe payments, Rocca *has* confirmed that illegal bribery payments were made by Techint Group executives.  Rocca further explained that the bribes paid by Zabaleta were paid from a Techint Group slush fund of sorts, which Rocca described (in translated Spanish testimony) as having come "from the central companies where the dividends paid by the operating companies are maintained," and which funds Rocca confirmed Zabaleta had "the capacity and autonomy" to access at the time.

## JURISDICTION AND VENUE

21.     Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  This Court

has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

22.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

23.     In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

24.     Lead Plaintiffs Jeffrey Lynn Sanders and Starr Sanders purchased Tenaris ADSs at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosure.  Their PSLRA certifications have been previously filed with the Court and are incorporated by reference herein.

25.     Defendant Tenaris is incorporated in Luxembourg.  The Company has an integrated worldwide network of steel pipe manufacturing, finishing, service and research facilities with industrial operation in North and South America, including Argentina, Europe, Asia, the Middle East, and Africa.  The Company's ADS are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "TS."

26.     Defendant San Faustin S.A. ("San Faustin") is a public limited liability company incorporated under the laws of Luxembourg and indirectly owned (through its wholly-owned subsidiary, Techint Holdings S.ár.l.) a 60.45% controlling stake in Tenaris at all relevant times. The principal executive offices of San Faustin are located at Boulevard Prince Henri 3B – 3rd

Floor, L-1724 Luxembourg, Grand-Duchy Luxembourg, the same location as the registered office for both Tenaris and Ternium in Luxembourg.[3]  Moreover, many of San Faustin's officers and directors maintain offices in Techint Group's main office building at Calle DellaPaolera 299, Buenos Aires, Argentina.  Furthermore, San Faustin is owned and controlled by Rocca & Partners Stichting Administratiekantoor Aandelen San Faustin ("RP STAK"), a private entity organized under the laws of the Netherlands.  The voting committee of RP STAK is comprised of the following individuals:  Defendant Rocca, Rocca's brother Gianfelice Rocca, Rocca's cousins Roberto Bonatti and Enrico Bonatti, and Rocca's nephew Lodovico Rocca.

27.    Defendant Techint Holdings S.á r.l. is a wholly-owned subsidiary of San Faustin and is a holding company organized under the laws of Luxembourg.  The principal executive offices of Techint Holdings S.à r.l. are located at Boulevard Prince Henri 3B – 3rd Floor, L-1724 Luxembourg, Grand-Duchy Luxembourg.  At all times relevant hereto, including prior to and during the Class Period, Defendant Techint Holdings S.à r.l. held a 60.45% controlling stake in Tenaris.

28.    Defendant Paulo Rocca served as Tenaris's Chairman and Chief Executive Officer ("CEO") at all relevant times prior to and throughout the Class Period.  At all times relevant hereto, Rocca also served as Chairman of Ternium, a Director and Vice President of San Faustin, and a Director of Techint Financial Corporation ("Techint Financial").  Rocca resides in Argentina.

29.    Defendant Edgardo Carlos ("Carlos") has served as the Company's Chief Financial Officer ("CFO") since July 1, 2013.  Carlos joined the Techint Group in 1987.  Carlos

---

[3] Tenaris and Ternium's registered office address is 29 Avenue de la Porte-Nueve, 3rd Floor (L-2227), Luxembourg.  This address is the same building and floor as San Faustin and Techint Holdings S.á r.l.'s principal executive offices (the building is located on the corner of Boulevard Prince Henri and Avenue de la Porte-Nueve); the only apparent difference is that Tenaris and Ternium use a Avenue de la Porte-Nueve address, while San Faustin and Techint Holdings S.á r.l. use a Boulevard Prince Henri address.

served as a financial manager in SIDOR until 2001, at which point he joined Tenaris as a Financial Director.   In 2005, Carlos was appointed Tenaris's Administration and Financial Manager for North America, and in 2007 he became Tenaris's Administration and Financial Director for Central America.  In 2009, Carlos was appointed Tenaris's Economic and Financial Planning Director, which position he held until he assumed his current position as Tenaris's CFO on July 1, 2013.  Tenaris recently announced that Carlos will be stepping down as CFO effective August 5, 2019.

30.     Defendants Tenaris, San Faustin, Techint Holdings S.á r.l., Rocca, and Carlos are collectively referred to herein as "Defendants."

31.     Defendants Rocca and Carlos are collectively referred to herein as the "Individual Defendants."

32.     Each of the Individual Defendants:

a.      directly participated in the management of the Company;

b.      was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was privy to confidential proprietary information concerning the Company and its business and operations;

d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was directly or indirectly involved in the oversight or implementation of  the Company's internal controls;

10

f.     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.     approved or ratified these statements in violation of the federal securities laws; and

h.     signed Tenaris's 2013 Form 20-F filed with the SEC on April 30, 2014; its 2014 Form 20-F filed on June 1, 2015; its 2015 Form 20-F filed on May 2, 2016; its 2016 Form 20-F filed on May 1, 2017; and its 2017 Form 20-F filed on April 30, 2018.

33.     Tenaris, San Faustin, and Techint Holdings S.á r.l. are liable for the acts of the Individual Defendants and their other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

34.     In addition, Tenaris, San Faustin, and Techint Holdings S.á r.l. act as alter egos of each other and of Defendant Rocca. As alleged herein, facts that support an alter ego theory of liability include, but are not limited to the following: (1) disregard of corporate formalities; (2) intermingling of funds; (3) overlap in ownership, officers, directors, and personnel; (4) common office space, address and telephone numbers of each entity; (5) the degree of business discretion shown by Tenaris, San Faustin, and Techint Holdings S.á r.l.; (6) entities are not treated as independent profit centers; and (7) intermingling of property between each entity. Moreover, the intermingling of control amongst Defendants was used to commit the fraud as alleged herein.

35.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior* and agency principles.

## ADDITIONAL KEY NON-PARTIES

36.     At all times relevant hereto, Hector Alberto Zabaleta ("Zabaleta") was a Director of Administration of Techint Group.  According to media sources, Zabaleta has been linked to Techint Group for approximately 48 years, and is considered one of Rocca's most trusted men.[4] According to a statement Zabaleta filed in the Notebooks Case, Zabaleta admitted that he was the person responsible for the payment of bribes and the handling of black money from the headquarters of the Techint Group to Argentine officials.  He is also reportedly credited with being the administrator of black money for Techint Group, not only in Buenos Aires but around the world, through Swiss accounts and offshore companies, and linking him to payments of bribes in Brazil.[5]  In his role as Techint Group's Director of Administration, Zabaleta managed a floor with restricted access at Techint Group's Buenos Aires headquarters.[6]  Zabaleta was also implicated in the 2007 Skanska case in Argentina, the first corruption case of the Kirchner era, which involved the investigation of a Swedish construction company.[7]  Zabaleta was implicated as the person allegedly responsible for paying bribes to La Pampa officials to guarantee Techint Group, then a Skanska AB partner, the contract for the Colorado River aqueduct.[8]

37.     Luis Maria Cayetano Betnaza ("Betnaza") has been the Techint Group's Corporate Director since approximately 2001.  According to media sources, Betnaza is

---

[4] https://www.perfil.com/noticias/politica/detienen-en-su-casa-a-hector-alberto-zabaleta-ex-directivo-de-techint.phtml
[5] *Id.*
[6] *Id.*
[7] Skanska AB's Argentine unit was being investigated on allegations of tax evasion on a 2005 natural gas pipeline, which resulted in several arrests on charges of criminal conspiracy. https://www.reuters.com/article/argentina-skanska/argentine-police-arrest-skanska-officials-report-idUSN0844779720070508
[8] https://www.perfil.com/noticias/politica/corrupcion-en-la-obra-publica-las-otras-denuncias-que-complican-a-techint.phtml

considered the "right hand of Rocca."[9]   According to a statement by Rocca filed in the Notebooks Case, as translated from Spanish to English, Betnaza (who was paid US $700,000 per month for his services for Techint Group), took charge of negotiations with the Venezuelan government regarding the nationalization of SIDOR.  Betnaza has been formally charged with bribery the Argentine National Court for Criminal and Correctional Matters in connection with the Notebooks Case.

38.     Roberto Baratta ("Baratta") was a Federal Planning Ministry official for the government of Argentina during the presidencies of Néstor Kirchner and Cristina Fernandez de Kirchner.  At all times relevant hereto, Barrata served as the Secretary of Coordination and Administration of the Argentine Planning Ministry.  According to documents filed in the Notebooks Case, Baratta collected bribe payments from various business leaders and companies (including the Techint Group) and subsequently delivered the cash payments to certain government officials, including the Kirchners.

39.     Oscar Centeno ("Centeno") authored the notebooks that detailed bribe payments that he delivered during his employment as Roberto Baratta's driver from 2005 to 2015.  Centeno has been formally charged with bribery and conspiracy in the Notebooks Case.

40.     Claudio Uberti ("Uberti") was the head of Argentina's Road Concessions Control Agency (a/k/a "OCCOVI"), which is responsible for the public roads and highways.  Uberti held this position from May 25, 2003 until his resignation on August 9, 2007.

41.     Julio  De Vido ("De Vido") was the Federal Planning Minister in charge of all public works in Argentina from May 25, 2003 to December 10, 2015.

---

[9] https://www.perfil.com/noticias/protagonistas/betnaza-de-techint-fue-pareja-de-una-de-las-legisladoras-mas-cercanas-a-cristina-kirchner-r.phtml

42.     Cristina Fernandez de Kirchner ("Cristina Kirchner") was the President of Argentina from December 10, 2007 to December 9, 2015.

43.     Néstor Kirchner ("Néstor Kirchner") was the President of Argentina from May 25, 2003 to December 10, 2007.

## **BACKGROUND**

### **Organization of Tenaris**

44.     Headquartered in Buenos Aires, Argentina, Tenaris is a global steel pipe manufacturer with a strong focus on manufacturing products and related services for the oil and gas industry.  Tenaris's principal products include casing, tubing, line pipe, and mechanical and structural pipes.

45.     Tenaris is among the largest of six operating companies operating under the umbrella of the Techint Group.  San Faustin wholly owns and controls Techint Holdings S.á r.l, through which San Faustin owns its shares in Tenaris and the other operating companies under the Techint Group umbrella.   At all relevant times, including before the Class Period when the bribery was occurring, and during the Class Period, San Faustin indirectly held approximately 60% of Tenaris's share capital via its 100% ownership of Techint Holdings S.á r.l.

46.     The operations of the various San Faustin-owned/controlled companies, including Tenaris, are closely intertwined and controlled by Defendant Rocca and his family.   For example, Defendant Rocca's brother, Gianfelice Rocca, is the Chairman of the Board of San Faustin.   Gianfelice Rocca is also a member of Tenaris's Board of Directors, as well as Ternium's Board of Directors.   San Faustin's President, Roberto Bonatti (Defendant Rocca's cousin) also holds a position on both the Tenaris and Ternium Boards of Directors.   In addition, at all relevant times, Defendant Rocca has served as San Faustin's Vice President, and the

Chairman of the Board of Directors of Ternium.  At least five (5) members of Tenaris's Board of Directors at all times relevant hereto, including during the Class Period, also served on either the Ternium Board or the San Faustin Board.[10]  Additionally, at all relevant times, Giovanni Sardagna, Tenaris's Director of Investor Relations, was also a member of San Faustin's Board of Directors.  At least five (5) of San Faustin's officers and directors[11] occupy the same business address – Av. Leandro N. Alem 1067/Calle Della Paolera 299, Buenos Aires, Argentina – as Defendant Tenaris.

47.     Moreover, according to the testimony of Rocca given in October 2018, San Faustin collects the dividends of the six operating companies and retains them for future dividends to shareholders or for future investments.

48.     According to a former employee ("FE1"), who was a Senior Risk Manager and Financial Planner during the period August 2010 to July 2012, "there is no movement you can do in [Techint Group] without San Faustin management knowing."  FE1 went on to explain, "…they're the brains of the whole thing."   FE1 further described that top management was strategically named to multiple San Faustin-controlled companies at the same time and were very loyal to Defendant Rocca.

49.     Another former employee of Tenaris, who worked in the Company's Human Resources department on matters regarding compensation and benefits management during the period August 2005 through April 2013 ("FE2"), confirmed the interrelated nature of the San Faustin/Techint Group companies, and Rocca's close oversight and control of the operations of the same.  According to FE2, Rocca was "highly involved in all processes: technical, commercial,

---

[10]  These individuals include Defendant Rocca, his brother Gianfelice Rocca, Rocca's cousin Roberto Bonatti, Carlos Condorelli, and Alberto Valsecchi.
[11]  These individuals include Defendant Rocca, Rocca's cousin Roberto Bonatti, Alberto Valescchi, Fernando Ricardo Mantilla, and Fernando Jorge Mantilla.

human resources.  He is a very involved person."  FE2 indicated that Rocca had an office on the 29th floor of the Pellegrini Building (*i.e.*, the same building where Tenaris and Ternium are located), and that this floor also contained a meeting room where the Tenaris Board of Directors would meet.  Regarding Betnaza's role in Tenaris and other San Faustin/Techint Group companies, FE2 explained that Betnaza's group "worked for all the companies of Paolo Rocca." FE2 further emphasized there was a culture of "unconditional loyalty" to Rocca among high-ranking executives of Tenaris and other San Faustin/Techint Group companies.  FE2 stated that executives "all stay for a long time.  It's a level extremely close to Paolo Rocca, with frequent contact with Paolo Rocca.  It's rare that somebody quits.  They only retire."

### The Close Relationship Between Tenaris And Ternium/SIDOR

50.    The business and operations of Tenaris and Ternium are closely intertwined.  At all relevant times, including prior to and during the Class Period, Tenaris held, and continues to hold, 11.5% of Ternium's share capital (including treasury shares), which according to the Company is "a significant investment" in Ternium S.A.  Ternium and Tenaris also shared operational and/or office locations in Venezuela, Argentina, and Luxembourg (where both companies are incorporated).

51.    According to the Company's Form 20-F for fiscal year ended December 31, 2008 filed with the SEC on June 30, 2009, Tenaris purchased steel bars from SIDOR for use in the Tenaris's steel pipe operations in Venezuela, which purchase amounts totaled $4.6 million in the first quarter of 2008, (thereafter SIDOR ceased to be a related party, and thus contract purchase amounts were not publicly disclosed), $45.8 million in 2007, and $30.5 million in 2006.  Thus, SIDOR was of critical importance to Tenaris because it provided extremely efficient production of high-quality steel in a prime location; without SIDOR, Tenaris would be forced to buy steel

from Techint Group competitors in China and Korea.  Thus, Tenaris had a particular interest in the operations and contemplated nationalization of SIDOR by Venezuela.

52.     In 1998, Tavsa, the Venezuelan seamless steel pipe producer controlled by Tenaris and which is housed within the same manufacturing facility as SIDOR,[12] entered a contract with SIDOR, under which SIDOR committed to sell up to 90,000 tons of blooms or 130,000 tons of liquid steel per year, until 2013.  This contract was active at the time of the Venezuelan government's contemplated renationalization of SIDOR, Tavsa, and certain other of Tenaris's holdings in Venezuela, including Matesi (described immediately below).

53.     In 2004, to guarantee its supply of raw materials, SIDOR, together with Tenaris, organized Matesi, in which SIDOR and Tenaris had interests of 49.8% and 50.2%, respectively. In July 2004, Matesi purchased the assets of Posven, a Venezuelan company for US $120 million.  Posven owned an idled iron ore briquette producing facility located in Ciudad Guayana, Venezuela, with an annual capacity of 1.5 million tons.  Tenaris and SIDOR were particularly interested in Posven's assets because iron ore is used in the production of steel.  Matesi began production at this newly purchased facility in October 2004 and was thus expected to provide SIDOR with an additional source of high-quality, low-cost iron ore briquettes, enabling crude steel production to exceed 4.5 million tpy (tons per year).[13]

54.     Exiros B.V., with presence in the United States, Canada, Mexico, Italy, Brazil, Romania and Argentina, provides Ternium's subsidiaries with purchase agency services in connection with Ternium's purchases of raw materials and other products or services.  Until September 2006, Exiros was a wholly-owned subsidiary of Tenaris.  In October 2006, Ternium

---

[12] According to Betnaza's Investigative Statement dated August 10, 2018, Tavsa is a pipe plant located inside the SIDOR building.

[13] https://www.sec.gov/Archives/edgar/data/1342874/000119312508139561/d20f.htm (Ternium's Form 20-F for fiscal year ended December 31, 2007)

acquired a 50% interest in Exiros, while Tenaris retained the remaining 50%. Exiros' objectives are to procure better purchase conditions and prices as a result of the combined demand of products and services by both companies' demand, as well as to secure joint control over the purchase process.[14]

### Tenaris's History of Corruption

### Uzbekistan Bribery

55.     In March 2011, Tenaris entered into a deferred prosecution agreement ("DPA") with the SEC stemming from an alleged bribery and corruption scheme the Company participated in in Uzbekistan during the 2006 to 2009 time period—*i.e.*, the same time that Defendants were paying bribes to Argentine officials, including as detailed in connection with the Notebooks scandal, in Argentina.

56.     The DPA stems from the SEC's allegations that Tenaris violated Sections 13(b)(2)(A) & (B) and Section 30A of the Exchange Act and the Foreign Corrupt Practices Act ("FCPA") by: (1) bribing Uzbekistan government officials during a bidding process to supply pipelines for transporting oil and natural gas; (2) failing to keep accurate books and records relating to those transactions; and (3) failing to maintain internal controls to ensure that the transactions in Uzbekistan were properly authorized by management and that the financial statements were prepared in conformity with generally accepted accounting principles.

57.     Tenaris's Uzbekistan bribery and corruption scandal began in or around December 2006, Tenaris engaged an agent to assist Tenaris on a series of contract bids with OJSC O'ztashqineftgaz ("OAO"), a subsidiary of a state-owned holding company of Uzbekistan's oil and gas industry, by providing information on Tenaris's competitors' bids—

---

[14] *Id.*

thereby allowing Tenaris to revise its bids accordingly and win contracts. Between approximately January 2007 and May 2007, Tenaris paid the agent between 3-3.5% commission for his/her services in bidding on four different OAO contracts, which were worth approximately $19 million to Tenaris. In or around November 2007, Tenaris's competitors complained to an Uzbekistani government agency with authority to launch an investigation into the bidding process, that Tenaris obtained access to competitors' bid information. In the summer of 2008, the OAO subsequently canceled all outstanding portions of contracts awarded to Tenaris.

58.     In or around March 2009, Tenaris retained Sullivan & Cromwell LLP to conduct an internal investigation of  allegations of Uzbekistan corruption and bribery and to conduct a thorough review of Tenaris's then-existing compliance program.  While the results of the investigation were not made public, preliminary findings were reported to the DOJ and SEC. Moreover, Tenaris claimed to have conducted a more detailed, world-wide internal investigation of its business operations and controls, including a review to detect potential instances of bribery and corruption, and agreed to enhance its anti-bribery and anti-corruption programs.

59.     The events of the Uzbekistan bribery allegations overlap substantially with the time period of the Argentine bribery events underlying this case, as detailed herein.

60.     Under the terms of the DPA, the SEC agreed to refrain from prosecuting Tenaris in a civil action, if Tenaris in turn complied with certain undertakings, including anti-corruption assurances.  Tenaris's required undertakings included, among other things:

      a.      a payment of $5.4 million to the SEC in disgorgement and pre-judgment interest;

      b.      a review of Tenaris's Code of Conduct on an annual basis beginning on February 1, 2012, and to provide the SEC with updates as appropriate;

c.    requirement for each director, officer, and management-level employee of Tenaris to certify compliance with the Code of Conduct on an annual basis beginning on February 1, 2011; and

d.    to conduct effective training regarding anti-corruption and compliance with the FCPA for: (1) all current officers and managers, (2) all employees working in Finance, Accounting, Internal Audit, Sales, and Government Relations, (3) all employees working in positions Tenaris deems to involve activities implicated by Tenaris's policies regarding anti-corruption and compliance with the FCPA, on or before December 31, 2011, and (4) all such future employees within 90 days of their affiliation with Tenaris.

**The Petrobras Scandal (Operation Lava Jato, or "Operation Car Wash")**

61.    Tenaris is also implicated in the infamous Operation Car Wash in Brazil, a multi-billion dollar corruption scandal involving state-owned oil giant, Petrobras, where executives are alleged to have accepted bribes in return for awarding construction contracts at inflated prices, and which led to the criminal convictions of 159 people, including former Brazilian president Luiz Inacio Lula da Silva, and the downfall of then-Brazilian President, Dilma Rousseff.

62.    Tenaris's involvement in the Petrobras scandal arises from its wholly-owned Brazilian-based subsidiary, Confab Industrial S.A. ("Confab"). The Sao Paulo-based company manufactures steel pipes and equipment in its plant in Sao Paulo. Between 2006 and 2012, through Confab, Tenaris maintained 48 material supply contracts with Petrobras.

63.    In connection with Operation Car Wash, Confab—along with numerous other companies in Brazil—was alleged to have paid bribes between 2009 and 2013 to Petrobras

through offshore accounts totaling US $9.4 million in order to obtain pipeline contracts worth approximately U.S. $1.2 billion.  Techint Engineering & Construction—the construction arm of Techint Group—was also alleged to have participated in the construction company cartel affecting not only Petrobras, but also Eletrobras, a major Brazilian electric utilities company that ran a corruption scheme similar to that of Petrobras.

64.     The time period of Tenaris's alleged bribery in Brazil in connection with Petrobras overlaps substantially with both the time period of the bribery activities underlying this case, as the Uzbekistan bribery allegations and the investigation thereof (including the 2011 DPA).

65.     Since 2016, apart from the Brazilian investigation, Italian authorities also have been investigating Defendant Rocca and his brother Gianfelice Rocca for alleged payments of bribes to Petrobras officials.  Two other members of the Rocca family are also the subject of the investigation – Lodovico Andrea Palu Rocca (Defendant Rocca's nephew and a member of the top group) and Roberto Bonatti (Defendant Rocca's cousin and Tenaris board member). Zabaleta is also a subject of the investigation.

66.     In a 6-K filed on November 4, 2016, Tenaris disclosed that it had instituted an internal investigation into possible improper payments to Petrobras.   Tenaris began the investigation after learning that Italian and Swiss authorities were investigating Rocca and other of the Company's executives and their activities in Brazil.   The results of this internal investigation have not been made public.

67.     In October 2018, Milan-based prosecutor Fabio De Pasquale sent Judge Claudio Bonadio and Argentine prosecutor Carlos Stornelli a request for collaboration in investigating Rocca.  The collaboration request explained that in Italy, Tenaris's wholly owned subsidiary was

under investigation for allegedly paying bribes totaling USD $10 million to Petrobras officials between 2009 and 2013 to obtain contracts for the sale of pipelines for USD $1.2 billion.  The request also included information regarding a declaration of the Argentine financier, Lorenzo Fenocchietto ("Fenocchietto"), who admitted having created an account in Uruguay in 2002 in the name of the Isla Mayor Society in order to move offshore funds of companies linked to Tenaris and Techint Group.[15]

## SUBSTANTIVE ALLEGATIONS

### The Notebooks Case

68.     Beginning in early August 2018, media outlets began publishing articles in the U.S. and Argentina, about eight notebooks (the "Notebooks") that detailed an elaborate corruption scheme involving illegal payments to Argentine government officials from approximately 2005 through 2015.  When the story first broke, thirteen (13) former government officials and business leaders had already been arrested.

69.     The Notebooks' author, Oscar Centeno, the driver of a powerful Planning Ministry official, Baratta, meticulously catalogued cash payments made by high powered and prominent businesses and their executives to various government officials, including most prominently payments delivered directly to the Kirchners.  Centeno included the times, value and even the weight of the bags of money he delivered to various addresses in Buenos Aires, including the Kirchners' apartment in Buenos Aires and their official presidential residence, Quinta de Olivos.

70.     Centeno gave the Notebooks along with bills, photos, and videos to a journalist, Diego Cabot ("Cabot"), at the newspaper La Nación, based in Argentina.  Prior to publishing the

---

[15] https://www.infobae.com/politica/2019/01/13/caso-cuadernos-k-desde-italia-enviaron-pedido-de-colaboracion-judicial-para-investigar-a-paolo-rocca

information Cabot received, the journalist submitted the Notebooks to Argentine authorities, which spurred an investigation into more than a decade of alleged corruption under former Presidents Cristina Kirchner and her late husband, Néstor Kirchner.

71.     Based on the authorities' investigation of the alleged bribery and corruption detailed in the Notebooks, raids on various Argentinian-based companies, including Tenaris and other Techint Group operations, were conducted in the summer of 2018.

72.     In total, charges have been filed against approximately seventy (70)  prominent business leaders and high-ranking Argentine government officials in connection with the Notebooks Case.

### Defendants' Participation In Undisclosed Bribery In Argentina To Further Their Interests, Including as Detailed in the Notebooks Case

73.     Defendants' role in the Notebooks Case is prominent and stems largely from Venezuela's planned re-nationalization of Techint Group's interests, including SIDOR and other of Tenaris's interests in Venezuela.

74.      According to the information contained the Notebooks, Uberti  and Baratta, were two of the top Argentine officials responsible for soliciting money from various companies and business leaders—including, as alleged herein, Defendant Rocca for the benefit of Tenaris and other Techint Group companies–to be delivered to Argentine officials, including Federal Planning Minister Julio De Vido, the Kirchners, and other officials.

75.     The Notebooks allegedly detail Techint Group's participation in bribery for so-called "roadway corridors" during the 2003 to 2007 timeframe.  Among the companies involved, Techint Group was named as one of the more noteworthy.  Specifically, Uberti states that he was in charge of requesting money from Betnaza in exchange for Techint Group being awarded with a project called "Caminos del Oeste."

76.     According to Betnaza's Investigative Statement in the Notebooks Case, dated August 10, 2018, the relationship between then-Venezuelan President, Hugo Chavez, and Techint Group became strained beginning in 2005, over the prospects of nationalization of SIDOR.

77.     In or around November 2005, in an unusual meeting of high-powered officials, Defendant Rocca and Betnaza met privately with Hugo Chávez, Cristina and Nestor Kirchner, in Mar del Plata, Argentina, in order to discuss SIDOR with Chavez.  According to Betnaza, at this meeting, Rocca and Betnaza specifically requested the Argentine government to intercede with the Venezuelan government in an attempt to prevent the nationalization of Techint Group's interests by Chávez.  Moreover, media sources reported that during that discussion, Néstor Kirchner acted as a mediator between Chávez and Rocca over the price of iron ore—a core component of steel critical to SIDOR's, and Tenaris's, business.

78.     Then in 2006, while attending a business conference in Venezuela, Defendant Rocca and Betnaza met privately with then-Argentine president Néstor Kirchner, Planning Minister De Vido, and top Planning Ministry official Claudio Uberti, in another attempt to convince the government to engage Chávez on behalf of Techint Group regarding Chavez's plans to nationalize SIDOR.  According to Uberti, "Rocca approached Kirchner. He talked to him and pulled him around.  [Uberti] approached Betnaza for [Betnaza] to tell Rocca to stop harassing Kirchner."  Uberti then explained that it was in that context that De Vido ordered Uberti to tell Techint Group to "fork [it] over" if they wanted to be "treat[ed] [] well" by the Argentine government.

79.     In February 2007, Rocca and Betnaza attended a ceremony and dinner to commemorate the gift of an oil well in the Venezuelan Orinoco Belt from Chávez to Kirchner

and Argentina, which event was also attended by Hugo Chávez, Néstor Kirchner, and Uberti, among other Venezuelan and Argentine officials.  Following the ceremony, Uberti again confronted Rocca and Betnaza in an attempt to persuade them to increase Techint Group's financial support for the Argentine government, specifically Néstor Kirchner.

80.     Ultimately, Kirchner directed Uberti to reach out to Rocca and Techint Group to solicit bribe payments, which Uberti did by contacting Betnaza and appearing at Betnaza's office in the Techint Group building located at Della Paolera street.[16]  According to Uberti, "[Betnaza] handed over US $100,000 and told [Uberti] it was for Kirchner."  Uberti stated that "[t]his was repeated fix or six times" before Uberti's resignation from his office in August 2007, totaling US $600,000 to US $700,000 in bribes paid by Techint Group to Argentine officials to further the interests of Techint Group companies, including Tenaris, in the 2006 to 2007 timeframe.

81.     In or around February 2008, Defendant Rocca met with former-President of Brazil, Lula Da Silva and then-President Dilma Rousseff and used the presence of Brazilian staff members in Venezuela as an attempt to convince the Brazilian government to engage Hugo Chávez for the benefit of Techint Group.

82.     On April 9, 2008, the Venezuelan government  announced its intention to move forward with the nationalization of SIDOR.  Around the time of the announcement, Defendant Rocca admitted to contacting Cristina Kirchner via telephone to discuss the issue of nationalization of SIDOR.

---

[16] Techint Group's Buenos Aires building (known as the "Pelligrini Building") has entrances from Della Paolera street and Avenida Leandro N. Alem.  Tenaris's primary address is identified as being located on the 27th floor, although it also occupies offices on a number of other floors.

83.     At the time, Ternium held an approximately 60% controlling stake in SIDOR, and Tenaris, in turn, held an approximate 11.5% stake in Ternium.  As of March 31, 2008, the book value of SIDOR's total assets was US $3.1 billion, with total liabilities of US $855.5 million.

84.     Following the Venezuelan government's announcement to nationalize SIDOR, Venezuela's Basic Industries and Mining Minister Rodolfo Sanz publicly stated, "[w]e have preliminarily concluded that the value of the shares of Ternium group is close to $800 million." Sanz added that Ternium, which held a 60% stake in SIDOR, had asked for between $3.2 billion and $4.8 billion dollars, which he said, "does not correspond to the preliminary analysis we have carried out."[17]

85.     According to media sources, in or around this time, Techint Group asked the Venezuelan government to pay at least $2.4 billion to take a 50% stake in SIDOR, leaving Ternium with a minority stake in SIDOR of 10%.[18]  Retention of some interest in SIDOR, and access to the steel it produced, was of critical importance to Tenaris, Ternium, and other Techint Group interests.

86.     On April 29, 2008 the National Assembly of the Republic of Venezuela passed a resolution declaring that the shares of Ternium's majority-owned subsidiary, SIDOR, together with all of its assets, are of public and social interest to Venezuela.  This resolution authorized the Venezuelan government to take any action it deemed appropriate in connection with any such assets, including expropriation.

87.     On July 12, 2008, Venezuela assumed operational control and complete responsibility for SIDOR's operations.   However, negotiations between the Venezuelan

---

[17] https://www.reuters.com/article/venezuela-nationalization-steel/venezuela-says-ternium-sidor-stake-worth-800-mln-idUSN2642760420080427
[18] https://www.reuters.com/article/argentina-techint/techint-asks-at-least-2-4-bln-for-sidor-stake-report-idUSN1334268020080613

government and Techint Group regarding the terms of the compensation continued over several months, and the compensation was not ultimately paid by Venezuela for a number of years. According to Betnaza's Testimonial Statement filed in the Notebooks Case, Techint Group approached the Argentine government for assistance in these continued compensation negotiations with the Venezuelan government.

88.     Over the next several months following Venezuela's official take-over of SIDOR, Betnaza, along with representatives from the Argentine government, including Uberti, De Vido, Baratta, and Jose Maria Olazagasti (De Vido's private secretary), regularly travelled to Venezuela to negotiate Techint Group's compensation for its stake in SIDOR.  On one particular occasion, Cristina Kirchner travelled to Venezuela and met privately with Chávez to discuss Techint Group's compensation for SIDOR.  According to Betnaza's Testimonial Statement, Betnaza then met with Cristina Kirchner who informed him that total amount of compensation agreed on was US $1.97 billion.

89.     In May 2009, the sale of Ternium's stake in SIDOR to the Venezuelan government was announced to the public with a staggering sale price of $1.97 billion.  In a report dated May 7, 2009, Deutsche Bank analysts commented that they "were surprised by the timing and value realized."  Both Deutsche Bank and UBS analysts had previously assigned a zero value to Ternium's stake in SIDOR due to an expectation that Ternium's stake would have been sold at a discount after the Venezuelan government decided to nationalize the asset.

90.     Aside from relying on the Kirchners and other Argentine officials to negotiate this favorable price, Defendants continued to rely on Cristina Kirchner and other Argentine officials to ensure collection of the agreed amount from Venezuela, which ultimately took approximately three (3) years (until 2012), as well as to negotiate with Chávez regarding Venezuela's

nationalization of Tenaris's interests in three (3) additional subsidiaries in Venezuela, as discussed herein below.

91.     Though viewed as a win for Techint Group by analysts and investors at the time, investors were not aware of the illegal bribes paid by or on behalf of Defendants to Argentine government officials at the expense of investors in order to assure a price more than double Venezuela's original valuation.

92.     In addition to Chávez's nationalization of SIDOR, moreover, in or around May 2009, Chávez also indicated his intent to nationalize Tenaris's holdings in three other steel product firms in Venezuela, including two majority-owned Tenaris subsidiaries (Tavsa and Matesi) and its minority interest in Complejo Siderúrgico de Guayana, C.A.  On information and belief, Cristina Kirchner met with Chávez on or around August 11, 2009, to discuss Chávez's plans to nationalize these additional Tenaris holdings in Venezuela.

93.     On August 19, 2009, Tenaris issued a press release announcing that Venezuela assumed exclusive operational control over the assets of Matesi.  Then, on November 17, 2009, Tenaris issued a press release announcing that Venezuela formally assumed exclusive operational control over Tavsa.

94.     According to the Notebooks, Techint Group had delivered money to Argentine government officials on at least the following dates, at least in part to ensure Argentina's intervention on its behalf with Chávez and the Venezuelan government to protect the interests of Tenaris, Ternium and other Techint Group companies in Venezuela:

        a.     On May 29, 2008, Zabaleta gave Baratta a bag of money in the Techint Group building, located at Calle Della Paolera 299, Buenos Aires, which

was subsequently delivered to Daniel Munoz (Néstor Kirchner's private secretary) at Calle Uruguay 1306, Buenos Aires.

b.   On June 30, 2008, a package of money was delivered to Baratta in the Techint Group building, which was delivered to Daniel Munoz at Calle Uruguay 1306, Buenos Aires on the same day.

c.   On August 1, 2008, Zabaleta gave Baratta a package of money in the basement of the Techint Group building.

d.   On August 27, 2008, Zabaleta gave Baratta a package of money in the subbasement of the Techint Group building, which was subsequently delivered to Daniel Munoz at Calle Uruguay 1306, Buenos Aires.

e.   On October 3, 2008, a person identified as "Ale," delivered to Baratta on behalf of Techint Group, the "dividends of the month" in the Techint Group building.

f.   On October 30, 2008, Zabaleta entered a vehicle driven by Centeno at the intersection of Della Paolera and Leandro N. Alem streets and descended to the subbasement of the Techint Group building where Zabaleta delivered a package of money, which was subsequently delivered to Daniel Munoz at Calle Uruguay 1306, Buenos Aires.

g.   On December 3, 2008, Zabaleta gave Baratta money in the subbasement of the Techint Group building, which was subsequently delivered to Daniel Munoz at Calle Uruguay 1306, Buenos Aires.

      h.     On December 18, 2008, Zabaleta gave Baratta money in the subbasement of the Techint Group building, which was subsequently delivered to Daniel Munoz at Calle Uruguay 1306, Buenos Aires.

95.     Both Betnaza and Zabaleta confirmed that at least $1 million was paid by Techint Group to Argentine officials during 2008.  Defendant Rocca confirmed that these payments were made from a Techint Group slush fund of sorts, testifying that the amounts were paid "from the central companies where the dividends paid by the operating companies are maintained," which funds Rocca confirmed Zabaleta had "the capacity and autonomy to" to access at the time.

96.     In early August 2018, under Judge Bonadio's order, the Argentine Federal Police raided the 27th floor of Techint Group's headquarters in Buenos Aires—the same floor where Tenaris is located—and confiscated a large number of boxes, which materials included the hard drives of two of Rocca's personal computers and Techint Group's server.  Additionally, at least one media source reported that Techint Group allegedly erased Zabaleta's emails and dismantled the offices on the 17th floor of the Techint Group building where Zabaleta worked.[19]

97.     In testimony provided in connection with the Notebooks Case, Betnaza stated that he authorized Zabaleta to make the payments to the Argentine government.  Betnaza also confirmed that Zabaleta paid bribes in order to get the Argentine government to negotiate with Venezuela's Hugo Chávez in 2008, after SIDOR was nationalized.  According to Betnaza's testimony, Zabaleta had the confidence of and authority to act on behalf of Techint Group even though Betnaza claimed that Zabaleta no longer held an executive position at the time due to Zabaleta's retirement.

---

[19] https://mundoempresarial.com.ar/noticia/1293/lavagato-techint-borro-e-mails-y-desmantelo-la-oficina-del-ejecutivo-de-las-coim

98.     Claudio Uberti, in his statement given in connection with the Notebooks Case, testified that beginning in 2006, Betnaza paid Uberti over US $100,000, which payment was repeated "five or six times," upon Uberti's visits to the Techint Group building in Buenos Aires. These payments, which were made on behalf of Defendants to garner favor with the Argentine government and to further the interests of Defendants, were subsequently handed over to Néstor Kirchner.

99.     According to Betnaza, the money Techint Group used to pay the bribe payments came from money meant for dividend payments to shareholders of Techint Group's various operating companies, ("Zabaleta withdrew the money to make the payments [from] the dividends of the [Techint Group] stockholders").   This fact was confirmed by Rocca, as detailed immediately below.

100.    Rocca confirmed that the payments alleged to have been made by or on behalf Techint Group in connection with the Notebooks Case were, in fact, made.   According to a statement Rocca filed in the Notebooks Case, as translated from Spanish to English, Rocca explained that "as far [as] we can determine, the fund for those payments were from the central companies where the dividends paid by the operating companies are maintained, and Zabaleta had the capacity and autonomy to have access to these funds at that time."   Rocca continued, "[t]he final recipients of those dividends had no knowledge of the destination of those funds.   Zabaleta had the autonomy to apply these funds at the request of Luis Betnaza.   I'm unaware of which accounting item these payments were made under.   We are trying to find that out with greater precision, in a context where the group dimension and the number of groups involved is very broad."

## Tenaris's Code of Ethics and Code of Conduct

101.    In 2003, Tenaris established a Code of Conduct governing the Company's guidelines and standards of integrity and transparency.  The Code of Conduct has been updated twice since its establishment in 2003, once in 2012 and again in 2018.  According to Tenaris, the 2012 Code of Conduct was revised following the introduction of new legislation affecting operations and extending the anti-bribery provisions.  According to Tenaris, its Code of Conduct "reflects the best practices regarding ethics and transparency" and is intended to "build[] the corporate culture of transparency and integrity based on ethical behavior and compliance with law."

102.    While the Company's original 2003 Code of Conduct is apparently no longer accessible online, the 2012 Code of Conduct contained a provision entitled, "Bribery is Strictly Prohibited."  The Code of Conduct further stated that "Tenaris will not condone, under any circumstances, the offering or receiving of bribes or any other form of improper payments." This provision as it appears in the Company's 2018 Code of Conduct is substantially repeated, although slightly revised to state, "Tenaris will not allow, under any circumstances, the offering or receiving of bribes or any other form of improper payments."

103.    In July 2005, Tenaris adopted a Code of Ethics for senior financial officers, including, but not limited to, its principal executive officer.  According to Tenaris, its Code of Ethics is "intended to supplement the Company's Code of Conduct."

104.    The Code of Ethics states that "the Company expects all of its employees … to comply with applicable law, deter wrongdoing and to abide by the Company's Code of Conduct."  The Code of Ethics further stated that "[Tenaris's] senior financial officers will …

[c]omply with any governmental laws, rules and regulations applicable to their areas of responsibility."

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD

105.    Information about management integrity is material to investors because they base their investment decisions on factors such as management ethics and accountability, at least in part.   Support for the recognition of investors' presumptive right to rely on the integrity of management in the conduct of corporate affairs is found both in case law and the literature.  *See, e.g.*, Donald C. Langevoort, Basic at Twenty: Rethinking Fraud-on-the-Market, 151 Wis. L. Rev. 151 n.140 (2009) ("Presumably, most stock price declines that follow a surprise revelation of fraud reflect not only the truth with respect to the specific facts misrepresented or omitted but also a readjustment in expectations regarding other matters on which management was previously thought credible.").

### Defendants' Core Material Omissions

106.    Throughout the Class Period, Defendants materially misled investors because they: (1) at all times omitted and/or failed to disclose the numerous instances of illegal/illicit bribery payments paid to Argentine officials, as detailed herein, made by or for the benefit of Defendants; (2) omitted and/or failed to disclose their violations of law and exposure to both criminal and civil liability that Defendants faced as a result of their participation in illegal/illicit bribery payments, as alleged herein; (3) omitted and/or failed to disclose the heightened risk of negative impact on Tenaris's business, operations, financial performance, and share price that existed as a result of their participation in illegal/illicit bribery payments, violations of law, and associated exposure to criminal and civil legal liability, as alleged herein; and (4) omitted and/or failed to disclose that the Company had inadequate internal controls over financial reporting to

detect and report, as required, the fact of Defendants having made the illegal/illicit bribery payments alleged herein.  Defendants had an affirmative duty to disclose the foregoing material information. Defendants also had a duty to disclose the foregoing material information so as to make their statements made during the Class Period not misleading, as alleged herein below.

### False and Misleading Statements and Omissions In Tenaris's Class Period Form 20-Fs

107.    On April 30, 2014, after-market hours, Tenaris filed a Form 20-F for the fiscal year ended December 31, 2013 with the SEC (the "2013 20-F"), which provided the Company's year-end financial results and position. The 2013 20-F was signed by Defendant Carlos and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Rocca and Carlos attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

108.    The 2013 20-F assured investors that Tenaris was "committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards[.]"

109.    The 2013 20-F also touted Tenaris's Code of Ethics and Code of Conduct, incorporating both codes by reference and stating in relevant part:

> In addition to the general code of conduct incorporating guidelines and standards of integrity and transparency applicable to all of our directors, officers and employees, we have adopted a code of ethics for financial officers which applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and is intended to supplement the Company's code of conduct.
>
> The text of our codes of conduct and code of ethics is posted on our Internet website at: www.tenaris.com/en/aboutus/codeofconduct.aspx

110.    The foregoing statements identified from Tenaris's 2013 Form 20-F were materially false and misleading because the statements omitted material facts, the disclosure of

which was necessary to make the statements made not misleading, including but not limited to: (1) the fact of Defendants' payments of illegal bribes and political kickbacks to Argentine officials over a period of years; (2) Defendants' violation of laws and legal exposure associated therewith; (3) the heightened risk of negative impact on Tenaris's business, operations, financial performance, and share price that existed as a result of their participation in illegal/illicit bribery payments, violations of law, and associated exposure to criminal and civil legal liability, as alleged herein; and (4) the woeful lack of internal controls that allowed these bribery payments to go unchecked and undisclosed for years both prior to and throughout the Class Period.

111.    Tenaris's 2013 20-F also provided the following materially incomplete and misleading risk disclosure regarding corruption and bribery:

> **If we do not comply with laws and regulations designed to combat governmental corruption in countries in which we sell our products, we could become subject to fines, penalties or other sanctions and our sales and profitability could suffer.**
>
> We conduct business in certain countries known to experience governmental corruption. Although we are committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards applicable to our business, there is a risk that our employees or representatives may take actions that violate applicable laws and regulations that generally prohibit the making of improper payments to foreign government officials for the purpose of obtaining or keeping business, including laws relating to the 1997 OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions such as the U.S. Foreign Corrupt Practices Act, or FCPA. Particularly in respect of FCPA, in May 2011, we entered into settlements with the U.S. Department of Justice, or DOJ, and the U.S. Securities and Exchange Commission, or SEC, and we undertook several remediation efforts, including voluntary enhancements to our compliance program. Our obligations under these settlements expired in May 2013.

112.    The foregoing risk disclosure was materially misleading and incomplete where Defendants omitted and failed to disclose that Defendants, at the very highest executive levels, *in fact had* participated in bribery and corruption and "the making of improper payments to foreign government officials for the purpose of obtaining or keeping business," in violation of the law,

including the above-cited laws, thereby actually exposing Tenaris and the other Defendants to "fines, penalties or other sanctions" that could harm Tenaris's business.

113.   On June 1, 2015, Tenaris filed a Form 20-F for the fiscal year ended December 31, 2014 with the SEC (the "2014 20-F"), which provided the Company's year-end financial results and position. The 2014 20-F was signed by Defendant Carlos. The 2014 20-F also contained signed SOX certifications by Defendants Rocca and Carlos attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

114.   The 2014 20-F stated the Company was "committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards[.]"

115.   The  2014 20-F also touted Tenaris's Code of Ethics and Code of Conduct, incorporating both codes by reference and stating in relevant part:

> In addition to the general code of conduct incorporating guidelines and standards of integrity and transparency applicable to all of our directors, officers and employees, we have adopted a code of ethics for financial officers which applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and is intended to supplement the Company's code of conduct.

> The text of our codes of conduct and code of ethics is posted on our Internet website at: www.tenaris.com/en/aboutus/codeofconduct.aspx

116.   The foregoing statements identified from Tenaris's 2014 Form 20-F were materially false and misleading because the statements omitted material facts, the disclosure of which was necessary to make the statements made not misleading, including but not limited to: (1) the fact of Defendants' payments of illegal bribes and political kickbacks to Argentine officials over a period of years; (2) Defendants' violation of laws and legal exposure associated therewith; (3) the heightened risk of negative impact on Tenaris's business, operations, financial

performance, and share price that existed as a result of their participation in illegal/illicit bribery payments, violations of law, and associated exposure to criminal and civil legal liability, as alleged herein; and (4) the woeful lack of internal controls that allowed these bribery payments to go unchecked and undisclosed for years both prior to and throughout the Class Period.

117.    Tenaris's 2014 20-F also provided the following materially incomplete and misleading risk disclosure regarding corruption and bribery:

> **If we do not comply with laws and regulations designed to combat governmental corruption in countries in which we sell our products, we could become subject to fines, penalties or other sanctions and our sales and profitability could suffer.**
>
> We conduct business in certain countries known to experience governmental corruption. Although we are committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards applicable to our business, there is a risk that our employees or representatives may take actions that violate applicable laws and regulations that generally prohibit the making of improper payments to foreign government officials for the purpose of obtaining or keeping business, including laws relating to the 1997 OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions such as the U.S. Foreign Corrupt Practices Act, or FCPA.

118.    The foregoing risk disclosure was materially misleading and incomplete where Defendants omitted and failed to disclose that Defendants, at the very highest executive levels, *in fact had* participated in bribery and corruption and "the making of improper payments to foreign government officials for the purpose of obtaining or keeping business," in violation of the law, including the above-cited laws, thereby actually exposing Tenaris and the other Defendants to "fines, penalties or other sanctions" that could harm Tenaris's business.

119.    On May 2, 2016, Tenaris filed a Form 20-F for the fiscal year ended December 31, 2015 with the SEC (the "2015 20-F"), which provided the Company's year-end financial results and position.   The 2015 20-F was signed by Defendant Carlos. The 2015 20-F also contained signed SOX certifications by Defendants Rocca and Carlos attesting to the accuracy of

financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

120.   The 2015 20-F stated the Company was "committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards[.]"

121.   The 2015 20-F also touted Tenaris's Code of Ethics and Code of Conduct, incorporating both codes by reference and stating in relevant part:

> In addition to the general code of conduct incorporating guidelines and standards of integrity and transparency applicable to all of our directors, officers and employees, we have adopted a code of ethics for financial officers which applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and is intended to supplement the Company's code of conduct.
>
> The text of our codes of conduct and code of ethics is posted on our Internet website at: www.tenaris.com/en/aboutus/codeofconduct.aspx

122.   The foregoing statements identified from Tenaris's 2015 Form 20-F were materially false and misleading because the statements omitted material facts, the disclosure of which was necessary to make the statements made not misleading, including but not limited to: (1) the fact of Defendants' payments of illegal bribes and political kickbacks to Argentine officials over a period of years; (2) Defendants' violation of laws and legal exposure associated therewith; (3) the heightened risk of negative impact on Tenaris's business, operations, financial performance, and share price that existed as a result of their participation in illegal/illicit bribery payments, violations of law, and associated exposure to criminal and civil legal liability, as alleged herein; and (4) the woeful lack of internal controls that allowed these bribery payments to go unchecked and undisclosed for years both prior to and throughout the Class Period.

123.   Tenaris's 2015 20-F also provided the following materially incomplete and misleading risk disclosure regarding corruption and bribery:

**If we do not comply with laws and regulations designed to combat governmental corruption in countries in which we sell our products, we could become subject to fines, penalties or other sanctions and our sales and profitability could suffer.**

We conduct business in certain countries known to experience governmental corruption. Although we are committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards applicable to our business, there is a risk that our employees or representatives may take actions that violate applicable laws and regulations that generally prohibit the making of improper payments to foreign government officials for the purpose of obtaining or keeping business, including laws relating to the 1997 OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions such as the U.S. Foreign Corrupt Practices Act, or FCPA.

124.    The foregoing risk disclosure was materially misleading and incomplete where Defendants omitted and failed to disclose that Defendants, at the very highest executive levels, *in fact had* participated in bribery and corruption and "the making of improper payments to foreign government officials for the purpose of obtaining or keeping business," in violation of the law, including the above-cited laws, thereby actually exposing Tenaris and the other Defendants to "fines, penalties or other sanctions" that could harm Tenaris's business.

125.    On May 1, 2017, Tenaris filed a Form 20-F for the fiscal year ended December 31, 2016 with the SEC (the "2016 20-F"), which provided the Company's year-end financial results and position. The 2016 20-F was signed by Defendant Carlos. The 2016 20-F also contained signed SOX certifications by Defendants Rocca and Carlos attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

126.    The 2016 20-F stated the Company was "committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards[.]"

127.   The  2016 20-F also touted Tenaris's Code of Ethics and Code of Conduct, incorporating both codes by reference and stating in relevant part:

> In addition to the general code of conduct incorporating guidelines and standards of integrity  and transparency  applicable  to all of our directors, officers  and employees, we have adopted a code of ethics for financial officers which applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and is intended to supplement the Company's code of conduct.
>
> The text of our codes of conduct and code of ethics is posted on our Internet website at: www.tenaris.com/en/aboutus/codeofconduct.aspx

128.   The foregoing statements identified from Tenaris's 2016 Form 20-F were materially false and misleading because the statements omitted material facts, the disclosure of which was necessary to make the statements made not misleading, including but not limited to: (1) the fact of Defendants' payments of illegal bribes and political kickbacks to Argentine officials over a period of years; (2) Defendants' violation of laws and legal exposure associated therewith; (3) the heightened risk of negative impact on Tenaris's business, operations, financial performance, and share price that existed as a result of their participation in illegal/illicit bribery payments, violations of law, and associated exposure to criminal and civil legal liability, as alleged herein; and (4) the woeful lack of internal controls that allowed these bribery payments to go unchecked and undisclosed for years both prior to and throughout the Class Period.

129.   Tenaris's 2016 20-F also provided the following materially incomplete and misleading risk disclosure regarding corruption and bribery:

> **If we do not comply with laws and regulations designed to combat governmental corruption in countries in which we sell our products, we could become subject to fines, penalties or other sanctions and our sales and profitability could suffer.**
>
> We conduct business in certain countries known to experience governmental corruption. Although we are committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards applicable to our business, there is a risk that our employees or

representatives may take actions that violate applicable laws and regulations that generally prohibit the making of improper payments to foreign government officials for the purpose of obtaining or keeping business, including laws relating to the 1997 OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions such as the U.S. Foreign Corrupt Practices Act, or FCPA.

130.     The foregoing risk disclosure was materially misleading and incomplete where Defendants omitted and failed to disclose that Defendants, at the very highest executive levels, *in fact had* participated in bribery and corruption and "the making of improper payments to foreign government officials for the purpose of obtaining or keeping business," in violation of the law, including the above-cited laws, thereby actually exposing Tenaris and the other Defendants to "fines, penalties or other sanctions" that could harm Tenaris's business.

131.     On April 30, 2018, Tenaris filed a Form 20-F for the fiscal year ended December 31, 2017 with the SEC (the "2017 20-F"), which provided the Company's year-end financial results and position. The 2017 20-F was signed by Defendant Carlos. The 2017 20-F also contained signed SOX certifications by Defendants Rocca and Carlos attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

132.     The 2017 20-F stated the Company was "committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards[.]"

133.     The 2017 20-F also touted Tenaris's Code of Ethics and Code of Conduct, incorporating both codes by reference and stating in relevant part:

In addition to the general code of conduct incorporating guidelines and standards of integrity and transparency applicable to all of our directors, officers and employees, we have adopted a code of ethics for financial officers which applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and is intended to supplement the Company's code of conduct.

The text of our codes of conduct and code of ethics is posted on our Internet website at: www.tenaris.com/en/aboutus/codeofconduct.aspx

134.    The foregoing statements identified from Tenaris's 2017 Form 20-F were materially false and misleading because the statements omitted material facts, the disclosure of which was necessary to make the statements made not misleading, including but not limited to: (1) the fact of Defendants' payments of illegal bribes and political kickbacks to Argentine officials over a period of years; (2) Defendants' violation of laws and legal exposure associated therewith; (3) the heightened risk of negative impact on Tenaris's business, operations, financial performance, and share price that existed as a result of their participation in illegal/illicit bribery payments, violations of law, and associated exposure to criminal and civil legal liability, as alleged herein; and (4) the woeful lack of internal controls that allowed these bribery payments to go unchecked and undisclosed for years both prior to and throughout the Class Period.

135.    Tenaris's 2017 20-F also provided the following materially incomplete and misleading risk disclosure regarding corruption and bribery:

**If we do not comply with laws and regulations designed to combat governmental corruption in countries in which we sell our products, we could become subject to fines, penalties or other sanctions and our sales and profitability could suffer.**

We conduct business in certain countries known to experience governmental corruption. Although we are committed to conducting business in a legal and ethical manner in compliance with local and international statutory requirements and standards applicable to our business, there is a risk that our employees or representatives may take actions that violate applicable laws and regulations that generally prohibit the making of improper payments to foreign government officials for the purpose of obtaining or keeping business, including laws relating to the 1997 OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions such as the U.S. Foreign Corrupt Practices Act, or FCPA.

136.    The foregoing risk disclosure was materially misleading and incomplete where Defendants omitted and failed to disclose that Defendants, at the very highest executive levels, *in*

*fact had* participated in bribery and corruption and "the making of improper payments to foreign government officials for the purpose of obtaining or keeping business," in violation of the law, including the above-cited laws, thereby actually exposing Tenaris and the other Defendants to "fines, penalties or other sanctions" that could harm Tenaris's business.

**Disclosure of Defendants' Participation In Bribery, and the Risks and Uncertainties Associated Therewith, Was Required By Item 303**

137.    SEC Regulation S-K required Tenaris to disclose known trends and uncertainties in its Class Period Form 20-F filings.   SEC Regulation S-K (27 CFR § 229.10) requires disclosure "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. § 229.10.  Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 n.1.

138.    Part I, Item 5(d) Form 20-F, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

139.    Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In an 1989 Interpretive Release, the SEC described the purposes of MD&A:

The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant

through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[20]

140.    Item 5(d) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id*. at \*4.

141.    NYSE-listed foreign companies must disclose both (a) known trends and uncertainties and (b) any material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at \*6. See also Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 721 (2d Cir. 2011).

142.    Indeed, because it is a foreign issuer, Tenaris faces heightened obligations to disclose government actions and political factors, such as Defendants' interactions with the Argentine government as alleged in this case. ***Item 303 specifically instructs foreign issuers of stock like Tenaris to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals."*** 17 C.F.R. § 229.303, Instructions to Item 303(a), at ¶11 (emphasis added).[21] Thus, Defendants were required to disclose their illicit and illegal bribery payments made to Argentine government officials, as alleged herein above.

---

[20] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, \*1 n.1 (same).

[21] There is no corresponding specific requirement for domestic companies.

## THE TRUTH IS REVEALED; LOSS CAUSATION

143.    On November 27, 2018, Bloomberg reported that the Argentine judge overseeing the Notebooks Case charged Defendant Rocca for his alleged role in the Notebooks Case. The charge came following Rocca's testimony confirming Techint Group made illegal bribe payments to Argentine government officials in connection with the nationalization of Ternium's subsidiary, SIDOR, in 2008. Judge Bonadio set a US $103 million bond and forbade Defendant Rocca from leaving Argentina.

144.    In response to this news, Tenaris's stock fell $2.64 per share or nearly 10% to close at $24.36 per share on November 27, 2018, damaging investors.

145.    On December 5, 2018, while the market was closed, media outlets reported that Argentine prosecutors requested that Defendant Rocca be detained for his alleged role in the Notebooks Case.

146.    In response to this news, Tenaris's stock fell an additional $0.95 per share to close at $23.43 per share on December 6, 2018, damaging investors.

147.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

148.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Defendants' compliance with all applicable laws. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company

and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed and the price of the Company's stock precipitously declined.

## ADDITIONAL SCIENTER ALLEGATIONS

149.    As alleged herein above, San Faustin, Techint Holdings S.á r.l, and Tenaris are alter egos of each other and of Rocca.  Moreover, each of these corporations is imputed with the scienter of its high-ranking corporate agents, including Betnaza and Zabaleta, who admitted to having paid multiple illegal bribe payments to Argentine officials for the benefit of Techint Group and its companies.

150.    Given the culture of "unconditional loyalty" among executives to Rocca, and his highly-involved management style, it is exceedingly unlikely that Rocca did not know about the numerous, substantial cash payments of bribe money to Argentine officials for the Kirchners; at the very least, he was extremely reckless in not knowing.

151.    As alleged herein above, SIDOR and Tenaris's other interests marked for nationalization in Venezuela were material and core operations to Tenaris's business and operations.  These interests were so important, in fact, that Defendants, including Rocca, specifically sought the Kirchners' intervention with Chávez on Defendants' behalf, and the nationalization of these interests was discussed at a number of meetings attended by high-powered government officials, including Chávez and the Kirchners (and their inner circle, including Baratta and Uberti), and Rocca and his right-hand-man, Betnaza.  Rocca also solicited

the Kirchners' help in negotiating the price of iron ore with Chávez, which is an integral component of Techint Group's and Tenaris's steel products.  Rocca was present when at least one request for bribery payments for the Kirchners was specifically communicated to Betnaza, and Rocca was aware of the same.  It is inconceivable that in the years of Argentine intervention and negotiations among the Kirchners, Rocca/Techint Group, and Chávez that followed, regarding interests that were integral to Rocca's businesses, that Defendant Rocca did not know about the multiple payments of bribe money to Argentine officials for the Kirchners, or, at the very least, he was extremely reckless in not knowing.

152.    The multiple investigations by law enforcement bodies and authorities around the world into Techint Group's alleged participation in bribery and graft, as well as Defendants' purported own internal investigations regarding bribery—including its promise to the SEC in 2009 that it had conducted a detailed, world-wide internal investigation of its business operations and controls, including a review to detect potential instances of bribery and corruption, including among high-ranking executives—further informs the strong inference of scienter, as well as Defendants' duty to disclose, in this case.  Had the Company conducted such a detailed, worldwide investigation of suspected bribery and corruption in 2009 as attested, it would have discovered the illicit payments of upwards of US $1.6 million to $1.7 million then-recently made from Techint Group funds, which Rocca himself admits, were intended for dividend payments for shareholders.  The most compelling inferences that can be drawn from this fact are (i) that the Company purposely continued to hide the illicit payments made to Argentine officials, or (ii) that controls over this the slush fund account were so purposely lax as to frustrate/disguise detection of the illicit payments.  Either scenario supports a strong inference of scienter.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

153.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Tenaris during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

154.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Tenaris ADS were traded publicly during the Class Period on the NYSE. As of December 31, 2017, Tenaris had 590,268,500 ADS outstanding. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

155.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

156.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs has no interests antagonistic to or in conflict with those of the Class.

157.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether Defendants' acts as alleged violated the federal securities laws;

b.     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e.     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

158.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as

a class action.

### APPLICABILITY OF THE FRAUD-ON-THE-MARKET<br>AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

159.     Plaintiffs and the members of the Class are entitled to the presumption of reliance

established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*,

406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class

Period statements in violation of a duty to disclose such information, as detailed above.  As a

result of Defendants' omissions of material information, Tenaris's securities traded at artificially

inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or

otherwise acquired Tenaris's securities relying upon the integrity of the market price of Tenaris's

securities and market information relating to Tenaris, and have been damaged thereby.

160.     At all relevant times, the market for Tenaris's securities was an efficient market

for the following reasons, among others:

a.     Tenaris's ADS met the requirements for listing, and were listed and
   actively traded on the NYSE, a highly efficient and automated market;

b.     As a regulated issuer, Tenaris filed periodic public reports with the SEC;

c.     Tenaris regularly communicated with public investors via established
   market communication mechanisms, including through regular
   dissemination of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.    Tenaris was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sale force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or;

e.    The average daily trading volume for Tenaris securities during the Class Period was approximately 2,193,170 ADS, with more than 590,268,500 ADS outstanding as of December 31, 2017, and a market capitalization reaching over US $28 billion during the Class Period.

161.    Positive proof of reliance is not a prerequisite to recovery because this action involves Defendants' failure to disclose material adverse information regarding Defendants' exposure to criminal and civil liability. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

162.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

163.    The statements alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may

be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

164.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Tenaris who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

165.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

166.     This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

167.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or

omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

169.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced  in  the  issuance or  dissemination  of  such  statements  or  documents  as  primary violations of the securities laws.  These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

170.    Individual Defendants, who are the senior officers and/or directors of the Company, and San Faustin and Techint Holdings S.ár.l., as alter egos of Rocca and the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

171.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements

and omissions, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements and omissions.

172.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

173.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

174.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants, San Faustin and Techint Holdings S.ár.l.**

175.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176.    During the Class Period, the Individual Defendants, San Faustin and Techint Holdings S.á r.l. participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

177.    As officers and/or directors of a publicly owned company, the Individual Defendants, San Faustin and Techint Holdings S.ár.l. had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

178.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period.   Throughout the Class Period, the Individual Defendants, San Faustin and Techint Holdings S.á r.l. exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

179.    Each of the Individual Defendants, San Faustin and Techint Holdings S.á r.l., therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants, San Faustin and Techint Holdings S.á r.l. had the power to direct the actions of, and exercised the  same  to cause, the Company to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants, San Faustin and Techint Holdings S.á r.l. exercised control over the general operations of the Company and possessed the power to control the specific activities

which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

180.    By reason of the above conduct, the Individual Defendants, San Faustin and Techint Holdings S.á r.l. are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  July 19, 2019

By:   *s/ Kara M. Wolke*

Kara M. Wolke (*admitted pro hac vice*)
Melissa C. Wright (*admitted pro hac vice*)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: kwolke@glancylaw.com

*Attorneys for Plaintiffs and the Putative Class*

EXHIBIT A

JUDICIAL POWER OF THE NATION

NATIONAL FEDERAL CRIMINAL AND CORRECTIONAL JUSTICE

**STATEMENT**

ASSIGNED ON: 06/12/2018                    FILE No.  **CFP 9608/2018/56**

(round) COURT 11 CLERK'S OFFICE 21

**COOPERATING-WITNESS FILE**

ON

UBERTI, CLAUDIO

ON COURT RECORDS

DEFENDANT   UBERTI, CLAUDIO

FOR

CONSPIRACY

JUDGE: CLAUDIO BONADIO

CLERK: CAROLINA LORES ARNAIZ

PROSECUTOR'S OFFICE: No. 4, DR. CARLOS ERNESTO STORNELLI

PUBLIC DEFENDER'S OFFICE:

[an illegible signature and illegible seal]

[an illegible signature and a seal reading: CARLOS E. STORNELLI FEDERAL PROSECUTOR]

[two illegible signatures]

In the City of Buenos Aires, on August 13, 2018, Mr. CLAUDIO UBERTI, National Identity Card No. 13178794, Argentinian, born on December 3, 1957 in the Province of Santa Fe, son of Eugenio and Elda Rosa Nicolai, a tradesperson, divorced, with domicile at Arcos 2229, piso 5°, CABA, and his defendant attorney, Dr. Alejandro Higa, registered with the Bar Association of the City of Buenos Aires on volume 55, page 638, with domicile at Tucuman 881, 1°, 11, of this city, who is present herein, appears before this National Federal Criminal and Correctional Prosecutor's Office No. 4, before the Chief Prosecutor, Carlos Ernesto Stornelli, and acting clerk, stating his desire to provide information in case No. 9608/2018 of the records of Clerk's Office No. 21 of the National Federal Criminal and Correctional Court No. 11 in the light of the procedure provided for in Article 41 ter of the Criminal Code of the Nation, overridden by Act 27304. He is hereby informed of the contents of Article 276 bis of the Criminal Code of the Nation.----------------------------------------------------

Next, and in accordance with the provisions in subsection a) of Article 7 of Act 27304 and with the consent of the appearing party and his defense attorney, express reference is made to the accusation of the facts that will be formulated on him in the framework of his investigative statement given before the intervening Court on the date above, as well as the detail of the evidence on which the accusation is based (also conducted thereby). All of the foregoing he claims to know and recall. The floor is hereby granted to him in order for him to provide the information he wishes to provide and says: "I was in public office in a 4th-line hierarchy. I was the Head of the OCCOVI. I held office from May 25, 2003 to August 9, 2007. I had to resign due to the Antonini Wilson's suitcase incident. What I saw, know, and heard was during the above period. Afterwards, I had no link to anyone. I was brought in by Julio De Vido. I met him in Santa Cruz. I worked for a company called SEYPSA in Santa Cruz. Architect De Vido was the owner of the company that constructed the Rio Gallegos PBX. I came close to what would be known as Kirchnerism in 2001-2002, coordinating the technical teams for the 2003 campaign. That year, Kirchner was elected President. I was a deep personal admirer of him – due to his drive and his ways. In Santa Cruz I never worked for them until the presidential campaign I just mentioned. Afterwards, when he was elected and until May 24, I did not know whether I would hold office or not. On May 25, I learned I was going to be the head of the body auditing and controlling all road concessions. My office was located at Paseo Colon 1151. I had delegations in other provinces of large cities. When I started

working, one day I got a call by Minister De Vido to his office. Dr. Lavagna was there.  He informed De Vido that the concession agreements for all road corridors would expire that year, and that the idea was to conduct a new tender under new conditions. Those tasks were entrusted to me. I did so using a 50-people team. We prepared the bidding conditions. There I had my first disappointment, for the request for tender was made using a data room. There was a multi-stage process in place which ended with the execution of the agreement. That was completed and a date had to be set in the President's agenda for execution of the agreement. That was the first time I approached the presidential office in December 2003. Afterwards, De Vido came out cursing and told me: "the President is not going to sign the agreements, no fucking way. Because you did things too well and did not arranged for the bribe money with the people. He's not fucking signing and you're going to get screwed. You have to call all businessmen and tell them to fork over. They're going to beg you, but you have to tell them to fork over, 'cos otherwise the President is not signing. Or you can resign. You see how the bad guy is". That is how I communicated with a desperate Miguel Aznal and told him what the deal was. I told him that Kirchner had told De Vido that he was going to crush the agreements. That payments had to be made. I wish to clarify that in this road-corridor system, the UCOFIN would make monthly payments. The first few months they would prepare one account for each of the six corridors. The approximate figure was USD 150,000. Such revenue was turned in to me by Aznar and I had to deliver it. As of 2003 to August 2007, it was so. First, I had to bring the USD 150,000 to Minister De Vido's office; then I took it personally to the presidential office and handed it to them in a suitcase personally to Nestor Kirchner. The first time, he had me deliver the full suitcase — pen and everything. He said "you have to give me more. Remember I'm going to have you whacked". Within the road corridor concession, there were two SHELL service stations — one Zarate and the other one in General Lagos. The concessionaire was the owner of the property. He executed an agreement for the exploitation of the service stations. From that agreement, Aznar offered to hand over 10 percent of the exploitation which was equal to USD 500,000. Then, I consulted with De Vido and he said "Take it, you stupid fuck. I'm going to meet with him (in reference to Kirchner). It's good news". I wish to clarify that regarding Betnaza's statements, I was no longer an official at that time. Roberto Baratta, when I left office, came to comfort me spiritually — him and no one else. In the year 2006 there was a visit of Argentinian businessmen to Venezuela — approximately a hundred, for IMPSA had signed an agreement in Macahuan. At the event, in an intermediate room, Rocca approached Kirchner. He talked to him and pulled him around. I approached Betnaza for him to tell Rocca to stop harassing him. At that moment I did not directly speak with Kirchner. In that context, De Vido asked me to tell Betnaza that if he wanted us to treat him well, he had to fork over. And so, I conveyed the message. Betnaza sadi to me that Techint would not — in a colloquial fashion. Then, Kirchner entrusted me with reaching TechInt. I contacted Betnaza and showed up at his office at

DellaPaolera street. On that occasion, he handed over USD 100,000 and told me it was for Kirchner. This was repeated five or six times. On these opportunities, Betnaza handed it over personally. Then he would ask me to go down to a different floor; that it would be handed by a different person. These money packages I directly handed over to Kirchner. In the year 2006, one day De Vido called me over to his house at Libertador and Ocampo. Ferreyra was there. De Vido entrusted me with the coordination with Ferreyra; that he would hand over something to me to take to the Presidential Residence (Quinta de Olivos). It was a lot of money. We agreed to meet at the Selquet parking lot. There, he handed me a suitcase which he said contained EUR 10 million. Ferreyra took the suitcase out from the car (a Fiat Mondeo). That suitcase I took to the Presidential Residence; I came in through the tunnel. Again, Ferreyra had to make another delivery but did not show up and told Kirchner that he had not handed it over to me and lashed out at me — even insulted me. On a different occasion, one of the first few times I called in on Nestor Kirchner, in the year 2005, I took the revenue from the road corridors to his office at Balcarce street. I wish to clarify that at all times I carried the revenue, he asked me whether it was dollars or euros. On one occasion, I brought him packages with pesos, euros, and peso [sic]. He started kicking the peso one and tossed it away. Kirchner was torture. If Nestor was hard, Cristina was much worse. During the 2003 campaign, I stayed at the Hotel Panamericano. There, Relats would provide free accommodation. Years later during a trip to New York, I was coordinating Minister De Vido's agenda with the businessmen. We were about to land and out comes Nestor Kirchner and slaps me and says "You stupid fuck! You're friends with Negro Relats and Cristina is constructing in Los Sauces and needs "clean" money. Go tell Relats to go to Calafate". And he told Cristina "he's going to sort this "clean" thing you need for us and we're going to shove him that dick you're doing". She said that what she was doing was the most wonderful thing in the world. When we got back, I visited Relats and he said he had no structure. He was not very content with what I asked. I conveyed his answer to Nestor Kirchner and he asked me to tell him not to be a dick; that he had several works; that I take him to El Calafate and bring his daughter. And that's how we met with Nestor and Cristina Kirchner, Relatz, his daughter and me. There we agreed on a USD 105,000-a month lease for the bare building and they would take care of the management. We flew in a private jet hired by Mr. Relatz. During the flight back, we stopped in Bariloche where his daughter got off. On the day following the agreement, Relats told me that 105,000 was a lot of money and that he was going to speak with De Vido for him to write off 105,000 from what he put in monthly — for the public work Relatz had, I suppose. Later Cristina called me and told me in her gym at the El Calafate house that this thing, the "clean" money thing was very important to her family, that it had been a great favor I had done to her. I wish to clarify that Cristina was very rude and not good with people. She wouldn't greet you. She would insult her employees — especially women. Nestor would hit his employees. To meet with them in person was terrible. Once I met with them at a

Hotel Westin in Madrid. We had officially travelled to meet with businessmen. There were Daniel Muñoz and Nestor went into a room of a hotel of Ruben Zacarias of ceremony and protocol. Nestor said to Muñoz "this one, the one who did not deliver, give him three". I think that person had not delivered the paper in time or something like that. Muñoz punched Ruben Zacarias three times. On one occasion, I came over to the apartment in Uruguay with Juncal. After my meeting with Ferreyra as above, he surrendered on two or three more occasions over 20-pound money bags. That I delivered at the Juncal apartment. He had already told me that when I had the "petty" cash package, I should take it to Balcarce's office, and that if the bulk was large, I should coordinate with him, and that's how he contacted me with Daniel Muñoz (the person who I handed the money over to at Juncal street). On one occasion, I went up to the apartment. There, on the landing were other suitcases and many other in his bedroom. There was no one in the apartment that day. Muñoz told me that those suitcases with money were to be taken to Santa Cruz. There were so many of them (roughly 20 of different sizes) that Muñoz said to me "after this, I'm going to start a suitcase business". The suitcases were to be taken to Nestor and Cristina Kirchner's house in Rio Gallegos located in the corner of the 25 de Mayo street, where there were vaults that they had purchased from the mortgage bank. The suitcases with the money were taken to Santa Cruz on the Tango 01. They would load them up at the Military Area Base at Aeroparque and unload them at the Rio Gallegos airport. That is what I saw. Lastly, I undertake to elaborate on my statement as I recall more details and information under this agreement.------------

Next, in the terms of subsection c) of Article 7 of Act 27304, the prosecutor agrees that, in case of confirmation of the plausibility and usefulness of the information provided in this agreement and other conditions in the terms of Article 13 of Act 27304, upon petition for punishment, it will be carried out considering the provisions referred to in Article 41 ter, paragraph 1 of the Criminal Code of the Nation. Also, it is agreed to consider this collaboration under Art 4 of Act 27304.----------------

Without anything further, this act is concluded, having read this record-agreement out loud which will be submitted with the Acting Court for ratification purposes. The attending parties this instrument before me, whereof I ATTEST.-

[two illegible signatures] [an illegible signature]

[Seal:] CARLOS E. STORNELLI
FEDERAL PROSECUTOR

In the City of Buenos Aires, on August 14, 2018, Mr. CLAUDIO UBERTI, National Identity Card No. 13178794, Argentinian, born on December 3, 1957 in the Province of Santa Fe, son of Eugenio and Elda Rosa Nicolai, a tradesperson, divorced, with domicile at Arcos 2229, piso 5°, departamento "B" in this city, with the attendance of his defendant attorney, Dr. Alejandro Higa, registered with the Bar Association of the City of Buenos Aires on volume 55, page 638, with domicile at Tucuman 881, 1° piso, departamento 11, of this city, who is present herein, appears before this National Federal Criminal and Correctional Prosecutor's Office No. 4, before the Chief Prosecutor, Carlos Ernesto Stornelli, and acting clerk, stating his desire to provide additional information to that he provided yesterday under the collaboration agreement executed in the light of the procedure provided for in Article 41 ter of the Criminal Code of the Nation, overridden by Act 27304 in case No. 9608/2018 of the records of the Prosecutor's office No. 21 of the National Federal Criminal and Correctional Court No. 11. He is hereby informed of the contents of Article 276 bis of the Criminal Code of the Nation.-

Next, and in accordance with the provisions in subsection a) of Article 7 of Act 27304 and with the consent of the appearing party and his defense attorney, express reference is made to the accusation of the facts that will be formulated on him in the framework of his investigative statement given before the intervening Court on the date above, as well as the detail of the evidence on which the accusation is based (also conducted thereby). All of the foregoing he claims to know and recall. The floor is hereby granted to him in order for him to provide the information he wishes to provide and says: "I wish to add that on the day Mr. Nestor Kirchner died , there were USD 60 million at the Juncal apartment. I did not see them, but I know that from the grapevine. His death, I understand, was due to infarction. The pilot for the Kirchners was Potro Velazquez, known as Sergio. I remember Kirchner took him out of the air force to put him in charge of the Tango 01. Velazquez was his pilot until the end of Cristina Kirchner's office. Daniel Muñoz was a cab driver in Rio Gallegos. The money transportation was made south by air, in bags or suitcases, and in broad daylight and in the sight of all present in the place. I did not see actual money, but I did see the suitcases. This matter was known to Mrs. Kirchner. She would witness such transportation. I wish to clarify that where I said that Muñoz gave him three to Zacarias, I meant that he punched him three times and knocked him down while he said, "this is what we do to traitors". I have nothing further to add at this time. If I should remember further details or information, I will do so under this agreement."

Next, in the terms of subsection c) of Article 7 of Act 27304, the prosecutor ratifies the agreement executed yesterday as to the fact that, in case of confirmation of the plausibility and usefulness of the information provided in this agreement and other conditions in the terms of Article 13 of Act 27304, upon petition for punishment, it will be carried out considering the provisions referred to

in Article 41 ter, paragraph 1 of the Criminal Code of the Nation. Also, it is agreed to consider this collaboration under Art 4 of Act 27304.--------------------------------------------------------------------------

It is hereby recorded that that Dr. Alejandro Higa has received, upon request, a copy hereof and of the record executed yesterday with his client, Claudio Uberti.  Without anything further, this act is concluded, having read this record-agreement out loud which will be submitted with the Acting Court for ratification purposes. The attending parties this instrument before me, whereof I ATTEST.-

[several illegible signatures]

[Argentine Coat of Arms]

**Federal Prosecutor's Office**

Buenos Aires, August 14, 2018.

Considering the collaboration agreement executed with Claudio UBERTI, let these records be submitted for their due ratification in the terms of Article 9, 10, and concordant of Act 27304.

Let this instrument be duly recorded.


[an illegible signature and stamp]


I attest:

[an illegible signature]

ARIEL GONZALO QUETY
LEGAL DEPUTY CLERK



Fulfilled on the same date. For the record.-

[an illegible signature]

Judicial Power of the Nation　　　　　[Handwriting: Bonadio]　　　　Case No.  9608/18

RECORD OF RATIFICATION OF AGREEMENT WITH CLAUDIO UBERTI:

In the city of Buenos Aires, on August fourteen two thousand eighteen, the Court composed of Dr. Claudio Bonadio, in my presence, Dr. Carolina Lores Arnaiz, stands as Ministry in order to hold a hearing per the provisions in Art. 10 of Act 27304 in this case No. 9608/18 of the records of this Court, with the presence of the Public Prosecutor, Dr. Carlos Ernesto Stornelli and the accused, Claudio Uberti, holder of NID No. 13178794, whose other personal data are filed in the court records, assisted by Dr. Alejandro Higa (Registered with the Bar Association of the City of Buenos Aires under Volume 55, page 638).-------------------------------------------------------------------------------

Upon start of this act, the Honorable Judge proceeds to explain to the accused the scopes of the proceedings in question and which are the obligations they shall fulfill and the consequence of their fulfillment/non-fulfillment.------------------------------------------------------------------------------------------

Thus, having reviewed case file No. 9608/2018/56 which, in the terms of Art. 41 of the Criminal Code of the Public Prosecutor's Office, is exhibited to the same. The accused takes this opportunity to acknowledge his signature as one of those inserted in each of the pages of the executed agreement.-

The floor is given to the Representative of the Public Prosecutor's Office to say whether he wants to give a statement with respect to the executed agreement, and he states that: "yes, we have executed an agreement. All I want to add is that in view of the characteristics of the narration, I believe we should address safety-related matters. Also, I hereby request from your Honor – if possible – to grant release to the accused in view of the collaboration provided by him and whether this release may be made from the court notice board".---------------------------------------------------

Subsequently, the floor is given to the defense for the same purposes, stating that: "I have nothing further to add. I second the Prosecutor's motion".----------------------------------------------------------

Next, the accused is interrogated about his knowledge and understanding of the procedure at hand. He states to fully know the scopes thereof and responds: "yes".---------------------------------------

OFFICIAL USE

He is asked whether his lawyer has explained to him the scopes of the agreement signed by him. He responds: "yes".--------------------------------------------------------------------------------------------------------

He is asked whether in the selection of his defense, he has received any suggestions or has been under any type of pressure with respect to whom he was to appoint. The appearing party states: "no".-----------------------------------------------------------------------------------------------------------------------

He is asked whether, upon execution of the agreement, he did so freely. He responds: "absolutely".-

He is asked whether he knows that he undertook the compromise in question under oath to tell the truth. He answers: "yes".--------------------------------------------------------------------------------------------

For further clarity, Art. 276 bis of the Criminal Code was read out loud.-------------------------------------

He is asked whether he wishes to add anything further. The appearing party states: "no".------------

Without anything further, this act has been finalized, having read the same fully and out loud and by the parties, and having been signed by the Judge and the parties, before me, which I attest to.--

[several illegible signatures]

<div align="center">

ENRIQUE RODRIGUEZ VARELA

FEDERAL CLERK

</div>

OFFICIAL USE

Judicial Power of the Nation                    [Handwriting: Bonadio]                    Case No.  9.608/18

Buenos Aires, August 14, 2018

**WHEREAS:**

Per the record in page 1/3, the Representative of the Public Prosecutor's Office and the accused, Claudio Uberti, assisted by his lawyer, yesterday, they executed a collaboration agreement in the terms of Article 41 ter of the Criminal Code of the Nation and Act 27304.-

From the record above appears that the accused, Uberti, has been duly accused of the facts as charged under these proceedings, his degree of participation therein, and the evidence supporting such accusation. The crime in question shall be provisionally be held as conspiracy (Article 210 of the Criminal Code of the Nation). This situation falls into the provisions in Article 41 ter, paragraph two, subsection g) of the abovementioned Code.-

Also, it is noted that the accused has provided information linked to the events under investigation, identifying co-perpetrators and participants of the crimes he is accused of, as well as about the places where these crimes took place.-

Lastly, upon confirmation of the plausibility and usefulness of the information provided herein, the Prosecutor agreed with the accused that, upon petition of punishment, this will be done considering the measure in Article 41 ter, paragraph one of the Criminal Code of the Nation. Also, for the purposes of the accused's exemption from prison, the provisions in Article 4 of Act 27304 shall be considered.-

[Seal:] ENRIQUE RODRIGUEZ VARELA

FEDERAL CLERK

Having submitted the collaboration agreement above, per the provisions in Article 9 of Act 27304, this Court notes that the same has been executed considering the requirements of Articles 7 and 8 of the above Act, and that it has been executed at the point in the proceedings referred to in Article 3 of that Act.-

Further, it should be noted that upon this Court holding the hearing for ratification of the collaboration agreement, in presence of the Representative of the Public Prosecutor's Office, the repentant accused and his defense, the parties were heard, Uberti acknowledging as his the signature inserted in the corresponding record.-

In the same manner, the accused was asked whether he had understood the facts he is accused of and the evidence gathered against him; whether he understood the scopes and consequences of the agreement executed in the terms of Act 27304, and whether he had acted voluntarily when deciding to execute the agreement. He responded affirmatively to all of the foregoing (Article 10, paragraphs one and two).-

Having exposed these considerations, this Court understands the provisions of Article 41 ter of the Criminal Code of the Nation and of Act 27304 as verified. For this reason, issuing the ratification of the executed collaboration agreement is admissible. It shall be integrated into the proceedings and differing the execution of the benefit for the moment of the ruling (Article 11 of Act 27304).-

As of the grounds as exposed, and for it is according to the law, this Court;

Judicial Power of the Nation                                    Case No. 9.608/18

**RESOLVES**:

I.    TO **APPROVE** THE **RATIFICATION** of the collaboration agreement executed between the Representative of the Public Prosecutor's Office and repentant accused, Claudio Uberti (Article 10 of act 27304).-

II.   Let it be notified to the Prosecutor, by entry of the court record, to the defense, via an urgent court notice, and the repentant accused, personally.-

[Handwriting: Bonadío]

Before me: [an illegible signature and stamp]

Fulfilled. For the record.-

[an illegible signature]

ENRIQUE RODRIGUEZ VARELA

FEDERAL CLERK

I attest that, in            notified to the Prosecutor (No. 4) and he signed.

I attest that, on this date, it was notified to Claudio Uberti and he signed.-

[two illegible signatures and one illegible stamp]

OFFICIAL USE

**Morningside**
Translations

450 Seventh Ave.
Tenth Floor
New York, NY 10123
(212) 643-8800

# TRANSLATION CERTIFICATION

Date: June 25, 2019

To whom it may concern:

This is to certify that the attached translation from Spanish into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Statement of Claudio Uberti

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of Eugene Li

**Global Solutions. Local Expertise.**

www.morningtrans.com | info@morningtrans.com

**PODER JUDICIAL DE LA NACIÓN**

JUSTICIA NACIONAL CRIMINAL Y CORRECCIONAL FEDERAL

## TESTIMONIO

FECHA ASIGNACION: **12/06/2018**

EXPTE N° **CFP 9608/2018/56**

(Turno) **JUZGADO N° 11  SECRETARIA N° 21**

## LEGAJO DE ARREPENTIDO

DE
**UBERTI, CLAUDIO**
**EN AUTOS**
IMPUTADO  **UBERTI, CLAUDIO**

**POR**

## ASOCIACION ILICITA

JUEZ:  CLAUDIO BONADIO

SECRETARIO:  CAROLINA LORES ARNAIZ

FISCALIA:  Nro. 4, DR. CARLOS ERNESTO STORNELLI

DEFENSORIA:

ARIEL GONZALO QUETY
PROCECRETARIO-

CARLOS E. STORNELLI
FISCAL FEDERAL

En la ciudad de Buenos Aires a los 13 días del mes de agosto de 2018 comparece en esta Fiscalía Nacional en lo Criminal y Correccional Federal N° 4, ante su titular, Carlos Ernesto Stornelli, y secretario actuante, el Señor CLAUDIO UBERTI, DNI N° 13.178.794, de nacionalidad argentino, nacido el 3 de diciembre de 1957 en la Provincia de Santa Fe , hijo de Eugenio y de Elda Rosa Nicolai, de profesión u ocupación comerciante, de estado civil divorciado , domiciliado Arcos 2229, piso 5to , CABA, con la asistencia de su abogado defensor Dr. Alejandro Higa, T° 55  , F° 638   CPACF, con domicilio constituido en  Tucuman 881, 1Ro , 11, de esta ciudad, quien se encuentra presente en el acto, manifestado su deseo de aportar información en el marco de la causa N° 9.608/2018 del registro de la Secretaría N° 21 del Juzgado Nacional en lo Criminal y Correccional Federal N° 11, a la luz del instituto previsto por el artículo 41 ter del Código Penal de la Nación, sustituido por la ley 27.304. En este estado se le hacer saber el contenido del artículo 276 bis del Código Penal de la Nación.-------------------------------------------------------

Acto seguido y de acuerdo a lo establecido en el inciso a) del artículo 7 de la ley 27.304 y con la anuencia del compareciente y de su letrado defensor, se hace expresa remisión a la imposición de los hechos que se le formulara en el marco de su declaración indagatoria prestada por ante el Juzgado interviniente en el día de la fecha, como así al detalle de la prueba en que se funda la imputación, también efectuada en dicho acto, todo lo cual dice conocer y recordar. En este acto se le concede la palabra al imputado a fin de que brinde la información que desee aportar y dice: "Estuve en la función pública en una jerarquía de 4ta línea. Yo era el Director del OCCOVI. Estuve en el cargo desde el 25 de mayo de 2003 hasta el 9 de agosto de 2007. Tuve que renunciar por el incidente de la valija de Antonini Wilson. Lo que vi, conozco, y escuche fue durante el período que mencioné, después no tuve vinculación con nadie. Yo llegue de la mano de Julio De Vido, lo conocí en Santa Cruz, yo trabaje en una empresa que se llamaba SEYPSA en Santa Cruz, el arquitecto De Vido era el dueño de la empresa que construyó la Central telefónica de Rio Gallegos. Yo me acerqué a lo que después se llamo el Kirchnerismo en el 2001-2002, coordinando los equipos técnicos para la campaña 2003, ese año Kirchner fue electo Presidente. Yo tenía una admiración personal profunda por él, por su empuje, por su forma. En Santa Cruz nunca trabaje con ellos, hasta la campaña presidencial que mencione. Después cuando fue electo y hasta el 24 de mayo no sabía si me iba a poder quedar o no en la gestión. El 25 de mayo me enteré que iba a ser el director del organismo de auditar y controlar las concesiones viales, mi oficina quedaba en Paseo Colon 1151, y tenía delegaciones en otras provincias en las grandes ciudades. Cuando empecé a trabajar un día me llama el Ministro De Vido a su despacho, estaba el Dr. Lavagna presente, y éste le informo a De

Vido que los contratos de concesión de los corredores viales finalizaban ese año, y que la idea era hacer una nueva licitación con nuevas condiciones. Esa tareas me la encomendaron a mí, y la hice con un equipo de 50 personas. Confeccionamos los pliegos. Ahí tuve la primera decepción, porqué el pedido de licitación se hizo con un data room, había un proceso de etapas múltiples que terminaba con la firma del contrato. Eso se terminó y había que poner una fecha en la agenda del presidente para la firma del contrato. Esa fue la primera vez que me acerqué al despacho presidencial, en diciembre de 2003. Al rato salió De Vido puteando, y me dijo "el presidente no va a firmar los contratos ni en pedo. Porque vos hiciste las cosas demasiado bien y no arreglaste la guita con la gente, no los va a firmar ni en pedo y te va a hacer cagar. Tenés que llamar a los empresarios y decirles que pongan, te van a llorar, pero vos deciles que pongan porque si no el presidente no va a firma, si no renuncia. Viste como es el malo". Así fue como me comuniqué con Miguel Aznal desesperado y le comenté como venia la mano. Le dije que Kirchner le había dicho a De Vido que va a pulverizar los contratos, que tienen que pagar. Quiero aclarar que en este sistema de corredores viales, pagaba mes a mes la UCOFIN. Los primeros meses sacaban una cuenta por cada uno de los seis corredores, era una cifra aproximada de 150.000 dólares, esa recaudación me la entregaba Aznar y yo debía entregarla. Desde 2003 hasta agosto de 2007 fue así. Primero le llevaba 150.000 dólares al despacho del Ministro De Vido, luego se lo llevé personalmente al despacho presidencial, y se los entregaba en un maletín a las manos de Néstor Kirchner. La primera vez me hizo entregarle el maletín completo, con birome y todo, y me dijo "me tenés que entregar mas, acordate que te voy a hacer cagar". Dentro de la concesión del corredor vial había dos estaciones de servicio SHELL una Zarate y otra en General Lagos, el concesionario como era el dueño del predio celebro un contrato por la explotación de las estaciones de servicio, de ese contrato Aznar le propuso entregar el 10 por ciento de la explotación que equivalía a 500.000 dólares. Entonces lo consulté con De Vido y me dijo "Agarralo pedazo de pelotudo que lo voy a ver al malo – refiriéndose a Nestor Kirchner- que es una buena noticia". Quiero aclarae que con relación a las declaraciones de Betnaza yo no era más funcionario en ese periodo. Roberto Baratta, cuando me fui de la función, venia consolarme espiritualmente., pero nadie me dio más trato. En el año 2006 hubo en Venezuela una visita de empresarios argentinos, cien aproximadamente, puesto que IMPSA había firmado un contrato en Macahuan. En el evento, en un cuarto intermedio, Rocca se le acercó a Kirchner, le hablaba, lo tironeaba, y yo me acerqué a Betnaza que le diga a Rocca que no lo atosigue. En ese momento yo no habla directamente con Kirchner. En ese contexto me pidió De Vido que le diga a Betnaza que si quiere que lo tratemos bien, tiene que ponerse. Y asi trasnmití el mensaje. Betnaza me dijo que Techint no, de un modo coloquial. Luego, Kirchner me encomendó que buque a Techint, me comuniqué con Betnaza y me presenté en su oficina en la calle Della

Paolera, en esa ocasión me entregó 100.000 dólares, y me dijo que era para Kirchner, eso se repitió entre cinco y seis veces. En esas oportunidades me lo entregó Betnaza personalmente, luego me pedía que bajara a otro piso, que me lo iba a entregar otra persona. Esos paquetes de dinero se los entregué directamente a Kirchner. En el año 2006, un día me llamo De Vido a su casa a la calle Libertador y Ocampo, allí estaba Ferreyra, De Vido me encomendó coordinar con Ferreyra, que este me iba a entregar algo para llevar a la quinta de Olivos, era mucha plata, acordamos encontrarnos en el estacionamiento de Selquet. Allí me entregó una valija que dijo que contenía 10 palos en Euros, Ferreyra sacó la valija de su auto un fiat mondeo. Esa valija la llevé para la Quinta de Olivos, entré por el túnel. Otra vez, Ferreyra tenía que hacer otra entrega, pero no se presentó y fue a decirle a Kirchner que no me lo había entregado y me dijo de todo insultándome incluso. En otra oportunidad, una de las primeras veces que fui a ver a Nestor Kirchner, en el año 2005, le llevé la recaudación de los corredores viales a su despacho de la calle Balcarce, quiero aclarar que siempre que llevaba una recaudación me preguntaba si eran euros o dólares, en una ocasión le llevé paquetes de pesos, euro, y peso, agarro a patadas el paquete de los pesos y lo tiro por el despacho. Kirchner era un suplicio. Si con Nestor era imposible trabajar con Cristina era mucho peor. Yo en la campaña 2003 estuve alojado en el Hotel Panamericano, allí Relats prestaban la habitación gratis, años después en un viaje a Nueva York, yo coordinaba la agenda del Ministro De Vido con los empresarios, y estábamos por aterrizar y viene Nestor Kirchner y me planta un cachetazo y me dijo "vos sos un pelotudo, porque sos amigo del Negro Relats y Cristina esta haciendo una construcción en los sauces y necesita plata blanca, decile a Relats que vaya a Calafate". Y le dijo a Cristina "el nos va a solucionar el problema del blanco que necesitas y le vamos a enchufar esa poronga que vos estas haciendo", ella dijo que lo que estaba haciendo era lo mas maravilloso del mundo. Cuando volvimos fui a verlo al ingeniero Relats, y me contesto que no el no tenia estructura. El no estaba muy conforme con lo que le pedia, transmití su contestación a Néstor Kirchner y me pidió que le diga que no sea pelotudo que el tenia muchas obras , que lo lleve a El Calafate y que traiga a su hija. Asi fue como nos reunimos con Nestor y Cristina Kirchner, Relatz su hija y yo. Alli arreglamos el alquiler 105.000 dolares mensuales por el edificio pelado y ellos se hacían cargo del gerenciamiento. Fuimos en un avión privado que contrato el ingeniero Relatz, a la vuelta hicimos una escala en Bariloche donde se quedo su hija. Al dia siguiente al acuerdo, Relats me dijo que era mucho dinero 105.000 y que iba a hablar con De Vido para que le descuente 105.000 de lo que el mensualmente ponía, supongo que por la obra pública que tenia Relatz. Cristina luego me llamó y me dijo en el gimnasio de ella en la casa de El Calafate que esto que había hecho de poner palta en blanco era muy importante para su familia, que había sido un gran favor el que le había hecho. Quiero aclara que Cristina tenía un destrato y una forma terrible de interactuar

con la gente, no te saludaba, insultaba a sus colaboradoras, especialmente a las mujeres. Nestor les pegaba a sus colaboradores. Encontrarte con ellos personalmente era terrible. Una vez me encontré con ellos en un hotel Westin en Madrid, habíamos viajado oficialmente a un encuentro con empresarios, estaban Daniel Muñoz y Nestor y entró a una habitación de un hotel de Ruben Zacarias de ceremonial y protocolo, y Nestor le dijo a Muñoz"a este que no cumplió, dale tres" creo que no le había entregado el periódico a tiempo o algo asi, y Muñoz le dio tres puños a Ruben Zacarias. En alguna oportunidad fui al departamento de Uruguay y Juncal, después del encuentro que relate con Ferreyra, el entrego en dos o tres ocasiones mas, bolsos de mas de diez kilos con dinero, eso lo entregué en el departamento de Juncal. El ya me había dicho que cuando tuviera un paquete de dinero chico lo llevara al despacho de Balcarce, que si bulto era grande debía coordinar con él, y es asi como me puso en contacto con Daniel Muñoz que me recibía el dinero en la calle Juncal. En una ocasión subí al departamento, allí había otras valijas en el palier y en su dormitorio había muchas otras más, en el departamento en esa ocasión no había nadie, pero por referencias de Muñoz esas valijas con dinero las iba a llevar a Santa Cruz. Eran tantas, alrededor de veinte valijas de distinto tamaño, que Muñoz me dijo "después de esto voy poner un negocio de valijas".  Las valijas tenían por destino la casa de Néstor y Cristina Kirchner en Rio Gallegos ubicada en esquina de la calle 25 de mayo donde se encontraban bóvedas que había comprado al banco hipotecario. Las valijas con el dinero las trasladaban a Santa Cruz en el Tango 01, las cargaban en el aeropuerto Base Aéra Militar en Aeroparque y las descargaban en el aeropuerto de Rio Gallego. Esto es lo que yo vi. Por último, me comprometo a ampliar mis dichos a medida que vaya recordando más detalles e información y en el marco de este mismo acuerdo.".---------

Seguidamente en los términos del inciso c) del artículo 7 de la ley 27.304, el fiscal acuerda que, en caso de que se confirme la verosimilitud y utilidad de la información suministrada en el presente acuerdo y demás condiciones en los términos del artículo 13 de la ley 27.304, al momento de efectuarse la petición de pena, ésta se haga teniendo en consideración la mensuración a la que alude el artículo 41 ter primer párrafo del Código Penal de la Nación. Asimismo se acuerda contemplar la presente colaboración a la luz del art. 4 de la Ley 27.304. ----------------------------------------------
No siendo para más se da por finalizado el presente acto, previa lectura a viva voz de la presente acta acuerdo la que será presentada ante el Juzgado interviniente a los fines de su homologación, firmando los aqui presentes y por ante mí que DOY FE.-

CARLOS E. STORNELLI
FISCAL FEDERAL

En la ciudad de Buenos Aires a los 14 días del mes de agosto de 2018 comparece en esta Fiscalía Nacional en lo Criminal y Correccional Federal N° 4, ante su titular, Carlos Ernesto Stornelli, y secretario actuante, el Señor CLAUDIO UBERTI, DNI N° 13.178.794, de nacionalidad argentino, nacido el 3 de diciembre de 1957 en la Provincia de Santa Fe, hijo de Eugenio y de Elda Rosa Nicolai, de profesión u ocupación comerciante, de estado civil divorciado, domiciliado en la calle Arcos N° 2229, piso 5to, departamento "B" de esta ciudad, con la asistencia de su abogado defensor Dr. Alejandro Higa, T° 55, F° 638    CPACF, con domicilio constituido en la calle Tucumán 881, 1er piso, departamento 11, de esta ciudad, quien se encuentra presente en el acto, manifestado su deseo de ampliar la información aportada en el día de ayer en el marco del acuerdo de colaboración celebrado a la luz del instituto previsto por el artículo 41 ter del Código Penal de la Nación, sustituido por la ley 27.304 en la causa N° 9.608/2018 del registro de la Secretaría N° 21 del Juzgado Nacional en lo Criminal y Correccional Federal N° 11. En este estado se le recuerda el contenido del artículo 276 bis del Código Penal de la Nación.------------------------------------------------------------------------------------------------------

Acto seguido y de acuerdo a lo establecido en el inciso a) del artículo 7 de la ley 27.304 y con la anuencia del compareciente y de su letrado defensor, se hace expresa remisión a la imposición de los hechos que se le formulara en el marco de su declaración indagatoria prestada por ante el Juzgado interviniente en el día de ayer, como así al detalle de la prueba en que se funda la imputación, también efectuada en dicho acto, todo lo cual dice conocer y recordar. En este acto se le concede la palabra al imputado a fin de que brinde la información que desee aportar y dice: "Deseo agregar que el día que murió Néstor Kirchner en el departamento de Juncal había 60 millones de dólares. No lo vi, pero lo sé por comentarios. Su muerte según tengo entendido se produjo por un infarto. El piloto del matrimonio Kirchner era un tal Potro Velazquez, de nombre Sergio, recuerdo que Kirchner sacó al piloto de la fuerza aérea, para poner esta persona a cargo del Tango 01, Velazquez fue su piloto hasta el final del mandato de Cristina Kirchner. Daniel Muñoz, era remisero de Rio Gallegos. Los transportes de dinero se hacían al sur por vía aérea, en bolso o valijas, y se hacían a la luz del día y a la vista de los que estuvieran en el lugar. No vi dinero pero si las valijas. Esta cuestión no era ajena la Señora de Kirchner que presenciaba los transportes. Quiero aclarar que donde dije que Muñoz le propino puños a Zacarias me refería a que le dio tres golpes de puño que lo dejaron tirado en el suelo y que le refirió "esto le hacemos a los traidores". No tengo nada más que agregar en este momento, pero de recordar otros detalles o información lo haré en el marco de este acuerdo."

Seguidamente en los términos del inciso c) del artículo 7 de la ley 27.304, el fiscal ratifica el acuerdo arribado en el día de ayer en cuanto a que de confirmarse la verosimilitud y utilidad de la información suministrada en el presente acuerdo y demás condiciones en los términos del artículo 13 de la ley 27.304, al momento de efectuarse la petición de pena, ésta se haga teniendo en consideración la mensuración a la que alude el artículo 41 ter primer párrafo del Código Penal de la Nación. Asimismo se acuerda contemplar la presente colaboración a la luz del art. 4 de la Ley 27.304. --------

Se deja constancia que en ese acto se hace entrega al Dr. Alejandro Higa a su pedido de una copia de la presente acta y de aquella celebrada en el día de ayer con su defendido Claudio Uberti. No siendo para más se da por finalizado el presente acto, previa lectura a viva voz de la presente acta acuerdo la que será presentada ante el Juzgado interviniente a los fines de su homologación, firmando los aquí presentes y por ante mi que DOY FE.-



*Ministerio Público de la Nación*

///nos Aires, 14 de agosto de 2018.

Habida cuenta el acuerdo de colaboración celebrado con Claudio UBERTI, remítase lo actuado para su pertinente homologación en los términos del artículo 9, 10 y concordante de la ley 27.304.

Sirva la presente de atenta nota de envío.

Juan LUIS E. STORNELLI
Fiscal Federal

Ante mí:

ARIEL GONZALO QUETY
ARIEL GONZALO QUETY
PROSECRETARIO LETRADO

En la misma fecha se cumplió. Conste.-

*Poder Judicial de la Nación*

*causa nro. 9.608/18*

## ACTA DE HOMOLOGACIÓN DE ACUERDO DE CLAUDIO UBERTI:

///la ciudad de Buenos Aires, a los catorce días de agosto de dos mil dieciocho, se constituye en Secretaría el Tribunal integrado por el Dr. Claudio Bonadio, ante mí presencia, Dra. Carolina Lores Arnaiz, a los efectos de celebrar audiencia conforme lo normado por el art. 10 de la ley 27.304, en el marco de la presente causa N°9.608/18 del registro de este Juzgado, encontrándose presente el Sr. Fiscal, Dr. Carlos Ernesto Stornelli y el imputado Claudio Uberti, titular del DNI N°13.178.794, de demás condiciones personales obrantes en autos, asistido por el Dr. Alejandro Higa (inscripto en el T°55 F°638 del C.P.A.C.F).-----------------------

Iniciado el presente acto S.S. procede a explicar al imputado los alcances del instituto en trato como asimismo en qué consisten las obligaciones a las que deberán ajustarse y las consecuencias de su cumplimiento o incumplimiento.-----------------

De esta manera, visto el expediente N°9.608/2018/56 en el cual en el término del art. 41 ter del CP del Ministerio Público Fiscal, se le exhibe el mismo, oportunidad en la que el imputado reconoce su firma como una de las insertas en cada una de las fojas del acuerdo celebrado.-------------------------------------------------------------------

Se le da la palabra al Representante del Ministerio Público Fiscal para que diga si quiere hacer alguna manifestación respecto al acuerdo celebrado, manifestó que: "sí, hemos celebrado un acuerdo, lo único que tengo para agregar es que atento a las características del relato creo que deberíamos proveer por algún tiempo cuestiones relativas a su seguridad. Además le solicito si es posible y S.Sa. concede la

USO OFICIAL

excarcelación, atento a la colaboración prestada, si se puede hacer la libertad desde los estrados del Tribunal".------------------------------------------------------------------

Posteriormente, se da la palabra a la defensa a idénticos efectos, manifestando que: "no tengo nada por agregar, acompaño la solicitud del Fiscal".-----------------------

Seguidamente, se procede a interrogar al imputado acerca de su conocimiento y entendimiento del instituto en trato, manifestado el encausado conocer plenamente los alcances del mismo y respondiendo que: "sí".---------------------------------------

Preguntado para que diga si su abogado defensor le explicó los alcances del acuerdo que firmó, respondió que: "sí".-------------------------------------------------------------

Preguntado para que diga si en la elección de su defensa sufrió alguna sugerencia o presión respecto de a quién debía designar, el compareciente manifestó que: "no".-

Preguntado para que diga si al momento de realizar el acuerdo lo hizo libremente, respondió que: "absolutamente".------------------------------------------------------------

Preguntado para que diga si sabe que asumió el compromiso en cuestión bajo apercibimiento de decir la verdad, respondió que: "sí".--------------------------------

Para mayor ilustración se le dio lectura al art. 276 bis del Código Penal.--------------

Preguntado para que diga si desea agregar algo más el compareciente manifestó que: "no".---------------------------------------------------------------------------------------

Con lo que no siendo para más, se dio por finalizado el presente acto, previa lectura íntegra de la presente a viva voz y por las partes, siendo firmada por el Sr. Juez y las partes, ante mí de lo que doy fe.



ENRIQUE RODRIGUEZ VARELA
SECRETARIO FEDERAL

USO OFICIAL

*Poder Judicial de la Nación*

Causa n° 9.608/2018

///nos Aires, 14 de agosto de 2018.-

### AUTOS, VISTOS Y CONSIDERANDO:

Conforme surge del acta obrante a fs. 1/3, el Representante del Ministerio Público Fiscal y el imputado Claudio Uberti –asistido por su abogado defensor–, en el día de ayer, celebraron un acuerdo de colaboración, en los términos del artículo 41 *ter* del Código Penal de la Nación y de la ley n° 27.304.-

Del acta referenciada, surge que el imputado Uberti ha sido debidamente impuesto de los hechos materia de reproche en el marco de estas actuaciones, su grado de participación en los mismos, así como también las pruebas que dan sustento a dicha imputación, siendo que el ilícito en cuestión debe ser calificado provisoriamente como asociación ilícita (artículo 210 del Código Penal de la Nación); situación que se ajusta a lo previsto en el artículo 41 *ter*, segundo párrafo, inciso g) del C.P.N..-

Asimismo, se advierte que el causante ha aportado información vinculada a los sucesos materia de investigación, identificando a coautores y partícipes de los delitos que se le atribuyeran, como también acerca de los lugares desde los cuales se llevaran a cabo las conductas delictivas.-

En última instancia, para el caso de que se confirme la verosimilitud y utilidad de la información suministrada en ese acta, el Fiscal acordó con el imputado que, al momento de efectuarse la petición de pena, se hará teniendo en consideración la mensura a la que alude el artículo 41 *ter*, primer párrafo del Código Penal de la Nación, debiendo contemplarse, a los fines de su exención de prisión, las previsiones del artículo 4 de la ley 27.304.-

USO OFICIAL

ENRIQUE RODRIGUEZ VARELA
SECRETARIO FEDERAL

Remitido el acuerdo de colaboración que antecede, conforme lo indicado en el artículo 9 de la ley 27.304, este Tribunal advierte que el mismo ha sido celebrado contemplándose los requisitos de los artículos 7 y 8 de la ley antedicha; y que también ha sido celebrado en la oportunidad procesal a la que alude el artículo 3 de la norma.-

Por otra parte, debe mencionarse que al momento en que este Tribunal celebró la audiencia de homologación del acuerdo de colaboración, en presencia del Representante del Ministerio Público Fiscal, el imputado arrepentido y su defensa, se procedió a escuchar a las partes, reconociendo Uberti como propia, la firma inserta en el acta pertinente.-

Del mismo modo, se le preguntó al encartado si había comprendido los hechos materia de imputación y la prueba de cargo reunida en su contra; si comprendía los alcances y consecuencias del acuerdo celebrado en los términos de la ley 27.304; y si había actuado voluntariamente, al momento de decidir celebrar el acuerdo, respondiendo afirmativamente a todo lo señalado (artículo 10, primer y segundo párrafo).-

Expuestas estas consideraciones, este Tribunal entiende verificadas las prescripciones del artículo 41 ter del Código Penal de la Nación y de la ley 27.304, motivo por el cual corresponde aprobar la homologación del acuerdo de colaboración celebrado, debiendo ser incorporado al proceso, y difiriéndose la ejecución del beneficio para el momento del dictado de la sentencia (artículo 11 de la ley 27.304).-

A partir de los fundamentos expuestos, y por resultar ajustado a derecho, este Tribunal;

*Poder Judicial de la Nación*                    Causa nº 9.608/2018

**RESUELVE:**

**I. APROBAR LA HOMOLOGACIÓN** del acuerdo de colaboración celebrado entre el Representante del Ministerio Público Fiscal y el imputado arrepentido Claudio Uberti (artículo 10 de la ley 27.304).-

**II.** Notifíquese al Sr. Fiscal, por nota, a la defensa, mediante cédula urgente, y al imputado arrepentido, personalmente.-

Ante mí:

Se cumplió. Conste.-

ENRIQUE RODRIGUEZ VARELA
SECRETARIO FEDERAL

En                          se notificó el Sr. Fiscal (nº 4) y firmó. Doy fe.-

En la fecha se notificó a Claudio Uberti y firmó. Doy fe.-

USO OFICIAL

# EXHIBIT B

| CARLOS ERNESTO STORNELLI<br>FEDERAL PROSECUTOR | <br>**Public Prosecutor's Office** | ARIEL GONZALO QUETY<br>SUB-CLERK - LEGAL COUNSEL |
|---|---|---|

[Three signatures]

In the city of Buenos Aires, on the seventh day of August of two thousand and eighteen, a person personally appeared before the federal prosecutor and the authorizing clerk in order to give a testimonial statement, in accordance with such provisions as set forth in sections 118 and 249 and pursuant to the Code of Criminal Procedure of the Nation. Immediately thereafter, the person was required to swear under oath as to truth of what he knew or was asked, based on his beliefs, and he swore so having been made aware of such penalties for perjury as provided in section 275 of the Criminal Code. He was as well informed of such rights as provided in sections 79, 80 and 81 of the Code of Criminal Procedure of the Nation on the treatment he should receive, the covered expenditures, the protection of physical and moral integrity, any and all information regarding the proceedings, status of the case as well as his powers, by reading the referenced sections. Additionally, he is informed of such power of refusal as provided in section 243 of the Code of Criminal Procedure of the Nation. Thereupon, he stated to be and be called: **Luis María Cayetano BETNAZA**, ID No. 11506316, born on August 7, 1954, in the province of Santa Fe, born to Marcelo Anibal and Dora Galotti, lawyer, divorced, domiciled at Libertador 2201, 14th floor, City of Buenos Aires. Having been asked by the prosecutor to state whether he was somehow related to the parties involved in the criminal proceedings or interested in the case or with respect to the parties involved therein, the declarant stated that he had no friendship or family relationship with any of the defendants and the rest of the parties to the case. Having been required by the prosecutor to describe as much information as he was aware of in relation to the facts under investigation, the declarant stated as follows: "Since 2000 or 2001, I have been holding the position of Corporate Institutional Director of Techint. As regards the relationship between Techint and Néstor Kirchner's government, a very good period existed in the beginning, to such an extent that a possibility to build the Northeast gas pipeline on our own account arose. This plan was even officially presented at the Government House during Kirchner's term of office, I think in 2003. At a given point, the relationship ceased to be on good terms. From that moment onwards, the Government refused to accept for us to build the gas pipeline on our own account and then launched a bidding process, which underwent several phases until it was annulled. For the gas pipeline project, we were excluded from the bidding, by adding a clause in the bidding terms establishing that the vendor constructing the tubes was not allowed to build the work of the gas pipeline. That clause was established only with the purpose of excluding Techint from the bidding process. Subsequently, another bidding process was carried out, which was divided into three sections and, at the time of opening the envelopes, Techint's bids were significantly cheaper in all its sections and the bidding was annulled. Then, a bidding process was launched again, this time divided into six sections; and, once again, when they opened the first envelope and realized our bid was more convenient than those of the others, we were returned the envelopes of the other 5 sections so that they could not be compared to the other bids. I would like to add that we were able to participate in that bidding process under the appeal for legal protection that we had filed and which enabled us to participate. I hereby promise that I will provide a copy thereof. In conclusion, they first tried for us not to be awarded anything by applying a tendentious exclusion clause. Then, another bidding process was launched and divided into three sections and then into six sections,

but was not awarded to Techint, even though we have presented the cheapest price in the three-section bidding, and, as for the bidding divided into six stages, we were awarded the section of Formosa and we were returned, as I said before, the other five envelopes containing the bids. What was occurring to our company was a total exclusion. Techint was the leading pipeline construction company in Argentina and the leading constructor of other complex works and we were being precluded from participating. We were the leading company in constructing kilowatt overhead wires, but were unable to undertake new ventures during this period. For instance, the installation of high-voltage cables of the 500kW line was awarded to another company, Electroingeniería, which was a company that barely existed, a small company, based in Cordoba, dedicated to manufacturing electrical panels. In the meantime, the topic of Venezuela emerged, and things got complicated back in 2005. Signs of Chavism began to arise in the form of the nationalization of private companies, to such an extent that as part of the Ibero-American Summit in Mar del Plata we managed to arrange an appointment with President Chavez in order to prevent SIDOR from being nationalized. Chavez informed us that no problems existed, that he was content with the company's performance, in the presence of the Kirchners. We had indeed done an extraordinary work with the company. After one year and a half, we began to notice a much more aggressive attitude at the beginning of 2007 or 2008. At the beginning of 2008, we were summoned by Rafael Ramirez, president of PDVSA and in turn Ministry of Energy, which was the regime economic core, and who informed us that he was discontent with our participation and that he did not want to be in any manner related to us and that they were planning to nationalize SIDOR. In a labor negotiation, the Vice-President intervened and informed us that SIDOR would be nationalized, the executive order being immediately thereafter issued. In parallel with this issue, a deputy of the Legislative Assembly showed up stating that no Argentinian involved in the management of the company would be allowed to leave Venezuela. What's more, we had to continue to conduct the company's business. I clearly underwent an aggressive situation, maybe the most aggressive situation in my whole life. An exit agreement was made, providing that between April and July of 2008 we had to take over SIDOR and transfer it to them. After concluding this stage, our situation was becoming even more difficult, so we resorted to the Argentinian government requesting them to give us a helping hand, for them to at least recover the debt, since this kind of companies are highly valuable. The government's spokespersons were Uberti, De Vido, Olazagasti, and Baratta to a lesser extent. They were the ones who used to travel to Venezuela. It was in this context that we began to be required the payment of funds, so far as we were informed, purportedly to have dealings with Venezuela. From that moment onwards, a series of trips began to take place, and we began to evacuate the whole personnel, in fear of them not being allowed to leave the country. Pablo Grisio, Fernando Duelo and I began to travel to Venezuela, and then Andreina Ostos joined us, who is Venezuelan and was there. We went there in person because, as we had not become involved in the management of the company in that country, we would be able to freely enter and leave Venezuela. Olazagasti and I used to travel to Venezuela regularly. On one occasion, President Cristina Fernández travelled to Venezuela and became actively engaged in discussions with President Chávez on this subject. On that occasion, I was recommended to stay at a different hotel so that no suspicions were raised and for no one to notice that Cristina was intervening between the Venezuelan government and the company. On



5073

**Public Prosecutor's Office**

[Three signatures]

that occasion, I stayed at the Eurobuilding Hotel, and the official retinue of Argentinian officials stayed at the Tamanaco Hotel. At Tamanaco, I had a meeting with Cristina where she told me to which extent she had moved forward and suggested that I should talk to Alí Rodríguez, who was then the Ministry of Finance in Venezuela, who in turn had been assigned to make the series of payments. The amount of one thousand nine hundred seventy million dollars was set as compensation, payable by means of an advance payment set in the amount of four hundred million dollars, the remaining sum being payable in installments. Another person who used to constantly travel to Venezuela was Nestor Kirchner, even when Cristina was already holding the office as President. As an anecdote, on one occasion, Chavez gifted the Argentinian Government an oil well from the Orinoco Belt. What Chavez intended to do by that was, on the one hand, to make a good impression and, on the other hand, to obtain the money to exploit it. So Nestor Kirchner assigned us to exploit said well. A dinner with Chavez was held, the relationship with that country being already very strained, and Paolo Rocca attended that dinner. I remember that during that dinner, Chavez told Paolo the following: "Brother, I was told that you are worried about us, but do not worry". Two events would be held on the following day; one of them was the act of delivery of the above referenced well and from there they would head towards SIDOR by helicopter in order to greet the engineers of our company who were working there. By the time we arrived at the well, a huge cape had been mounted, and Uberti approached me and told me that the President, in reference to Nestor, was very angry with us. I told him that I found that weird, since the previous night we had spent time with him and Chavez, and so he told me that the reason of his anger was that we did not provide any economic contribution to him. I told Uberti that he already knew our position that we did not and would not collaborate.

After hearing my answer, Uberti stood up, whispered in Kirchner's ear and immediately after that they adjourned the meeting, quitted the team, took the helicopter, greeted no one and left. They did not pass by the plant to greet the engineers that were waiting. In Chavez's opinion, that was the sign that we did not have the Argentinian government's support. More worrying was that tax, environmental and labor claims began to appear concurrently, a number of contingencies with criminal risk from behind. In Venezuela, we were threatened to be precluded from leaving the country, based on the argument that companies caused pollution, and received intimidating messages all the time. De Vido did not use to go to Venezuela, unless when the President did go. I had a number of talks with De Vido in Argentina, some of them due to my role as president of the Industrial Union, some of them due to energy-related issues, and we also discussed the conflict existing with Venezuela. Basically, we never reached to any agreement because we never provided with any contribution. Uberti was the one who compelled us. I also remember that we had a route corridor, the concession of which was to expire just at the time of the change of government, and I remember Uberti summoning me to ask me if I was willing to pay any amount for an extension, to which I refused —this happened at the beginning of the term of office. I told him I was not interested in giving them anything and that I was not interested in the extension either. I think it was the concession of Caminos del Oeste. This used to happen on a regular basis. I also comment that at some point we were the most important company of the Chamber of Construction, so several partners of our company asked us if we were willing to preside over the Chamber and face the government to set a limit to them, which we considered and accepted. The end of the movie is that someone became aware of that, and not only were we not appointed as presidents, but we were also removed from the Executive Committee, to which we returned not earlier than 2016. Many entrepreneurs asked for the insanity to cease, but as soon as one offered to help, pressure came from somewhere. We also managed TGN. On one occasion, TGN built a compressor station, and the Government, on its own account and by means of a trust, built another similar compressor station but incurring into significantly higher prices. We had the obligation to tell the difference in prices registered by the station built by the Government. So a statement was published in all the newspapers of the City of Buenos Aires describing a case of corruption between private individuals and conspiracy involving Clarín and La Nación newspapers; this occurred on May the first. This led to a search in TGN, and a note submitted by the company before ENARGAS appeared whereby it was informed that we would not support the cost of that work because it was madness. We had to defend TGN's lawyer almost hiding him due to the persecution he suffered. I will attach that note as well. These cases of blackmail were very common. In San Juan, we built two central hydraulic systems and we were about to build the third one when; on the occasion of Cristina's trip to China, because of a statement that I made as President of the Industrial Union, she, from China, stated that she did not understand how the Chinese financing the work could tolerate the fact that we were the contractors. She made that statement in public. Everything began to be delayed; the financing never materialized, even though we had already worked on previous infrastructure. Suddenly, it was over. Many situations like this one took place. Our historical relationship of defense of the media, both with respect to La Nación and Clarín also led us to considerable hostility with the government. Going back to the conflict relative to SIDRO, if we had failed to accept to make the payments required by Argentinian officers, I am



**Public Prosecutor's Office**

sure that they would not have become involved in that matter. With regard to that requirement, the stated that said required funds were intended to cover expenses or travel allowances necessary to the management with Venezuela, and it was at that point where the story that has been made publicly available in this case emerged. I do not remember who the Government's spokesperson was for the required delivery of money, maybe it was De Vido, Olazagasti or Baratta, Uberti may have been the spokesperson as well. They required the money directly to me. The Government was always attempting to obtain some benefit from us. The answer was the same, that we did not do business with politicians, until the above mentioned situation occurred and, in exchange, they required us to contribute with money. By that means, they compelled us to fulfill a commitment. The starting point was the conflict with Venezuela; SIDOR was the Achilles heel, where the persecution began. There is something noteworthy here: a visit, in the middle of all this, by Chavez to Calafate where he announces that the other companies would be nationalized. At that time, Chavez visited Brazil and there he made declarations in secret — even though he ended up being recorded — telling them not to be worried since Brazilians were not involved in the issue. At the meetings — where we were pressed — held with Venezuelan officers, Argentinian officers were present, mainly Olazagasti, who afterward informed the Argentinian authorities what had occurred at the meeting. Getting back on track, it is in this context when this requirement for money took place, and so I made Héctor Zabaleta responsible for the payments. He met Baratta and agreed the mechanism for that. I do not remember the exact amounts, but I estimate it was a monthly amount of roughly fifty or one hundred thousand dollars. What Zabaleta points out will be more accurate, because he was the one dealing with the deliveries". Having been asked by the prosecutor to inform how that money was generated, the declarant answered: "I do not know how the money was generated or how the company's internal rules were negotiated to obtain the money for the payments. The one in charge of that, as I previously said, was Zabaleta, who was in charge of a register that was not only related to the payments of the company, but also to us as members                              of                              the                              company.

He did all of this. I made the decision, but I assigned the task to Zabaleta, who had full effectiveness on the matter. Zabaleta did not keep me posted on the payments. I told him that he had to make an agreement with those people, and he took charge of the matter. Going back to the topic of Venezuela, I remember that, at that time, Alicia Castro, who then acted as Argentinian ambassador in that country, just on the day the nationalization was declared, she was visiting London. That is, we did not even have an ambassador available to whom we could resort. Going back to the subject on Uberti, at almost all the meetings he played the role of the bad news teller, he always used to come up with the news that everything was going wrong. After a meeting, he would tell us that he was very angry with us because we did not collaborate and so they did not have any obligation towards us. He was always speaking to us in a pushing manner. We were not directly pressed by Cristina, other than by her disgusting manners that we all know, even though she was the one who had power over the negotiation with Chavez's government within the framework of the above referenced extortion about SIDOR. I ceased to participate as soon as the whole process was concluded, that is, when we received the compensation. Nevertheless, there were two more companies and one oil company that we practically had to abandon. When the time came, we delivered the keys and ran out. We lost about seven hundred or eight hundred million dollars. In Argentina, we were required a monthly fee for the management with Venezuela, as long as it lasted, and then we ceased to pay, repeating that Baratta was the person who attended on behalf of the Government to make this matter viable. I hereby provide a chronography of my trips to Venezuela during 2008 (identified under number 1), a timeline of all the circumstances occurred after the announcement of SIDOR's nationalization (under number 2), agreement relative to the transfer of SIDOR to the Venezuelan State (under number 3), publication on the Bolivarian Official Gazette announcing the nationalization of said company (number 4), copy of the executive order issued by Chavez, rendering the company as nationalized (number 5), copy of the knowledge memorandum between Amazonia consortium and Corporación Venezolana de Guayana for the corporate buyout (number 6), copy of the transfer of shares contract (number 7), copy of letter by TERNIUM to the Ministry of Basic Industries and Mining, stating our warning due to the threats of the National Integrated Service for the Administration of Customs Duties and Taxes (*Servicio Nacional Integrado de Administración Aduanera y Tributaria*, SENIAT), which was the tax entity (number 8); condensed balance sheet of SIDERAR, one of the owners of SIDOR, explanatory of the situation (number 9)". Having been asked whether he wished to make any more comments, the declarant answered "No". Therefore, there being nothing further to record, this written document is concluded, read in a loud voice, ratified and signed by the appearing party after the prosecutor, before me, I attest.

|  |  |
| --- | --- |
| **CARLOS ERNESTO STORNELLI**<br>**FEDERAL PROSECUTOR** | **ARIEL GONZALO QUETY**<br>**SUB-CLERK - LEGAL COUNSEL** |

[Three signatures]



5075

**Public Prosecutor's Office**

NOTE: This is to certify that on this date Dr. Gabriel Cavallo personally appeared at the reception desk of this Public Prosecutor's Office, who stated that Luis María Cayetano BETNAZA wished to make a testimonial statement within the framework of case No. 9608/2018, signing for certification therefore. I hereby attest.

Public Prosecutor's Office No. 4, August 7, 2018

[Signature]

<div style="border:1px solid black; display:inline-block; padding:10px; text-align:center;">

**[Signature]**
**ARIEL GONZALO QUETY**
**SUB-CLERK - LEGAL COUNSEL**

</div>

[Blank page]

5076



**Public Prosecutor's Office**

Buenos Aires, August 7, 2018.

Be the previous clerk note considered.

Be the testimonial statement from Luis María Cayetano Betnaza received on this date.

I hereby date these presents. Be these records referred to the intervening court, this document serving as delivery note.

<div style="text-align:right">

[Signature]
**CARLOS ERNESTO STORNELLI**
**FEDERAL PROSECUTOR**

</div>

Before me:

[Signature]
**ARIEL GONZALO QUETY**
**SUB-CLERK - LEGAL COUNSEL**

Complied [illegible]. Certified.

[Signature]
**ARIEL GONZALO QUETY**
**SUB-CLERK - LEGAL COUNSEL**

[Illegible] August 8 [illegible]

450 Seventh Ave.
Tenth Floor
New York, NY 10123
(212) 643-8800

# TRANSLATION CERTIFICATION

Date: July 17, 2019

To whom it may concern:

This is to certify that the attached translation from Spanish into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Betnaza Investigative Statement
- Betnaza Testimonial Statement
- Zabaleta Testimony

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Eugene Li

**Global Solutions. Local Expertise.**

www.morningtrans.com    |    info@morningtrans.com

**Ministerio Público de la Nación**

///n la ciudad de Buenos Aires, a los siete días del mes de agosto del año dos mil diciocho, comparece ante el Sr. Fiscal Federal y Secretaria Autorizante una persona a efectos de prestar declaración testimonial, de conformidad con las disposiciones de los artículos 118 y 249 y concordantes del Código Procesal Penal de la Nación. Acto seguido se le requirió promesa o juramento de decir la verdad de todo lo que supiere o le fuera preguntado, de acuerdo con sus creencias, y leídas las penas correspondientes al delito de falso testimonio del artículo 275 del Código Penal, expresa que lo jura. Se le anuncian asimismo sus derechos previstos en los artículos 79, 80, y 81 del Código Procesal Penal de la Nación referidos al trato que debe recibir, sufragio de gastos, protección de integridad física y moral e información del acto, estado de la causa, así como también de sus facultades, dándosele lectura de los mencionados artículos. Asimismo se le advierte de la facultad de abstención prevista en el artículo 243 del Código Procesal Penal de la Nación, tras lo cual dijo ser y llamarse: **Luis María Cayetano BETNAZA**, titular del DNI 11.506.316, nacido el 7 de agosto de 1954 en la Provincia de Santa Fe, hijo de Marcelo Aníbal y de Dora Galotti, de profesión u ocupación abogado, estado civil divorciado, domiciliado en Libertador 2201, piso 14, Capital Federal. Preguntado el declarante por el Señor Fiscal para que diga si posee algún parentesco con las partes del juicio o interés en la causa o respecto de las partes que en ella intervienen manifestó que no posee vínculo de amistad o parentesco con ninguno de los imputados y el resto de las partes intervinientes." Invitado por el Sr. Fiscal a que relate todo cuanto fuera de su conocimiento sobre los hechos investigados, manifestó: "Desde el año 2000 o 2001 ocupo el cargo de Director Corporativo Institucional de la organización Techint. En la relación de Techint con el Gobierno de Néstor Kirchner existió una etapa muy buena al principio, a punto tal que aparece la posibilidad de construir por cuenta y orden propia el gasoducto del Noreste. Esto incluso fue presentado oficialmente en casa de Gobierno con Kirchner y todo, creo en el año 2003. En un momento dado la relación dejó de ser buena. Desde allí, el Gobierno no aceptó que construyéramos por cuenta propia ese gasoducto y entonces lanzó una licitación, que pasó por varias fases, hasta que se anuló. En ese gasoducto nos excluyeron de la licitación, poniendo una cláusula en el pliego que establecía que el proveedor que construía los tubos no podía construir la obra del gasoducto. Esa cláusula la establecieron solo a los fines de excluir a Techint del proceso licitatorio. Posteriormente se llevó adelante otra licitación, que se dividió en tres tramos y en ocasión de la apertura de los sobres, las ofertas de Techint eran sensiblemente más barata en todos sus tramos y anularon la licitación. Luego la lanzaron nuevamente, esta vez en seis tramos, también cuando abrieron el primer sobre y vieron que la oferta nuestra era más conveniente que las

emás, nos devolvieron los sobres de los otros 5 tramos para que no pudieran ser comparados con las otras ofertas. Agrego que pudimos participar de esa licitación merced al recurso de amparo que interpusimos y que nos habilitó a participar. En este acto me comprometo a aportar copia del mismo. En conclusión, primero trataron de que no ganemos nada aplicando una cláusula de exclusión tendenciosa. Después abrieron otra licitación en tres tramos y luego en seis tramos y no nos la adjudicaron pese a haber presentado el precio más bajo en la de tres tramos, y en el caso de la licitación de seis tramos, nos adjudicaron el tramo de Formosa y nos devolvieron, como dije, los otros cinco sobres con las ofertas. Lo que ocurría con nuestra empresa era una exclusión total. Eramos la mayor constructora de ductos en Argentina y de otras obras complejas y nos excluían de la posibilidad de participar. Eramos la mayor empresa que hacía tendidos de kilovolts, no habiendo podido tener nuevos emprendimientos durante este período. Doy como ejemplo el caso, en el que se le adjudicó el cableo de alta tensión de la línea de 500 kv a otra empresa, en este caso Electroingeniería, que era una compañía que casi no existía, que era una empresita chica, cordobesa, que fabricaba tableros de electricidad. En el medio aparece el tema de Venezuela que se empieza a complicar allá por el año 2005, empieza a haber señales del chavismo de que iban por las empresas privadas, a punto tal de que nos corremos a Mar del Plata a la cumbre Iberoamericana y logramos concertar una cita con el Presidente Chavez para que no se nacionalizara la empresa SIDOR. Chavez nos dijo que no había ningún problema, que estaba conforme con el desempeño de la empresa, ello en presencia del matrimonio Kirchner. Realmente habíamos hecho un trabajo extraordinario con la empresa. Y así transitó un año y medio cuando comenzamos a percibir una actitud mucho más agresiva a principios de 2007 o 2008. A comienzos de 2008 nos convoca Rafael Ramirez, presidente de PDVSA y a la vez Ministro de Energía, que era el núcleo económico del régimen, y nos manifiesta su descontento por la participación nuestra, y dijo que no querían nada con nosotros y que estaban pensando en nacionalizar SIDOR. En una paritaria laboral interviene el Vicepresidente y nos comunica que iban a nacionalizar SIDOR e inmediatamente sale el decreto presidencial. En paralelo de esta cuestión aparece un diputado de la Asamblea Legislativa diciendo que no iban a permitir salir de Venezuela a ningún argentino involucrado con la gestión de la empresa. A todo esto debíamos continuar con la actividad de la empresa. Fue una situación donde yo viví palmariamente una cuestión agresiva, tal vez la mayor en todos mis años. Se hace un acuerdo de salida, que preveía que entre abril y julio de 2008 teníamos que hacer el take over de la sociedad SIDOR, pasársela a ellos. Terminamos esta etapa y la situación nuestra se estaba complicando aún más, entonces acudimos al gobierno argentino a pedir que

CARLOS E. STORNELLI
Fiscal Federal

ARIEL GONZALO CHIDT...

**Ministerio Público de la Nación**

nos den una mano, que por lo menos salvaran el cobro ya que son empresas de valor muy alto. Los interlocutores del gobierno eran Uberti, De Vido, Olazagasti, Baratta creo que fue el que menos. Eran los que viajaban a Venezuela habitualmente. Es en este contexto que nos empiezan a exigir la entrega de fondos, supuestamente, según nos dijeron, para manejarse con Venezuela. Ahí empieza una secuencia de viajes y empezamos a evacuar a todo el personal, por temor a que no los dejaran salir de ese país. Empiezo a ir yo, Pablo Grisio, Fernando Duelo y se sumó Andreina Ostos que es venezolana y estaba allí. Fuimos nosotros personalmente porque como no habíamos participado de la gestión de la empresa en ese país, íbamos a poder entrar y salir libremente de Venezuela. Nosotros viajábamos asiduamente con Olazagasti. En una oportunidad viajó la Presidenta Cristina Fernández que participó activamente en charlas con el Presidente Chávez por este tema. En esa oportunidad me sugirieron que me hospedara en un hotel distinto para no levantar suspicacias y que nadie advirtiera que Cristina estaba intercediendo entre el gobierno venezolano y la empresa.  Esa vez me hospedé en el hotel Euro Building y la comitiva oficial de funcionarios argentinos en el Hotel Tamanaco. En el Tamanaco tuve una reunión con Cristina y allí me contó hasta donde había avanzado y me dio la indicación de hablar con Alí Rodriguez que en ese momento era el Ministro de Finanzas venezolano, que era quien tenia a su vez encomendado hacer la secuencia de pagos. Se acordó el monto total a modo de indemnización de mil novecientos setenta millones de dólares, pagaderos en un anticipo de cuatrocientos millones de dólares y el resto en cuotas.   Otra persona que viajaba permanentemente a Venezuela era Nestor Kirchner, aún cuando Cristina ya era la Presidenta. Como anéctoda, en una oportunidad Chavez le regaló al gobierno argentino un pozo de petróleo de la faja del Orinoco. Lo que Chavez buscaba con eso era, por un lado quedar bien y  por otro conseguir la plata para explotarlo. Entonces Nestor Kirchner nos encarga hacer la explotación de dicho pozo. Se hace una cena con Chavez, ya muy tensa la relación con ese país, y estaba Paolo Rocca. Recuerdo que en esa cena Chavez le dijo a Paolo la siguiente frase: hermano me dijeron que estas preocupado por nosotros, pero quedate tranquilo. Habían dos eventos al día siguiente, uno de ellos era el acto de entrega del pozo antes referido y luego de ahí iban a ir con el helicopetero a SIDOR para saludar a los ingenieros nuestros que estaban trabajando allí. Llegamos al pozo, habían montado una enorme carpa, y se acerca Uberti y me dice que el Presidente, en referencia a Nestor, estaba enojadísimo con nosotros. Yo le dije que me parecía raro dado que la noche anterior estuvimos con él y con Chavez, y entonces me dice que el enojo era porque no colaborábamos económicamente con él. Le dije a Uberti que ya conocía

la posición nuestra, que no colaborábamos ni íbamos a colaborar. Luego de escuchar mi respuesta, Uberti se levantó, le hablo al oído a Kirchner y ahí nomás levantaron el acto, se bajaron del equipo, tomaron el helicóptero, no saludaron a nadie y se fueron. No pasaron por la planta nuestra a saludar a los ingenieros que estaban esperando. Para chavez fue la señal de que nosotros no teníamos el apoyo del gobierno argentino. Lo preocupante es que paralelamente empezaron a aparecer reclamos de tipo impositivo, medioambiental, laboral, una cantidad de contingencias que tenían riesgo penal por detrás. A nosotros nos apretaban en Venezuela con que no íbamos a poder salir del país, que las empresas contaminaban, todo el tiempo mensajes intimidatorios. De Vido no solía viajar a Venezuela, salvo cuando iba el Presidente. Con De Vido tuvimos en Argentina numerosas charlas, algunas por mi rol como presidente de la Unión Industrial, otras por cuestiones de energía, y también conversamos por el conflicto con Venezuela. Lo concreto es que jamás conseguíamos nada porque nunca contribuíamos con nada. Uberti era el apretador. Recuerdo que también teníamos un corredor de rutas cuya concesión se vencía justo ahí, al cambio de gobierno, y me acuerdo que me convocó Uberti para preguntarme si estaba dispuesto a apagar algo para prorrogar, y yo le dije que no, esto fue al principio de la gestión. Le dije que no me interesaba darles nada y que tampoco me interesa prorrogar. Creo que era la concesión de Caminos del Oeste. Esto siempre era así. También comento que en algún momento nosotros éramos la empresa mas importante de la Cámara de Construcción, entonces varios de nuestros socios nos pidieron si estábamos dispuestos a Presidir la cámara y hacer un fronting frente al gobierno para ponerle un límite, lo evaluamos y aceptamos. El final de la película es que alguien se enteró y no solo no nos pusieron en la presidencia sino que nos sacaron de la comisión directiva, a la cual retornamos recién en el año 2016. Muchos empresarios pedían parar la locura, pero cuando uno se ofrecía a ayudar, venía el apriete desde algún lado. Nosotros también administramos TGN. En una oportunidad TGN construyó una planta compresora y el Gobierno, por su cuenta y por fideicomiso, armó otra planta compresora similar pero con precios significativamente más altos. Nosotros teníamos la obligación de manifestar la diferencia de precios que registraba la planta construida por el Gobierno. Entonces salió una solicitada en todos los diarios de la Capital Federal hablando de corrupción entre privados y conspiración que involucraba a los diarios Clarín y La Nación, era un primero de mayo. Esto desata un allanamiento en TGN y aparece una nota presentada por la empresa ante el ENARGAS diciendo que no íbamos a avalar el costo de esa obra que era un disparate. Al abogado de TGN tuvimos que defenderlo casi escondiéndolo por la persecución de la que fue víctima. Dicha nota también la acompañaré. Estos

**Ministerio Público de la Nación**

chantajes eran muy normales. Nosotros en San Juan hicimos dos centrales hidráulicas y estábamos por hacer la tercera y en un viaje de Cristina a China, a raíz de una declaración que hice como Presidente de la Unión Industrial, ella desde allá salió con una declaración diciendo que no entendía como los chinos financistas de la obra podían soportar que el contratista fuésemos nosotros. Lo dijo públicamente. Empezaron a dilatar todo, la financiación nunca apareció, pese a que ya habíamos hecho infraestructura previa. De pronto se acabó. De estas situaciones hay muchas. Nuestra relación histórica de defensa de los medios, tanto respecto de la Nación como de Clarín, también nos generó una enemistad importante con el gobierno. Volviendo al conflicto de SIDOR, si no hubiéramos aceptado pagar la exigencia de los funcionarios argentinos, estoy seguro de que no habrían intercedido en dicho tema. Respecto de esa exigencia, ellos manifestaban que era para gastos o viáticos necesarios para la gestión con Venezuela, y es ahí donde aparece la historia que ahora se hace pública en esta causa. No recuerdo quien era el interlocutor del Gobierno para la exigencia de entrega de dinero, puede haber sido De Vido, Olazagasti o Baratta, podía ser Uberti también.   La exigencia de dinero me la hicieron directamente a mi. Siempre el gobierno trataba de sacar algo de nosotros, siempre. La respuesta era la misma, que no hacíamos negocios con la política. Hasta que se generó la situación antes indicada y a cambio nos pidieron la contribución de dinero. Ahí nos sacan un compromiso. El punto de arranque era el conflicto de Venezuela, el talón de Aquiles era SIDOR, donde empieza la persecución. Hay algo llamativo, y es, en medio de todo esto, una visita de Chavez al Calafate donde anuncia que nos van a nacionalizar las otras empresas. En ese mismo momento Chavez visita Brasil y allí hace declaraciones en off aunque lo terminan grabando, diciendo que no se preocupen, que el problema no era con los brasileros. En las reuniones con los funcionarios venezolanos donde nos presionaban estaban presentes funcionarios argentinos, principalmente Olazagasti, que informaba después a las autoridades argentinas lo que había pasado en la reunión. Retomando el relato, en este contexto es cuando aparece esta exigencia de dinero y le encargué entonces a Héctor Zabaleta que se ocupe de los pagos. Se reúne con Baratta y acuerda el mecanismo para ello. No recuerdo los montos exactamente, pero estimo que se trataba de una mensualidad de cincuenta o cien mil dólares aproximadamente. Lo que indique Zabaleta será más certero porque él manejaba las entregas." Preguntado por el Sr. Fiscal para que diga óomo se generaba ese dinero, respondió: "No se cómo se generaba y cómo se sorteaban las normas internas de la empresa para obtener el dinero para los pagos,  el encargado de esto, como dije, era Zabaleta, quien manejaba una caja que no solamente tenían que ver con pagos de la

sociedad sino con nosotros como socios de la empresa. Todo esto lo hacía él. Yo tomé la decisión pero la tarea se la delegué a Zabaleta, quien tenía la operatividad total. Zabaleta no me iba informando los pagos. Yo le dije que tenía que hacer un acuerdo con esta gente y se ocupó del tema. Volviendo al tema de Venezuela, recuerdo que en aquel momento Alicia Castro, entonces embajadora argentina en dicho país, coincidentemente con el día en que nos declararon la nacionalización, justo estaba de visita en Londres. Es decir, ni siquiera teníamos embajador en ese momento a quien acudir. Volviendo a Uberti, era en casi todas las reuniones el que hacía el rol de malo, siempre venía con la noticia de que todo iba mal, después de una reunión podía decirnos que estaba muy enojado con nosotros porque no colaborábamos y que entonces no tenían ningún compromiso con nosotros. Siempre era mensajes poniéndonos al límite. No hubo aprietes directos de Cristina salvo sus modos desagradables que todos conocemos, aunque ella era quien tenía el dominio de la negociación con el Gobierno de Chávez en el contexto de la extorsión antes relatada sobre la empresa Sidor. Yo dejo de participar cuando se cierra todo el paquete, es decir cuando cobramos la indemnización.  Aunque nos quedaron dos empresas más que y una petrolera que prácticamente tuvimos que abandonar. Cuando llego el momento entregamos las llaves y salimos corriendo. Perdimos unos setecientos u ochocientos millones de dólares. En argentina nos exigían un fee mensual para la gestión con Venezuela, mientras duró la misma, y luego no pagamos más, reiterando que Baratta fue la persona que concurría en nombre del Gobierno para viabilizar esta cuestión. En este acto aporto una cronografía de mis viajes a Venezuela durante el período 2008 (identificado con número  1), cronología de todo lo ocurrido con posteriroridad al anuncio de la nacionalización de SIDOR (numerado 2),  acuerdo relativo a la transferencia de SIDOR al estado venezolano (numero 3), publicación en la gaceta oficial bolivariana que anuncia la nacionalización de dicha empresa (número 4),  copia del decreto de Chavez dando por nacionalizada la empresa (número 5), copia de memorándum de entendimiento entre el consorcio Amazonia y la corporación Venezolana de Guayana para el traspaso (número 6), copia de contrato de cesión de acciones (número 7), copia de carta de TERNIUM al Ministro de Industrias Básicas y Minería manifestando nuestra alarma por las amenazas del SENIAT que era el ente tributario (número 8); extracto del balance de SIDERAR, que era una de las dueñas de SIDOR, explicativo de la situación (número 9)". Preguntado para diga si desea agregar algo más, respondió que "No", con lo que no siendo para mas se da por finalizado el acto previa lectura en alta voz y ratificación firmando el compareciente después del Sr. Fiscal, por ante mí, que doy fe.-

JOSE E. STOPNICKI
-Fiscal Federal-

ARIEL GONZALO QUETY
PROSECRETARIO



**Ministerio Público de la Nación**

NOTA: Para dejar constancia que en el día de la fecha se hizo presente en la mesa de entradas de esta Fiscalía Federal el Dr. Gabriel Cavallo, quien manifestó que Luis María Cayetano BETNAZA deseaba prestar declaración testimonial en el marco de la causa 9608/2018, firmando para constancia de ello. Es todo cuanto dejo constancia.

Fiscalía Federal N° 4, 7 de agosto de 2018

ARIEL GONZALO QUETY
PROSECRETARIO LETRADO



**Ministerio Público de la Nación**

///nos Aires, 7 de agosto de 2018.

    Téngase presente la nota actuarial que antecede.

    Recíbasele declaración testimonial a Luis María Cayetano Betnaza en el día de la fecha.

    Fecho, remítanse las actuaciones al Juzgado interventor sirviendo la presente de atenta nota de remisión.

CARLOS E. STORNELLI
Fiscal Federal

Ante mí:

ARIEL GONZALO QUETY
PROSECRETARIO LETRADO

En     se cumplió. Conste.-

ARIEL GONZALO QUETY
PROSECRETARIO LETRADO

# EXHIBIT C

[Illegible signature & Stamp]

**[Ilegible stamps and signatures]**                                                                                **Cn°**
**9.608/18**

## LUIS MARIA CAYETANO BATNAZA'S INVESTIGATIVE STATEMENT

In the city of Buenos Aires, on the tenth day of August of two thousand and eighteen, a person who is notified that he will give an investigative statement personally appears before Your Honor. and the Authorizing Clerk, pursuant to such provisions as contained in section 294 of the National Criminal Procedural Code. In addition, he is notified of such provisions as set forth in section 295 of the above referenced Code. He is hereby notified that he is exempted from the oath took in the statement on page 5072/5074. Having informed him of his rights to refuse to state and to designate a reliable defense attorney, with which he may have an interview immediately before the commencement of the investigative statement, he declared that he wished to appoint Lawyer Hermana Luis Folgueiro (V.63, P.100 - tel. 5031-1972// 15-6381-1657), electronic domicile 20-22302811-0, and Lawyer Gabrel Rubén Caballo (V.30 P.11 - tel. 5031-1972 // 11-5669-8162), electronic domicile 20-12961594-0, who accept the position, swearing to act as such faithfully and establish their legal domicile, together with their client, at Marcelo T. de Alvear 636, 2nd floor of this city.-------
--------------------------------------------------------------------

Having interrogated him pursuant to the provisions set forth in section 297 of the relevant Code, and having requested him to say his name and other personal information, he stated to be called: **Luis María Cayetano Betnaza**, who submits ID No. 11.506.316, born on August 7 of 1954 in Rosario, province of Santa Fe, Argentinian, divorced, director of a company, born to Marcelo Aníbal Betnaza and Dora Galliotti, domiciled at Av. del Libertador 2201, 14th floor of this city, who knows to read and write.--------------------------
------------------------------------

Having been asked whether or not he has any criminal records or any proceedings concluded or under process, he answered: *"No"*.----------------------------------------------------
---------

Having been asked about his living conditions, he answered: *"Good"*.---------------------

Having been asked about his economic income, the appearing party stated: *"I earn around ARS $700,000 per month as Corporative Director of Techint. I have been holding that position since 2001 or so"*.-------------------------------------------------------------------------
-----------

Having been asked to state whether he owns any tangible personal or real property under his name, he answered: *"Yes, I own four fields in the province of Buenos Aires, three in the legal jurisdiction of Balcarce and one in the legal jurisdiction of Lobería. I also own, besides my residence, another apartment located here in the City of Buenos Aires, I think at*

[Illegible signature & Stamp]

*Avenida Callao 1249, 7th floor,  apartment "B". I also have four houses in Balcarce as well. I also have a car; I do not remember its patent".--------------------------*

Next, in accordance with section 298 of the Code of Criminal Procedure, the appearing party is made aware of the following: I- **UNLAWFUL ASSOCIATION**: he is accused of having been involved in an unlawful association along with Roberto Baratta, Walter Rodolfo Fagyas, Nelson Javier Lazarte, Fabián Ezequiel García Ramón, Hernán Camilo Gómez, Rafael Enrique Llorens, Oscar Bernardo Centeno, José María Olazagasti, Jorge Omar Mayoral, Julio Miguel De Vido, Néstor Carlos Kirchner, Héctor Daniel Muñoz, Hugo Martín Larraburu, Juan Manuel Abal Medina, Cristina Elisabet Fernández, Carlos Guillermo Enrique Wagner, Armando Roberto Loson, Héctor Javier Sánchez Caballero, Ángel Jorge Antonio Calcaterra, Francisco Rubén Valenti, Carlos José Mundin, Jorge Guillermo Neira, Gerardo Luis Ferreyra, Oscar Alfredo Thomas, Claudio Javier Glazman, Juan Carlos de Goycoechea, Héctor Alberto Zabaleta, Rodolfo Armando Poblete and other still unidentified persons; all of whom performed their activities from roughly the beginning of the year 2008 until November 2015, and the purpose of which was to organize a fund collection system to receive illegal money with the purpose of being unlawfully enriched and using part of these funds in the perpetration of other crimes, by taking advantage of their position as officers of the National Executive Power. The unlawful association was commanded by Néstor Carlos Kirchner and Cristina Elisabet Fernández, who held the position of President of the Argentine Republic, exercised between May 25 of 2003 and December 9 of 2007, and from December 10 of 2007 until December 9 of 2015, respectively. The money was alternatively delivered to the executive power officials or their private secretaries at Uruguay 1306 and Juncal 1411, City of Buenos Aires, at the Olivos Presidential Residence and at the Government House. Part of this money was redistributed or payments were made for other public officers. The maneuver was organized by Julio Miguel De Vido [then Ministry of Federal Planning, Public Investment and Services] and Roberto Baratta [former Subsecretary of Coordination and Control of Management of the Ministry of Planning], who, by means of the positions held by them, took charge of assuring the agreed payments to be collected. The funds were collected mainly by Baratta and Nelson Javier Lazarte [Baratta's private secretary]. The following persons also became actively engaged in the collection system receiving payments: Walter Fagyas [advisor of the Subsecretariat of Coordination of the Ministry of Federal Planning and President of ENARSA], Rafael Enrique Llorens [Legal Subsecretary of the Ministry of Planning], Hernán Camilo Gómez [servant of the Subsecretariat of Coordination and Control of Management of the Ministry of Federal Planning] and Fabián Ezequiel García Ramón [National Director of Renewable Energies and Energy Efficiency of the Ministry of Federal Planning]. The named persons in almost all cases were transferred to the places where the payments were collected by Oscar Bernardo Centeno, who received orders from Baratta and De Vido.

[Illegible signature & Stamp]

II. **DESCRIPTION OF THE COLLECTION SYSTEM**. Having determined that the above mentioned persons were the main leaders and commanders of this organization, an overview of the collection system should be given, given the procedural act under process: *a) As an example of what will be developed in the following paragraphs, below we will transcribe some passages of a true "crime logbook" written by Oscar Bernardo Centeno between 2005 and 2015: a) \* quote of November 19 of 2009, at 20:05: "… Ministry I took Baratta to fetch <u>Hernán Gómez</u> and we were unable to get there due to the traffic jam, and <u>Mr. Baratta</u> called him by phone and told him to take a taxi very carefully and calmly because of the money that he had to bring along. We waited for Hernán at the entrance of Baratta's building and **then they went up to Baratta's apartment to distribute the amounts to each of them as appropriate; they also took the amount of <u>Dr. Llorens Rafael;</u> <u>Ezequiel García</u> and <u>Walter Fagias</u>**; then they went down from the apartment and I **took them to Uruguay 1306 to deliver the bulk amount of money to <u>Daniel Muñoz</u>**. Then I took Baratta to his apartment and to Hernán Gómez to the garage (sic) and then I went home…" (Emphasis added by the Court). \*Quote of June 3 of 2009 at 7:15 p.m.: "… Minister I fetched Mr. Baratta and Nelson to the Presidential Residence, at 8:05 p.m. I took them to the Ministry of Labor to a meeting; then, at 9:30 p.m., left with <u>Walter Fagias</u> and took them to **Walter's apartment where he gave a backpack with money to Baratta; considering its weight, the backpack must have contained USD 300,000**; then, I took Baratta to his apartment…" (Emphasis added by the Court). \*Quote of June 9 of 2015 at 10:20 a.m.: "… I took Nelson to the building of former YPF and **a man called Nivello who had to give us the money had mixed up the delivery place and headed towards the Ministry**; as we had trouble in going back due to the traffic and Plaza de Mayo was completely blocked due to national strike, **Nivello, who was with the "dead", decided to deliver the money to Baratta in person at the office; the sum was estimated to be set in USD 1,250,000 (one million two hundred fifty thousand dollars)…"** (Emphasis added by the Court).*

*\*Quote of July 16 of 2013 at 12:30 p.m.: "… I took Mr. Baratta and Nelson L to Manuela Saenz 323, Puerto Madero, to fetch a bag full of money and we went back to the Ministry; then, at 20:00 I left the Ministry with Baratta and Nelson L and took them to Andonaegui 2138 1º B to leave the money there; I want to make clear that two identical bags are always used and changed again for the operations, I mean, the same black bags are emptied or filled, according to the pictures…" (Emphasis added by the Court). \*Quote of November 12 of 2008 at 10:30 a.m.: "Minister I took Mr. Baratta to an event at the Olivos Presidential Residence; then I took him to his bunker, he was waiting for a man <u>called Oscar whose phone numbers are 154085-6111 and 154085-3330</u>, who handed over to Baratta a little bag containing money; then I took him to the Ministry…" (Emphasis added by the Court). \*Quote of July 13 of 2015 at 13:48: "… I took Nelson to the Hilton Hotel parking lot to the subfloor, where Javier was waiting for him inside an Audi car, patent GZP687, and Nelson handed over to him a package containing USD 250,000 (two hundred*

[Illegible signature & Stamp]

*fifty thousand dollars), which then he delivered to Mr. Baratta at the Ministry. I attach the ticket of the parking lot…". \*Quote of August 4 of 2015 at 15:50: "… I took Nelson to the Hilton Hotel subfloor, which shares the parking lot with the adjacent building, where **Mr. Sanchez Caballero was waiting for us; and he handed over to him a bag containing USD 1,250,000 (one million two hundred fifty thousand dollars)** and we returned to the Ministry and he gave it to Mr. Baratta at his office, I attach the ticket of the parking lot…" (Emphasis added by the Court). \*Quote of January 27 of 2010 at 1:35 p.m.: "… Ministry I took Mr. Baratta to First's Park Hotel (Esmeralda 1366), we went down to the second subfloor by car and no one was waiting for him**, and he went up to meet Eng. Ruben Valenti; then, after 15 minutes, they went down carrying a bag full of money (USD 200,000) and a box of Lagarte red wine**  and I took him to the Ministry…" (Emphasis added by the Court). \*Quote of January 27 of 2010 at 8:30 p.m.: "… Ministry I took Baratta to his apartment, **he went up carrying all the money he had collected on that day; then, after collecting his part, he went down and I took him to deliver it to <u>Daniel Muñoz</u> at <u>Uruguay 1306</u>** and then I took him to his apartment and then I went home…" (Emphasis added by the Court). \*October 7 of 2010 at 19:50: "… I took Mr. Baratta and Nelson from the Ministry to <u>**Callao 1175**</u>**, where Neyra was waiting for us with a bag containing 4,000,000 (four million dollars)**; by order of Mr. Baratta, he told me to open the trunk without getting out of the car, <u>**Neyra put it into the trunk**</u> **and then he got into the backseat, and handed to him a sheet <u>containing the amounts of different works</u> for the previously referenced total amount (sic).***

*Then, <u>Mr. Baratta called</u> **Hernán Gómez, since he already had the collected money by other means, he asked him by phone where the delivery would take place, and Hernan got close to the place and <u>Mr. Baratta</u> got into Hernan's Meriva van, patent IIC 258, and headed towards Uruguay 1306. I and Nelson were following them by car**, we arrived at the place and we had to wait for <u>Daniel Muñoz</u>; **when <u>Daniel</u> arrived, Baratta got off Hernan's Meriva van carrying two bags containing USD 800,000 (eight hundred thousand dollars) each**, which he handed over to <u>Daniel Muñoz</u>, and he told me to open the trunk, and **Baratta took the luggage out of the car and enter by the gate of <u>Juncal</u> with the total volume of money, that is, <u>USD 5,600,000</u> (five million six hundred thousand dollars);** after 10 minutes, Mr. <u>Baratta</u> went out and took out of my car **his personal bag, which was empty, and entered the domicile again; after 30 minutes, he came out and got into Hernan's Meriva van, I was following him <u>with Nelson</u>, who remained there clearly to <u>watch over</u> me, so that I did not do anything strange; then, we arrived at Baratta's domicile, they took out the personal bag <u>containing the amount of money given by Daniel Muñoz</u>,** and then each of us went to our own houses (emphasis added by the Court). \*Quote of January 5 of 2009; after holding a meeting at the Olivos Residence with Néstor, President Cristina and the Minister, he headed towards the apartment of the latter and then to the Ministry, at 4:00 p.m.: "… Minister I took Baratta to <u>Maipú 741</u>, where he met at the door with two persons and then went up to <u>floor 1 B</u>, and*

[Illegible signature & Stamp]

*then* **Baratta and another person went down from the apartment carrying a luggage of about 90cm high, 40cm wide and 20cm thick, which I put into the car trunk and must have weighed around 40kg; it was money**, *and then I took Baratta to his apartment, where he got out of the car with his luggage and then I took him to the Ministry.* **The persons belong to  Isolux-Corsan. Inside the luggage, there was about 6 million dollars…"** *(Emphasis added by the Court). *Quote of January 12 of 2009 at 8:00 p.m.: "… Minister I took Baratta to his apartment, he* **fetched the luggage that we had took last Monday and delivered it to** _Daniel Muñoz_ **at** _Uruguay 1306_; *and then we fetched Walter Fagias at his apartment and I left them at a restaurant at Honduras 5700…" (Emphasis added by the Court). *Quote of June 3 of 2015 at 11:20 a.m.: "… I took Nelson to* **Nestor Otero's office in Retiro and he brought along two hundred fifty thousand dollars (USD 250,000)** *and I took him to the Ministry where Nelson delivered it to Mr. Baratta…" (Emphasis added by the Court).*

*\*Quote of Wednesday, July 21 of 2010 at 2:00 a.m.: "…* _Mr. Baratta_, _Javier Mosera_ *and* _Nelson Lazarte_ *left the Ministry by the car driven by Pablo Avalos, and* _Mr. Baratta_ *told me that* **I had to take** _Ezequiel García_ **to a place at 14:45 and that I should go with my eyes wide open just in case we were chased**. *At 2:45 p.m., I received a phone call from* **Eng. Garcia** *telling me that he would wait for me at the gate; I went out and took him to* **Alem 454**; *we went down to the* **subfloor** *and he communicated with a person and told him that we were already downstairs; then this person went out carrying a* **grey luggage** *and put it into my car's trunk;* **García and this man** *were saying that it was an amount of* **USD 4,500,000 (four million five hundred thousand dollars) which were for** _Comahue_ **and for the other stuff"**; *then, we left that place, and this man got out of the car at Alem and Peron; and we kept going,* **and García Ezequiel told me to head for the** _Olivos_ _Residence_; *on the way,* _Ezequiel García_ *received a phone call from* _Mr. Baratta_, *who told him that he would wait for us at Alcorta, near the MALVA museum; at the place, he got into the car, and we headed towas the* _Olivos Residence_; **at Libertador and Melo, Baratta made Ezequiel got out and told us to wait for him at an YPF station that was nearby, and so we kept going; but he told me that he had to** _deliver the money to Dr. Néstor Kirchner_ _in hand_ **and that he would enter alone and driving the car himself, so I stayed outside the Residence, and he entered at** _15:55_ **and got out at** _4:30 a.m._, **picked me up and kept going to fetch** _Ezequiel García_; **we switched places and I moved to the steering wheel seat and took them to the** _Ministry of Planning_; **and they got in together with a personal bag of Mr. Baratta where they were supposedly carrying the sums of each of them…"** *(emphasis added by the Court). *Quote of July 23 of 2010 at 12:55 p.m.: "…I took Mr. Baratta from the Ministry to* **Alem 454, to the subfloor, where the** _same person_ **was waiting for us. Baratta called him at his cellphone as well and told him** _'Jorge, we are arriving'_. **This man got into the car carrying a** _black luggage_ **and told Mr. Baratta that it was the money** _for Comahue_ **and told him to try for the other** _Comahue Cuyo_ **project to succeed, which are electric energy works. He told him that the luggage contained** _USD 2,500,000_ **(two**

[Illegible signature & Stamp]

*million five hundred thousand dollars). Then, this sir also got out at Alem and Peron;*
*Baratta told me to* **head** *towards* **Olivos;** *on the way he called* **Hernán Gómez** *and told*
*him to wait for us at the YPF located at* **Libertador** *(Olivos), but Hernán went wrong and*
*waited for us at the Esso located at Libertador (Vicente López), so I called him by phone*
*and he came up to where we were and handed over to Baratta a bag with the* **weekly**
**collection** *and told him that it contained* **USD 1,500,000** *(one million five hundred*
*thousand dollars) and left; we moved on;* **Mr. Baratta** *again told me that he would enter*
*alone and so I gave him the car; because he had to deliver the* **USD 4,000,000** *(four*
*million dollars) in hand to* **Dr. Nestor Kirchner** *at the chalet where* **Dr. Kirchner** *lived*
*with* **President Cristina** *and they did not want me to be seen; he entered at 2:00 p.m. and*
*left at 2:25 p.m., he picked me up and we headed up to the YPF located at Libertador and*
*Melo, where he got out of my car and got into* **Hernán Gómez's Merica (patent IIC258),**
*and I followed them up to Mr. Baratta's apartment;* **apparently, while coming, they**
**distributed among themselves** *the portion of money that had been given to him by* **Dr.**
**Kircher,** *after driving Mr. Baratta; Hernán left, and told me to wait for him at the corner*
*of his apartment, he left at 3:20 p.m. and I took him to* **Gorostiaga 2337,** *he spent an*
*hour there and drove him to his apartment again. During this trip,* **he ironically told me**
**that he wanted to cease to collect the payments,** *and I told him that as long as he could*
*get any advantage, and he told me* **'No, little Oscar, I just screw up my face'; I insinuated**
*him that I was always left out of the picture; and he told m: 'this is how things are', that*
*Dr. Kirchner wanted it all for him and that he also asked him 'isn't there anymore?'.*
*When we arrived at his apartment, he told me to wait until he let me go…" (Emphasis*
*added by the Court).*

b) The system was basically based on a series of "fixed collection points" where the
officers identified with the entrepreneurs from whom they received cash mainly in dollars
gathered. Alternatively, those "fixed points" were materialized in either public or private
parking lots and the "passing" of money was made directly from car to car or also at either
public or private offices. After a confusing episode occurred on October 22 of 2015, in
which unknown persons attempted to intercept the car of the Ministry with which an
amount of money has been collected from "Supercemento S.A.I.C.", the system changed,
and the entrepreneurs had to attend the Ministry of Planning, enter by the private parking
lot and from there they could directly access Baratta's office. Subsequently, only official
cars passed by a company to collect the payments from time to time. c) In this context, it
could be affirmed that there was a first circle of collection of funds formed of those who
had direct contact with those who provided the involved funds. A second circle was
comprised of those who in turn collected those illegal funds to deliver them to those who
ultimately commanded and organized that system. The persons who formed that first circle
include, but were not limited to, Roberto Baratta, Walter Rodolfo Fagyas, Nelson Javier
Lazarte, Fabian Ezequiel García Ramón, Hernán Camilo Gómez, Rafael Enrique Llorens
and Germán Ariel Nivello. The second level was formed of those who received the

[Illegible signature & Stamp]

collected funds and referred them to the leaders and commanders or applied those funds to other criminal activities: José María Olazagasti, Hugo Martín Larraburu, Juan Manuel Abal Medina and Daniel Muñoz. Finally, the persons who benefited from this collection system, which, by the way, is not the only one, according to the knowledge under process or processed in other cases in this court or that is made publicly and commonly available, are Néstor Carlos Kirchner, Cristina Elisabet Fernández and Julio Miguel De Vido.---------------
---------------------------------------------------------------------------------------------

III. **THE ONES WHO RECEIVED THE ILLEGAL FUNDS. THE FACTS**. Among who received the money carried by the above named persons include, but are not limited to, Igor Rudy Fernando Ulloa, Oscar Parrilli (General Secretary of the Presidence and Director of the Intelligence Federal Agency), Héctor Daniel Muñoz (Private Secretary of Presidence), Hugo Martín Larraburu (Unit Coordinator, Ministry of the Chief of the Cabinet of Ministers), Juan Manuel Abal Medina (Chief of Cabinet of Ministers), José María Olazagasti (De Vido's private secretary), Jorge Omar Mayoral (Mining Secretary of the Ministry of Federal Planning) and Germán Ariel Nivello (Subsecretary of Urban Development and Household reporting to the Secretariat of Public Works of the Ministry of Federal Planning).------------------------------------------------------------------------------

a) **Néstor Carlos Kirchner and Cristina Elisabet Fernández**: on October 8 of 2009, Baratta handed it over to Muñoz; February 3 and 17 of 2010, Baratta; on June 2 of 2010, Baratta and Lazarte handed it over to Muñoz-; on July 21 of 2010, Baratta; on August 11 of 2011, Baratta to Muñoz,  the collected funds are referred to the Olivos Residence; on July 20 of 2010, they met at the Olivos Residence with Néstor Kirchner by reason of the collections made on Wednesdays; on March 17 of 2010, May 20 of 2010 and July 27 and 29 of 2010, October 6 of 2010, Néstor Carlos Kirchner met Baratta and Lazate and told him how to make the collection; on August 4 of 2010, Kirchner and De Vido met by reason of the collection of the day; on April 22 of 2010, Néstor Carlos Kirchner called Baratta and asked him how the collection was going —the call was made by Juan Francisco Alarcón, alias "tatú"; on November 4 of 2008, Baratta attended Lavalle 462 5º, City of Buenos Aires, after having a meeting with Néstor Carlos Kirchner at the Olivos Residence. On August 1st of 2013, the collected funds were delivered to the person driving the car plate number "MNI589", which was then driven into the Government House.

b) **Julio Miguel De Vido**: De Vido, for his part, received money on April 7 of 2010 from Baratta at his apartment; on May 31 of 2010, from Baratta and Lazarte; on June 3, 16, 23 and 29 of 2015 and on July 1 of 2015, Lazarte delivered the money to "Hernan", Secretary of José María Olazagasti for him to deliver it to De Vido. On June 18 of 2015, Baratta took money to De Vido's. On May 28 of 2015, Lazarte took the funds collected at "Feir's Park" set in the amount of one million dollars and delivered it to "Hernán", secretary of José

[Illegible signature & Stamp]

María Olazagasti for him to deliver it to De Vido. In addition, on September 10 of 2013, Lazarte gave an envelope containing thirty thousand dollars (USD 30,000) to his son, Facundo De Vido, at Av. Libertador 4850 8°, City of Buenos Aires.-----------------------------
--------------------------------------------------------

c) **Private Secretaries**. Daniel Muñoz: he received money from Baratta at Uruguay 1306, City of Buenos Aires: 1) on May 21 of 2008; 2) on May 29 of 2009 after fetching a bag from "Feir's Park" from Valenti and another one from Techint building; 3) on June 30 of 2008; 4) on July 23 of 2008; 5) on August 27 of 2008; 6) on September 4 of 2008; 7) on September 11 of 2008; 8) on September 15 of 2008; 9) on September 18 of 2008; 10) on October 9 of 2008; 11) the funds collected at least on October 22 of 2008 were delivered to Muñoz at Uruguay; 12) the funds collected by Baratta, on October 28 of 2008; 13) on October 30 of 2008; 14) on November 11 of 2008; 15) on December 2 of 2008, Baratta took the funds collected at Lavalle 462, 5th floor, City of Buenos Aires, to Electroingeniería, handed them over to Daniel Muñoz at Uruguay; 16) on Decemer 3 of 2008; 17) Oscar Alfredo Thomas, Executive Officer of Entidad Binacional Yacireta, on December 18 of 2008, paid to Baratta, who took that package afterwards and another package from Techint to Muñoz to Uruguay; 18) on December 15 of 2008, Baratta took the collected funds paid by Electroingeniería to Muñoz; 19) "Grupo Isolux Corsán S.A." paid six million dollars (USD 6,000,000.00) to Baratta at Maipú 741, City of Buenos Aires, who handed them to Muñoz at Uruguay on January 12 of 2009; 20) on January 14 of 2009, Baratta took the funds collected from Neira at Reconquista and Florida to Muñoz; 21) he is delivered to Muñoz the funds collected on the following days; on February 10 of 2009; 22) on February 25 of 2009; 23) on March 11 of 2009; 24) on March 26 of 2009 —along with García Ramón; 25) on April 7 of 2009; 26) on April 29 of 2009; 27) on May 14 of 2009; 28) on May 19 and 20 of 2009; 29) on May 26 of 2009, in presence of Fagyas; 30) on June 4 of 2009, Baratta took the funds collected at "Feirs Park" to Muñoz at Uruguay; 31) on June 11 of 2009; 32) on June 2 and 9 of 2009, in the presence of García Ramón-; 33) on June 22 of 2009, in the presence of García Ramón as well; 34) on June 24 of 2009, in the presence of García Ramón; 35) on July 16 of 2009; 36) on July 22 of 2009, García Ramón was present; 37) on July 30 of 2009, in the presence of Gómez-; 38) on August 6 of 2009, in the presence of García Ramón and Gómez; 39) Baratta and Gómez delivered three bags with collected funds to Muñoz on August 12 of 2009; 40) on August 21 of 2009; 41) on September 3 of 2009; 42) on September 10 of 2009, in the presence of García Ramón and Gómez-; 43) on September 17 of 2009,  Gómez was present; 44) on October 19 and 22 of 2009; 45) on October 28 of 2009, Gómez was present; 46) on November 19 of 2009; 47) on December 3 and 10 of 2009; 48) on January 20 of 2010; 49) on January 27 of 2010; 50) on February 10 and 24 of 2010; 51) on March 10 of 2010; 52) on March 17 of 2010; 53) on April 15 of 2010; 54) on May 27 of 2010, Lazarte; 55) on April 28 of 2010, in the presence of Gómez; 56) on June 9 of 2010, in the presence of Fagyas-; 57) on July 8 of 2010, before Lazarte; 58) on July 14 and 28 of 2010; 59) on August 4, 6 and 25 of 2010; 60) on September 3 and 9 of 2010, with Lazarte; 61) on September 15 and 30 of 2010, with

[Illegible signature & Stamp]

Lazarte; 62) on October 7 of 2010, Barata and Lazarte collected four million dollars (USD 4,000,000.00) from Neira at Callao 1175, City of Buenos Aires, said money was delivered to Gómez for him to deliver it to Muñoz at Uruguay 1306, City of Buenos Aires.

d) **Hugo Martín Larraburu**: 1) on August 1, 5, 6, 8 and 9 of 2013 and on September 2, 4, 5, 10, 12, 17 of 2013, Lazarte and Barata delivered the collected funds to a person located at the Presidential Residence who drove a Ford Focus vehicle, plate number MNI589, driven by Hugo Martín Larraburu; the funds collected on September 5 were to be delivered by him to Abal Medina, as ordered by Cristina Elisabet Fernández; 2) on August 7 of 2013, Lazarte collected funds at Feirs Park from Valenti and passed them to the Ford Focus presidential car, plate number MNI589, driven by Hugo Martín Larraburu; 3) on August 29 of 2013, the dollars provided by Loson to Lazarte (USD 300,000.00) were sent to the Government House and delivered to Hugo Martín Larraburu, who had to deliver them to Juan Manuel Abal Medina, and on August 30 funds are also delivered to Larraburu at the government house; 4) on September 19 of 2013, Lazarte  withdrew six thousand dollars (USD 60,000), which were then delivered to Hugo Martín Larraburu; 5) on September 18 and on October 17 of 2013, the money was delivered to Hugo Martín Larrabury, who drove a car, plate number MNI588; 6) on September 20, 24 and 25 of 2013, the money is delivered to Hugo Martín Larraburu, who on that occasion drove a car plate number KIM064; 7) on October 1 and 22 of 2013, the money is delivered to Hugo Martín Larraburu, who had to delivered it to Abal Medina; 8) on October 1, 15 and 24 of 2013, the money is delivered to Hugo Martín Larraburu.-----------------------

e) **Others: A. Norberto Oyarbide**: he participated in the unlawful association. On September 3 of 2013, he met Baratta and De Vido at Sagardi restaurant, located at Humberto 1º 319, City of Buenos Aires. On September 26 of 2013, Baratta and Lazarte met Oyarbide at Comodor Py 2002, 3rd floor, City of Buenos Aires. On October 11 of 2013, Oyarbide handed a resolution over to Lazarte at Estilo Campo restaurant, located at Alicia Moreau de Justo 1840, City of Buenos Aires. On June 22 of 2015, Lazarte attended Oyarbide's house, located at Rodríguez Peña 1978, City of Buenos Aires, and withdrew documents, after attending said place several times to withdraw and deliver money. On October 14 of 2015, Oyarbide gave Lazarte a resolution at Estilo Campo restaurant, located at Alicia Moreau de Justo 1840, City of Buenos Aires. It should be highlighted that during the specified period, Norberto Mario Oyarbide acted as judge in charge of the Federal Criminal and Correctional Prosecutor's Office No. 5 of the City of Buenos Aires. **B. Javier Fernández**. On August 2 of 2013 and on August 7 of 2013, Lazarte handed money over to Javier Fernández at the latter's house, at Andonaegui 2138, 1st floor  of this city. On July 16 of 2013, Baratta and Lazarte delivered money to Javier Fernández at the same domicile. **C. Oscar Parrilli**: he received money on November 12 of 2008 from Baratta, at Scalabrini Ortiz 3358, 5th floor, apartment "B", City of Buenos Aires.-----------------------------

[Illegible signature & Stamp]

IV. **PERSONS WHO PAID - THE FACTS**. The collectors from the unlawful association relied on the participation of entrepreneurs who paid sums of money for a rough amount of USD dollars THIRTY FIVE MILLION SIX HUNDRED FORTY FIVE THOUSAND (USD 35,645,000.00), on countless occasions between 2008 and 2015, which allows for proving the continuation of the unlawful organization through the course of time. Without excluding prospective persons to be related to this case, the entrepreneurs have been so far determined to include the following:--------------------------------------------------------------------------------------------

**A. Carlos Guillermo Enrique Wagner** made payments by ESUCO S.A., which were effectively made at San José 151, City of Buenos Aires, where the headquarters of said company were located on June 2 of 2010, place from where Baratta and Lazarte withdrew five hundred thousand dollars (USD 500,000.00), which were then delivered to Muñoz along with other collected funds; on May 14 of 2013 and on July 25 of 2013, the named persons withdrew a bag with money; on August 7 of 2013, Baratta and Lazarte headed towards there and withdrew a bag with money and on September 6 of 2013, Baratta and Lazarte again went there and withdrew a bag with money; on July 27 of 2015 only Lazarte went and withdrew the money. Likewise, on one occasion, on September 22 of 2010, Wagner headed towards there driving a Honda Accord car, plate number ELL 129, delivered one million dollars (USD 1,000,000.00) to Baratta.-------------------------------------

**B. Armando Roberto Loson** made payments by Albanesi S.A., which were effectively paid at the building located at Leandro N. Alem 855, City of Buenos Aires, where the premises of said company were located on July 18 of 2013; Lazarte headed towards there and withdrew a bag with money; on the 25th day of the same month and year, Baratta and Lazarte headed towards there to withdraw the bag with money. On August 29 of 2013, Lazarte headed towards there and received from Loson a bag containing three hundred thousand dollars (USD 300,000,000), who was with a person named "Marcelo" and pointed out to them "… let Mr. Baratta know that I will be renting another machine for the work…" On August 30 of 2013, Loson delivered to Lazarte two hundred thousand dollars (USD 200,000.00). On September 10 of 2013, Loson handed over to Lazarte a bag with three hundred thousand dollars (USD 300,000.00). On September 16 of 2013, Lazarte received from Loson three hundred fifty thousand dollars (USD 350,000.00). On June 2 of 2015, Lazarte received two packages containing one million two hundred fifty thousand dollars (USD 1,250,000.00). On June 29 of 2015, Lazarte received from Loson five hundred thousand dollars (USD 500,000.00). On July 21 of 2015, Loson handed over to Lazarte one million dollars (USD 1,000,000.00). On October 6 of 2015, Lazarte withdrew four hundred thousand dollars (USD 400,000.00).--------------------------------------------------------------------------------------------------

[Illegible signature & Stamp]

**C. Héctor Javier Sánchez Caballero** made payments by OSD S.A. and IECSA S.A. — of which Ángel Jorge Antonio Calcaterra was a stockholder— , which were effectively paid at the Hilton Hotel's garage located at Macacha Güemes 351, City of Buenos Aires. On October 1 of 2013, Lazarte withdrew one million dollars (USD 1,000,000.00), which were handed over to him by Sánchez Caballero, and then delivered to Hugo Martín Larraburu. On June 30 of 2015, Lazarte withdrew one million five hundred thousand dollars (USD 1,500,000.00) that were delivered to him by Sánchez Caballero. On July 13 of 2015, Lazarte received two hundred fifty thousand dollars (USD 250,000.00) from Sánchez Caballero. On August 4 of 2015, Lazarte withdrew one million two hundred fifty thousand dollars (USD 1,250,000.00) from the hands of Sánchez Caballero. Lazarte collected four more sums of money at the same garage on September 11, 17, 18 and 24 of 2013 at the amount of one million five hundred thousand dollars (USD 1,500,000.00) on each occasion. Also, money was withdrawn at a building located at Manuela Saenz 323/351, City of Buenos Aires, where OSD S.A. operates. On July 16 of 2013 and on August 1 of 2013 the money was withdrawn by Baratta and Lazate. On August 9 of 2013, Lazarte collected an amount of money. On October 22 of 2013, Lazarte withdrew one million two hundred fifty thousand pesos (USD 1,250,000.00). On May 28 of 2015, Lazarte withdrew one million two hundred thousand dollars (USD 1,200,000.00). On August 18 of 2015, Lazarte withdrew the money. On September 14 of 2015, Lazarte withdrew seven hundred fifty thousand dollars (USD 750,000.00); and on October 21 of 2015, Lazarte withdrew three hundred fifty thousand dollars (USD350,000.00).

**D. Francisco Rubén Valenti** made payments by IMPSA S.A. (Industrias Metalúrgicas Pescarmona S.A.I.C. y F) having met Baratta at the Feirs Park hotel, located at Esmeralda 1366, City of Buenos Aires, on February 8 and 28 of 2008; on April 8 of 2008; on May 29 of 2008; on July 11 of 2008 Barata withdrew a package from Feirs Park; on September 2 of 2008; on October 28 of 2008, Baratta withdrew a box of wine and a bag with money, as he usually did every month; on December 11 of 2008, Baratta withdrew the money; on March 4 of 2009, he also withdrew money; on June 4 of 2009 he withdrew a bag with money; additionally, on August 20 of 2009, Baratta received a package with money and a box with bottles of wines; on September 23 of 2009, Baratta and Gómez received a sum of roughly one hundred fifty thousand dollars (USD 150,000.00) and a box with bottles of wine, which amount was then delivered to Muñoz at Uruguay and along with other collected funds; on December 7 of 2009, Baratta received two hundred thousand dollars (USD 200,000.00) and a box with bottles of wine; on January 27 of 2010, Baratta withdrew two hundred thousand dollars (USD 200,000.00) and a box with bottles of wine; on April 22 of 2010, Baratta and Lazarte withdrew a bag with thirty five thousand dollars (USD 135,000.00) and a box with bottles of wine; on July 26 of 2013, a bag with money is received at Libertad 1535, City of Buenos Aires; on September 1 of 2010, at the Feirs Park hotel, located at Esmeralda 1366,

[Illegible signature & Stamp]

at the second subfloor, where Valenti's driver was waiting for him, I walked him to the room, and then Baratta went downstairs along with Valenti, carrying a bag with USD 700,000 (seven hundred thousand dollars), and a box with six bottles of wines; on August 7 of 2013, Lazarte received money at Feir's Park from Valenti; On May 28 of 2015, Lazarte withdrew one million dollars (USD 1,000,000.00) at Feir's Park; on July 30 of 2015, Lazarte withdrew a bag containing five hundred thousand dollars (USD 500,000).------

**E. Carlos José Mundin** orders BRU S.A. to make payments on May 21 of 2009 to Baratta, for which he drove a Renault Megane car, plate number EBY711. Meetings were held with Mundin at Croque-Madame restaurant, located at Libertador 1902, City of Buenos Aires, on June 1 of 2010, at which meeting discussions about projects approved by Néstor Carlos Kirchner and Julio Miguel De Vido were held. The meeting was attended by Santiago de Vido —the Minister's son—, Lazarte and Baratta. After the meeting, the last named persons headed towards the Olivos Residence. On July 7 of 2010, Baratta met Mundin at the same place. On July 28 of 2010, Barata met Mundin early. On August 5 of 2010 in the evening, Baratta headed towards De Vido's domicile and from there he went out with his son, Santiago De Vido, and they again met Mundi at the referenced restaurant with Wagner and a person named "Flavio", at which meeting discussions about 4 works in the south and two works in the north were held —gas infrastructure works. On August 13 of 2010, Baratta, Santiago de Vido and Mundi met at the same place. On September 13 of 2010, Baratta and Fagyas headed towards Alem 896, 5th floor, City of Buenos Aires, to withdraw a bag with money from that place where BRU S.A. operated. On August 30 of 2013, Baratta and Lazarte headed towards Alem 896, City of Buenos Aires, to meet Santiago De Vido and Mundin.----------------------------------------------------------------------------------------

**F. Jorge Guillermo Neira and Gerardo Luis Ferreyra** ordered by Grupo Eling S.A.-Electroingeniería S.A. to make payments, which were effectively made at Lavalle 462, 5th floor, City of Buenos Aires, where the premises of the company were located; on October 9 and 22 of 2008, Baratta conducted the operation; on the last day, he delivered the collected funds to Muñoz at Uruguay 1306, City of Buenos Aires; on December 2 of 2008, Baratta received money from Ferreyra at Lavalle 462, 5th floor, City of Buenos Aires, and then delivered it to Muñoz at Uruguay 1306, City of Buenos Aires; on December 15 of 2008, Baratta and Llorens met Ferreryra, who gave them a package containing money; on January 14 of 2009, Baratta and García Ramón withdrew the money collected on a monthly basis; on September 30 of 2009, the payment was made by Neira at Reconquista and Florida, City of Buenos Aires, who delivered it to Baratta, who then delivered it to Uruguay 1306, City of Buenos Aires; on October 7 of 2010, the payment was made by Neira at Callao 1175, City of Buenos Aires, who delivered to Baratta and Lazarte a luggage with four million dollars (USD 4,000,000.00); on October 13 of 2010, a payment was made by Neira at

[Illegible signature & Stamp]

Azucena Villaflor 450, 25th floor of 3, City of Buenos Aires, who delivered to Baratta three million dollars (USD 3,000,000) along with a summary of the contribution; on October 21 of 2010, the payment was made by a person in substitution of Neira at Callao 1175, City of Buenos Aires, in the amount of USD 3,500,000 (three million five hundred thousand dollars) and then delivered to Muñoz; on November 12 of 2010, Baratta and Gómez headed twice towards Lavalle 462, City of Buenos Aires, to receive money; on November 26 of 2010, Baratta and Lazarte headed twice toward Lavalle 462, City of Buenos Aires, to collect funds; on September 18 of 2013, Baratta and Lazarte withdrew the money near 25 de Mayo 489, City of Buenos Aires; on June 18 of 2015, Lazarte withdrew two hundred fifty thousand dollars (USD 250,000.00); on August 3 of 2015, Lazarte withdrew two hundred fifty thousand dollars (USD 250,000.00) and on August 14 of 2015 Lazarte also withdrew money.-------------------------------------------------------------------------------------

**G. Oscar Alfredo Thomas**, Executive Office of Entidad Binacional Yaciretá, made payments at Juncal 1740, City of Buenos Aires, on December 18 of 2008, to Baratta. Thomas delivered money to Baratta on January 28 of 2009. On May 27 of 2009, he delivered a package with money to Baratta. On July 29 of 2009, Baratta and Fagyas received a box with money; on August 5 of 2009, he delivered to Baratta seven hundred thousand dollars (USD 700,000.00). On August 12 of 2009, he delivered to Baratta and Gómez a bag with one million one hundred thousand dollars (USD 1,100,000.00). On September 2 of 2009, Baratta received a package with money. On January 15 of 2010, Baratta withdrew a bag with money. On January 21 of 2010, Thomas delivered to Baratta roughly two hundred thousand dollars (USD 200,000.00). On January 26 of 2010, Baratta received a package with money. On February 25 of 2010, Baratta received two bags with roughly three hundred thousand dollars in total (USD 300,000.00. On March 15 of 2010, Baratta withdrew a bag with two hundred fifty thousand dollars (USD 250,000.00). On July 20 of 2010, Baratta received a bag with two hundred fifty thousand dollars (USD 250,000.00). On August 7 of 2013, Baratta and Lazarte withdrew the money from the offices located at Eduardo Madero 942, City of Buenos Aires. On August 19 of 2010, Baratta and Lazarte withdrew one million two hundred thousand dollars (USD 1,200,000) at Juncal 1740, City of Buenos Aires. On August 13 of 2013, Lazarte withdrew a bag with money from the offices located at Madero 942, City of Buenos Aires. On September 19 of 2013, Lazarte withdrew the money from the offices located at Madero 942, City of Buenos Aires.---------------------------------

**H. Juan Carlos De Goycoechea** ordered to make payments by Grupo Isolux Corsán S.A., which were effectively made at Maipú 741, City of Buenos Aires, on June 19 of 2008, to Baratta, who then delivered the money to Uruguay 1306, City of Buenos Aires. On January 5 of 2009, Baratta was handed a luggage containing six million dollars (USD

[Illegible signature & Stamp]

6,000,000.00). On April 7 and April 29 of 2009, Baratta received both bags of money. On May 14 of 2009, two bags with money were delivered to Baratta and García Ramón. On May 15 of 2009, Baratta and García Ramón received a backpack with money. On April 8 of 2010, a meeting was held with Llorens and Baratta. On May 19 of 2010, two hundred thousand dollars (USD 200,000). On May 27 of 2010, Baratta and Eng. Ezequiel García attended Azucena Villaflor and Aime Paine, related to Goycoechea, both of them leaving carrying a bag containing one million three hundred thousand dollars (USD 1,300,000). On September 15 o 2010, Lazarte and Barata withdrew nine hundred thousand dollars (USD 900,000) from Maipú 741. On November 24 of 2010, Barrata withdrew two hundred thousand dollars (USD 200,000) at Maipú 741, City of Buenos Aires. On August 1 of 2013, Baratta and Lazarte took an empty bag and withdraw it containing money; on September 5 o f2013, Lazarte and Hugo Martín Larraburu withdrew the money in order to deliver it to Juan Manuel Abal Medina afterwards, as ordered by Cristina Elisabet Fernández. On September 19 of 2013, Lazarte withdrew sixty thousand dollars (USD 60,000.00). On October 23 of 2013, Lazarte withdrew three hundred thousand dollars (USD 300,000.00). The sum of money was collected at Venezuela 151, City of Buenos Aires. On August 8 of 2013, Baratta and Lazarte received a bag from a person named "Juanca". On June 3 of 2015, Lazarte received one million five hundred thousand dollars (USD 1,500,000.00) from a person named "César". On July 13 of 2015, Lazarte withdrew one million two hundred thousand dollars (USD 1,200,000.00) and on October 6 of 2015, Lazarte received a box containing two hundred fifty thousand dollars (USD 250,000.00).--------------

**I. Otero**. On June 3 of 2015, Otero handed the amount of two hundred fifty thousand dollars (USD 250,000.00) over to Lazarte at his withdrawal office.------------------------------ ----------------------------

**J. Claudio Javier Glazman**. The referenced person delivered to Hernán Gómez the following amoutns of money: a) On 9/23/09, he delivered the sum of two hundred fifty thousand dollars (USD 250,000), at Emma de la Barra 353 of this city. On that same night, the collected funds were delivered to Daniel Muñoz. b) On 9/30/09, he delivered the money collected on a weekly basis in the amount of two hundred fifty thousand dollars (USD 250,000) to Muñoz, at Emma de la Barra 353 of this city, along with other collected funds. c) On 2/24/10, he handed over to him a bag with money, on the subfloor of the parking lot located at Av. Córdoba Galerías Pacífico of this city. d) On 3/10/10, he delivered to him a bag containing two million five hundred thousand dollars (USD 2,500,000) at Pasaje Levenne 950 of this city. On that same day, he handed over to Daniel Muñoz the collected funds at Uruguay 1306, City of Buenos Aires. e) On 3/23/10, he delivered the sum of one million two hundred forty eight thousand dollars (USD 1,248,000) at the intersection of Belgrano and Paseo Colón of this city and the sum of six hundred sixty thousand dollars (USD 660,000) at Av. Alem 1050, City of Buenos Aires. All the referenced sums of money were delivered to Daniel Muñoz, along with other collected funds, at Uruguay 1306, City of Buenos Aires, and Baratta notified De Vido thereof. f) On 4/28/10, he handed over to

[Illegible signature & Stamp]

him a bag with money at the intersection of Moreno and Balcarce of this city. g) On 8/18/10, he delivered to him the sum of one million two hundred thousand dollars (USD 1,200,000), at the intersection of Anchorena and Juncal of this city. Said collected funds were handed to Daniel Muñoz at Uruguay 1306, City of Buenos Aires.------------------------- -------------------------------------

K. **Rodolfo Armando Poblete**. On March 19 of 2010, he delivered a bag containing three hundred thousand dollars (USD 300,000) to Baratta, in the presence of Lazarte, on the second subfloor of Av. Alvear 1491 of this city. They payment was made by order of Hidrovía S.A., a company that in turn delivered a bag with eight hundred thousand dollars (USD 800,000) to Baratta on January 20 of 2010 at Av. Corrientes 316 of this city. After that, Centeno drove Lazarte and the above named persons to the Ministry of Federal Planning. Afterward, Baratta delivered the collected funds to Daniel Muñoz, who was in the vehicle plate number EQL442 at Uruguay 1306 of this city; and on August 9 of 2013 at Av. Corrientes 316 of this city, Lazarte passed a bag with money to the vehicle plate number MNI589 driven by Hugo Martín Larraburu.

L. **Héctor Alberto Zabaleta**. He delivered the following amounts of money of Grupo Techint, as pointed out by **Luis María Cayetano Betnaza**, who was then acting as Institutional Director of the Group: On May 29 of 2008, he delivered a bag with money to Baratta, at Techint Group building, located at Della Paolera 299 of this city, which bag was then delivered to Daniel Muñoz at Uruguay 1306 of this city. On August 1 of 2008, on the subfloor of the referenced building, Zabaleta delivered a bag with money to Baratta; on August 27 of 2008, Zabaleta delivered a bag with money to Baratta at the Techint Group building, which package was then delivered to Daniel Muñoz at Uruguay 1306 of this city. On October 30 of 2008, Zabaleta got into a vehicle driven by Centeno at the intersection of Della Paolera and L.N. Alem and by this means they headed down towards the second subfloor of the Techint Group building, where he delivered to him a package with money, which was finally given to Daniel Muñoz, who was at Uruguay 1306 of this city. On December 3 and 18 of 2008, Zabaleta delivered money to Baratta on the second subfloor of the Techint Group building referenced above. On those same dates, said money was delivered to Daniel Muñoz at Uruguay 1306 of this city. The payments were made by order of the Techint Group, a company that delivered as well a package with money to Baratta on June 30 of 2008, at the same place, which was in turn delivered to Daniel Muñoz on the same day. And on October 3 of 2008, a person on behalf of the same group and at the same place identified as Ale delivered the monthly

[Illegible signature & Stamp]

dividends to Baratta.------------------------------------------------------------------------------------------------------

V. **OTHER COLLECTED SUMS OF MONEY**:-------------------------------------------------------------

a) On the other hand, Llorens delivered money to Baratta at Ugarteche 3260, City of Buenos Aires, on September 3 of 2009; he attended a meeting at which money was given to Baratta on September 18 of 2008 at the Hilton Hotel. Moreover, on November 19 of 2009, sums of money were distributed among Llorens, García Ramón, Fagyas, Gómez and Baratta.-----------------------

b) In addition to the detailed sums of money, Fabián Ezequiel García Ramón received money on September 15 and 16 of 2008, February 10 of 2009, May 14 of 2009, May 15 of 2009, June 11 of 2009, October 8 of 2009 —along with Gómez; and he delivered dividends to Baratta on October 21 of 2008, May 29 of 2009 and December 10 of 2009.------------------------------------------

c) Rudy Fernando Ulloa in turn delivered to Baratta dividends at Viamonte 367, 10th floor, City of Buenos Aires, on October 14 of 2008, December 16 of 2008, February 9 of 2009.--------------------

d) Moreover, Walter Fagyas delivered money to Baratta on June 3 of 2009 and on December 20 of 2010 at his domicile, Malabia 2174, City of Buenos Aires.-------------------------------------

e) On July 19 and 25 of 2013, Lazarte received money from Jorge Omar Mayoral at the Ministry of Mining.--------------------------------------------------------------------------------------------

f) On June 9 of 2015, German Ariel Nivello delivered one million two hundred fifty thousand dollars (USD 1,250,000.00) to Baratta at the Ministry. On June 29 of 2015, Nivello delivered seven hundred thousand dollars (USD 700,000.00) to Lazarte at the building of the Ministry of Housing. On July 1 of 2015, Germán Ariel Nivello delivered one million dollars (USD 1,000,000) to Lazarte, who then delivered them to a secretary of Olazagasti, on the subfloor of the Ministry of Planning.------------------------------------------------------------------------------------------------------------

Thereupon, the appearing party is made aware of the evidence recorded in these proceedings: 1) Testimonial statement of a witness whose identity has been reserved on page 2/6 reverse; 2) Clerk's certifications on page 7 reverse/ 9 reverse, 11/13, 15 reverse/17, 2374, 2375, 2380, 2576, 2716 and 4799/4801; 3) Printed media releases on page 18/39; 4) Proceedings carried out by the Federal Operations Division of the Argentine Federal Police on page 49/1756, 1803/2085, 2218/2225, 2233/2240, 2396, 2476/2513,

[Illegible signature & Stamp]

2554/2575, 2690/2710, 2726/2791, 2806/2831, 2857/2897, 2955/2993, 4168/4176, 4227/4399, 4535/4595 and 4655/4798; 5) notes of the firm Telecom Argentina S.A. on page 1782/1783, 2100/2101, 2216/2217 and 2798/2897; 6) note of the firm NSS S.A. (IPLAN) on page 1785; 7) notes of the firm Nextel Communications Argentina S.R.L. on page 1787, 2600 and 2721; 8) notes of the firm Claro on page 1787/1790 reverse, 2205/2206 reverse, 2801/2802 and 2804; 9) notes of the firm Telefónica Argentina S.A. on page 1791, 1793, 2098/reverse, 2598, 2711/2714, 2722, 2835, 2838/2844 and 2852/2855 reverse; 10) note of the firm Telecentro S.A. on page 1795; 11) note of the firm Telecom Personal S.A. on page 1796/1799 reverse; 12) notice of the Argentine Army Welfare Directorate on page 1801; 13) note of the firm NH Collection Buenos Aires Centro Histórico on page 2092; 14) note of the Automotive Property Registry on page 2095/2097; 15) copies of case No. 14.305/15 of the register of this Court on page 2104/2105; 16) reports of title status and historical records provided by the Department of Regulatory and Judicial Affairs of the National Directorate of the Automotive Property Registries and of Pledge Loans on page 2113/2191; 17) proof of -email of the Registry Branch No. 2 (San Pedro) of the Automotive Property Registry on page 2194; 18) note of the Registry Branch No. 25 of the Automotive Property Registry on page 2195; 19) note of the Registry Branch No. 76 of the Automotive Property Registry on page 2196; 20) note of the Registry Branch No. 3 (Lomas de Zamora) of the Automotive Property Registry on page 2197; 21) proceedings carried out by the Directorate of Judicial Assistance in Complex Crimes and Rackeetering of the National Judiciary on page 2198, 2547/2547 reverse, 2597, 2724/2725 reverse, 4440/4445, 4610/11 and 4967/70; 22) note of the Registry Branch No. 70 of the Automotive Property Registry on page 2199; 23) note of the Registry Branch No. 2 (Avellaneda) of the Automotive Property Registry on page 2200; 24) note of the Registry Branch No. 45 of the Automotive Property Registry on page 2201; 25) note of the Registry Branch No. 26 of the Automotive Property Registry on page 2204; 26) note of the Registry Branch No. 16 (La Plata) of the Automotive Property Registry on page 2207; 27) note of the Registry Branch No. 43 of the Automotive Property Registry on page 2208/2210 and 2213; 28) proof of e-mail on page 2211; 29) note of the Registry Branch No. 11 of the Automotive Property Registry on page 2211; 30) note of the Registry Branch No. 1 (Florencio Varela) of the Automotive Property Registry on page 2215; 31) note of Registry Branch No. 1 (Quilmes) of the Automotive Property Registry on 2215; 32) Record sheet of plate number GKF-405 on page 2231; 33) note of the Registry Branch No. 5 (Tigre) of the Automotive Property Registry on page 2241; 31) note of the Registry Branch No. 3 (San Martín) of the Automotive Property Registry on page 2242; 35) note of the Registry Branch No. 6 (La Matanza) of the Automotive Property Registry on page 2244; 36) note of the Registry Branch No. 1 (Esteban Echeverría) of the Automotive Property Registry on page 2245; 37) note of the Registry Branch No. 1 (Mercedes) of the Automotive Property Registry on page 2246; 38) note of the Registry Branch No. 2 (San Pedro) of the Automotive Property Registry on page 2247; 39) note of the Registry Branch No. 4 of the Automotive Property Registry on page 2251; 40) copies of the record of entries to the

[Illegible signature & Stamp]

Olivos Presidential Residence extracted from case No. 1.614/2016 of the register of the Federal Criminal and Correctional Court of Appeals No. 7, Clerk's Office No. 13 on page 2252/2373; 41) note of the Registry Branch of San Vicente of the Automotive Property Registry on page 2376; 42) note of the Registry Branch No. 8 (Olivos) of the Automotive Property Registry on page 2377; 43) note of the Registry Branch No. 13 (La Plata) of the Automotive Property Registry on page 2391; 44) note of the Registry Branch No. 3 (San Miguel) of the Automotive Property Registry on page 2391; 45) proceedings referred by the Directorate of Administration of Human Resources of the General Secretariat of the Presidency of the Nation on page 2397/2474, which include the dockets of the following agents: Héctor Daniel Muñoz, Martín Federico Aguirres and Juan Francisco Alarcón; 46) note of the Registry Branch of Santo Tome of the Automotive Property Registry on page 2475; 47) note of the Registry Branch No. 2 (San Nicolás) of the Automotive Property Registry on page 2514; 48) note of firm Ford Argentina S.C.A. on page 2515/2518 reverse and 2580/2580/2594; 49) note of firm BM Centro S.A. on page 2519/2537 reverse; 50) note of firm Volkswagen Argentina S.A. on page 2538/2544 reverse; 51) notice from the General Inspection of Justice on page 2551/2552; 52) note of the Registry Branch of Cruz del Eje Córdoba of the Automotive Property Registry on page 2578; 53) note of the Registry Branch No. 6 (San Isidro) of the Automotive Property Registry on page 2579; 54) reports of NOSIS on page 2595/2596, 2864/2848, 3026/3032, 3053/3055 and 4402/4404; 55) note of firm General Motors de Argentina S.R.L. on page 2601/2623; 56) Registry of the National Directorate of Migration on page 2624/2671 reverse; 57) reports of VERAZ on page 2672/2684 and 2845; 58) note of firm Arbitra S.A. on page 2682/2685; 59) proceedings of the Legal and Administrative Subsecretariat of the General Secretariat of the Presidency of the Nation on page 2832/reverse and 2834; 60) note of the General Administration of General Services of the General Secretariat of the Presidency of the Nation on page 2833; 61) note of the Directorate of Operations and General Services of the Chief of the Cabinet of Ministers on page 2836/2837 reverse; 62) clerk's report on page 2898; 63) report of the Ministry of the Chief of the Cabinet of Ministers 2945/2946; 64) report of the Ministry of Energy 2948/2950; 65) testimonial statement of Hilda María Horovitz on page 2951/2953 and personal appearance on page 2997; 66) testimonial statement of Diego Hernán Cabot on page 2999/3003; 67) clerk's certifications on page 2994, 3004/3006, 4207 and 4407/4408; 68) testimonial statement of Candela Ini on page 3009/3010; 69) testimonial statement of Jorge José Bacigalupo on page 3011/3012 and personal appearance on page 3025; 70) clerk's report on page 3017 and page 4400; 71) report of the National Registry of Weapons —(*Registro Nacional de Armas*, RENAR— on page 3024, 3051 and 4153; 72) report of Veraz Localiza on page 3052; 73) report of the Ballistics Division of the Argentine Federal Police on page 3150/3151; 74) report of the Financial Information Unit (*Unidad de Información Financiera*, UIF) on page 3152; 75) press releases provided by David Jabif on page 3560/3181; 76) proceedings carried out by the Division of Federal Operations of P.F.A. , in relation to the search of the estate of real property located at Tres de Febrero 1194, 5th floor, Apartment "D" on page 3191/3220; 77)

[Illegible signature & Stamp]

proceedings of the Division of Federal Operations in relation to the search carried out on August 1 of 2018, on page 3336 to 4131; 78) report of the Ministry of Energy and Mining on page 4132/4134; 79) testimonial statement of Damián Ignacio Jerez on page 4166/4167; 80) reports of firm Techint Compañía Técnica Internacional on page 4188/4196 and 4959/61; 81) report of the Chief of the Cabinet of Ministers on page 4211/4215; 82) inquiry of number plate from D.N.R.P.A. on page 4401; 83) proceedings carried out by the Technological Support Judicial Division of P.F.A [Argentine Federal Police] on page 4597/4599 and 4915; 84) proceedings carried out by Banco de la Ciudad de Buenos Aires on page 4626/31; 85) proceedings carried out by the Federal Operations Division of P.F.A. in relation to the search carried out on August 6 of 2018 on page 4802/77; 86) proceedings of the Directorate of Contentious Affairs of the Chief of the Cabinet of Ministers on page 4921/26; 87) report of Banco Francés on page 4974; 88) testimonial statement of Gabriel Adrián Marino on page 5008; and the totality of the reserves items, which are made available to the appearing party.

Finally, the appearing party is informed of such provisions as set forth in section 41, 3) of the National Criminal Codeand of Act No. 27.304.-----------------------------------------------

At this stage, the appearing party is reminded that he has the right to refuse to declare, without his silence entailing presumed culpability in any manner whatsoever against him, and that he has the possibility to hold an interview with his attorney, in relation to which he declares that he has already had an interview with his attorneys. Then, the appearing party is requested to state as much as he deems appropriate for explanation or to clarify the facts and point out such evidence as deemed convenient by him, in relation to which he stated as follows: *"Firstly, I ratify all that I said in the testimonial statement. I have the documentation that I had promised I would bring along in said statement, which I hereby produce. We, as a group, based on a hostile relationship with the government, due to failing to accept bribery and contributions, have been practically excluded from the public work during this period, I mean, during the term of both Kirchnerists' governments. During that period, we were only awarded, in terms of public works, less than 1% the national public work existing in the first years, from 2003 to 2006. In that period, we were awarded with three sections of the route to resurface and provide maintenance, and one part of a piping installation work for the revamping of Atucha II, which, I imagine, was due to the fact that we were the only company who had been involved in building nuclear power plant. I believe that we were awarded the pipelines revamping work of Atucha II for this reason. Since then, we have not been awarded any other public work, other than a section of the northeast gas pipeline, which, at the time, by 2003 I guess, we proposed to build under the Hydrocarbons Act No. 17.319, on our own account and risk, providing for the funds and the construction. The proposal was not accepted, and issued bidding process was launched at successive stages. This fact occurred because claims were raised that this*

[Illegible signature & Stamp]

*might mean a direct award, even though the law allows so when the carrier, dealer of the zone cannot or does not want to build it.*

*This was the case, even when T.G.N. had frozen its rates and had no funds to carry out the work. We are talking about over one thousand million dollars. It should be highlighted that this modality does not entail expenditure on the part of the Government, neither before nor after. This allowed us to evacuate our gas from fields owned by us in Bolivia and in the province of Salta, and also allowed and obligated us to provide access to transport capacity to other producers if any surplus capacity was left. In this case, transportation fees were charged to the other bidders. This was cancelled. The proposal was rejected and, after years, the Government decided to face the fact on its own account and risk. When the bidding was launched, as a way to exclude us from participating, it was launched with a clause stating that the supplier of the piping was not allowed to participate in the construction of the duct; because that could lead to a dominant position, a decisive position, which was not the case, since a common price position existed for all bidders. It should be clarified that Techint is the leading duct construction company in America. In the end, an amparo action was filed before the court, which forced the bidder, which was ENARSA I think, to receive our bid (Document 1).* Then, since the possibility to exclude us had been settled by the court, the zone was first divided into three sections. The purchase authority divided them like that and simultaneously opened the three economic envelopes, which, in my opinion, was a mistake. In all the bids appearing for these three sections, we were the ones winning by an extremely high percentage. So, even though we could only be awarded one, it was too aggressive to award the rest at such high prices, so the whole bidding was annulled. The spokesmen in this bidding were the Ministry of Federal Planning and ENARSA, as well as the construction company and SIAT from the "group". Finally, six sections were generated; the economic envelope of the first section (Formosa, as expected) was opened; we had our tender accepted, and they returned to us the other unopened economic envelopes. The bidding process was further carried out with the other bidders. In fact, some of them failed to finishthe work. This was the only national public work that we were awarded during that period, I mean, from 2007 to 2015. Surprisingly, the city of Buenos Aires launched a bidding process, we were awarded the contract and built six line H subway stations, which were awarded to us by reason of the price, of course. The province of San Juan awarded to us two large-scale hydraulic power plants, awarded to us by reason of the price as well. We were also the biggest private-work construction company in the whole period, highlighting all works relative to mining, of Barrick in Pascualamas and in the province of Mendoza, the work of the company Vale as part of the entrepreneurship Potacio, Río Colorado, in Malargue and other oil refinery works from various national oil companies.--------------------------------------------------------------------
------------------

[Illegible signature & Stamp]

Having been asked by Your Honor. to describe Techint Group's relationship with Venezuela, the appearing party stated that: *"In relation to our activity, there we had a company encompassing an area of 1200 hectares that was privatized in two sections: "SIDOR grande", which ended up being called like that, dedicated to the production of steel, big and plain products; and the piping plant that was inside SIDOR premises, which was bidded separately and was called TAVSA, "Tubos de acero de Venezuela Sociedad Anónima". Just to give a glimpse of magnitude, it was the biggest company in Venezuela, after PDVSA. The successive open biddings, both SIDOR and TAVSA, during the times of President Caldera, were acquired by the Techint Group. In the case of SIDOR, along with a Mexican company called HYISA, which formed the Amazonia consortium. Upon the coming of the Chávez regime, there was a first stage, from 2003 to 2004, which matches the time when there was a good and reasonable relationship between the national government and Chavez regime; we made huge investments and led the plant to produce from four hundred thousand tons to near five million tons by the time it was nationalized. The first attacks on the part of Chávez regime began to be observed at the end of the year 2005, when we held a meeting with the presence of both governments at the Ibero-American Summit in Mar del Plata. On that occasion, we requested the Argentinian Government to intervene before Chavez government due to the risk of nationalization. We managed to more or less — and by facing several media and union-related conflicts — pass through to the period of the year 2007. In 2007, the conflict with Kirchner's government arose, triggered by an unacceptable discrepancy in the building of two compressor stations of TGN One of them was made by us by administration and the other one was made by the government by means of an official trust. Since we had the responsibility to administrate TGN, we opposed and reported the surcharges in this compressor plant, I mean, the work carried out by the trust. We, as inspected parties of TGN, had the obligation to control the reasonableness of all the works performed in the installation of TGN, wherefor we were responsible.*


*Relevant documentation related thereto is attached hereto. This work is the one that triggers the conflict in Venezuela. On May 1 of 2007, extraordinarily, the national government issued a publication in all the newspapers of the capital city claiming corruption among private persons. Find attached a document related thereto (Document 2). From that moment onwards, conflicts with Venezuela worsened, up to a point that President Chavez treated us as corrupt based on said publication and stated that the company would be nationalized. I provide documentation related thereto as well. This whole virulent attack against the company continued, to such an extent that the Bolivarian National Guard of Venezuela, the labor union and the very authorities of the Bolivarian government —along with the Vice-President— intervened in a salary negotiation and the*

[Illegible signature & Stamp]

*very Chavez said that he would intervene unless the union situation was settled. Here is where physical violence began, burning busses at the entrance and blocking the Argentinian administration from having access. In April 2008, the nationalization was declared. We were summoned to sign a shareholders agreement for the transfer of the shares; an executive order was issued whereby the nationalization became effective, and the company is requested to quit no later than July 2008, in order to ensure the transfer from one administration modality to the other (State-owned). Upon the issuance of the order and by the time of the "Hello Mr. President" show, Chavez and the persons appointed by him, began to engage in harassment by indicting for tax, environmental and labor breaches; on the one hand, to decrease the price of the compensation and, on the other hand, to engage our executive officers in criminal proceedings. At that time, the company made the decision to transfer all the Argentinian personnel, in successive series, beginning with the highest senior officials, who were mostly exposed. At that time, I was appointed, as well as Mr. Pablo Brizzio, Dr. Fernando Duelo and a Venezuelan lawyer, who is here in Argentina, whose name is Andreina Ostos; all of us were less exposed to the extortion of the Venezuelan government because we had not held senior positions. In this context, we asked for help to the national government, between February and March of 2008. I talked to the personnel from the Ministry of Federal Planning, who were still related to Venezuela. Minister De Vido, José María Olazagasti, Roberto Baratta and Claudio Uberti were aware of our situation. When it was my duty to attend the presidential meetings with Chavez here, the homeowner was Uberti.*

*In an incident that we had shortly before the nationalization, upon the delivery made by Chavez to Kirchner of a well at the Orinoco Belt, to which event we were invited under the excuse that, as we were the only Argentinian company operating in Venezuela at the time, they wanted us to take charge of the operation of that well. After a very friendly dinner, on the following day, Uberti approached me and told me that President Kirchner was angry with us, alleging that the company did not provide any economic contribution to the government. He said "you never provide us with any contribution, and President Kircher is very angry with you". My answer was: "Teching Group never does business with politicians". This had an effect that, in my opinion, led to end the bond with Chávez, since President Kirchner had agreed to pass by SIDOR plant on the same day of the event of the oil well, which was a few kilometers away therefrom, to greet the over one hundred Argentinian engineers who worked there. After my response, I noticed Uberti whispered in Kircher's ear, and, on the same day, they took the helicopter, flew over our company, took the plane and left. I think this was the last clear sign for Chávez that the way was clear for him to nationalize the company, which occurred shortly afterward. At the beginning of 2008, by means of many press news, we appealed to the Argentine government, to the personnel from the Ministry of Federal Planning, who told us to make a contribution*

[Illegible signature & Stamp]

*because that meant expenses that the Argentinian government would not have to incur into. This was pointed out, as context, by De Vido, and Baratta was the one who arranged the quantum and method. It was evident that considering the situation we were undergoing, especially because of the amount of Argentinians there, we had to try to evacuate the place quickly. Irrespective of that, I commenced the meetings with the Chavist government in search of indemnification. The Venezuelan dealers were Rafael Ramírez, who then acted as the president of PDVSA and as Ministry of Energy. I wish to clarify that PDVSA was the "Venezuelan treasury". After the meeting I attended with Ramírez, I was referred to the Vice-President of the entity, who is an engineer called Eulogio del Pino. We then began to negotiate the operation economic phase. At these meetings, Olazagasti began to attend these meetings, who was referred by Kirchner to participate; with the exception of the last meeting, where the compensation price was settled, where Venezuelans forbade him to intervene. To set a reference price, we proposed the value of other similar companies around the world, as a reference, between three thousand five hundred and four thousand million dollars.*

*In this regard, Chávez, on "Hello Mr. President" said that it was an outrageous amount, that we were such thieves. Apart from constantly discrediting us, he began —publicly, by means of the "Hello Mr. President" show — to mistreat us and give instructions to the entities related to taxes, environment and labor to establish contingency fees for us to pay. They said that we had paid about one thousand three hundred million dollars, excluding other expenses and investments. Finally, the previously mentioned valued was counted along with the necessary additional investments to begin to operate the plant, in the amount of five hundred or six hundred million more. Finally, that was the paid amount: roughly one thousand nine hundred million dollars. One of the mistakes I made was to believe that this was a normal take over and to agree to give a six-month exit term, when they failed to greet the Argentinian managers and remarkably wiped the floor with Maria Elena Posadas, who was then the manager of industrial relations. Equally, a deputy of the government party requested at the National Assembly for SIDOR's Argentinian personnel not to be allowed to leave the country until the situation was clarified. The person that we appointed as exit general manager changed hotels every day to prevent worse evils. What is more, a very complex issue arose: TAVSA piping plant was at the same site where SIDOR was. We were never allowed to enter and it was not nationalized but after one year along with two plants of iron bricks, which were nationalized in 2008 as well, and for which we were not compensated. We filed the relevant claims before the International Center for Settlement of Investment Disputes (ICSID), and we have won two arbitrations in both cases, but logically unpaid. I am not aware of the exact amount, but this one amounts to hundreds of million dollars that will be available as a result of some change of government. At the end of 2008, what we were left was our financial personnel, an office in*

[Illegible signature & Stamp]

*Caracas with a secretary and a driver. That's what I kept on resorting to when I returned to Caracas at the last phase to attempt to be paid. The financial year was closed at the end of 2008 and 2009, with the intervention of Cristina Kirchner, at several meetings. I was asked not to show up near the official delegation, Cristina asked me so. Then, she summoned me to appear at Tamanaco hotel, where the official delegation was located, pointing me out that the price had been agreed in the amount of one thousand nine hundred seventy million, but it was the payment that had not been yet agreed.*

*She informed me that she had talked to Chávez, and that we should contact the regime Finance Minister, called Alí Rodríguez, in order to agree the payment method. Upon the signing and closing in 2009, they paid an advanced price of four hundred million and successive payments, on a biannual basis, for the balance. And that is where we got just stuck; we did not receive the rest of the payments.-------------------------------------------------*

Having been asked by Your Honor. to state the payments specified in the accusation, the appearing party stated that: *"As I previously said, during the period comprised of the departure of the people from Venezuela, between April and December of 2008, we were requested to contribute with the Government. As I said before, De Vido and Baratta intervened in this case. By reason of the situation that we were undergoing in Venezuela, I gave him instructions from Zabaleta for him to make the relevant payments. I want to make clear that Zabaleta was a very reliable person in the Group; even though he did not have any senior position because he had retired, he continued to manage the personal matters of all of us, I mean, of me and the stockholders. For this reason, when this happened, I contacted Zabaleta and ceased to continue with the company course. Zabaleta withdrew the money to make the payments of the dividends of the group stockholders. To be honest, I have been holding this position for 20 years, and I am fed up with dealing with requests for contributions and bribes from all kinds of governments. One of the things that I have tried to state is that in my 20 years of management, a period during which we have tried to avoid these things, the Group has had no trouble in growing. We have grown, without any problem and without any need to maintain business with politicians, as other entrepreneurs have indeed done. Having said this, when the topic of Venezuela was brought up, considering the danger it posed for the people, when I saw what happened to Posadas, when I saw the busses being burned, and the national government told us "we help you but the dealer" I took "the dealer". This happened just due to a humanitarian reason. Alí Rodríguez was the acting official at this time, which acted in the capacity of General Secretary for OPEP, former guerrilla fighter, and a person that I must admit was remarkably intellectually honest with me. Unfortunately, the government action after payments prevented other companies from being paid. The only person who was involved in this was Zabaleta, I am not fully aware of the amount paid, but the global amount would be equal to less than one million dollars. When I told Zabaleta "do what you can", what I*

[Illegible signature & Stamp]

*meant was for him to calm Baratta down, because I was concerned for the people who was there in Venezuela.*

*We are the biggest gas and electric energy consumer and the only supplier of oil piping. The critical period of gas and energy supply is winter, when the shutoff would occur, they would shut off the energy supply at our plant before any other company, when at any normal cycle one can disconnect the electricity generation and gas can be turned into liquid. At our plants, gas is not used to burn but to directly reduce the mineral, a consumable. When we were informed of the shutoff, this meant for the plant and for us a loss of millions of dollars. By chance, and I cannot swear this was retaliation, YPF, I mean, Esqunazi, decided to export twenty seven thousand tons of Chinese pipes. We filed the anti-dumping claim but it did not succeed.----------------------------------------------------------------------------------------------------------*

Having been asked by Your Honor., at the request of the defense counsel, to state the relevance of SIDOR's loss, the appearing party stated: *"Our production systems are highly complex, the plant of Venezuela was very efficient, it uses electric energy at a very cheap price, has a very good-quality iron mineral and leads on to the sea, which efficiently allowed for the production of iron. It may have been the most efficient iron production plant at a global level. When this company was expropriated, an additional vast damage was caused, since the plants at Mexico and Argentina ran out of their basic raw material and exposed us to be forced at that time to purchase raw material in Brazil and iron from our competitors in China and Korea."*

The following documentation is hereby submitted: 1) documentation relative to the northeast gas pipeline subject; 2) documentation relative to the surcharge at the compressor stations; 3) documentation of the events occurred in Venezuela; 4) a folder containing a list of the evacuated personnel, and a timeline of the situation with all its annexes.

Having been asked to say whether he wished to make any other statement, the appearing party said: *"No"*.

The defense counsel hereby requests a copy of this record, to which Your Honor. agrees.

Finally, the appearing party is informed of the provisions set forth in section 300 of the Code of Criminal Procedure of the Nation. Therefore, said section was read. There being nothing further to record, this document is concluded, having been previously read by the relevant clerk, the appearing party ratifying the content thereof, along with his attorney, and signing for certification purposes, after Your Honor. and before me, I attest.

Bonadio [illegible seal]

[Illegible signature & Stamp]


[Illegible signatures]

CAROLINA LORES [illegible]



450 Seventh Ave.
Tenth Floor
New York, NY 10123
(212) 643-8800

# TRANSLATION CERTIFICATION

Date: July 17, 2019

To whom it may concern:

This is to certify that the attached translation from Spanish into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Betnaza Investigative Statement
- Betnaza Testimonial Statement
- Zabaleta Testimony

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____

Signature of Eugene Li

**Global Solutions. Local Expertise.**

www.morningtrans.com | info@morningtrans.com

Poder Judicial de la Nación

Cn° 9.908/18

**DECLARACIÓN INDAGATORIA DE LUIS MARIA CAYETANO BATNAZA:**

/n la ciudad de Buenos Aires a los diez días de agosto de dos mil dieciocho, comparece ante S.S. y Secretario Autorizante una persona a la que se le hace saber que se le recibirá declaración indagatoria conforme las previsiones contenidas en el artículo 294 del Código Procesal Penal de la Nación. Asimismo se le enuncia lo dispuesto por el artículo 295 del Código de rito. En este mismo, acto se le hace saber que se encuentre relevado del juramento presentado en la declaración de fs. 5072/5074. Puesto en conocimiento de los derechos que posee a negarse a declarar y de designar abogado defensor de su confianza, con el que podrá entrevistarse inmediatamente antes de comenzar con la indagatoria manifestó que desea la designar a los Dres. Hermana Luís Folgueiro (T° 63 F° 1000 – tel. 5031-1972 // 15-6381-1657) con domicilio electrónico 20-22302811-0, y Gabriel Rubén Cavallo (T° 30 F° 11 – tel. 5031-1972 // 11-5669-8162) con domicilio electrónico 20-12961594-0, quienes aceptan el cargo, jurando desempeñarlo fielmente y constituyen domicilio legal, junto con su asistido, en la calle Marcelo T. de Alvear 636, piso n° 2, de esta ciudad.------------------------------------------

Interrogado a tenor de lo dispuesto por el artículo 297 del Código de Forma, e invitado a que manifieste su nombre y demás datos personales, dijo ser y llamarse: **Luís María Cayetano Betnaza**, quien exhibe D.N.I. N° 11.506.316, nacido el día 7 de agosto de 1954 en Rosario, Prov. de Santa Fe, de nacionalidad argentina, de estado civil divorciado, director de empresa, hijo de Marcelo Aníbal Betnaza y Dora Galliotti, domiciliado en la Av. del Libertador 2201, piso n° 14 de esta ciudad, que sabe leer y escribir.----------------------------------------------------------------------------------------------

Preguntado por si tienen antecedentes penales o causa en trámite o concluidas, contestó: "*no*".------------------------------------------------------------------------------------------------

Preguntado por sus condiciones de vida, contestó que "*buenas.*".----------------------------

Preguntado que fue para que diga su ingreso económico, el compareciente manifestó que "*percibo aproximadamente $700.000 por mes, como Director Corporativo de la Organización Techint. Ocupo ese cargo desde el año 2001aproximadamente*".-----------

Preguntado para que diga si tiene algún bien mueble o inmueble a su nombre respondió: "*sí, tengo cuatro campos en Provincia de Buenos Aires, son tres en el partido de Balcarce y uno en el partido de Lobería. Tengo, además de mi vivienda, otro departamento aquí en capital, creo que es en la Avenida Callao 1249, piso n° 7,*"

USO OFICIAL



CAROLINA LORES ARNAIZ
SECRETARIA ESPEC.

*departamento "B". También tengo, en Balcarce, otras cuatro viviendas. Asimismo, tengo un auto, no recuerdo la patente".* ----------------------------------------------------------------

 A continuación, de conformidad con el artículo 298 del Código Adjetivo, se pone en conocimiento del compareciente que: **I- DE LA ASOCIACIÓN ILICITA:** se le imputa haber integrado una asociación ilícita junto con Roberto Baratta, Walter Rodolfo Fagyas, Nelson Javier Lazarte, Fabián Ezequiel García Ramón, Hernán Camilo Gómez, Rafael Enrique Llorens, Oscar Bernardo Centeno, José María Olazagasti, Jorge Omar Mayoral, Julio Miguel De Vido, Néstor Carlos Kirchner, Héctor Daniel Muñoz, Hugo Martín Larraburu, Juan Manuel Abal Medina, Cristina Elisabet Fernández, Carlos Guillermo Enrique Wagner, Armando Roberto Loson, Héctor Javier Sánchez Caballero, Ángel Jorge Antonio Calcaterra, Francisco Rubén Valenti, Carlos José Mundin, Jorge Guillermo Neira, Gerardo Luis Ferreyra, Oscar Alfredo Thomas, Claudio Javier Glazman, Juan Carlos de Goycoechea, Héctor Alberto Zabaleta, Rodolfo Armando Poblete y otras personas aún sin identificar, la cual desarrolló sus actividades aproximadamente desde principios del año 2008 hasta noviembre del año 2015, y cuya finalidad fue organizar un sistema de recaudación de fondos para recibir dinero ilegal con el fin de enriquecerse ilegalmente y de utilizar parte de esos fondos en la comisión de otros delitos, todo ello aprovechando su posición como funcionarios del Poder Ejecutivo Nacional. La asociación ilícita fue comandada por Néstor Carlos Kirchner y Cristina Elisabet Fernández, quienes detentaron el cargo de Presidente de la República Argentina que ejercieron entre el 25 de mayo de 2003 y el 9 de diciembre de 2007, y el 10 de diciembre de 2007 hasta el 9 de diciembre de 2015, respectivamente.- El dinero era entregado alternativamente a los titulares del poder ejecutivo o sus secretarios privados en Uruguay 1306 y Juncal 1411 CABA, en la Residencia Presidencial de Olivos, en la Casa de Gobierno, parte de este dinero fue redistribuido o se realizaron pagos para otros funcionarios públicos. La maniobra fue organizada por Julio Miguel De Vido [entonces Ministro de Planificación Federal, Inversión Pública y Servicios] y Roberto Baratta [ex-Subsecretario de Coordinación y Control de Gestión del Ministerio de Planificación], quienes desde los cargos que ocupaban se encargaban de que se realizaran los cobros comprometidos. Los cobros fueron recaudados principalmente por Baratta y Nelson Javier Lazarte, [secretario privado de Baratta]; también participaron activamente de este sistema de recaudación recibiendo pagos Walter Fagyas [Asesor de

*Poder Judicial de la Nación*

Cn° 9.608/18

la Subsecretaría de Coordinación del Ministerio de Planificación Federal y Presidente de ENARSA], Rafael Enrique Llorens [Subsecretario Legal del Ministerio de Planificación], Hernán Camilo Gómez [funcionario de la Subsecretaría de Coordinación y Control de Gestión del Ministerio de Planificación Federal] y Fabián Ezequiel García Ramón [Director Nacional de Energías Renovables y Eficiencia Energética del Ministerio de Planificación Federal]. Los nombrados en casi todas las oportunidades fueron trasportados a los lugares donde se hicieron los pagos/cobros por Oscar Bernardo Centeno, que recibía órdenes de Baratta y De Vido.-----------------------------

**II.- DESCRIPCIÓN DEL SISTEMA DE RECAUDACIÓN.** Determinados que fueron los jefes y organizadores principales de esta organización es pertinente, atento el acto procesal en curso trata, una descripción global del sistema de recaudación.- *a) A modo de ejemplo de lo que se desarrollará en los siguientes párrafos transcribiremos algunos pasajes de una verdadera "bitácora del delito" que escribiera Oscar Bernardo Centeno entre 2005 y 2015, a saber: 1) * cita del 19 de noviembre de 2009 a las 20:05 hs. "... Ministerio lo lleve al lic para buscarlo a <u>Hernán Gómez</u> y no pudimos por el tránsito que estaba muy congestionado y el <u>Lic Baratta</u> lo llamo por teléfono y le dijo que se tome un taxi con mucho cuidado y tranquilidad por el dinero que tenía que traer lo esperamos en la puerta del <u>edificio de Baratta</u> a Hernán y **luego subieron al departamento del licenciado, para repartirse lo que a cada uno le corresponde;** también sacan la parte del Dr. <u>Llorens Rafael; Ezequiel García</u> y <u>Walter Fagias</u>; luego bajaron del dpto. y **los lleve a Uruguay 1306 a entregar el grueso del dinero a** <u>**Daniel Muñoz.**</u> Luego lo lleve al lic y a Hernán Gómez hasta el garage(sic) y me fui a casa..." (el resaltado corresponde al tribunal);* cita del 3° de junio de 2009 a las 19:15hs. "... Ministerio lo fui a buscar al lic y Nelson a Presidencia, a las 20.05 los lleve al ministerio de trabajo a una reunión; luego a las 21.30 salió con <u>Walter Fagias</u> y los lleve **al dpto de Walter donde le entregó una mochila con dinero a Baratta; por el peso la mochila tendría 300.000 U$S;** luego lo lleve al lic a su dpto ..." (el resaltado corresponde al tribunal);* cita del 9 de junio de 2015 a las 10:20hs. "... Lo lleve a Nelson al Edificio de la ex YPF y **un tal Nivello que tenía que darnos el dinero se había confundido el lugar de la entrega y se fue al ministerio,** como nosotros estábamos con problema para regresar por el transito y estaba cortado toda la plaza de Mayo por el paro nacional, **Nivello estaba con el "muerto", decidió entregarle en***



CAROLINA LORES ARNÁIZ
SECRETARIA FEDERAL

*persona al licenciado Baratta en la oficina, se hablaba de 1.250.000 (un millón doscientos cincuenta mil dólares) ..." (el resaltado corresponde al tribunal);* cita del 16 de julio de 2013 a las 12:30hs. "... Llevo al Lic Baratta y Nelson L a Manuela Saenz 323 de Pto Madero retiran un bolso lleno de dinero y regresamos al ministerio; luego a las 20.00 salimos del minist. Baratta y Nelson L y los llevo a Andonaegui 2138 1° B a dejar el dinero, **quiero dejar en claro que siempre usan dos bolsos gemelos que se van recambiando para las operaciones, o sea se vacían o llenan los mismos bolsos negros según fotos** ..." (el resaltado corresponde al tribunal);* cita del 12 de noviembre de 2008 a las 10:30hs. "... Ministerio lo lleve al lic a la Residencia Presidencial de Olivos, fue a un acto, luego lo lleve a su bunquer **esperaba a un señor cuyo contacto es Oscar 154085-6111 y 154085-3330;** al cual le entrego el lic al contacto un bolsita con dinero luego lo lleve al lic al ministerio..." (el resaltado corresponde al tribunal); * cita del 13 de julio de 2015 a las 13:48hs. "... Lo lleve a Nelson al estacionamiento del Hotel Hilton al subsuelo, donde lo esperaba Javier en Audi chapa GZP 687, y le pasó a Nelson un paquete con 250.000U$S (doscientos cincuenta mil dólares) y luego en el ministerio se lo dio al lic Baratta. Acompaño ticket estac ..."; * 4 de agosto de 2015 a las 15:50hs. "... Lo lleve a Nelson al subsuelo del Hotel Hilton que comparte el estacionamiento con el edificio contiguo, donde **nos esperaba el Sr. Sanchez Caballero y le entrego una bolsa que contenía 1.250.000 U$S (un millón doscientos cincuenta mil dólares)** y regresamos al ministerio y se lo dio al Lic Baratta en su oficina, acompaño ticket del estacionamiento ...", (el resaltado corresponde al tribunal); * cita del 27 de enero de 2010 a las 13:35hs. "... Ministerio lo llevé al lic Baratta al Hotel Firs't Park (Esmeralda 1366), bajamos al 2° subsuelo con el auto y no lo esperaba nadie y subió a verlo al Ing Ruben Valenti; luego a los 15' bajaron con un bolso lleno de dinero (200.000 U$S) y una caja de vino tinto Lagarde y lo llevé al ministerio ...", (el resaltado corresponde al tribunal); * cita del 27 de enero de 2010 a las 20:30 "... Ministerio lo lleve al lic a su dpto., subió con todo el dinero recaudado del día, luego de sacar su parte, bajó y lo lleve a entregarle a Daniel Muñoz en Uruguay 1306 y luego lo lleve al lic a su dpto y me fuí a casa ...", (el resaltado corresponde al tribunal); * cita del 7 de octubre de 2010 a las 19:50hs. ".... Del ministerio lo lleve al Lic Baratta y a Nelson a Callao 1175, donde nos esperaba Neyra con una valija con 4.000.000 (cuatro millones dólares) por orden del Lic Baratta me dice que le abra el*

*Poder Judicial de la Nación*

Cn° 9.608/18

*baúl sin bajar del auto,* <u>*Neyra la subió al baúl y*</u> *luego subió él al auto en el asiento de atrás, y le pasa el papel* <u>*con las cantidades de diversas obras*</u> *por la cantidad por la cantidad(sic) total ya nombrada. Luego* <u>*el lic lo llama*</u> *a* <u>**Hernán Gómez**</u> *que ya tenía lo recaudado por otro lado, le dice por teléfono donde entregamos y Hernan se acerca a lugar y el* <u>*Lic Baratta*</u> *se sube a la camioneta de Hernan una* <u>*Meriva chapa IIC 258*</u> *y se dirigen a* <u>*Uruguay 1306*</u> *yo con Nelson en el auto lo seguíamos por detrás, llegamos la lugar y lo tuvimos que esperar a* <u>*Daniel Muñoz;*</u> *cuando llego* **Daniel** *el lic se baja de la Meriva de Hernan* <u>*con dos bolsos*</u> *que tenían* <u>**800.000 U$S**</u> *(ochocientos mil dólares) cada uno, los cuales se los da a* <u>*Daniel Muñoz*</u> *y me dice que abra el baúl y el lic la baja él a la valija y entran por la puerta de* <u>*Juncal*</u> *con todo o sea* <u>*5.600.000 U$SS*</u> *(cinco millones seicientos mil dólares); a los 10´ sale el Lic* <u>*Baratta*</u> *y retira de mi auto su* **bolso personal** *que lo tenía* <u>*vacío*</u> *y entra al domicilio nuevamente; a los 30´ sale y sube a la Meriva de Hernán y yo los sigo siempre* <u>*con Nelson*</u> *que queda evidente para que* <u>*custodie a mí,*</u> *para que no haga ninguna cosa rara; luego llegamos al domicilio del lic, bajan con el bolso personal con la* <u>*parte que le dio*</u> <u>**Daniel Muñoz**</u> *y luego nos fuimos, cada uno a su casa ...", (el resaltado corresponde al tribunal); * cita del 5 de enero de 2009 luego de mantener una reunión en la Quinta de Olivos con Néstor, la Presidenta y el Ministro, se dirige al dpto. de este último y luego al ministerio: A las 16.00hs. "... Ministerio lo lleve al licenciado a* <u>*Maipú 741*</u>*, donde se encontró en la puerta con dos personas y luego subieron al* <u>*1° B,*</u> *y luego bajaron del dpto el lic y una persona con una valija más o menos de 90 cm de alto por 40 de ancho y 20 cm de espesor, yo la cargué al baúl del auto y pesaría mas o menos 40 kgs, era dinero y luego lo lleve al lic a su dpto donde se bajo con la valija y luego lo traje al lic al ministerio. Las personas son* **de Isolux- Corsan,** *en la valija había más o menos 6 millones de dólares ...", (el resaltado corresponde al tribunal); * cita del 12 de enero de 2009 a las 20:00hs. "... Ministerio lo lleve al lic a su dpto,* **fue a buscar la valija que llevamos el lunes pasado y la fuimos a entregar a** <u>*Daniel Muñoz a*</u> <u>*Uruguay 1306;*</u> *y luego fuimos a buscar a Walter Fagias a su dpto. y los deje en un restaurante en Honduras 5700 ...", (el resaltado corresponde al tribunal); * cita del 3° de junio de 2015 a las 11:20hs. "... Lo lleve a Nelson a la* **oficina de Néstor Otero en Retiro y trajo doscientos cincuenta mil dólares (250.000 U$S)** *y lo lleve al ministerio donde Nelson se lo dio al Licenciado Baratta ...", (el resaltado corresponde al*

USO OFICIAL



*tribunal); * cita del miércoles 21 de julio de 2010 a las 14:00hs. "... Del ministerio se fue el Lic <u>Baratta Javier Mosera</u> y <u>Nelson Lazarte;</u> en el auto cuyo chofer es Pablo Avalos y me dice el <u>Lic Baratta</u> que 14.45 **tengo que llevarlo a Ezequiel García a un lugar y que vaya con los ojos bien abierto por si nos siguen.** A las 14.45 me llama por celular el <u>**Ing García**</u> y me dice que me espera en la puerta de calle; salgo y lo llevo a <u>**Alem 454;**</u> bajamos al <u>subsuelo</u> y el se comunica con una persona y le dice que ya estamos abajo; luego sale esta persona con una <u>valija color gris</u> y la pone en el baúl de mi auto; hablaban <u>García y este señor</u> de que eran 4.500.000U$S (cuatro millones quinientos mil dólares) que eran <u>**"del Comahue**</u> y <u>de lo otro"</u> decían; luego salimos del lugar y este señor se bajo en Alem y Peron; y nosotros seguimos y **me dice García Ezequiel** que vayamos para la <u>quinta de Olivos ;</u> en el camino lo llama el <u>Lic Baratta</u> a <u>Ezequiel García</u> para decirle que nos esperaba en Alcorta a la altura del museo MALVA; en el lugar se sube al auto y nos dirigimos a la <u>Quinta de Olivos;</u> **en Libertador y Melo, el lic lo hace bajar a Ezequiel y que nos espere ahí que hay una estación de servicio YPF, y seguimos;** pero el li me dice que tenía que <u>**entregar en mano propia al Dr. Nestor Kirchner la plata**</u> y me dice que va a entrar el solo y manejando el auto y así fue que me quedo afuera de la Quinta y él entra a las <u>**15.55**</u> **hs y sale a las** <u>**16.30**</u> **hs y me levanta a mi y seguimos en busca de** <u>Ezequiel García</u> **y cambiamos el volante y sigo manejando yo y los llevo al** <u>ministerio de planificación;</u> **y subieron juntos con un bolso personal del lic Baratta donde supuestamente llevaban sus partes década uno ...",** (el resaltado corresponde al tribunal); * cita del 23 de julio de 2010 a las 12.55hs. "... Del ministerio lleve al <u>lic Baratta</u> a <u>**Alem 454,**</u> al subsuelo, donde la <u>misma persona</u> nos esperaba, el lic lo llamo por celular también y le dijo <u>Jorge ya estamos llegando,</u> este señor subió al auto con una <u>valija color negra</u> y le dice al lic Baratta que era lo <u>de Comahue</u> y que tratara de que salga el otro proyecto <u>Comahue Cuyo</u> son obras de energía eléctrica; le dice que hay en la valija U$S <u>2.500.000</u> (dos millones quinientos mil dólares), luego este señor también se bajo en Alem y Peron; el lic me dice vamos <u>para olivos,</u> en el camino lo llama a <u>**Hernán Gómez**</u> y le dice que nos espere en la YPF de <u>Libertador</u> (Olivos), pero Hernán se equivoca y nos espera en la Esso de Libertador (Vte Lopez) lo llame por teléfono y vino hacia nosotros y le da al lic un bolso con la <u>recaudación de la semana</u> y le dice que hay <u>1.500.000 U$S</u> (un millón quinientos mil dólares) y se va; nosotros*

*Poder Judicial de la Nación*

Cn° 9.608/18

*seguimos; el Lic Baratta nuevamente me dice que va a entrar solo y le doy el auto; porque tenía que entregar los 4.000.000 U$S (cuatro millones de dólares) en mano propia al Dr. Nestor Kirchner en el chalet donde vive el Dr Kirchner con La Presidenta Cristina y que no querían que me vean a mi; entro a las 14.00 hs y salió 14.25 hs, me levanto a mi y fuimos hasta la YPF de Libertador y Melo, donde se bajo de mi auto y se subió a la Meriva de Hernán Gómez chapa IJC 258, y yo los seguí hasta dpto del Lic Baratta; se ve que mientras venían se repartían la parte de dinero que le había dado el Dr. Kirchner, luego de dejarlo al Lic; Hernán se fue y me dice a mi que lo espere a la vuelta de su dpto. a las 15:20 salió y lo lleve a Gorostiaga 2337, estuvo una hora y lo deje en su dpto nuevamente. Durante este viaje me decía irónicamente que quería dejar de hacer las recaudaciones y yo le dije que mientras se lleve algo y me dice: no Oscarcito yo pucherear nomás; le di a entender que yo siempre quedo afuera y me dice esto es así no mas; que el Dr. Kirchner las quiere a todas para él y que además le dijo: no hay más? Cuando llegamos a su dpto. me dice que espere hasta que me avise que me vaya..." (el resaltado corresponde al tribunal).-*

b) El sistema estribaba básicamente en una serie de "puntos fijos de recaudación" en los cuales se reunían los funcionario identificados con los empresarios de los cuales recibían dinero en efectivo principalmente en moneda estadounidense, alternativamente esos "puntos fijos" se concretaban en estacionamientos públicos o privados y el "pase" de dinero se hacía directamente de automóvil a automóvil o también en oficina públicas y privadas.- Después de un episodio confuso el 22 de octubre de 2015, en el cual, personas desconocidas intentaron interceptar el automóvil del Ministerio que había retirado una recaudación de "Supercemento S.A.I.C.", el sistema cambió, y los empresarios debían concurrir al Ministerio de Planificación ingresar por el estacionamiento privado y de allí accedían directamente al despacho de Baratta.- Con posterioridad solo esporádicamente autos oficiales pasaban por alguna empresa a retirar la recaudación. c) En este contexto se puede afirmar que había un primer círculo de percepción de fondos conformado por quienes tenían contacto directos con quienes aportaban los fondos involucrados.- En un segundo circulo estaban quienes a su vez recolectaban esas fondos ilegales para entregarlas a quienes en definitivas comandaron y organizaron ese sistema.- Quienes integraban ese primer círculo se encontraban entre otros Roberto Baratta, Walter Rodolfo Fagyas, Nelson Javier Lazarte, Fabián Ezequiel



García Ramón, Hernán Camilo Gómez, Rafael Enrique Llorens y Germán Ariel Nivello.- En el segundo nivel quienes recibían los fondos recaudados y los derivaban a los jefes y organizadores o aplicaban esos fondos a otra actividades delictivas eran: José María Olazagasti, Hugo Martín Larraburu, Juan Manuel Abal Medina y Daniel Muñoz.- Finalmente quienes se beneficiaron de este sistema recaudatorio, que por cierto no es el único, según el conocimiento que en otras causas tramitan o tramitaron en este tribunal o son de público y notorio son Néstor Carlos Kirchner, Cristina Elisabet Fernández y Julio Miguel De Vido.----------------------------------------------------------------------

**III.- QUIENES RECIBIAN LOS FONDOS ILEGALES - LOS HECHOS.-** Entre las personas que recibían el dinero que les llevaban los nombrados se encuentran entre otros Igor Rudy Fernando Ulloa, Oscar Parrilli -Secretario General de la Presidencia y Director de la Agencia Federal de Inteligencia-, Héctor Daniel Muñoz -Secretario privado de Presidencia-, Hugo Martín Larraburu —Coordinador de la Unidad Ministro de la Jefatura de Gabinete de Ministros-, Juan Manuel Abal Medina -Jefe de Gabinete de Ministros-, José María Olazagasti —Secretario Privado de De Vido-, Jorge Omar Mayoral -Secretario de Minería del Ministerio de Planificación Federal- y Germán Ariel Nivello -Subsecretario de Desarrollo Urbano y Vivienda dependiente de la Secretaría de Obras Públicas del Ministerio de Planificación Federal.---------------------

**a) Néstor Carlos Kirchner y Cristina Elisabet Fernández:** el 8 de octubre de 2009 —Baratta se lo entrega a Muñoz-, 3 y 17 de febrero de 2010 -Baratta-, el 2 de junio de 2010 -Baratta y Lazarte le entregan a Muñoz-, el 21 de julio de 2010 -Baratta-, el 11 de agosto de 2011 —Baratta a Muñoz- se deja la recaudación en la Residencia de Olivos; el 20 de julio de 2010 se reúnen en la Residencia de Olivos con Néstor Kirchner por la recaudación de los miércoles; el 17 de marzo de 2010, 20 de mayo de 2010 y el 27 y 29 de julio de 2010, 6 de octubre de 2010 Néstor Carlos Kirchner se reúne con Baratta y a Lazarte y les dice cómo hacer la recaudación; el 4 de agosto de 2010 reunión con Kirchner y De Vido por la recaudación del día; el 22 de abril de 2010 Néstor Carlos Kirchner lo llama a Baratta y le pregunta cómo viene la recaudación -el llamado lo hace Juan Francisco Alarcón, alías "tatú"-; el 4 de noviembre de 2008 Baratta concurre a Lavalle 462 5°-CABA—luego de tener una reunión con Néstor Carlos Kirchner en la Residencia de Olivos; El 1° de agosto de 2013 la recaudación se entregó a quien manejaba el automóvil dominio "MNI589", que luego ingresó en Casa de Gobierno.----

*Poder Judicial de la Nación*

b) **Julio Miguel De Vido:** De Vido por su parte recibió dinero el 7 de abril de 2010 de Baratta en su departamento, el 31 de mayo de 2010 de Baratta y Lazarte, el 3. 16, 23 y 29 de junio de 2015 y 1° de julio de 2015 Lazarte le entrega el dinero a "Hernan", Secretario de José María Olazagasti para que este se lo de a De Vido. El 18 de junio de 2015 Baratta lleva dinero a lo de De Vido. Lazarte el 28 de mayo de 2015 lleva el producido de la recaudación de "Feir's Park" por un millón de dólares y lo entrega a "Hernán", secretario de José María Olazagasti para que este se lo dé a De Vido. Además el 10 de septiembre de 2013 Lazarte le dejó a su hijo, Facundo De Vido, en Av. Libertador 4850 8° CABA un sobre con treinta mil dólares (U$S 30.000)"----------

c) **Los Secretarios Privados.-** Daniel Muñoz: a saber recibió dinero de Baratta en Uruguay 1306 CABA: 1) el 21 de mayo de 2008; 2) el 29 de mayo de 2008 luego de retirar un bolso de "Feir's Park" proveniente de Valenti y otro del edificio de Techint; 3) el 30 de junio de 2008; 4) el 23 de julio de 2008; 5) el 27 de agosto de 2008; 6) el 4 de septiembre de 2008; 7) el 11 de septiembre de 2008; 8) el 15 de septiembre de 2008; 9) el 18 de septiembre de 2008; 10) el 9 de octubre de 2008; 11) el producido de la recaudación de al menos el 22 de octubre de 2008 es entregado a Muñoz en la calle Uruguay; 12) lo recaudado por Baratta el 28 de octubre de 2008; 13) 30 de octubre de 2008; 14) el 11 de noviembre de 2008; 15) el 2° de diciembre de 2008 Baratta lleva lo recaudado en Lavalle 462 5° CABA a Electroingeniería lo entrega a Daniel Muñoz en la calle Uruguay; 16) el 3 de diciembre de 2008; 17) Oscar Alfredo Thomas El Director Ejecutivo de la "Entidad Binacional Yaciretá el 18 de diciembre de 2008 pagó a Baratta quién luego llevó ese paquete y otro de Techint a Muñoz a Uruguay; 18) el 15 de diciembre de 2008 Baratta llevó el producido de lo pagado por Electroingeniería a Muñoz; 19) el "Grupo Isolux Corsán S.A." paga seis millones de dólares (u$s 6.000.000,00) a Baratta en Maipú 741 - CABA quien se la entrega a Muñoz en Uruguay el 12 de enero de 2009; 20) el 14 de enero de 2009 Baratta le lleva lo cobrado a Neira en Reconquista y Florida a Muñoz; 21) al mismo le entrega las recaudaciones de los siguientes días: el 10 de febrero de 2009; 22) el 25 de febrero de 2009; 23) el 11 de marzo de 2009; 24) el 26 de marzo de 2009 –con García Ramón–; 25) 7 de abril de 2009; 26) el 29 de abril de 2009; 27) el 14 de mayo de 2009; 28) el 19 y 20 de mayo de 2009; 29) el 26 de mayo de 2009 –en presencia de Fagyas–; 30) el 4 de junio de 2009 Baratta lleva el producido de la recaudación en "Feir's Park" a Muñoz en la calle

USO OFICIAL



CAROLINA LOPEZ ARNAIZ
SECRETARIA FEDERAL

Uruguay; 31) el 11 de junio de 2009; 32) el 2 y 19 de junio de 2009 -en presencia de García Ramón-; 33) el 22 de junio de 2009 -también en presencia de García Ramón-; 34) el 24 de junio de 2009 -en presencia de García Ramón-; 35) el 16 de julio de 2009; 36) el 22 de julio de 2009 estaba presente García Ramón-; 37) el 30 de julio de 2009 -en presencia de Gómez-; 38) 6 de agosto de 2009 -estaban García Ramón y Gómez-; 39) Baratta y Gómez entregan el 12 de agosto de 2009 tres bolsos con producidos a Muñoz; 40) el 21 de agosto de 2009; 41) el 3 de septiembre de 2009; 42) 10 de septiembre de 2009 -en presencia de García Ramón y Gómez-; 43) el 17 de septiembre de 2009 - estaba Gómez-; 44) el 19 y 22 de octubre de 2009; 45) el 28 de octubre de 2009 -estaba Gómez-; 46) 19 de noviembre de 2009; 47) el 3° y 10 de diciembre de 2009; 48) el 20 de enero de 2010; 49) el 27 de enero de 2010; 50) el 10 y 24 de febrero de 2010; 51) el 10 de marzo de 2010; 52) el 17 de marzo de 2010; 53) 15 de abril de 2010; 54) 27 de mayo de 2010 -Lazarte-; 55) 28 de abril de 2010 -en presencia de Gómez-; 56) el 9 de junio de 2010 -en presencia de Fagyas-; 57) el 8 de julio de 2010 -frente a Lazarte-; 58) el 14 y 28 de julio de 2010; 59) el 4, 6 y 25 de agosto de 2010; 60) el 3 y 9 de septiembre de 2010 -con Lazarte-; 61) 15 y 30 de septiembre de 2010 -con Lazarte-; 62) el 7 de octubre de 2010 Barata y Lazarte cobran cuatro millones de dólares (u$s 4.000.000,00) de Neira en Callao 1175 - CABA dicho dinero lo entregaron a Gómez para que se lo dé a Muñoz en Uruguay 1306 - CABA.------------------------------------

**d) Hugo Martín Larraburu:** 1) Los días 1, 5, 6, 8 y 9 de agosto de 2013, el 2, 4, 5, 10, 12 y 17 de septiembre de 2013 Lazarte y Barata entregan la recaudación a una persona de presidencia que manejaba el rodado marca "Ford" modelo "Focus" dominio MNI 589, utilizado por Hugo Martín Larraburu, la del 5 de septiembre se la debía entregar a Abal Medina por orden de Cristina Elisabet Fernández; 2) el 7 de agosto de 2013 Lazarte recauda en "Feir's Park" de Valenti y pasa al auto de presidencia un automóvil marca "Ford" modelo "Focus" dominio MNI 589 utilizado por Hugo Martín Larraburu; 3) el 29 de agosto de 2013 los dólares aportados por Loson a Lazarte (u$s 300.000,00) es llevado a la casa de Gobierno y entregado a Hugo Martín Larraburu, que se lo tenía que entregar a Juan Manuel Abal Medina y el 30 le entregan también a Larraburu en casa de gobierno 4) el 19 de septiembre de 2013 Lazarte retira sesenta mil dólares (u$s 60.000) luego se lo entregan a Hugo Martín Larraburu; 5) el 18 de septiembre y el 17 de octubre de 2013, el dinero se lo entregan a Hugo Martín Larraburu el que conducía un

*Poder Judicial de la Nación*

USO OFICIAL

automóvil con el dominio MNI 588; 6) el 20, 24 y 25 de septiembre de 2013 le entregan el dinero a Hugo Martín Larraburu quien esa oportunidad conducía un automóvil con el dominio KIM 064; 7) El 1° y 22 de octubre de 2013 le dan el dinero a Hugo Martín Larraburu que se lo tiene que dar a Abal Medina; 8) el 1, 15 y 24 de octubre de 2013 le entregan el dinero a Hugo Martín Larraburu.---------------------------------------------------------

**e) Otros: A.- Norberto Oyarbide**: participó de la asociación ilícita, siendo que el 3 de septiembre de 2013 se reunió a comer con Baratta y De Vido en restaurante "Sagardi", Humberto 1° 319 – CABA. El 26 de septiembre de 2013 Baratta y Lazarte se reúnen con Oyarbide en avenida Comodoro Py 2002, piso n° 3 - CABA. El 17 de octubre de 2013 Oyarbide le da una resolución a Lazarte en el restaurante "Estilo Campo" en Alicia Moreau de Justo 1840 - CABA. El 22 de junio de 2015, Lazarte concurre a la casa de Oyarbide, ubicada en Rodríguez Peña 1978 - CABA, y retira papeles, luego de ir varias veces a retirar y entregar dinero. El 14 de octubre de 2015 Oyarbide le da una resolución a Lazarte en el restaurante "Estilo Campo", sito en Alicia Moreau de Justo 1840 - CABA. Corresponde destacar que durante el período indicado, Norberto Mario Oyarbide fue el Juez titular a cargo del Juzgado Nacional en lo Criminal y Correccional Federal n° 5 de la Ciudad Autónoma de Buenos Aires. **B.- Javier Fernández**.- El 2 de agosto de 2013 y el 7 de agosto de 2013, Lazarte le llevó dinero a Javier Fernández a su casa, en la calle Andonaegui 2138, piso n° 1, de esta ciudad. El 16 de julio de 2013 Baratta y Lazarte le entregaron dinero a Javier Fernández, en el mismo domicilio.- **C.- Oscar Parrilli**: recibió dinero el 12 de noviembre de 2008 de Baratta, en Scalabrini Ortiz 3358, piso n° 5, Dpto. "B", C.A.B.A.------------------------------------------------------

**IV.- QUIENES PAGABAN - LOS HECHOS.-** Los recaudadores de la asociación ilícita contaron con la participación de empresarios que pagaron sumas de dinero por una suma aproximada de dólares estadounidenses TREINTA Y CINCO MILLONES SEISCIENTOS CUARENTA Y CINCO MIL (u$s 35.645.000,00); en un sinnúmero de oportunidades entre 2008 y 2015 lo que permite acreditar la permanencia en el tiempo de la organización ilícita.- Entre estos empresarios y hasta el momento se determinó, sin excluir futuras personas a vincular a la presente causa, la participación de:----------------

**A.- Carlos Guillermo Enrique Wagner** realizó pagos por "ESUCO S.A.", los cuales se concretaron en San José 151 - CABA, donde tenía sede dicha empresa el día 2° de junio de 2010 lugar desde el cual Baratta y Lazarte retiraron quinientos mil dólares (u$s



CAROLINA LORES AKNAIZ
SECRETARIA FEDFE

500.000,00) luego se lo llevan a Muñoz junto con otra recaudación; los días 14 de mayo de 2013 y el 25 julio de 2013 los nombrados retiraron un bolso con dinero; el 7 de agosto de 2013 fueron Baratta y Lazarte a retirar un bolso con dinero y el 6 de septiembre de 2013 fueron nuevamente Baratta y Lazarte a retirar un bolso con dinero; el 27 de julio de 2015 fue solo Lazarte.- También en una oportunidad el 22 de septiembre de 2010 fue Wagner a bordo de un automóvil marca "Honda" modelo "Accord" dominio ELL 129 y entregó a Baratta un millón de dólares (u$s 1.000.000,00).------------------------------------------------------------------------------------

**B.- Armando Roberto Loson** realizó pagos por "Albanesi S.A.", los cuales se concretaron en el edificio ubicado en Leandro N. Alem 855 - CABA, donde tenía sede dicha empresa el día 18 de julio de 2013 fue Lazarte y retiró un bolso con dinero, el 25 del mismo mes y año fue Baratta y Lazarte a retirar el bolso con dinero, el 29 de agosto de 2013 fue Lazarte y recibió de Loson un bolso con trescientos mil dólares (u$s 300.000,00) quién estaba con una persona de nombre "Marcelo" y les señaló "...decile al lic Baratta que ya alquilo otra máquina para el trabajo..."; el 30 de agosto de 2013 Loson le entregó a Lazarte doscientos mil dólares (u$s 200.000,00); el 10 de septiembre de 2013 Loson le entregó a Lazarte una bolsa con trescientos mil dólares (u$s 300.000,00), el 16 de septiembre de 2013 Lazarte recibió de Loson trescientos cincuenta mil dólares (u$s 350.000,00); el 2 de junio de 2015 Lazarte recibió dos paquetes con un millón doscientos cincuenta mil dólares (u$s 1.250.000,00); el 29 de junio de 2015 Lazarte recibió de Loson quinientos mil dólares (u$s 500.000,00); el 21 de julio de 2015 Loson le entregó a Lazarte un millón de dólares (u$s 1.000.000,00); el 6 de octubre de 2015 Lazarte retiró cuatrocientos mil dólares (u$s 400.000,00).- .---------

**C.- Héctor Javier Sánchez Caballero** realizó pagos por "ODS S.A." y "IECSA S.A.", de las cuales fuera accionista **Ángel Jorge Antonio Calcaterra**, que se concretaron en el garaje del hotel "Hilton" ubicado en Macacha Güemes 351 CABA; el 1 de octubre de 2013 Lazarte retiró un millón de dólares u$s 1.000.000,00) que le entregó Sánchez Caballero, siendo luego entregado a Hugo Martín Larraburu; el 30 de junio de 2015 Lazarte retiró un millón quinientos mil dólares (u$s 1.500.000,00) que le entregó Sánchez Caballero; el 13 de julio de 2015 Lazarte recibió doscientos cincuenta mil dólares (u$s 250.000,00) de Sánchez Caballero; el 4 de agosto de 2015 Lazarte retiró un millón doscientos cincuenta mil dólares (u$s 1.250.000,00) de manos de Sánchez

Caballero; Lazarte realizó cuatro cobros más en la misma cochera los días 11, 17, 18 y 24 del mes de septiembre de 2013 por un millón quinientos mil dólares (u$s 1.500.000,00) en cada oportunidad.- También hubo retiro de dinero en el edificio de Manuela Saenz 323/351 CABA, donde funciona "ODS S.A." el 16 de julio de 2013 y el 1° de agosto de 2013 retiran el dinero Baratta y Lazarte; el 9 de agosto de 2013 cobra Lazarte; el 22 de octubre de 2013 Lazarte retiró un millón doscientos cincuenta mil pesos (u$s 1.250.000,00); el 28 de mayo de 2015 Lazarte retiró un millón doscientos mil dólares (u$s 1.200.000,00); el 18 de agosto de 2015 Lazarte retiró el dinero; el 14 de septiembre de 2015 Lazarte retiró setecientos cincuenta mil dólares (u$s 750.000,00); y el 21 de octubre de 2015 Lazarte retiró trescientos cincuenta mil dólares (u$s 350.000,00).--------------------------------------------------------------------------

**D.- Francisco Rubén Valenti**, realizó pagos por "IMPSA S.A." -"Industrias Metalúrgicas Pescarmona S.A.I.C. y F"-, habiéndose reunido con Baratta en el hotel "Feir's Park" ubicado en Esmeralda 1.366 CABA los días 8 y 28 de febrero de 2008; 8 de abril del 2008; el 29 de mayo de 2008; el 11 de julio de 2008 Baratta retira de "Feir's Park" un paquete; el 2 de septiembre de 2008; el 28 de octubre de 2008 Baratta retira caja de vino y bolso de dinero como todos los meses; el 11 de diciembre de 2008 Baratta retira el dinero; el 4 de marzo de 2009 también retira dinero; el 4 de junio de 2009 retira un bolso con dinero; también el 20 de agosto de 2009 Baratta recibe un paquete con dinero y una caja de vinos; el 23 de septiembre de 2009 Baratta y Gómez recibieron aproximadamente ciento cincuenta mil dólares (u$s 150.000,00) y una caja de vinos, que luego se lleva a Muñoz a Uruguay junto con otra recaudación; el 7 de diciembre de 2009 Baratta recibe doscientos mil dólares (u$s 200.000,00) y una caja de vinos; el 27 de enero de 2010 Baratta retira doscientos mil dólares (u$s 200.000,00) y una caja de vinos; el 22 de abril de 2010 Baratta y Lazarte retiran un bolso con ciento treinta y cinco mil dólares (u$s 135.000,00) y caja con vinos; el 26 de julio de 2013 Libertad 1535 CABA reciben un bolso de dinero; el 1 de septiembre de 2010 al Hotel "Feir's Park" de Esmeralda 1366 al 2° subsuelo, donde lo esperaba el chofer de Valenti y lo acompaño hasta la habitación, luego bajo el Lic Baratta con Valenti, y traía un bolso con dinero con 700.000U$S (setecientos mil dólares), y una caja de vino con seis botellas; el 7 de agosto de 2013 Lazarte recibe dinero en "Feir's Park" de Valenti; el 28 de mayo de 2015 Lazarte retira un millón de dólares (u$s 1.000.000,00) en "Feir's



CAROLINA LOREN ARNAIZ
SECRETARIA FEDER

Park"; el 30 de julio de 2015 Lazarte retira un bolso con quinientos mil dólares (u$s 500.000).--------------------------------------------------------------------------------

**E.- Carlos José Mundin**, ordenó que "BTU S.A." realizara pagos el 21 de mayo de 2009 a Baratta para lo que se utilizó el rodado marca "Renault" modelo "Megane" dominio EBY 711; Con Mundin hubo reuniones en el restaurante "Croque-Madame", ubicado en Libertador 1902 CABA el 1° de junio de 2010 en la que se habló de proyectos que tenían el visto bueno de Néstor Carlos Kirchner y de Julio Miguel De Vido, de la reunión participó Santiago de Vido -hijo del Ministro-, Lazarte y Baratta, luego del encuentro los últimos nombrados fueron a la Residencia de Olivos; El 7 de julio de 2010 Baratta se reúne con Mundin en el mismo lugar; el 28 de julio de 2010 Baratta se reunió temprano con Mundin; El 5 de agosto de 2010 por la tarde Baratta fue al domicilio del Ministro De Vido y de ahí salió con su hijo, Santiago De Vido, y fueron nuevamente a reunirse con Mundin al restaurante indicado con Wagner y una persona de nombre "Flavio" en la cual hablaron de 4 obras en el sur y dos obras en el norte, obras de infraestructura de gas; El 13 de agosto de 2010 se reunieron en el mismo lugar Baratta, Santiago de Vido y Mundin; El 13 de septiembre de 2010 Baratta y Fagyas van a Alem 896 - 5° piso - CABA a retirar un bolso de dinero de dicho lugar donde funcionaba "BTU S.A."; El 30 de agosto de 2013 Baratta y Lazarte van a Alem 896 - CABA a reunirse con Santiago De Vido y Mundin.------------------------------------

**F- Jorge Guillermo Neira y Gerardo Luis Ferreyra** ordenaron por el "Grupo Eling S.A."-"Electroingeniería S.A." realizar pagos los cuales se concretaron en Lavalle 462 - 5° - CABA, donde tenía sede la empresa, el 9 y el 22 de octubre de 2008 fue Baratta, el último día se lleva la recaudación a Muñoz a Uruguay 1306 CABA; el 2 de diciembre de 2008 Baratta recibe dinero de Ferreyra en Lavalle 462 5° piso CABA y luego se lo entrega a Muñoz en Uruguay 1306 CABA; el 15 de diciembre de 2008 Baratta y Llorens se encontraron con Ferreyra quien les dio un paquete con dinero; el 14 de enero de 2009 Baratta y García Ramón retiran el dinero mensual; el 30 de septiembre de 2009 el pago lo realiza Neira en Reconquista y Florida CABA y se lo entrega a Baratta quién luego lo lleva a Uruguay 1306 CABA; el 7 de octubre de 2010 el pago lo hace Neira en Callao 1175 - CABA le entrega a Baratta y Lazarte una valija con cuatro millones de dólares (u$s 4.000.000,00); el 13 de octubre de 2010 el pago lo hace Neira en Azucena Villaflor 450 25° of. 3 CABA le entregó a Baratta tres millones de dólares (u$s

*Poder Judicial de la Nación*

Cn° 9.608/18

3.000.000) junto con un resumen de lo aportado; el 21 de octubre de 2010 el pago lo hace una persona en remplazo de Neira en Callao 1175 CABA 3.500.000 U$S (tres millones quinientos mil dólares) y luego se lo llevan a Muñoz; el 12 de noviembre de 2010 van dos veces a Lavalle 462 CABA a recibir dinero Baratta y Gómez; el 26 de noviembre de 2010 van Baratta y Lazarte a cobrar a Lavalle 462 CABA; el 18 de septiembre de 2013 Baratta y Lazarte retiran el dinero por 25 de mayo 489 - CABA; el 18 de junio de 2015 Lazarte retiró doscientos cincuenta mil dólares (u$s 250.000,00); el 3 de agosto de 2015 Lazarte retiró doscientos cincuenta mil dólares (u$s 250.000,00) y el 14 de agosto de 2015 también Lazarte retiró dinero.------------------------------------

**G.- Oscar Alfredo Thomas,** -Director Ejecutivo de la "Entidad Binacional Yaciretá"- realizó pagos en Juncal 1740 - CABA el 18 de diciembre de 2008 a Baratta; Thomas entregó dinero el 28 de enero de 2009 a Baratta; el 27 de mayo de 2009 a Baratta le entregó un paquete con dinero; el 29 de julio de 2009 Baratta y Fagyas reciben una caja con dinero; el 5 de agosto de 2009 le entrega a Baratta setecientos mil dólares (u$s 700.000.00); el 12 de agosto de 2009 le entrega a Baratta y Gómez un bolso con un millón cien mil dólares (u$s 1.100.000,00); el 2° de septiembre de 2009 Baratta recibe un paquete con dinero; el 15 de enero de 2010 Baratta retira una bolsa con dinero; el 21 de enero de 2010 Thomas le entrega a Baratta aproximadamente doscientos mil dólares (u$s 200.000,00); el 26 de enero de 2010 Baratta recibe paquete con dinero; el 25 de febrero de 2010 Baratta recibe dos bolsas con aproximadamente trescientos mil dólares en total (u$s 300.000,00); el 15 de marzo de 2010 Baratta retira bolsa con doscientos cincuenta mil dólares (u$s 250.000,00); el 20 de julio de 2010 Baratta recibe una bolsa con doscientos cincuenta mil dólares (u$s 250.000,00); el 7 de agosto de 2013 Baratta y Lazarte retiran el dinero de las oficinas de avenida Eduardo Madero 942 – C.A.B.A.; el 19 de agosto de 2010 retiran Baratta y Lazarte un millón doscientos mil dólares (U$S 1.200.000) de Juncal 1740 CABA; el 13 de agosto de 2013 Lazarte retira de las oficinas de avenida Madero 942, C.A.B.A. un bolso con dinero; el 19 de septiembre de 2013 Lazarte retira el dinero de las oficinas de avenida Madero 942, C.A.B.A.----------------

**H.- Juan Carlos De Goycoechea**, ordenó realizar pagos por el "Grupo Isolux Corsán S.A." los cuales se concretaron en Maipú 741 - CABA el 19 de junio de 2008 a Baratta quién luego llevó el dinero a Uruguay 1306 CABA; el 5 de enero de 2009 le entregan una valija con seis millones de dólares (u$s 6.000.000,00) a Baratta; el 7 de abril y el 29

USO OFICIAL



CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

de abril de 2009 entregan sendas bolsas con dinero a Baratta; el 14 de mayo de 2009 dos bolsos con dinero a Baratta y García Ramón; el 15 de mayo de 2009 Baratta y García Ramón una mochila con dinero; 8 de abril de 2010 hay una reunión con Llorens y Baratta; el 19 de mayo de 2010 doscientos mil dólares (U$S 200.000); el 27 de mayo de 2010 Baratta y el Ing Ezequiel García concurren a Azucena Villaflor y Aime Paine, vinculado a "Goycoechea", retirándose ambos con un bolso que tenía un millón trescientos mil dólares (U$S 1.300.000); el 15 de septiembre de 2010, Lazarte y Baratta retiran de Maipú 741 novecientos mil dólares (900.000 U$S); 24 de noviembre de 2010 dólares doscientos mil (U$S 200.000) va Barata a retirar a Maipú 741 CABA; el 1° de agosto de 2013 Baratta y Lazarte llevan un bolso vacío y lo retiran con dinero; el 5 de septiembre de 2013 Lazarte y Hugo Martín Larraburu retiran el dinero para luego llevárselo a Juan Manuel Abal Medina por indicación de Cristina Elisabet Fernández; el 19 de septiembre de 2013 Lazarte retira sesenta mil dólares (u$s 60.000,00); el 23 de octubre de 2013 Lazarte retira trescientos mil dólares (u$s 300.000,00); el cobro se realizó en Venezuela 151 CABA: el 8 de agosto de 2013 retiran un bolso Baratta y Lazarte de un tal "Juanca", el 3 de junio de 2015 Lazarte recibe de un tal "César" un millón quinientos mil dólares (u$s 1.500.000,00), y el 13 de julio de 2015 Lazarte retira un millón doscientos mil dólares (u$s 1.200.000,00) y el 6 de octubre de 2015 Lazarte recibe una caja con doscientos cincuenta mil dólares ($ 250.000,00).------------------------

**I.- Otero** El 3 de junio de 2015 Otero le entrega doscientos cincuenta mil dólares (u$s 250.000,00) en su oficina de retiro a Lazarte.------------------------------------------------

**J.- Claudio Javier Glazman** El nombrado le hizo entrega a Hernán Gómez de las siguientes sumas de dinero: a) El día 23/9/09, le entregó la suma de doscientos cincuenta mil dólares (u$s 250.000), en la calle Emma de la Barra 353 de esta ciudad. Esa misma noche, se llevó la recaudación a Daniel Muñoz; b) el 30/9/09, le entregó doscientos cincuenta mil dólares (u$s 250.000), en la calle Emma de la Barra 353 de esta ciudad, la plata de la semana y luego junto con otra recaudación se la entregó a Muñoz c) El día 24/2/10, le entregó un bolso con dinero, en el subsuelo del estacionamiento de la Av. Córdoba de "Galerías Pacífico" de esta ciudad; d) El día 10/3/10, le entregó un bolso con dos millones quinientos mil dólares (u$s 2.500.000), en Pasaje Levenne al 950 de esta ciudad. Ese mismo día se hizo entrega de la recaudación a Daniel Muñoz en Uruguay 1306 CABA; e) El día 23/3/10, le entregó la

*Poder Judicial de la Nación*

suma de un millón doscientos cuarenta y ocho mil dólares (u$s 1.248.000), en la intersección de las Avenidas Belgrano y Paseo Colón de esta ciudad y de seiscientos sesenta mil dólares (u$s660.000) en la Av. Alem 1050 CABA. Todo ello se le entregó junto con otras recaudaciones a Daniel Muñoz en Uruguay 1306 CABA y Baratta se lo informó a De Vido; f) El día 28/4/10, le entregó un bolso con dinero, en la intersección de las calles Moreno y Balcarce de esta ciudad; g) El día 18/8/10, le entregó la suma de un millón doscientos mil dólares (u$s 1.200.000), en la intersección de las calles Anchorena y Juncal de esta ciudad. Dicha recaudación fue entregada a Daniel Muñoz, en Uruguay 1306 CABA.----------------------------------------------------------------------

**K.- Rodolfo Armando Poblete:** el 19 de marzo de 2010  entregó un bolso con trescientos mil dólares (u$s 300.000) a Baratta –en presencia de Lazarte-, en el segundo subsuelo del domicilio de la Av. Alvear 1491 de esta ciudad. El pago habría sido realizado por orden de "Hidrovía S.A.", empresa que también habría entregado el 20 de enero de 2010 un bolso con ochocientos mil dólares (u$s 800.000), a Baratta, en Av. Corrientes 316 de esta ciudad, luego de ello, Centeno trasladó a Lazarte y a los nombrados al Ministro de Planificación Federal, más tarde, Baratta le entregó lo recaudado a Daniel Muñoz, quien se encontraba en el vehículo dominio "EQL 442" en la calle Uruguay 1306 de esta ciudad y el 9 de agosto de 2013 un bolso con dinero Lazarte en la Av. Corrientes 316 de esta ciudad, éste lo pasó al vehículo dominio "MNI 589", utilizado por Hugo Martín Larraburu.-------------------------------------------------------

**L.- Héctor Alberto Zabaleta:** realizó las siguientes entregas de dinero del "Grupo Techint", por indicación de **Luis María Cayetano Betnaza**, quien fuera Director Institucional del grupo: el 29 de mayo de 2008, entregó un bolso con dinero a Baratta, en el edificio del "Grupo Techint", ubicado en la calle Della Paolera 299 de esta ciudad, bolso que luego fue entregado a Daniel Muñoz, en la calle Uruguay 1306 de esta ciudad; el día 1 de agosto de 2008, en el subsuelo del edificio mencionado, Zabaleta le entregó un paquete con dinero a Baratta; el día 27 de agosto de 2008, Zabaleta le entregó un paquete con dinero a Baratta, en el edificio del "Grupo Techint", paquete que luego fue entregado a Daniel Muñoz en la calle Uruguay 1306 de esta ciudad. El día 30 de octubre de 2008, Zabaleta  subió al vehículo conducido por Centeno en la intersección de las calles Della Paolera y L.N. Alem y de este modo descendieron al segundo subsuelo del edificio del "Grupo Techint", allí, el nombrando el entregó un



CAROLINA LORE... ...NAIZ
SECRETARIA ...

paquete con dinero, el cual fue finalmente dado a Daniel Muñoz, quien se encontraba en la calle Uruguay 1306 de esta ciudad. Los día 3 y 18 de diciembre de 2008, Zabaleta le entregó dinero a Baratta, en el segundo subsuelo del edificio del "Grupo Techint" antes mencionado. En esas mismas fechas, dicho dinero fue entregado a Daniel Muñoz en la calle Uruguay 1306 de esta ciudad. Los pagos habrían sido realizados por orden del "Grupo Techint.", empresa que también habría entregado el 30 de junio de 2008 un paquete con dinero a Baratta, en el mismo lugar, que también fue entregado a Daniel Muñoz el mismo día. Y el 3 de octubre de 2008 una persona de parte del mismo grupo y en igual lugar identificada como "Ale" le entregó los dividendos del mes a Baratta.----

**V.- OTRAS PERCEPCIONES DE DINERO:**----------------------------------------------

**a)-** Por otro lado Llorens le hizo entrega de dinero a Baratta en Ugarteche 3260 CABA el 3 de septiembre de 2009; participó de una reunión en la que le habrían dado dinero a Baratta el 18 de septiembre de 2008 en el hotel Hilton. Además el 19 de noviembre de 2009 hicieron una división de plata entre Llorens, García Ramón, Fagyas, Gómez y Baratta.--------------------------------------------------------------------------------------

**b)-** Además de las detalladas, Fabián Ezequiel García Ramón recibió dinero el 15 y 16 de septiembre de 2008, 10 de febrero de 2009, 14 de mayo de 2009, 15 de mayo de 2009, 11 de junio de 2009, 8 de octubre de 2009 -junto con Gómez-; y el 21 de octubre de 2008, 29 de mayo de 2009, 10 de diciembre de 2009 le entregó dividendos a Baratta.--------------------------------------------------------------------------------------

**c)-** Por su parte Rudy Fernando Ulloa le hizo entrega a Baratta de dividendos en Viamonte 367 10° CABA, 14 de octubre de 2008, 16 de diciembre de 2008, 9 de febrero de 2009.--------------------------------------------------------------------------------

**d)-** Además Walter Fagyas le entregó a Baratta dinero el 3 de junio de 2009 y el 20 de diciembre de 2010 en su domicilio Malabia 2174 CABA.------------------------------------

**e)-** El 19 y 25 de julio de 2013 Lazarte recibe dinero de Jorge Omar Mayoral en la Secretaría de Minería.--------------------------------------------------------------------------

**f)-** El 9 de junio de 2015 Germán Ariel Nivello le entregó a Baratta un millón doscientos cincuenta mil dólares (u$s 1.250.000,00) en el Ministerio; El 29 de junio de 2015 Nivello le entregó a Lazarte, en el edificio de la Secretaría de Vivienda, setecientos mil dólares (u$S 700.000,00). El 1° de julio de 2015, Germán Ariel Nivello le entregó un millón de dólares (U$S 1.000.000) a Lazarte, quien luego se los dio a un

*Poder Judicial de la Nación*

Cn° 9.608/18

secretario de Olazagasti, en el subsuelo del Ministerio de Planificación.------------------

Acto seguido se pone en conocimiento del compareciente que las pruebas obrantes en autos son: 1) Declaración testimonial de testigo de identidad reservada de fs. 2/6vta.; 2) Certificaciones actuariales de fs. 7vta/9vta, 11/13, 15vta/17, 2374, 2375, 2380, 2576. 2716 y 4799/4801; 3) Impresiones de notas periodísticas de fs. 18/39; 4) Actuaciones de la División Operaciones Federales de la Policía Federal Argentina de fs. 49/1756, 1803/2085, 2218/2225, 2233/2240, 2396, 2476/2513, 2554/2575, 2690/2710, 2726/2791, 2806/2831, 2857/2897, 2955/2993, 4168/4176, 4227/4399, 4535/4595 y 4655/4798; 5) notas de la firma "Telecom Argentina S.A." de fs. 1782/1783, 2100/2101, 2216/2217 y 2798/2800; 6) Nota de la firma "NSS S.A. (IPLAN)" de fs. 1785; 7) Notas de la firma "Nextel Communications Argentina S.R.L." de fs. 1787, 2600 y 2721; 8) Notas de la firma "Claro" de fs. 1789/1790vta, 2205/2206vta, 2801/2802 y 2804; 9) Notas de la firma "Telefónica Argentina S.A." de fs. 1791, 1793, 2098/vta, 2598, 2711/2714, 2722, 2835, 2838/2844 y 2852/2855vta; 10) Nota de la firma "Telecentro S.A." de fs. 1795; 11) Nota de la firma "Telecom Personal S.A." de fs. 1796/1799vta; 12) Oficio de la Dirección de Bienestar del Ejército Argentino de fs. 1801; 13) Nota de la firma "NH Collection Buenos Aires Centro Histórico" de fs. 2092; 14) Nota del Registro de la Propiedad Automotor de fs. 2095/2097; 15) Copias de la causa n°14.305/15 del registro de este Juzgado de fs. 2104/2105; 16) Informes de Estados de Dominio Históricos aportados por el Departamento de Asuntos Normativos y Judiciales de la Dirección Nacional de los Registros Nacionales de la Propiedad Automotor y de Créditos Prendarios de fs. 2113/2191; 17) Constancia de correo electrónico del Registro Seccional N°2 (San Pedro) del Registro de la Propiedad Automotor de fs. 2194; 18) Nota del Registro Seccional N°25 del Registro de la Propiedad Automotor de fs. 2195; 19) Nota del Registro Seccional N°76 del Registro de la Propiedad Automotor de fs. 2196; 20) Nota del Registro Seccional N°3 (Lomas de Zamora) del Registro de la Propiedad Automotor de fs. 2197; 21) Actuaciones de la Dirección de Asistencia Judicial en Delitos y Crimen Organizados del Poder Judicial de la Nación de fs. 2198, 2547/2547vta, 2597, 2724/2725vta, 4440/4445, 4610/11 y 4967/70; 22) Nota del Registro Seccional N°70 del Registro de la Propiedad Automotor de fs. 2199; 23) Nota del Registro Seccional N°2 (Avellaneda) del Registro de la Propiedad Automotor de fs. 2200; 24) Nota del Registro Seccional N°45 del Registro

USO OFICIAL



CAROLINA LORES MINAIZ
SECRETARIA FEDER...

de la Propiedad Automotor de fs. 2201; 25) Nota del Registro Seccional N°26 del Registro de la Propiedad Automotor de fs. 2204; 26) Nota del Registro Seccional N°16 (La Plata) del Registro de la Propiedad Automotor de fs. 2207; 27) Nota del Registro Seccional N°43 del Registro de la Propiedad Automotor de fs. 2208/2210 y 2213; 28) Constancia de correo electrónico de fs. 2211; 29) Nota del Registro Seccional N°11 del Registro de la Propiedad Automotor de fs. 2211; 30) Nota del Registro Seccional N°1 (Florencio Varela) del Registro de la Propiedad Automotor de fs. 2214; 31) Nota del Registro Seccional N°1 (Quilmes) del Registro de la Propiedad Automotor de fs. 2215; 32) Hoja de registro dominio GKF-405 de fs. 2231; 33) Nota del Registro Seccional N°5 (Tigre) del Registro de la Propiedad Automotor de fs. 2241; 34) Nota del Registro Seccional N°3 (San Martín) del Registro de la Propiedad Automotor de fs. 2242; 35) Nota del Registro Seccional N°6 (La Matanza) del Registro de la Propiedad Automotor de fs. 2244; 36) Nota del Registro Seccional N°1 (Esteban Echeverría) del Registro de la Propiedad Automotor de fs. 2245; 379 Nota del Registro Seccional N°1 (Mercedes) del Registro de la Propiedad Automotor de fs. 2246; 38) Nota del Registro Seccional N°2 (San Pedro) del Registro de la Propiedad Automotor de fs. 2247; 39) Nota del Registro Seccional N°4 del Registro de la Propiedad Automotor de fs. 2251; 40) Copias de los registro de ingresos a la Residencia Presidencial de Olivos extraídos de la causa N°1.614/2016 del registro del Juzgado Nacional en lo Criminal y Correccional Federal N°7, Secretaría N°13 de fs. 2252/2373; 41) Nota del Registro Seccional San Vicente del Registro de la Propiedad Automotor de fs. 2376; 429 Nota del Registro Seccional N°8 (Olivos) del Registro de la Propiedad Automotor de fs. 2377; 43) Nota del Registro Seccional N°13 (La Plata) del Registro de la Propiedad Automotor de fs. 2391; 449 Nota del Registro Seccional N°3 (San Miguel) del Registro de la Propiedad Automotor de fs. 2392; 45) Actuaciones remitidas por la Dirección de Administración de Recursos Humanos de la Secretaría General de la Presidencia de la Nación de fs. 2397/2474 - entre los que se encuentran los legajos de los agentes: Héctor Daniel Muñoz, Martín Federico Aguirres y Juan Francisco Alarcón-; 46) Nota del Registro Seccional Santo Tomé del Registro de la Propiedad Automotor de fs. 2475; 47) Nota del Registro Seccional N°2 (San Nicolás) del Registro de la Propiedad Automotor de fs. 2514; 48) Nota de la firma Ford Argentina S.C.A. de fs. 2515/2518vta y 2580/2594; 49) Nota de la firma "BM Centro S.A." de fs. 2519/2537vta; 50) Nota de la firma "Volkswagen

*Poder Judicial de la Nación*

Cn° 9.608/18

Argentina S.A." de fs. 2538/2544vta; 51) Oficio de la Inspección General de Justicia de fs. 2551/2552; 52) Nota del Registro Seccional de Cruz del Eje Córdoba del Registro de la Propiedad Automotor de fs. 2578; 53) Nota del Registro Seccional N°6 (San Isidro) del Registro de la Propiedad Automotor de fs. 2579; 54) Informes de NOSIS de fs. 2595/2596, 2846/2848, 3026/3032, 3053/3055 y 4402/4404; 55) Nota de la firma "General Motors de Argentina S.R.L." de fs. 2601/2623; 56) Registro de la Dirección Nacional de Migraciones de fs. 2624/2671vta; 57) Informes de VERAZ de fs. 2672/2684 y 2845; 58) Nota de la firma "Arbitra S.A." de fs. 2682/2685; 59) Actuaciones de la Subsecretaría Legal y Administrativa de la Secretaría General de la Presidencia de la Nación de fs. 2832/vta y 2834; 60) Nota de la Administración General de Servicios Generales de la Secretaría General de la Presidencia de la Nación de fs. 2833; 61) Nota de la Dirección de Operaciones y Servicios Generales de la Jefatura de Gabinete de Ministros de fs. 2836/2837vta; 62) Informe actuarial de fs. 2898; 63) Informe del Ministerio de la Jefatura de Gabinete de Ministros 2945/2946; 64) Informe del Ministerio de Energía 2948/2950; 65) Declaración testimonial de Hilda María Horovitz fs. 2951/2953 y comparecencia de fs. 2997; 66) Declaración testimonial de Diego Hernán Cabot a fs. 2999/3003; 67) Certificaciones actuariales a fs. 2994, 3004/3006, 4207 y 4407/4408; 68) Declaración testimonial de Candela Ini a fs. 3009/3010; 69) Declaración testimonial de Jorge José Bacigalupo a fs. 3011/3012 y comparecencia a fs. 3025; 70) Informe actuarial a fs. 3017, y fs. 4400; 71) Informe del Registro Nacional de Armas -RENAR-de fs. 3024, 3051 y 4153; 72) Informe de "Veraz Localiza" de fs. 3052; 73) Informe de la División Balística de la Policía Federal Argentina de fs. 3150/3151; 74) Informe de la Unidad de Información Financiera –UIF- de fs. 3152; 75) Recortes periodísticos aportados por David Jabif a fs. 3560/3181; 76) Actuaciones de la División Operaciones Federales de la P.F.A., en relación al allanamiento de la finca sita en calle tres de febrero 1194, piso 5to. Departamento "D", de fs. 3191/3220; 77) Actuaciones de la División Operaciones Federales en relación a los allanamientos llevados a cabo el día 1ro. de agosto de 2018, de fs. 3336 a 4131; 78) Informe del Ministerio de Energía y Minería a fs. 4132/4134; 79) Declaración testimonial de Damián Ignacio Jerez a fs. 4166/4167; 80) Informes de la firma "Techint Compañía Técnica Internacional" de fs. 4188/4196 y 4959/61; 81) Informe de la Jefatura de Gabinetes de Ministros a fs. 4211/4215; 82) Consulta de dominio del



CAROLINA CORES ARNÁIZ
SECRETARIA FEDERAL

D.N.R.P.A. de fs. 4401; 83) Actuaciones de la División Apoyo Tecnológico Judicial de la P.F.A. de fs. 4597/4599 y 4915; 84) actuaciones del Banco de la Ciudad de Buenos Aires de fs. 4626/31; 85) Actuaciones de la División Operaciones Federales de la P.F.A., en relación a los allanamientos realizados el día 6 de agosto de 2018, de fs. 4802/77; 86) Actuaciones de la Dirección de Asuntos Contencioso de la Jefatura de Gabinete de Ministros de fs. 4921/26; 87) informe del "Banco Francés de fs. 4974; 88) declaración testimonial de Gabriel Adrián Marino de fs. 5008; y la totalidad de elementos reservados, los cuales son puestos a disposición del compareciente.------------

Finalmente, se pone en conocimiento del compareciente las previsiones del artículo 41ter del Código Penal de la Nación y de la Ley 27.304.-----------------------------------

En este estado se le recuerda a la compareciente que tiene derecho a negarse a declarar, sin que su silencio implique presunción de culpabilidad alguna en su contra, y que cuenta con la posibilidad de mantener una entrevista con su abogado, frente a lo cual manifiesta que ya mantuvo la entrevista con sus abogados. Luego de ello, se invita al compareciente a manifestar cuanto estime por conveniente para su descargo o aclarar los hechos e indicar las pruebas que estime oportunas, frente a lo cual dijo: *"Primero ratificó todo lo que dije en la testimonial. Tengo la documentación que había prometido en dicha declaración, la cual aporto en este acto. Nosotros como grupo, en base a una mala relación con el gobierno, por no habernos prestado al pago de sobornos y contribuciones, prácticamente hemos estado excluidos de la obra pública durante este periodo, quiero decir, de los dos gobiernos "kirchneristas". En ese periodo, solo recibimos como obra pública menos del 1% de la obra pública nacional que se componía en los primeros años, del 2003 al 2006. En ese periodo recibimos tres tramos de ruta para repavimentar y dar mantenimiento, y una parte de un tendido de cañería para el rebummping de la central Atucha II, que imagino que fue por haber sido la única empresa que participó en la construcción de centrales nucleares. Entiendo que por esta razón nos asignaron el cambio de tubería de Atucha II. A partir de este periodo, no tuvimos más obra pública, salvo un tramo del gasoducto del noreste, gasoducto que en su oportunidad, creo que era el año 2003, propusimos construir dentro de la ley de hidrocarburos n° 17.319, por nuestra cuenta y riesgo, aportando el financiamiento y la construcción. Eso no fue aceptado, y se llamó en sucesivas etapas a licitación. Ello fue así, porque hubo denuncias de que esto podía*

*Poder Judicial de la Nación*

Cn° 9.608/18

*significar una adjudicación directa, a pesar de que la Ley lo permite cuando el transportista, concesionario, de la zona no puede o no quiere construirlo. Este era el caso, atento a que T.G.N. tenía congeladas sus tarifas y no tenía financiamiento para hacerlo. Estamos hablando de más de mil millones de dólares. Es importante destacar que este formato no implica una erogación del Estado, ni antes ni después. Esto nos permitía evacuar nuestro gas de yacimientos que teníamos en Bolivia y en la Provincia de Salta, y además permitía y obligaba a que si quedaba capacidad excedente teníamos que dar a otros productores acceso de capacidad de transporte. En este caso, a los otros oferentes, se les cobraba una tarifa de transporte. Esto se canceló. No fue aceptada la propuesta y años después el Estado decidió afrontarlo por su cuenta y riesgo. Cuando sale la licitación, como una forma de excluirnos de la participación, se saca con una cláusula que decía que el proveedor de la tubería no podía participar en la construcción del ducto. Ello porque podía genera una posición dominante, una posición decisiva. Situación que no era así, dado que había una posición de precio común para todos los oferentes. Vale aclarar que Techint es el mayor constructor de ductos de América. En definitiva, se presentó un amparo ante la justicia que obligó al licitante, creo que era ENARSA, a recibir la oferta nuestra. (Aportado doc. 1).* A continuación, como ya la posibilidad excluirnos había sido zanjada en la justicia, se dividió. en primer lugar, la zona en tres tramos. La autoridad de compra los dividió así y abrió simultáneamente los tres sobres económicos, lo cual en mi opinión fue un error. En las ofertas que aparecen de esos tres tramos, nosotros ganábamos por un porcentaje altísimo, en todas. Entonces, si bien sólo nos podían adjudicar una, era demasiado violento tener que adjudicar los otros a precios tan altos, por lo que se anuló toda la licitación. Los interlocutores en esta licitación fueron el Ministerio de Panificación Federal y ENARSA, y del "grupo" era la constructora y SIAT. Finalmente, se generaron seis tramos, se abrió el sobre económico del primer tramo, de Formosa, que como era esperable, lo ganamos, y nos devolvieron los otros cinco sobre económicos sin abrir. Continuaron la licitación con los otros oferentes. De hecho, alguno de ellos nunca terminó la obra. Esto fue la única obra pública nacional que tuvimos en este periodo, quiero decir del 2007 al 2015. Sorprendentemente, la ciudad de Buenos Aires, licitó y nos adjudicó, y construimos, seis estaciones del subte "H", habiéndolas ganado obviamente por precio. La provincia de San Juan nos adjudicó dos centrales hidráulicas

USO OFICIAL



CAROLINA LORES ARNAIZ

de gran magnitud, también ganadas por precio. También fuimos el mayor constructor de obras privadas en todo el periodo, resaltando todas las obras de minería, de Barrick en Pascualamas y en Provincia de Mendoza, la obra de la empresa "Vale" en emprendimiento Potacio, Río Colorado, en Malargue y obras de distelerías de varias de las empresas petroleras nacionales.".------------------------------------------------------

Preguntado que fue por S.S. para que diga la relación del "Grupo Techint" con Venezuela, el compareciente manifestó *"En relación al nuestra actividad allí teníamos una empresa que abarcaba 1200 hectáreas de superficie que se privatizó en dos tramos, lo que era la SIDOR grande, que quedó llamándose así, dedicada a la producción de acero, productos largos y productos planos. Y lo que era la planta de tubería que estaba dentro del predio de SIDOR, que se licitó por separado y se lo llamo TAVSA, "Tubos de acero de Venezuela Sociedad Anónima.". Para dar una idea de magnitud, era después de PDVSA, la mayor empresa de Venezuela. Las licitaciones abiertas sucesivas, tanto SIDOR como TAVSA, en la época del presidente Caldera, las adquirió el Grupo Techint. En el caso de SIDOR, junto con una empresa Mejicana de nombre HYLSA, que conformó el consorcio Amazonia. Al avenimiento del régimen Chavista, hubo una primera etapa, entre el año 2003 al 2005, que coincide con la etapa de buena relación con el gobierno nacional donde l relación con régimen Chavista fue razonable, hicimos enormes inversiones y llevamos la planta de producir cuatrocientas mil toneladas a cerca de cinco millones de toneladas al momento de la nacionalización. Los primeros ataques, por parte del régimen chavista, se empiezan a ver sobre fines del año 2005, momento en que realizamos una reunión con presencia de ambos gobiernos en la cumbre iberoamericana de Mar del Plata. Allí le solicitamos al gobierno Argentino que intercediera ante el gobierno de Chávez, ante el peligro de nacionalización. Con sus más y con su menos, y con bastantes conflictos de tipo gremial y mediático, transitamos hasta periodo del año 2007. En 2007, surge el conflicto nuestro con el gobierno de Kirchner motivado por una discrepancia inaceptable en la construcción de dos centrales compresoras de T.G.N. En una de las cuales, la realizamos nosotros por administración y la otra la realizó el gobierno a través de un fideicomiso oficial. Como nosotros teníamos la responsabilidad de administrar TGN, nos opusimos y denunciamos los sobreprecios en esta planta compresora, quiero decir en la obra del Fideicomiso. Nosotros como administrados de*

*Poder Judicial de la Nación*

*TGN, teníamos la obligación de controlar la razonabilidad de todas las obras que se hicieron en el tendido de TGN, de la cual éramos responsables. Sobre ello se aporta en este acto la documentación pertinente. Esta obra es la que desata el conflicto en Venezuela. El 1° de mayo de 2007, en forma insólita, el gobierno nacional, en todos los diarios de la capital, saca una solicitada denunciando corrupción entre privados. Aporto documentación de ello (doc. 2). A partir de ese momento, se agravan los conflictos con Venezuela. Al punto de que el Presidente Chávez nos trata de corruptos en base a dicha publicación, y allí dice que va a nacionalizar la empresa. Sobre ello también aporto documentación. Sigue toda esta escalada de virulencia contra la empresa, al punto que la guardia bolivarina, el sindicato y las propias autoridades del gobierno bolivariano con participación del vicepresidente, intervienen en una negociación salarial y el propio Chávez dice que si no se arregla la situación gremial iba a intervenirla. Aquí empieza la violencia física, quemando los colectivos de transporte de persona en la entrada y evitando acceso de la gerencia argentina. En abril de 2008, se declara la nacionalización. Se nos convoca a un acuerdo de accionistas para el traspaso de las acciones, se saca un decreto en donde se hace la nacionalización efectiva, y se pide a a la empresa haga una salida no antes de fin de julio de 2008, para garantizar el traspaso de una gestión a la otra -estatal-. Al momento del decretó y del "alo presidente", Chávez y los entes nombrados por él, comienzan un hostigamiento ligado a involucrando en incumplimientos de tipo impositivo, medioambiental y laboral. Por un lado, para bajarle el precio a la indemnización y por otro para involucrar a nuestros ejecutivos en acciones penales. En ese momento, la empresa toma la decisión de trasladar a todo el personal argentino, en sucesivas tandas, empezando por los más altos ejecutivos, que eran los más expuestos. En ese momento, me nominaron a mi, al señor Pablo Brizzio, al Dr. Fernando Duelo y a una abogada venezolana, que esta aquí en Argentina, de nombre Andreina Ostos, que por no haber tenido gestión teníamos menos exposición a la extorsión del gobierno Venezolano. En el marco de esto es que pedimos ayuda al gobierno nacional, esto fue entre febrero y marzo 2008. Hablo con la gente de planificación federal que era quienes mantenía el vinculo con Venezuela. El ministro De Vido, José María Olazagasti, Roberto Baratta y Claudio Ubertí estaban al tanto de nuestra situación. Cuando a mí me tocó venir a las reuniones presidenciales con Chávez aquí, el dueño de*

USO OFICIAL



CAROLINA LORES HERNANDEZ
SECRETARIA FEDERAL

*casa era Ubertí. En un incidente que tuvimos poco antes de la nacionalización, en oportunidad de la entrega que le hizo Chávez a Kirchner de un pozo en la faja del Orinoco, al cual nos invitaron con la excusa de que como éramos la única empresa argentina que operaba en Venezuela en ese momento, querían que nos hiciéramos cargo de la operación de ese pozo. Después de una cena muy amigable, al día siguiente, se me acerca Uberti y me manifiesta el enojo del presidente Kirchner, alegando que la empresa no contribuía económicamente con el gobierno. Él dijo "ustedes no nos aportan nunca nada, y el presidente Kirchner esta muy enojado con ustedes", mi respuesta fue "el Grupo Techint no hace negocios, nunca, con la política". Esto tuvo un efecto que, en mi opinión, fue el que cerró el vinculo con Chávez, porque el presidente Kirchner se había comprometido a pasar el mismo día del pozo petrolífero por la planta de SIDOR, que quedaba a pocos kilómetros del mismo, a saludar a los más de cien ingenieros argentinos que trabajaban allí. A partir de mi respuesta, percibo un dialogo al oído entre Uberti y Kircher, y ese mismo día tomaron el helicoptero, pasaron pór encima de la empresa nuestra, se subieron al avión y se fueron. Creo que esta fue la ultima señalar clara para Chávez, de que tenía vía libre para expropiarnos, cosas que sucedió poco tiempo después. En el inicio 2008, con muchas noticias periodísticas, apelamos al gobierno argentina, en las personas de Ministerio de Planificación Federal y nos manifiestaron que hagamos un aporte porque ello significaban gastos que el gobierno argentino no tenía porque afrontar. Esto lo planteó, como contexto, De Vido y el que arregló el quantum y la forma, fue Baratta. Obviamente en la situación en que nos encontrábamos, especialmente por la cantidad de argentinos allí, teníamos que rápidamente tratar de evacuar el lugar. Independientemente de ello, yo inicio con el gobierno chavista las reuniones en búsqueda del resarcimiento. Los negociadores venezolanos fueron Rafael Ramírez, que era presidente de PDVSA y Ministro de Energía. Quiero acalrar que PDVSA era la "tesorería Venezolana". Después de la reunión que mantengo con Ramírez, me deriva en el vicepresidente de la entidad, que es un ingeniero llamado Eulogio del Pino. Ahí empezamos a negociar la fase económica de la operación. En estas reuniones, empieza a participar Olazagasti, que es a quien deriva Kirchner para participar. Salvo en la última reunión, donde se fijo el precio de la indemnización, donde los venezolanos no le permitieron intervenir. Para poner un precio de referencia, nosotros propusimos*

*Poder Judicial de la Nación*

CFP 9.608/18

USO OFICIAL

*como referente el valor de otras empresas similares en el mundo, esto será entre tres mil quinientos y cuatro mil millones de dólares. Sobre esto Chávez, en "Alo presidente", decía que era un disparate, que éramos unos piratas. Más allá de descalificarnos permanentemente, empieza en forma publica a través del "Aló presidente", a maltratarnos y a darles instrucciones a los entes ligados a impuestos, medioambiente y laborales para que establecieran las contingencias que debíamos pagar. Ellos decían que habíamos pagado cerca de mil trescientos millones de dólares, sin contar otros gastos e inversiones. Finalmente, se contabilizó el valor mencionado anteriormente junto a las inversiones adicionales necesarias para poner en funcionamiento la planta, por el monto de quinientos o seiscientos millones más. Finalmente el monto que se pagó fue ese mil novecientos millones de dólares aproximadamente. Uno de los errores que cometí, es creer que esto era un "take over" normal, y acceder a dar un plazo de salida nuestro de seis meses. cuando no saludaban a los gerentes argentinos y le pegaron una paliza notable a Maria Elena Posadas, que era la gerente de relaciones industriales. En paralelo, un diputado del Partido del Gobierno, solicitó en la Asamblea Nacional que no se permitiera la salida del País del personal argentino de SIDOR, hasta tanto no se aclarara la situación. La persona que pusimos para que se hiciera de gerente general de salida, cambiaba cada día de hotel para evitar males mayores. Ademas nos quedó algo que era muy complejo, que es que la planta de tubos TAVSA, estaba en el mismo predio que SIDOR. Nunca nos dejaron entrar y recién la nacionalizan al año siguiente junto con dos plantas de briquetas de hierro, que también nacionalizan en el 2008, y que nunca nos pagaron. Hicimos los reclamos ante el CIADI, y tenemos los arbitraje ganados en los dos casos, pero obviamente no cobrados. No tengo exacto el monto, pero este son cientos de millones de dólares que estarán a las resultas de algún cambio de gobierno. fin de 2008, lo único que queda es nuestra gente financiera, una oficina en caracas con una secretaria y un chofer. Es lo que yo seguí usando cuando volví a Caracas en la ultima fase para tratar de cobrar. El cierre financiero se realicó, a fines de 2008 y 2009, con intervención de Cristina Kirchner, en varias reuniones. Me pidieron que no aparezca por la delegación oficial, Cristina me lo pidió. Luego ella me convocó, al hotel Tamanaco, donde estaba la delegación oficial, señalandome que el precio estaba acordado en mil novecientos setenta millones, pero lo que no estaba acordado era el*



CAROLINA LORES PINAIZ
SECRETARIA FEDERAL

*pago. Ella me informa que había hablado con Chávez, y que nos comunicáramos con el Ministro de Finanzas del régimen, que se llama Alí Rodríguez, para acordar la forma de pago. En la firma del cierre que ocurrió en el 2009, ellos pagaron un precio anticipado de cuatrocientos millones y sucesivos pagos, semestrales, por el saldo. Ahí quedamos, no cobramos las otras."*-----------------------------------------------------------------

Preguntado que fue por S.S. para que diga acerca de los pagos señalados en la imputación, el compareciente manifestó *"Como dije anteriormente, durante el período que abarcó la salida de la gente de Venezuela, entre abril y diciembre de 2008, nos solicitaron que contribuyéramos con el Gobierno. Como dije antes, aquí intervinieron De Vido y Baratta. En razón de la situación que estábamos viviendo en Venezuela, le doy instrucciones de Zabaleta para que haga los pagos. Quiero aclarar que Zabaleta era una persona de mucha confianza en el Grupo, si bien no tenía una posición ejecutiva porque estaba retirado, seguía realizando los temas personales de todos nosotros, digo mío y de los accionistas. Por esta razón, cuando sucede esto, yo contactó a Zabaleta y no sigo con la línea de la empresa. Zabaleta sacó la plata para hacer los pagos de los dividendo de los accionistas del grupo. Con toda honestidad, llevo 20 en esta posición, y me he cansado de lidiar con pedido de contribuciones y coimas de todo tipo de gobiernos. Una de las cosas que siempre he tratado de manifestar es que en 20 años de gestión, donde estas cosas las hemos intentado evitar, el Grupo no ha tenido problemas en su crecimiento. Hemos crecido, sin ningún problema y sin necesidad de mantener negocios con la política, como si lo han hecho otros empresarios. Dicho esto, cuando se planteó el tema de Venezuela, con el peligro que significaba para la gente, cuando vi lo que le pasó a Posadas, cuando vi que nos quemaban los colectivos, y el gobierno nacional nos dijo "te ayudamos pero el camello", me llevé "el camello". Esto pasó por una cuestión humanitaria. Aquí interinó Alí Rodríguez, que fue Secretario General de la OPEP, ex guerrillero, y una persona que debo reconocer tuvo una honestidad intelectual conmigo notable. Lamentablemente la acción del gobierno luego de los pagos, hizo que las otras empresas no pudieran ser cobradas. La única persona que estuvo involucrada en esto fue Zabaleta, no tengo el detalle de lo que se pagó, pero el monto global sería un equivalente a menos de un millón de dólares. Cuando le referí a Zabaleta "hace lo que puedas", era para que terminara de tranquilizar a Baratta porque mi preocupación era*

*Poder Judicial de la Nación*

5368

Cnº 9.608/18

*la gente allá en Venezuela. Nosotros somos el mayor consumidor de gas y energía eléctrica y el único proveedor de tubos para petróleo. El periodo crítico de suministro de gas y energía, es el invierno, cuando había que cortar, antes que a nadie nos cortaban la planta, cuando en cualquier ciclo normal uno corta la generación eléctrica y la pasa a líquido. En las Plantas nuestras, el gas no se utiliza para quemar sino para la reducción directa del mineral, un insumo. Cuando nos dicen que nos van a cortar, para nosotros significa para la planta, esto nos significa una perdida de millón de dólares. Coincidentemente, y no puedo jurar que fuera una retaliación, YPF, quiero decir Esqunozi. decidió exportar veintisiete mil toneladas de tubos chinos. Hicimos la denuncia de ello en anti-dumping pero no prosporo."*.----------------------------------

Preguntado que fue por S.S., a solicitud de la Defensa, para que diga la relevancia de la perdida de SIDOR, el compareciente manifestó *"Los sistemas productivos nuestros son altamente complejos, la planta de Venezuela era muy eficiente, tiene energía eléctrica muy barata, muy buen mineral de hierro y tiene una salida al mar, que permitían con mucha eficiencia producir acero. Posiblemente haya sido la planta más eficiente para producir acero del mundo. Cuando nos sacan esta empresa, se genera un daño adicional enorme, porque las plantas de Méjico y Argentina se quedaron sin su materia prima básica y nos expuso a que en ese momento, tuviéramos que salir a comprar una empresas en Brasil y comprar acero a nuestra competencia, en China y Corea."*.-------

En este acto se hace entrega de la siguiente documentación: 1) documentación relativa al tema del gasoducto del noreste; 2) documentación relativa al sobreprecio en las plantas compresoras; 3) documentación de los eventos sucedidos en Venezuela; 4) una carpeta con la lista del personal evacuado, y cronología de la crisis con todos sus anexos

Preguntado para que diga si desea agregar algo más el compareciente dijo: *"No"*.--------

En este acto la defensa solicita copia de la presente acta, a lo cual S.S accede.------------

Finalmente se le enuncian las previsiones del artículo 300 del Código Procesal Penal de la Nación para lo que se procede a dar lectura del mismo. No siendo para más se da por finalizado el acto, previa lectura por la Actuaría, ratificando el compareciente su contenido, junto con su letrado, firmando para constancia de ello, después de S.S. y por ante mi, que Doy Fe.----------------------------------------------------------------

CAROLINA LOPEZ
SECRETARIA

USO OFICIAL

# EXHIBIT D



REPUBLIC OF  ARGENTINA

JUDICIAL POWER OF THE NATION

FEDERAL CRIMINAL AND CORRECTIONAL COURT OF APPEALS

**TESTIMONY**

**WITH PERSONS IN CUSTODY**

ASSIGNED ON: 06/12/2018          FILE NO.: **CFP 9608/2018/33**

(On duty) **COURT NO. 11 CLERK'S OFFICE NO. 21**

**COOPERATING WITNESS DOCKET**

OF

ZABALETA, HECTOR ALBERTO (D)

**RECORD OF PROCEEDINGS**

DEFENDANT: **ZABALETA, HECTOR ALBERTO (D)**

COUNSEL: FEDERICO GUILLERMO MARIA MEDINA FERNANDEZ

**ON GROUNDS OF**

**UNLAWFUL ASSOCIATION**

JUDGE: CLAUDIO BONADIO

CLERK: CAROLINA LORES ARNAIZ

PROSECUTOR'S OFFICE: No. 4, CARLOS ERNESTO STORNELLI

COUNSEL FOR THE DEFENSE:

Government because they would otherwise shut off Siderar and Siderca plants' electricity and gas. On that occasion, Betnaza mentioned a figure that in pesos was roughly equal to one million dollars, as far as I can remember. I answered to him that I would not give him dollars because I did not have any, and he told me "sort it out with Baratta and see

| **ARIEL GONZALO QUETY** | **CARLOS ERNESTO STORNELLI** |
| **SUB-CLERK - LEGAL COUNSEL** | **Federal Prosecutor** |

[Three signatures]

In the city of Buenos Aires, on August 7 of 2018, Mr. **Héctor Alberto ZABALETA** —ID No. 4,541,917, Argentinian, born in Rosario del Tala, province of Entre Rios, on March 9, 1946, born to Héctor Francisco and Irma Rosa Pino, both of them deceased, married, Certified Public Accountant, domiciled at Pareja 4375, Villa Devoto of this city— personally appeared at this Federal Criminal and Correctional Prosecutor's Office No. 4, before the head thereof, Carlos Ernesto Stornelli, as well as the authorizing clerk, with the assistance of his defense attorney Federico Guillermo María Medina Fernández, T°.26, F°.948, CPACF [Lawyers' Bar Association of the City of Buenos Aires], domiciled established at Esmeralda 570, 13th floor, Office 48, of this city, who personally appeared before me, stating his desire to provide information within the framework of case No. 9.608/2018 of the register filed with Clerk's Office No. 21 of the Federal Criminal and Correctional Court No. 11, in the light of such norm as provided by section 41 of the Criminal Code of the Nation, substituted by Act No. 27.304. At this stage, he is hereby informed of the content of section 276 bis of the Criminal Code of the Nation.

Immediately thereafter, and in accordance with such provisions as established in Act No. 27.304, section 7, subsection a), and with the consent of the appearing party and his defense counsel, express referral is made to the facts stated on this date as part of the defendant's statement made before the intervening court, as well as the itemized evidence on which the accusation is grounded, produced therein as well.

The defendant is hereby allowed to speak in order to provide such information as he wishes to provide, and he states as follows: "Roberto Baratta called me by phone. I do not remember if he called me at my cellphone 5319-9414 or at my office at Techint, the phone number of which was 4018-2032. I received said call ten days or one week before the first delivery of which I am accused today in this statement. That first conversation was very kind, he told me that his name was Roberto Baratta, Vice-Minister of De Vido and that he had talked to Luis Betnaza, institutional director of the company, who had given him my phone number for him to call me. During that conversation, Baratta told me that I had to give him some dollars, to which I said no, as I was only able to pay in pesos since I had no dollars available, but after verifying together with Luis that this was indeed so. After that phone call, I talked to Luis Betnaza, who told me that he had a commitment with the Government because they would otherwise shut off Siderar and Siderca plants' electricity and gas. On that occasion, Betnaza mentioned a figure that in pesos was roughly equal to one million dollars, as far as I can remember. I answered to him that I would not give him dollars because I did not have any, and he told me "sort it out with Baratta and see what you can do".

Just to clear things up: we had not been awarded any public work at that time. We had even withdrawn from the concession of Route 7 because Néstor Kirchner had asked us for money. After what I narrated, Baratta indeed came to fetch the money, which, I estimate, was the biggest bulge of money out of all the deliveries we made; it may have been set in the amount of about two million pesos. That delivery was made in the form of a travel bag that we brought along, which Baratta took and left on the ground of the backseat of the car he came with, a Toyota Corolla. I am convinced that he always came with the same car, always along with a driver whose face I have not noticed. On following occasions, deliveries were always made in packages made with brown paper envelopes, which had pleats that were opened to be wider and into which about four hundred pesos could fit per package. Before each delivery, Baratta would always call me by phone, possibly at any of the two cellphones I previously mentioned, at all times requiring me to deliver dollars. He used to tell me that pesos were useless to him. He threatened me in several ways, such as telling us that he would shut off our gas system or that he would import tubes from China, telling me that now you will see where you will fit the tubes that you have in Campana. He would also threaten me by telling me that no other public work would ever be awarded to us. The way he threatened us by phone was revolting. But Baratta finally gave up and passed by to withdraw the pesos. The money delivery method described in the quotes that were made available to me as part of my statement was in general like that. All the deliveries were made on the second subfloor of Techint building located at Della Paolera 297. Services such as elevators and the like in that building are in the middle, and such core is surrounded by offices. The garage is located on the first and second subfloors. As on the first subfloor we owned just a few parking lots, the parking lots best located for the deliveries were those on the second subfloor, all of which were owned by us. Moreover, no cameras had been installed at that place to register the passing of the cars. The only camera that had been installed on each of the two subfloors only registered the pedestrian entering from the garage to the central part of the building. That is, the entry of the car from which the money was removed could have never been registered. The first time I arranged the delivery with Baratta by phone, he told me that his greatest concern was that he did not want to be registered or identify himself at the building, to which I answered that he should not worry, and for that reason we made the deliveries at the referenced site. To clear things up, it is not true that I marked the entry at the garage with my card, I directly ordered the security personnel to lift up the barrier. It is true what the quotes of the notebook express as to the fact that one or two times I waited for him outside, I got into Baratta's car and we entered the garage. On one occasion, it was raining; so, so as not to wait for him outside, I let the security personnel know that if the car happened to approach and anyone asked about Hector, they should let him pass. I cannot recognize the so-called Ale appearing in one of the quotes. It was always me who delivered the money to Baratta. As far as I am aware, all the deliveries were set in the amount of fifty to twenty million pesos in total. I remember Baratta telling me to remember that I had never given him money in dollars, one of the last times. After the last delivery, I have never seen Baratta again. I am not aware of the reasons why the deliveries failed to continue to be made."

Next, as provided in Act No. 27.304, section 7, subsection c), the prosecutor agrees that, in the event the credibility and usefulness of the information provided in this agreement is confirmed, as well as the rest of the conditions in such terms as provided in section 13 of Act No. 27.304, upon the filing of the request for punishment, the latter shall be made under such consideration as referenced in section 41 of the first paragraph of the Criminal Code of the Nation. In addition, it is agreed that this collaboration should be analyzed in the light of section 4 of Act No. 304.

There being nothing further to record, these proceedings are hereby concluded, this record being previously read in a loud voice, which shall be submitted before the relevant Court for the purposes of the approval thereof. The appearing parties stamp their signatures before me, I ATTEST.

[Three signatures]

**CARLOS ERNESTO STORNELLI**
**Federal Prosecutor**

**ARIEL GONZALO QUETY**
**SUB-CLERK - LEGAL COUNSEL**



**Public Prosecutor's Office**

Buenos Aires, August 7, 2018.

Upon the execution of the collaboration agreement on this date with Hector Zavaleta [sic], the relevant docket shall be prepared and duly referred for the relevant approval thereof, as provided in sections 9 and 10 and in accordance with Act 27.304.

The document hereof shall be considered as delivery note.

[Signature]

> **CARLOS ERNESTO STORNELLI**
> **Federal Prosecutor**

Before me:

[Signature]

[Illegible seal]


Enforced on the same date. Certified.

[Signature]

[Illegible seal]

[Signature:]

[Two signatures]

*Judicial Power of the Nation*                              Case No. 9.608/18

**<u>APPROVAL RECORD OF AGREEMENT WITH HÉCTOR ALBERTO ZABALETA</u>**:

In the city of Buenos Aires, on August the seventh of two thousand and eighteen, at the relevant Clerk's Office, the Court formed of Claudio Bonadio is created before me, Carolina Lores Arnaiz, with the purpose of holding such hearing as provided by section 10 of Act No. 27.304, within the framework of case No. 9.608/18 of the register filed with this Court; in the presence of Mr. Prosecutor Carlos Ernesto Stornelli and defendant Héctor Alberto Zabaleta, ID No. 4,541,917, whose other personal particulars are recorded in these proceedings, legally aided by Federico Guillermo María Medina Fernández (registered at T° 26, F° 948 of the City of Buenos Aires Bar Association, CPACF).

Upon the commencement of this act, Your Honor explains to the defendant the scope of the rules at issue as well as the obligations to which he shall be subject and the consequences of his compliance or non-compliance.

Therefore, upon observance of file No. 9.608/2018/33, which is put before him, as provided in section 41, III, of the CC of the Public Prosecutor's Office, the defendant recognizes his signature as well as one of those signatures stamped in each of the pages of the executed agreement.

The Representative of the Prosecutor's Office is allowed to speak for him to inform whether he wishes to make any statement as regards the executed agreement. He stated as follows: "We have come to an agreement. The Prosecutor's Office agrees to incorporate it into the benefits provided by the law, including the granting of freedom, pointing out for the Prosecutor's Office that it is very beneficial for the case for the purpose of searching the truth. I request for its approval."

OFFICIAL
USE



# REPUBLIC OF ARGENTINA

Subsequently, the defense counsel is allowed to speak for the same purposes, who stated "we agree to the proceedings carried out so far, and the defendant has been notified of all the regulations set forth in section 41, III, of the CC."

Immediately thereafter, the defendant is then interrogated about his knowledge and understanding of the agreement at hand, and stated to be fully aware of the scope thereof by answering: "Yes, my attorney has explained me so".

Having been asked to state whether his defense attorney explained to him the scope of the agreement signed by him, he answered: "Yes, he explained it to me by specifying the sections of the law".

Having been asked to state whether in choosing his defense attorney he was subject to any suggestion or pressure as regards which attorney he should designate, the appearing party stated: "No".

Having been asked to state whether he entered into the agreement freely, he answered: "willingly and freely".

Having been asked to state whether he is aware of the fact that he has assumed the obligation at hand under penalty of perjury, he answered: "I have said the truth".

For greater clarity, section 276 bis of the Criminal Code was read.

Having been asked to state whether he wishes to add something else, the appearing party stated: "I would like you to position the facts between the month of April and the month of December 2008, when the facts that I narrated in the agreement occurred".

Judicial Power of the Nation                    Case No. 9.608/18

There being nothing further to record, these proceedings are concluded, these presents having been previously read in a loud voice and by the parties, and signed by the Judge and the parties, before me, I attest.

[Signature:]

[Three illegible signatures]

OFFICIAL USE

[Signature]

*Judicial Power of the Nation*                    Case No. 9.608/2018 [Seal:]

Buenos Aires, August 7, 2018.

> **CLAUDIO BONADIO**
> **Federal Judge**

**WHEREAS**:

OFFICIAL
USE

As specified in record on p. 1/2, the Representative of the Public Prosecutor's Office and defendant Héctor Alberto Zabaleta, legally aid by his defense attorneys, on this date, entered into a collaboration agreement, under the terms of section 41, III, of the Criminal Code of the Nation, and Act No. 27.304.

The referenced record proves that defendant Zabaleta has been duly informed of the facts subject matter of accusation within the framework of these proceedings, his level of participation therein, as well as the evidence supporting said accusation, since the unlawful act at hand must be temporarily defined as unlawful association (section 210 of the Criminal Code of the Nation); situation adjusted to such provisions as set forth in section 41, III, second paragraph, subsection g) of the Criminal Procedure Code.

Additionally, it is informed that the author has provided information related to the series of facts subject matter of investigation, identifying co-authors and participants of the crimes of which he is accused, as well as to the places from where the criminal conduct was carried out.

Ultimately, in the event the credibility and usefulness of the information provided in this record is confirmed, the Prosecutor agreed with the defendant that, upon the filing of the request for punishment, said petition shall be made under such consideration as referenced in section 41, III, paragraph one of the Criminal Code of the Nation; for the purposes of his release from custody, such provisions as set forth in section 4 of Act No. 27.304 must be observed.

Having submitted the previous collaboration agreement, as provided in section 9 of Act No. 27.304, this Court notifies that said agreement has been executed in compliance with such requirements as provided in sections 7 and 8 of the previously mentioned Act, and that it has been entered into at such procedural time as referenced in section 3 of the relevant norm.



# REPUBLIC OF  ARGENTINA

```
[Signature]
RAFAEL DIEGO [Illegible]
Federal Clerk
```

On the other hand, it should be mentioned that upon holding the hearing for the approval of the collaboration agreement on the part of this Court in the presence of the Representative of the Public Prosecutor's Office, the repented defendant and his defense counsel, the parties were further heard, Zabaleta recognizing the signature stamped in the relevant record as his own.

Likewise, the defendant was asked whether he had understood the facts subject matter of accusation and the evidence for the prosecution produced against him; whether he was aware of the scope and consequences of the agreement executed under the terms of Act No. 27.304; and whether he had acted by his own will when deciding to enter into the agreement, to all of which he answered affirmatively (section 10, paragraphs one and two).

Having pointed out these considerations, this Court regards the commands of section 41, III, of the Criminal Code of the Nation and Act No. 27.304 as verified, for which reason the executed collaboration agreement shall be approved, incorporated into the proceedings, and the enforcement of the benefit shall be adjourned until judgement is issued (section 11 of Act No. 27.304).

In accordance with the specified grounds, and since they are in accordance with the law, this Court:

**RULES**:

I.      **TO AUTHORIZE THE APPROVAL** of the collaboration agreement entered into by and between the Representative of the Public Prosecutor's Office and the repented defendant Héctor Alberto Zabaleta (section 10 of Act No. 27.304).

*Judicial Power of the Nation*                    Case No. 9.608/18

      II.    To notify thereof to the prosecutor, in writing, to the defense counsel, by means of urgent notice; and to the defendant, in person.

[Signature:]

Before me,
[Signature]

Enforced. Registered.

On 8/7, the prosecutor (No. 4) was notified and he signed. I attest.

OFFICIAL USE

On this date, Héctor Alberto Zabaleta was notified, and he signed. I attest.

[Signatures]
[Handwritten:] Carlos Stornelli
Prosecutor

[Signature]
RAFAEL DIEGO [Illegible]
Federal Clerk

*Judicial Power of the Nation*

In the city of Buenos Aires, on the seventh day of the month of August of the year two thousand and eighteen, I submitted an uncertified copy of the resolution whereby Héctor Alberto Zabaleta is released from custody and of the memorandum of agreement under the terms of section 41, III of the CC, to  Federico Guillermo María Medina Fernández (filed with T° 26, F° 948 of CPACF); which was signed by the defendant and the prosecutor. For certification purposes, signed in agreement and for certification purposes. Certified.


[Illegible signatures]


OFFICIAL USE

[Illegible] on this date of this case[Illegible] incidents and/or effects thereof at the reception desk of the Clerk's Office No. 21, signed for certification purposes.

Buenos Aires, 8/8/18                    Signature and printed name

[Handwritten text:] Note of this incident is taken exclusively. Certified.

[Illegible signature]

[Illegible] on this date of this case [Illegible] incidents and/or effects thereof at the reception desk of the Clerk's Office No. 21, signed for certification purposes.

Buenos Aires, 8/8/18                    [Signature]

                                        Signature and printed name

[Illegible] on this date of this case [Illegible] incidents and/or effects thereof at the reception desk of the Clerk's Office No. 21, signed for certification purposes.

Buenos Aires, 8/8/18                          Signature and printed name

Note of this incident is taken exclusively. Certified.

[Illegible signature]

[Illegible] on this date of this case [Illegible] incidents and/or effects thereof at the reception desk of the Clerk's Office No. 21, signed for certification purposes.

Buenos Aires, 8/8/18                          [Signature]

                                              Signature and printed name



450 Seventh Ave.
Tenth Floor
New York, NY 10123
(212) 643-8800

# TRANSLATION CERTIFICATION

Date: July 17, 2019

To whom it may concern:

This is to certify that the attached translation from Spanish into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Betnaza Investigative Statement
- Betnaza Testimonial Statement
- Zabaleta Testimony

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Eugene Li

**Global Solutions. Local Expertise.**

REPÚBLICA  ARGENTINA

PODER JUDICIAL DE LA NACIÓN
JUSTICIA NACIONAL CRIMINAL Y CORRECCIONAL FEDERAL

TESTIMONIO

CON DETENIDOS

FECHA ASIGNACIÓN: 12/06/2018

EXPTE N: **CFP 9608/2018/33**

(Turno) JUZGADO N° 11  SECRETARIA N° 21

LEGAJO DE ARREPENTIDO

DE
ZABALETA, HECTOR ALBERTO (D)
EN AUTOS
IMPUTADO   **ZABALETA, HECTOR ALBERTO** (D)
LETRADO   FEDERICO GUILLERMO MARIA MEDINA FERNANDEZ

POR

ASOCIACION ILICITA

JUEZ:  CLAUDIO BONADIO
SECRETARIO.  CAROLINA LORES ARNAIZ
FISCALIA:  Nro 4, DR. CARLOS ERNESTO STORNELLI
DEFENSORIA

Gobierno porque si no le iban a cortar la luz y el gas de las plantas de Siderar y Siderca.
Betnaza me habló en esa ocasión de una cifra que en pesos equivalía
aproximadamente a un millón de dólares, según lo que recuerdo. Yo le respondí que
dólares no le iba a dar porque no tenía y me dijo arreglate con Baratta y fijate que

ARIEL GONZALO DÍA
PROSECRET

MOS E. STORNELLI
Fiscal Federal

En la ciudad de Buenos Aires a los 7 días del mes de agosto de 2018 comparece en esta Fiscalía Nacional en lo Criminal y Correccional Federal N° 4, ante su titular, Carlos Ernesto Stornelli, y actuario que autoriza, el Señor **Héctor Alberto ZABALETA**, D.N.I. N°4.541.917, de nacionalidad argentino, nacido en Rosario del Tala, Provincia de Entre Ríos, el 9 de marzo de 1946, hijo de Héctor Francisco e Irma Rosa Pino, ambos fallecidos, de estado civil casado, profesión contador público nacional, domiciliado en Pareja 4375, Villa Devoto, de esta ciudad, con la asistencia de su abogado defensor Dr. Federico Guillermo María Medina Fernández, T°26, F° 948 CPACF, con domicilio constituido en Esmeralda 570, piso 13, Of. 48, de esta ciudad, quien se encuentra presente en el acto, manifestado su deseo de aportar información en el marco de la causa N° 9.608/2018 del registro de la Secretaría N° 21 del Juzgado Nacional en lo Criminal y Correccional Federal N° 11, a la luz del instituto previsto por el artículo 41 ter del Código Penal de la Nación, sustituido por la ley 27.304. En este estado se le hacer saber el contenido del artículo 276 bis del Código Penal de la Nación.----------------

Acto seguido y de acuerdo a lo establecido en el inciso a) del artículo 7 de la ley 27.304 y con la anuencia del compareciente y de su letrado defensor, se hace expresa remisión a la imposición de los hechos que en el día de la fecha se le formulara en el marco de su declaración indagatoria prestada por ante el Juzgado interviniente, como así al detalle de la prueba en que se funda su imputación, también efectuada en dicho acto.-----------------------------------------------------------------

En este acto se le concede la palabra al imputado a fin de que brinde la información que desee aportar y dice: "Roberto Baratta me llamó por teléfono, no recuerdo si a mi número celular 5319-9414 o a mi oficina en Techint que era el número 4018-2032, esto habrá sido diez días o una semana antes de la primera entrega que se me imputara hoy en la indagatoria. Esa primera conversación fue muy amable, me dijo que era Roberto Baratta, que era vice ministro de De Vido y que había hablado con Luis Betnaza, director institucional de la empresa, y que éste le había dado mi número para que me llamara. En esa conversación Baratta me dijo que le tenía que dar unos dólares, a lo que le dije que no, que solamente le podía dar pesos ya que no contaba con liquidez de dólares, pero luego de verificar con Luis que eso efectivamente fuera así. Luego de la llamada lo hablé con Luis Betnaza, y este me dijo que tenía un compromiso con el Gobierno porque si no le iban a cortar la luz y el gas de las plantas de Siderar y Siderca. Betnaza me habló en esa ocasión de una cifra que en pesos equivalía aproximadamente a un millón de dólares, según lo que recuerdo. Yo le respondí que dólares no le iba a dar porque no tenía y me dijo arreglate con Baratta y fijate que

podes hacer. Aclaro que no teníamos en esa época ninguna obra pública. Incluso nos habíamos retirado de la concesión de la Ruta 7 porque Néstor Kirchner nos pedía dinero. Luego de lo que relaté, efectivamente vino Baratta a buscar el dinero, estimo que fue el bulto más grande de todas las entregas que le hicimos, calculando que pudo haber sido unos dos millones de pesos aproximadamente. Esa entrega se hizo en un bolso de viaje que trajimos nosotros, que Baratta agarró y dejó en el piso del asiento trasero del auto en el que venía, que era un Toyota Corolla. Estoy convencido que siempre vino con el mismo auto, siempre con chofer en cuyo rostro no repare. En las ocasiones siguientes, las entregas fueron paquetes hechos con sobres de papel madera que tenía pliegues que se abrían para tener más amplitud y en los que entraban aproximadamente cuatrocientos mil pesos en cada paquete. Siempre antes de cada entrega Baratta me llamaba por teléfono, posiblemente a alguno de los dos teléfonos que antes mencioné y todas las veces me exigía dólares, me decía que los pesos no le servían, me profería distintas amenazas como cortarnos el gas o importar tubos de China diciéndome ahora vas a ver donde te vas a meter los tubos que tenes en Campana. También me amenazaba con que no nos iban a dar nunca más obra pública. Era repugnante como patoteaba por teléfono. Pero finalmente Baratta se resignaba y pasaba a retirar los pesos. El mecanismo de entrega de dinero descripto en las citas que se me hicieran conocer en mi indagatoria en general era así. Todas las entregas fueron en el segundo subsuelo del edificio de Techint sito en Della Paolera 297. Ese edificio tiene los servicios como ascensores y otros en el medio, y las oficinas alrededor de ese núcleo. Abajo están las cocheras, en el primer y segundo subsuelo. Como en el primer subsuelo teníamos pocas cocheras nuestras, las cocheras mejor ubicadas para las entregas eran las del segundo subsuelo que eran todas nuestras. Además en ese lugar no había cámaras para registraran el paso de los autos. La única cámara que había en cada uno de los dos subsuelos registraba solamente al peatón que ingresaba desde la cochera al cuerpo central del edificio. Es decir, nunca pudo quedar registrado el ingreso del auto en el que se retira el dinero. La primera vez que combiné por teléfono con Baratta las entregas, la primera preocupación que me manifestó es que no quería quedar registrado o identificarse en el edificio, a lo que le respondí que se quedara tranquilo, y por eso hicimos las entregas en el sitio indicado. Aclaro que no es cierto que yo marcara con mi tarjeta la entrada a la cochera, yo directamente le ordenaba al personal de seguridad que levantara la barrera. Es cierto lo que dicen las citas del cuaderno en cuanto a que una o dos veces lo esperé afuera, me subí al auto de Baratta, e ingresamos a la cochera. En alguna oportunidad que llovía, para no esperarlo afuera, dejé avisado en Seguridad que si venía el auto y preguntaba por Héctor lo dejaran pasar. No reconozco al tal Ale que figura en una de las citas. Siempre fui yo el que entregaba el dinero a Baratta. Estimo que entre todas las entregas fueron quince a veinte millones de pesos en total. Recuerdo que en una de las últimas veces,

Baratta me dijo acordate que nunca me diste dólares. Luego de la última entrega, nunca más lo vi a Baratta. Los motivos por los cuales no continuaron las entregas los desconozco."

Seguidamente en los términos del inciso c) del artículo 7 de la ley 27.304, el fiscal acuerda que, en caso de que se confirme la verosimilitud y utilidad de la información suministrada en el presente acuerdo y demás condiciones en los términos del artículo 13 de la ley 27.304, al momento de efectuarse la petición de pena, ésta se haga teniendo en consideración la mensuración a la que alude el artículo 41 ter primer párrafo del Código Penal de la Nación. Asimismo se acuerda contemplar la presente colaboración a la luz del art. 4 de la Ley 27.304.

No siendo para más se da por finalizado el presente acto, previa lectura a viva voz de la presente acta acuerdo la que será presentada ante el Juzgado interviniente a los fines de su homologación, firmando los aquí presentes y por ante mí que DOY FE.-

CARLOS E. STORNELLI
Fiscal Federal

ARIEL GONZALO
PROSECRE



*Ministerio Público de la Nación*

///nos Aires, 7 de agosto de 2018.

Habida cuenta el acuerdo de colaboración celebrado en el día de la fecha con Hector Zavaleta, fórmese legajo y remítase el mismo para su pertinente homologación en los términos del artículo 9, 10 y concordante de la ley 27.304.

Sirva la presente de atenta nota de envío.

CARLOS E. STORNELLI
Fiscal Federal

Ante mi:



MARIA AGUSTINA
SECRETARIA

En la misma fecha se cumplió. Conste.-

MARIA AGUSTINA
SECRETARIA

Poder Judicial de la Nación

**ACTA DE HOMOLOGACIÓN DE ACUERDO DE HECTOR ALBERTO ZABALETA:**

///la ciudad de Buenos Aires, a los siete días de agosto de dos mil dieciocho, se constituye en Secretaría el Tribunal integrado por el Dr. Claudio Bonadio, ante mi presencia, Dra. Carolina Lores Arnaiz, a los efectos de celebrar audiencia conforme lo normado por el art. 10 de la ley 27.304, en el marco de la presente causa N°9.608/18 del registro de este Juzgado, encontrándose presente el Sr. Fiscal. Dr. Carlos Ernesto Stornelli y el imputado Héctor Alberto Zabaleta, titular del DNI N°4.541.917, de demás condiciones personales obrantes en autos, asistido por el Dr. Federico Guillermo María Medina Fernández (inscripto en el T°26 F°948 del CPACF).---------------------------------------------------------------------------------

Iniciado el presente acto S.S. procede a explicar al imputado los alcances del instituto en trato como asimismo en qué consisten las obligaciones a las que deberán ajustarse y las consecuencias de su cumplimiento o incumplimiento.------------------

De esta manera, visto el expediente N°9.608/2018/33 en el cual en el término del art. 41 ter del CP del Ministerio Público Fiscal, se le exhíbe el mismo, oportunidad en la que el imputado reconoce su firma como una de las insertas en cada una de las fojas del acuerdo celebrado.----------------------------------------------------------------

Se le da la palabra al Representante del Ministerio Público Fiscal para que diga si quiere hacer alguna manifestación respecto al acuerdo celebrado, manifestó que: "hemos llegado a un acuerdo, la Fiscalía se compromete a incorporarlo en los beneficios que nos acuerda la ley incluida la obtención de la libertad, señalando

REPUBLICA



para la Fiscalía que para la causa es muy beneficioso para la búsqueda de la verdad. Solicito que lo homologue".------------------------------------------------------------

Posteriormente, se da la palabra a la defensa a idénticos efectos, manifestando que: "estamos de acuerdo en lo realizado y a mi asistido se le ha explicado toda la normativa del art. 41 ter del CP".------------------------------------------------------------

Seguidamente, se procede a interrogar al imputado acerca de su conocimiento y entendimiento del instituto en trato, manifestado el encausado conocer plenamente los alcances del mismo y respondiendo que: "sí, mi abogado me explicó".------------

Preguntado para que diga si su abogado defensor le explicó los alcances del acuerdo que firmó, respondió que: "sí, me los explicó con los artículos de la ley".----------

Preguntado para que diga si en la elección de su defensa sufrió alguna sugerencia o presión respecto de a quién debía designar, el compareciente manifestó que: "no".

Preguntado para que diga si al momento de realizar el acuerdo lo hizo libremente, respondió que: "voluntaria y libremente".------------------------------------------------

Preguntado para que diga si sabe que asumió el compromiso en cuestión bajo apercibimiento de decir la verdad, respondió que: "he dicho la verdad".------------

Para mayor ilustración se le dio lectura al art. 276 bis del Código Penal.------------

Preguntado para que diga si desea agregar algo más el compareciente manifestó que: "me gustaría que sitúen entre el mes de abril y el mes de diciembre de 2008 que es cuando ocurrieron los hechos que relate en el acuerdo".-------------------------

*Poder Judicial de la Nación*   causa nro. 9.608/18

Con lo que no siendo para más, se dio por finalizado el presente acto, previa lectura integra de la presente a viva voz y por las partes, siendo firmada por el Sr. Juez y las partes, ante mi de lo que doy fe.-

USO OFICIAL

*Poder Judicial de la Nación*



Causa n° 9.608/2018

CLAUDIO BONADIO
JUEZ FEDERAL

///nos Aires, 7 de agosto de 2018.-

### AUTOS, VISTOS Y CONSIDERANDO:

Conforme surge del acta obrante a fs. 1/2, el Representante del Ministerio Público Fiscal y el imputado Héctor Alberto Zabaleta –asistido por sus abogados defensores–, en el día de la fecha, celebraron un acuerdo de colaboración, en los términos del artículo 41 *ter* del Código Penal de la Nación y de la ley n° 27.304.-

Del acta referenciada, surge que el imputado Zabaleta ha sido debidamente impuesto de los hechos materia de reproche en el marco de estas actuaciones, su grado de participación en los mismos, así como también las pruebas que dan sustento a dicha imputación, siendo que el ilícito en cuestión debe ser calificado provisionalmente como asociación ilícita (artículo 210 del Código Penal de la Nación); situación que se ajusta a lo previsto en el artículo 41 *ter*, segundo párrafo, inciso g) del C.P.N..-

Asimismo, se advierte que el causante ha aportado información vinculada a los sucesos materia de investigación, identificando a coautores y partícipes de los delitos que se le atribuyeran, como también acerca de los lugares desde los cuales se llevaron a cabo las conductas delictivas.-

En última instancia, para el caso de que se confirme la verosimilitud y utilidad de la información suministrada en ese acta, el Fiscal acordó con el imputado que, al momento de efectuarse la petición de pena, se hará teniendo en consideración la mensura a la que alude el artículo 41 *ter*, primer párrafo del Código Penal de la Nación, debiendo contemplarse, a los fines de su excarcelación, las previsiones del artículo 4 de la ley 27.304.-

Remitido el acuerdo de colaboración que antecede, conforme lo indicado en el artículo 9 de la ley 27.304, este Tribunal advierte que el mismo




**ARGENTINA**



ha sido celebrado contemplándose los requisitos de los artículos 7 y 8 de la ley antedicha; y que también ha sido celebrado en la oportunidad procesal a la que alude el artículo 3 de la norma.-

Por otra parte, debe mencionarse que al momento en que este Tribunal celebró la audiencia de homologación del acuerdo de colaboración, en presencia del Representante del Ministerio Público Fiscal, el imputado arrepentido y su defensa, se procedió a escuchar a las partes, reconociendo Zabaleta como propia la firma inserta en el acta pertinente.-

Del mismo modo, se le preguntó al encartado si había comprendido los hechos materia de imputación y la prueba de cargo reunida en su contra; si comprendía los alcances y consecuencias del acuerdo celebrado en los términos de la ley 27.304; y si había actuado voluntariamente, al momento de decidir celebrar el acuerdo, respondiendo afirmativamente a todo lo señalado (artículo 10, primer y segundo párrafo).-

Expuestas estas consideraciones, este Tribunal entiende verificadas las prescripciones del artículo 41 *ter* del Código Penal de la Nación y de la ley 27.304, motivo por el cual corresponde aprobar la homologación del acuerdo de colaboración celebrado, debiendo ser incorporado al proceso, y difiriéndose la ejecución del beneficio para el momento del dictado de la sentencia (artículo 11 de la ley 27.304).-

A partir de los fundamentos expuestos, y por resultar ajustado a derecho, este Tribunal:

**RESUELVE:**

**I. APROBAR LA HOMOLOGACIÓN** del acuerdo de colaboración celebrado entre el Representante del Ministerio Público Fiscal y

*Poder Judicial de la Nación*

Causa n° 9.608/2018

el imputado arrepentido Héctor Alberto Zabaleta (artículo 10 de la ley 27.304).-

 **II.** Notifíquese al Sr. Fiscal, por nota, a la defensa, mediante cédula urgente, y al imputado, personalmente.-

Ante mí;

Se cumplió. Conste.-

En 7/8 se notificó el Sr. Fiscal (n° 4) y firmó. Doy fe.-

En la fecha se notificó a Héctor Alberto Zabaleta y firmó. Doy fe.-

Carlos Stornelli
Fiscal

*Poder Judicial de la Nación*

///en la ciudad de Buenos Aires, a los siete días del mes de agosto del año dos mil dieciocho hice entrega al Dr. Federico Guillermo María Medina Fernández (inscripto en el T°26 F°948 del CPACF) de una copia simple de la resolución mediante la cual se hace lugar a la excarcelación de Héctor Alberto Zabaleta y del acta acuerdo en los términos de art. 41 ter del CP, firmado por su defendido con el Sr. Fiscal. Para constancia de ello, firmó de conformidad y para constancia. Conste.-

USO OFICIAL



De haber tomado vista en el día de la fecha de la presente causa y/o incidentes y/o efectos de la misma en la mesa de entradas de la Secretaría n° 21, firmando como constancia de ello.—

Buenos Aires 8, 8, 18                    Firma y aclaración/sello

Tome vista de este incidente exclusivamente conste

h. Valerie Prieto

De haber tomado vista en el día de la fecha de la presente causa y/o incidentes y/o efectos de la misma en la mesa de entradas de la Secretaría n° 21, firmando como constancia de ello.—

Buenos Aires 8, 8, 18                    Firma y aclaración/sello



de haber tomado vista en el día de la fecha de la presente causa y/o
incidentes y/o efectos de la misma en la mesa de entradas de la Secretaría
nº 21, firmando como constancia de ello.—

Buenos Aires 8.8.18           Firma y aclaración sello

*Tome viste de este i madee*
*te exclusivamente conste*

de haber tomado vista en el día de la fecha de la presente causa y/o
incidentes y/o efectos de la misma en la mesa de entradas de la Secretaría
nº 21, firmando como constancia de ello.—

Buenos Aires 8 / 8 / 18          Firma y aclaración sello

# EXHIBIT E

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]


[Note: All bold/italic/underline emphases are present in the original throughout.]


## INVESTIGATION STATEMENT OF PAOLO ROCCA:

In the city of Buenos Aires, on the 5th day of the month of October of the year two thousand eighteen, a person appears before your honor and the Authorizing Secretary who is informed that an investigative statement will be received, in accordance with the provisions of articles 294 of the Code of Criminal Procedure of the Nation. Furthermore, he has been read the terms Article 295 of the ritual plexus, with regard to only people who can attend this declaration shall be the honorable Prosecution Agent and the defense of the declaring party. It is hereby noted that the honorable prosecutor Dr. Carlos Ernesto Stomelli and Dr. Carlos Rivolo are present in this action. After this, and in accordance with articles 104, 107, 197, and 295 of the Code of Rite, he is reminded that he has the right to appoint up to two defense attorneys he trusts, or failing that, to be assisted by the corresponding Public Defender on duty at the time, or also to provide his defense personally, providing that this does not prejudice the expediency and does not prejudice the normal conduct of the proceeding, being able to hold an interview with whomever he chooses prior to the receipt of this statement of inquiry to which he replied that he has already designated Dr. Jose Maria Manuel Figueredo and Dr. Santiago Ramon Fontan Balestra, who are present in this act.

Finally, The appearing party is reminded that he may abstain from making statements and that in the case that he does, he is not required to swear an oath or a declaration to tell the truth.

Questioned in accordance with the provisions of Article 297 of the Code of Form, and invited to state his name and other personal data. He states that his name is: **Paolo Rocca**, who demonstrates his identity via [blacked out], born on the 14th of

October, 1952, in the city of Milan, Italy, of Italian nationality,  of the civil status of divorced, whose occupation is as a businessman, son of Roberto Rocca (f) and Andreina Rocca, with residence on the street [blacked out] of this city, telephone number [blacked out] who knows how to read and write.

When asked whether he had any criminal record or pending or finished cases against him, his response was: "No, none that I know of". When asked about his living conditions, he responded that: "they're good." Asked to state whether he owns any or moveable property or real property

in his name, his response was: "Yes, I own a real estate property in the Federal Capital [City of Buenos Aires], where I live: a property in the province of Buenos Aires, and a property in Chubut. At this time, I have a car in my name."

Following this, in accordance with Article 298 of the Adjective Code, the following is made known: **I. Regarding illicit association:** it is imputed that the appearing party has formed part of an illicit association together with Roberto BARATTA, Walter Rodolfo FAGYAS, Nelson Javier LAZARTE, Fabian Ezequiel GARCIA RAMON, Heman Camilo GOMEZ, Rafael Enrique LLORENS, Oscar Bernardo CENTENO, Jose Maria OLAZAGASTI, Jorge Omar MAYORAL, Julio Miguel DE VIDO, Cristina Elisabet FERNANDEZ, Nestor Carlos KIRCHNER, Hector Daniel MUÑOZ, Carlos Guillermo Enrique WAGNER, Armando Roberto LOSON, Hector Javier SANCHEZ CABALLERO, Angel Jorge Antonio CALCATERRA, Francisco Ruben VALENTI, Carlos Jose MUNDIN, Jorge Guillermo NEIRA, Gerardo Luis FERREYRA, Claudio Javier GLAZMAN, Juan Carlos DE GOYCOECHEA, Hector Alberto ZABALETA, Luis Maria Cavetano BETNAZA, Heman DEL RIO - alias "Hernan/El pelado" -, Jorge Juan Mauricio BALAN, Rodolfo Annando POBLETE, Juan CHEDIACK, Eduardo Hugo Antranik EURNEKIAN, Francisco Javier FERNANDEZ, Alejandro Pedro IVANISSEVICH, Juan Carlos LASCURAIN, German Ariel NIVELLO, Nestor Emilio OTERO, Norberto Mario OYARBIDE, Oscar Isidro Jose PARRILLI, Raimundo PEDUTO, Ernesto CLARENS, Carlos Alberto RODRIGUEZ, Aldo Benito ROGGIO, Benjamin Gabriel ROMERO, Rudy Fernando ULLOA IGOR, Claudio UBERTI, Manuel Sartos URIBELARREA, Raul Victor VERTUA, Hugo Alberto DRAGONETTI, Jose Francisco LOPEZ, Jorge Ernesto RODRIGUEZ, Sergio TASSELLI, Alberto TASSELLI, Osvaldo Antenor ACOSTA, Enrique Menotti PESCARMONA, Hugo Martin LARRABURU, Juan Manuel ABAL MEDINA, Oscar Alfredo THOMAS, Roberto Nestor SOSA, Julio Daniel ALVAREZ, Victor Fabian GUTlERREZ, Ricardo Fabian BARREIRO, Raul Horacio COPETTI, Juan Carlos MAZZON, Jose Maria OTTAVIS ARIAS, Eduardo DE PEDRO, Andres LARROQUE, Sergio SZPOLSKI, and others, who carried out their activities

Judicial Authority of the Nation

[signatures]                                                C no. 9/608/18

[sidebar: "Official Use"]

beginning approximately in the year 2003 until the year 2015, and whose purpose was to organize a system of collection of funds to receive illegal money in order to enrich themselves illegally and to use part of the funds for committing other crimes, all of which was done taking advantage of their positions as officials of the National Executive Branch. The illicit associations were run by Nestor Carlos KIRCHNER and Cristina Elizabet FERNANDEZ, who held the Office of President of the Republic of Argentina between May 25, 2003 through December 9, 2007, and December 10, 2007 through December 9, 2015, respectively. The money was made available to persons holding positions in the National Executive Branch or their private secretaries located at the addresses of Uruguay 1306 and Juncal 1411, CABA ("*Ciudad Autonoma de Buenos Aires*", the Autonomous City of Buenos Aires) - the private address of Nestor Carlos KIRCHNER and Cristina Elisabet FERNANDEZ, in the presidential residence of Olivos and in the Government house, part of this money was redistributed, or payments were made to other public officials. The maneuver was organized by Julio Miguel DE VIDO, then the Minister of Federal Planning, Public Investment and Services), and Roberto BARATTA (former undersecretary of Coordination and Management Control of the Ministry of Planning), who, from the positions they held, carried out the collections of the compromised funds. The collections were made primarily by Roberto BARAITA and Nelson Javier LAZARLE (Baratta's private secretary); with the following persons also actively participating in this collection system and receiving payments: Walter FAGYAS [Advisor of the Subsecretariat of Coordination of the Ministry of Federal Planning and President of ENARSA), Rafael Enrique LLORENS (Legal sub-Secretary of the Ministry of Planning), Heman Camilo GOMEZ (official of the sub-Ministry of coordination and Management Control of the Ministry of Federal Planning) and Fabian Ezequiel GARCIA RAMON (National Director of renewable energy and energy efficiency of the Ministry of Federal Planning). The persons named in almost all the cases were transported to the places where the payments/charges were made by Oscar Bernardo CENTENO, who received orders from BARATTA and DE VIDO.

**II.- Description of the Collection System:** Having determined who were the leaders and

primary organizers of this organization, it would be appropriate to provide an overall description of the collections system:

**a)** In order to give an example of what will be developed in the following paragraphs, we will list certain passages from the "crime logbook" that Oscar Bernardo CENTENO wrote between 2005 and 2015, including: "meeting on November 12, 2008, at 10:30 a.m. "... *Minister takes the Lic. to the Presidential Residence in Olivos, went to a ceremony, then took him to his bunker, **waited for a man whose contact is** <u>**Oscar 15 4085-6111 \ 15 4085-3330**</u>, to whom the Lic. delivered to the contact a bag of money, then he took the Lic. to the ministry..."* (emphasis added by the court); * meeting on January 5, 2009, after holding a meeting at the Quinta de Olivos with Nestor, the President, and the Minister, he goes to the apt. of the latter of these two, and then to the ministry; at 4:00 p.m., "... Ministry takes the person to <u>Maipu 741</u>, where he met at the door with two people and then they went up to <u>1B</u>. and then **the Lic. and another person came down from the apartment with a suitcase about 90 cm high by 40 cm wide and 20 cm thick, I loaded it into the trunk of the car, it would have weighed about 40 kgs, it was money**, and then I took the Lic. to his department where he got off with his suitcase and then I took the Lic. to the ministry. **The persons were from Isolux- Corsan, there were about 6 million dollars in the suitcase...**", (emphasis added by the court); * meeting on January 12, 2009 at 8:00 p.m. "... Ministry to take the Lic. to his apartment, **he went to get the suitcase that we carried last Monday, and we went to deliver** <u>**Daniel Munoz to Uruguay 1306**</u>; then we went to look for Walter Fagias at his department. and I dropped them off at a restaurant at the address of Honduras 5700...", emphasis added by the court. Meeting on June 3, 2009 at 7:15 p.m. "... Ministry, I went to look for the Lic. and Nelson at the Presidency, at 8:05 I took them to the Ministry of Labor for a meeting; then at 9:30 I left with Walter Fagias **who I then took to Walter's apartment where he gave a backpack with money in it to Baratta: judging from the backpack, it would have held about 300,000 USD**; then I took the Lic. to his apartment ..." (emphasis added by the court); *meeting of November 19, 2009 at 8:05 p.m. "... Ministry, I took the Lic. to look for Heman Gomez and we couldn't, because the traffic was very congested and Mr. Baratta called him by phone and told him to take a taxi and to be very careful, and

Judicial Authority of the Nation

[signatures]                                                          C no. 9/608/18

[sidebar: "Official Use"]

*to stay calm because of the money that he had to carry, we waited for Hernan at the door of Baratta's building and* **they went up to the apartment of the "licenciado", to distribute everyone's share; they also took the share of Dr. Llorens Rafael, Ezequiel Garcia, and Walter Fagias,** *then they* **left the apartment and I took them to Uruguay 1306 to deliver the majority of the money to Daniel Muñoz**. *then I took him to his apartment and Hernan Gomez to the garage(sic), and I went home..." (emphasis added by the court); * Meeting of January 27, 2010 at 1:35 p.m. "... Ministry, I took the Lic. Baratta to the Hotel First Park (Esmeralda 1366), we went down to the 2nd underground level with the car and nobody was waiting for him and* **the Engineer Ruben Valenti got in, then at 3:00 they came down with a bag full of money (200,000 USD)** *and* **a box of Lagarde red wine** *and I took him to the ministry ... ", (emphasis added by the court): * Meeting of January 27, 2010 at 1:35 p.m."... Ministry, I took the Lic. to his apartment,* **he went up with all the money he had collected for the day, after taking his share, he came down and I took him to deliver it to Daniel Muñoz at Uruguay 1306,** *and then I took the Lic. to his apartment and I went home ... ", (emphasis added by the court); * Meeting on Wednesday, July 21, 2010 at 2: 00 p.m. The Lic. Baratta, Javier Mosera, and Nelson Lazarte left from the ministry: in the car driven by Pablo Avalos and the Lic. Baratta told me that at 14:45* **I have to take him to Ezequiel Garcia to a place and to keep a close eye on anyone that might be following us.** *At 2:45 the* **engineer Garcia** *called me by cell phone* **and told me that he was waiting for me at the door on the street; I went out and took him to Alem 454; we went down to the underground level and he communicated with a person and told him that we are now down; then this person came out with a gray suitcase and put it in the trunk of my car; Garcia and this man said that it was 4,500,000 USD (four million, five hundred thousand dollars) that were "for Comahue and the other one"** *they said; then we left that place and the man got out at Alem and Peron; and we went on and* **Garcia Ezequiel told me to go to the Quinta de Olivos,** *on the way, Ezequiel Garcia called the Lic. Baratta to tell him to wait for us at Alcorta near the MALBA Museum; at that place, he got in the car and we headed to the Quinta de Olivos:* **at Liberator and Melo, the Lic. made Ezequiel get out and wait for us there since there was a YPF gas station there, and we went on; but the Lic. told me that I had to give the money to Dr. Nestor Kirchner with my own hands** *and he tells me that*

*he is going to enter alone driving the car, and so I stayed outside the Quinta and he entered at <u>3:55</u> <u>(p.m.)</u> and left at <u>4:30</u> and he picked me up and we kept looking for <u>Ezequiel Garcia</u> and we changed the steering wheel and I was still driving and I took them to the <u>ministry of planning</u> and they went up together with a personal bag of Lic. Baratta where they supposedly carried each person's share..."* (emphasis added by the court): * meeting of July 23, 2010 at 12:55 p.m. *"... From the ministry, I took the <u>Lic. Baratta</u> to <u>Alem 454</u>. to the lower level, where the <u>same person</u> was waiting for us, the Lic. called him by cell phone as well and told him, <u>Jorge we're arriving now</u>, this man went up to car with a <u>black-colored suitcase</u> and told the Lic. Baratta that it was <u>for Comahue</u> and that he would try to get the other project, <u>Comahue Cuyo</u>, they were electrical energy projects, he told him that it was <u>2,500,000 USD</u> (two million five hundred thousand dollars) in the suitcase. then the man also got off at Alem and Peron, the lic told me to <u>go</u> <u>to Olivos</u>, on the way he called <u>Hernan Gomez</u> and told him to wait for us at the YPF at <u>Libertador</u> (Olivos), but Hernan made a mistake and waited for us at the Esso on Libertador (Vicente Lopez), I called him on the phone and he came to us and he gave the Lic. a bag with the <u>money collected from the week</u> and he told him that it was <u>1,500,000 USD</u> (one million five hundred thousand dollars) and he left; we went on; the <u>Lic. Baratta</u> told me again that he is going to go in alone and I gave him the car; because he had to deliver the <u>4,000,000 USD</u> (four million dollars) to <u>Dr. Nestor Kirchner</u> with his own hands at the chalet where <u>Dr Kirchner</u> lived with <u>the President</u>, Cristina, and that they did not want me to be seen; I entered at <u>2:00 (p.m.)</u> and left at <u>2:25</u>. I got up and we went to the YPF at Libertador and Melo, where he got out of my car and got into the <u>Meriva owned by Hernan Gomez, license plate IIC 258</u>. and I followed them to the Department of the Lic. Baratta: it was clear that while they were on the way, <u>they were</u> <u>distributing</u> the portion of the money that <u>Dr. Kirchner</u> had given him, after leaving the Lic.; Hernan left and told me to wait for him on the way back from his apartment, at 15: 20 he went out and I took him to <u>Gorostiaga 2337</u>. He was there for an hour and then I dropped him off at his apartment again. During this trip, <u>he said to me ironically that he wanted to stop doing the</u> <u>collections</u>, and I told him for him to take something in the meantime, and he said to me; <u>not</u> <u>Oscarcito, I'm just a "caretaker"</u>. I took this to mean that I always stayed out and he told me that <u>that was the way it was, nothing more</u>; that Dr. Kirchner wants them all for himself and that in addition he said to him, there aren't any more? When*

Judicial Authority of the Nation

[signatures]                                           C no. 9/608/18

[sidebar: "Official Use"]


we got to his apartment, he told me to wait until he told me to go..." (emphasis added by the court). * Meeting of October 7, 2010 at 7:50 p.m. "....I took the Lic. Baratta and Nelson from the ministry to **Callao 1175, where Neyra was waiting for us with a suitcase with 4,000,000 (four million dollars)**, by order of the Lic., he told me to open the trunk without getting out of the car. **Neyra put it into the trunk and then he got into the car in the back seat, and he gave a paper with the amounts of various works projects for the amount for the amount [sic] total that has already been listed.** Then **the Lic. called Hernan Gomez who already had the collected amounts, and told him by phone where we would deliver it and Heman approaches to place and the Lic. Baratta got into the Hernan's truck, a Meriva with license plate IIC 258 and they headed to Uruguay 1306, I went with Nelson in the car, following from behind.** We arrived at the place and we had to wait for Daniel Munoz; **when Daniel arrived, the lic got out of Heman's Meriva with two bags holding 800,000 USD (eight hundred thousand dollars) each.** who gives them to Daniel Muñoz: and he told me to open the trunk and **the Lic. put in the suitcase and entered through the door on Juncal with all of it, which is to say, 5,600,000 USD (five million, six hundred thousand dollars):** at 10 after, the Lic. Baratta came out and **took his personal bag out of my car, which was empty, and goes back into the residence; at 30 after, he gets out and gets in Hernan's Meriva, and I again followed them with Nelson who made it clear that he would keep an eye on me, to make sure I didn't do anything strange: then we arrived at the house of the Lic. they got out with the personal bag with the part that Daniel Munoz gave him** and then we left, each of us going to our own house..." (emphasis added by the court) * Meeting of July 16, 2013 at 12:30 p.m. "... I took Lic. Baratta and Nelson to Manuela Saenz 323 in Puerto Madero, they pick up a bag full of money and we return to the ministry; then at 8: 00 p.m. we leave the ministry, Baratta y Nelson I., and I took them to Andonaegui 2138, apartment 1B to drop off the money. **I want to make it clear that they always use two identical bags that they constantly change for operations, that is to say, they empty or fill the same black bags according to the photos** ..."(emphasis added by the court); * meeting of June 3, 20/5 at 11:20 a.m. "... I took Nelson to **Nestor Otero's office in Retiro, and I brought two hundred and fifty thousand dollars (250,000 USD) and took it to the ministry** where Nelson gave it to the "Licenciado" Baratta ...",

*(emphasis added by the court); * Meeting of June 9, 2015 at 10:20 a.m. "... I took Nelson to the former YPF building, along with **a Mr. Nivello who had to give us the money, we had mixed up the delivery spot, and he went to the ministry,** since we were having problems with traffic and the entire Plaza de Mayo was closed for the national strike. **Nivello was with the "dead man", he decided to deliver it in person to the "licenciado" Baratta at the office, he mentioned 1,250,000 (one million, two hundred and fifty thousand dollars)** . " (emphasis added by the court); * the meeting of July 15, 2015 at 3:48 p.m. "... I took Nelson to the Hilton hotel parking lot, on an underground level, where Javier was waiting with Audi with license plate GZP 687, and he gave Nelson a package with 250,000 USD (two hundred and fifty thousand dollars) and then at the ministry, he gave it to the Lic. Baratta. I'm attaching the parking receipt... * Meeting of August 4, 2015 at 3:50 p.m. "... I took Nelson to the underground level of the Hotel Hilton, which shares the parking lot with the adjacent building, where **Mr. Sanchez Caballer was waiting for us, and he gave him a bag containing 1,250,000 USD (one million two hundred fifty thousand dollars)** and we returned to the ministry and gave it to Mr. Baratta at his office. I'm attaching a parking receipt... ", (emphasis added by the court).*

**b)** The system was essentially based on a series of 'fixed collection points'. where the officials identified met with the businesspeople, who delivered them money in cash, mainly in US dollars: alternatively, these "fixed points" were mainly at public or private parking lots, and the "handing off" of the money was made directly from one car to another, or also in public and private offices. After a confusing episode on October 22, 2015, in which unknown persons tried to intercept the vehicle of the Ministry of Planning that had picked up a collection from "Supercemento S.A.I.C", the system changed, and the businesspeople were required to go to the Ministry of Planning, enter through the private parking lot, and from there, directly access the office of Baratta. Later, and only sporadically, official cars passed by some of the companies to pick up the collections.

**c)** In this context, it can be determined that there was an initial circle of the reception of

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]


funds, carried out by those who had direct contact with the persons who provided the funds involved. A second circle was made up of the persons who in turn collected these illegal funds to deliver them to those who had definitively ordered them and organized this system. Among those who formed part of this inner circle were, among others, Roberto BARATTA, Walter Rodolfo FAGYAS, Nelson Javier LAZARTE, Fabian Ezequiel GARCIA RAMON, Heman Camilo GOMEZ, Rafael Enrique LLORENS and German Ariel NIVELLO. At the second level, those who received the funds that were collected and passed them on the leaders and organizers or applied those funds to other illegal activities were: Jose Maria OLAZAGASTI, Hugo Martin LARRABURU, Juan Manuel ABAL MEDINA, and Hector Daniel MUÑOZ. Finally, the persons who benefitted from this collection system, which indeed was not the only one, according to the knowledge from other cases that have been heard before this court that are public and notorious, are Nestor Carlos KIRCHNER, Cristina Elisabet FERNANDEZ,

and Julio Miguel DE VIDO.

**III.- The persons receiving the illegal funds - The facts:** Among the persons who received the money brought to them by the persons mentioned above are,  among others: Rudy Fernando ULLOA IGOR, Ernesto CLARENS, Oscar PARRILLI - Secretary General of the Presidency and Director of the Federal Intelligence Agency -, Hector Daniel MUÑOZ - Private Secretary of the Presidency -, Hugo Martin LARRABURU Unit Coordinator, Minister of the Headquarters of the Cabinet of Ministers-. Juan Manuel ABAL MEDINA - Chief of Staff of Ministers-, Jose Maria OLAZAGASTI -Private Secretary of De Vido -, Heman DEL RIO - Secretary a Olazagasti -. Jorge Omar MAYORAL, Secretary of Mining of the Ministry of Federal Planning - German Ariel NIVELLO -Undersecretary of Urban Development and Housing, part of the Ministry of Public Works of the ministry of Federal Planning - and Jose Francisco LOPEZ - Secretary of Public Works of the Nation.    -

**a) Nestor Carlos Kirchner and Cristina Elisabet Fernandez,** received money in the following manner: on October 8, 2009 -BARATTA delivered it to MUÑOZ-, on February 3 and 17 of 2010 -BARATEA-, on June 2, 2010 -BARATTA and LAZARTE

delivered it to MUÑOZ-, on July 21, 2010 -BARATTA-, on August 11, 2011 - BARATTA to MUÑOZ - the collections were left at the Residencia de Olivos; on July 20, 2010, the met at the *Residencia de Olivos* with Nestor KIRCHNER for the collections on Wednesday, on March 17, 2010, May 20, 2010, and July 27 and 29, 2010, and October 6, 2010, Nestor Carlos KIRCHNER met with BARATTA and LAZARTE and told them how to make the collections, on August 4, 2010 there was a meeting with KIRCHNER and DE VIDO for the collection of the day; on April 22, 2010, Nestor Carlos KIRCHNER called BARATTA and asked how the collection was going - the call was made by Juan Francisco Alarcon, whose alias was "Tatu"-; on November 4, 2008, BARATTA was present at Lavalle 462, 5th floor, CABA, after having a meeting with Nestor Carlos KIRCHNER at the Residencia de Olivos, on August 1, 2013, the collections were delivered to the person driving the vehicle with plates MNI589, Which later entered the House of Government. **b) Julio Miguel De Vido;** he received money on April 7, 2010 from BARATTA at his apartment, on May 31, 2010, from BARATTA > LAZARTE. on  June 3, 16, 23, and 29 of 2015, and July 1st of 2015, LAZARTE delivers the money to Hernan DEL RIO, Secretary of Jose Maria  OLAZAGASTI, in order for him to give it to DE VIDO, and on June 18, 2015, BARATTA brought money to that of DE VIDO. On May 28, 2015, LAZARTE brought the results of the collection of "Feir's Park", at one million dollars, and gave it to Hernan DEL RIO, Secretary of Jose Maria OLAZAGASTI, so that he could give it to DE VIDO. In addition, on September 10, 2013, LAZARTE left for his son, Facundo DE VIDO, at Avenida Libertador 4850, 8th floor, CABA, an envelope with thirty thousand dollars (USD 30,000).

**c) Hector Daniel Muñoz** received money from BARATTA at Uruguay 1306, CABA: 1) on May 21, 2008; 2) on May 29, 2008. after withdrawing a bag from "Feir's Park' from VALENTI and another from the Techint building; 3) on June 30, 2008; 4) on July 23, 2008; 5) on August 27, 2008; 6) on September 4, 2008: 7) on September 11, 2008; 8) on September 15, 2008: 9) on September 18, 2008; 10) on October 9, 2008; 11) the results of the collection on at least 22 October 2008 is delivered to MUÑOZ at the address on *calle* Uruguay; 12)

Judicial Authority of the Nation

[signatures]                                          C no. 9/608/18

[sidebar: "Official Use"]


The money collected by BARATTA on October 28, 2008: 13) October 30, 2008; 14) November 11, 2008: 15) December 2, 2008, BARATTA brought the results of the collection to Lavalle 462, 5C, CABA "Electroingeniería. SA", he delivered it to Daniel MUÑOZ at *calle* Uruguay; 16) on December 3, 2008; 17) Oscar Alfredo THOMAS - The Executive Director of the "Entidad Binacional Yaciretá" - on December 18, 2008, paid BARATTA, who then brought this package and others to MUÑOZ at the address on Uruguay; 18) on December 15, 2008 BARATTA took the payments made by "Electroingeniería S.A." to MUÑOZ; 19) the "Grupo Isolux Corsan SA" paid six million dollars (6,000,000 USD) to BARATTA at Maipu 741 - CABA who then delivered it to MUÑOZ at Uruguay 1306 on January 12, 2009: 20) on January 14, 2009, BARATTA took the funds collected to NEIRA at Reconquista and Florida to MUÑOZ; 21) he brought the collections to these same parties on February 10, 2009: 22) on February 25, 2009: 23) on March 11, 2009: 24) On march 26, 2009 - with GARCIA RAMON -: 25) on April 7, 2009; 26) on April 29, 2009; 27) on May 14, 2009; 28) on May 19 and 20, 2009; 29) on May 26, 2009 - in the presence of FAGYAS-; 30) on June 4, 2009, BARATTA brought the funds collected from "Feir's Park" to MUÑOZ at *calle* Uruguay 1306; 31) on June 11, 2009; 32) on June 2 and 19, 2009 - in the presence of GARCIA RAMON-; 33) on June 22, 2009 - in the presence of GARCIA RAMON-; 34) on June 24, 2009 - in the presence of GARCIA RAMON -; 35) on July 16, 2009; 36) on July 22, 2009 with GARCIA RAMON present-: 37) on July 30, 2009 -in the presence of GOMEZ-: 38) on August 6, 2009 - with GARCIA RAMON and GOMEZ-: 39) BARATTA and GOMEZ delivered thee bags on 12 August 12, 2009, with what had been produced to Muñoz; 40) on August 21, 2009; 41) on September 3, 2009: 42) on September 10, 2009 - in the presence of GARCIA RAMON and GOMEZ-: 43) on September 17, 2009 - with GOMEZ -; 44) on October 19 and 22, 2009; 45) on October 28, 2009 -with GOMEZ -; 46) on November 19, 2009: 47) on December 3 and 10, 2009; 48) on January 20, 2010: 49) on January 27, 2010: 50) on February 10 and 24, 2010: 51) On March 10, 2010: 52) on March 17, 2010; 53) on April 15, 2010; 54) on May 27, 2010 -LAZARTE-; 55) on April 28, 2010 - in

the presence of GOMEZ-; 56) on June 9, 2010 - in the presence of FAGYAS-; 57) on 8 July 8, 2010 - in front of LAZARTE-; 58) on July 14 and 28, 2010: 59) on August 4, 6, and 25, 2010: 60) on September 3 and 9, 2010 -with LAZARTE-; 61) on September 15 and 30, 2010 -with LAZARTE-: 62) on October 7, 2010, BARATTA and LAZARTE charged four million dollars (USD 4,000,000) from NEIRA at Callao 1175 - CABA, said money was given to GOMEZ for him to give it to MUÑOZ at Uruguay 1306 -CABA.

**d) Hugo Martin LARRABURU,** 1) On August 1, 5, 6, 8, and 9, 2013, and September 2, 4, 5,

10, 12, and 17 of September, 2013, LAZARTE and BARATTA delivered the collections to a person from the Presidency who drove the vehicle of the make "Ford", model "Focus", license plate MNI 589, used by Hugo Martin LARRABURU, on September 5, he was required to deliver it to ABAL MEDINA by order of Cristina Elisabet FERNANDEZ; 2) on August 7, 2013. LAZARTE collected at "Feil's Park" from VALENTI, and passed it to the car of the Presidency of the make "Ford", model "Focus", license plate MNI 589 used by Hugo Martin LARRABURU; 3) on August 29, 2013, the three hundred thousand dollars (USS 300,000) contributed by LOSON to LAZARTE were brought to the Government House and delivered to Hugo Martin LARRABURU. who then had to deliver them to Juan Manuel Abal Medina, and also deliver it on the 30th to ARRABURU at the government house: 4) on September 19, 2013 Lazarte picked up sixty thousand dollars (USD 60,000) then gave it to Hugo Martin LARRABURU: 5) on September 18 and October 17, 2013, the money was delivered to Hugo Martin LARRABURU, driving a car with the license plate MNI 588; 6) on September 20, 24, and 25, 2013, they delivered the money to Hugo Martin LARRABURU. who at that time was driving a car with the license plate KIM 064; 7) on October 1 and 22, 2013, they gave the money to Hugo Martin LARRABURU, who had to give it to ABAL MEDINA; 8) on October 1, 15, and 24, 2013, they delivered the money to Hugo Martin LARRABURU.

e) Among other persons, the movement or hiding of money illicitly for Nestor Carlos Kirchner and Cristina Elisabet Fernandez in the period under investigation - 2003 and 2015 - saw the participation of **Roberto Nestor Sosa** - Secretary of the National Presidency Nacional, **Julio Daniel**

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]

**Alvarez**, Secretary of the National Presidency, **Victor Fabian Gutierrez,** Secretary of the National Presidency, **Ricardo Fabian Barreiro** - employee of the Regulatory Agency of the National Airport System (ORSNA) at the airport of Califate, Province of Santa Cruz, and **Raul Horacio Copetti.**

**f) Others A. - Norberto Oyarbide**: participated in the illicit association, it being such that on the 3rd of September, 2013, he met to eat with BARATTA and DE VIDO at the "Sagardi" restaurant, on Humberto Primo 319, CABA. On September 26, 2013 BARATTA and LAZARTE met with OYARBIDE at Avenue Comodoro Py 2002, floor no. 3 - CABA. On October 17, 2013, OYARBIDE gave a resolution to LAZARTE at the restaurant "Estilo Campo" on Alicia Moreau de Justo 1840 - CABA. On June 22, 2015, Lazarte appeared at the house of OYARBIDE, located on Rodriguez Peña 1978 - CABA, and picks up papers, after appearing several times to pick up and drop off money. On October 14, 2015, OYARBIDE gives Lazarte a resolution at the restaurant "Estilo Campo", located at Alicia Moreau de Justo 1840 - CABA. It should be noted that during the period indicated, Norberto Mario OYARBIDE was the Judge responsible for the National Criminal and Correctional Court No. 5 of the Autonomous City of Buenos Aires. **B.- Javier Fernandez,** on August 2, 2013 and August 7, 2013, LAZARTE brought money to Javier FERNANDEZ at his home, at the address of Andonaegui 2138, floor no. 1,  of this city. On July 16, 2013, BARATTA and LAZARTE gave money to Javier FERNANDEZ, at the same address. **C. - Oscar Isidro Jose Parrilli:** received money on November 12, 2008, from BARATTA, at Scalabrini Ortiz 3358, floor No. 5. Apt. "B", C.A.B.A.

**IV.- The persons who paid - The facts:** in light of the evidence gathered and the various facts presented in these proceedings, it is possible to establish that the collectors in the illegal association were assisted by the participation of entrepreneurs who paid sums of money totaling to an approximate amount in US dollars of FIFTY FIVE MILLION FOUR HUNDRED SIXTY THOUSAND (USD 55,460,000), during countless opportunities between 2003 and 2015, which allowed for the determination to be made during this time of the illicit organization. As of this time, the following have been determined to be included among these businesspeople, without ruling out future persons,

who have been linked with this case:

**A.- Carlos Guillermo Enrique Wagner,** who made payments for "ESUCO SA", which

were made at San Jose 151 - CABA. where said company was headquartered: on June 2, 2010, the location from which BARATTA and LAZARTE collected five hundred thousand dollars (USD 500,000). Then they took it to MUÑOZ, along with other funds gathered: on May 14, 2013 and July 25, 2013, the persons named above picked up a bag with money inside; on August 7, 2013, BARATTA and LAZARTE went to pick up a bag with money inside, and on September 6, 2013, BARATTA and LAZARTE went again to pick up a bag with money: on July 27, 2015, LAZARTE went alone. Also, on another occasion, on September 22, 2010, WAGNER went in a car of the make "Honda", model "Accord", license plate "ELL 129" and delivered one million dollars (USS 1,000,000) to BARATTA.

**B.- Armando Roberto Loson** made payments for "Albanesi S. A.", which

were made at the building located at Leandro N. Alem 855 - CABA. where that company was headquartered: on the day of July 18, 2013, LAZARTE went there and picked up a bag with money, on the 25th of the same month and year, BARATTA and LAZARTE went to pick up a bag with money inside. on August 29, 2013, LAZARTE went and received from LOSON a bag with three hundred thousand dollars (USD 300,000), who was with a person named "Marcelo", and told him: "...tell 'lic' Baratta I'm renting another machine for the job..."; on August 30, 2013, LOSON gave LAZARTE two hundred thousand dollars ($ 200,000): on September 10, 2013, LOSON gave LAZARTE a bag with three hundred thousand dollars (USD 300,000), on September 16, 2013 LAZARTE received from LOSON three hundred fifty thousand dollars (USD 350,000); on June 2, 2015, LAZARTE received two packages containing one million, two hundred fifty thousand dollars (USD 1,250,000); on June 29, 2015, LAZARTE received five hundred thousand dollars from LOSON ($ 500.000): on July 21, 2015, LOSON one million dollars (USD 1,000,000), and on October 6, 2015, LAZARTE picked up four hundred thousand dollars (USD 400,000).

**C.- Hector Javier Sanchez Caballero** made payments for "ODS S.A." and "IECSA S.A." on orders of **Angel Jorge Antonio Calcaterra**, shareholder of the firms

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]

mentioned above, which were made in the garage of the Hotel "Hilton" located on Machacha Guemes 351, CABA: on October 1, 2013, Lazarte picked up one million (USD 1,000,000) who gave SANCHEZ CABALLERO, which were then delivered to Hugo Martin LARRABURU: on June 30, 2015, LAZARTE collected one million five hundred thousand dollars (USD 1,500,000) who gave them to SANCHEZ CABALLERO; on July 13, 2015 LAZARTE received two hundred fifty thousand dollars (USD 250.000) from SANCHEZ CABALLERO: on August 4, 2015, LAZARTE collected one million two hundred fifty thousand dollars (USD 1,250,000) from SANCHEZ CABALLERO: LAZARTE made four more collections at the same parking lot on the days of September 11, 17, 18, and 24, 2013, for one million five hundred thousand dollars (USD 1.5 million) each time. A collection of cash was also made at the building of Manuela Saenz, 323/351, CABA, where "ODS S.A. operated, on July 16, 2013, and August 1, 2013, in which BARATTA and LAZARTE withdrew the money; on August 9, 2013, LAZARTE made the collection: on October 22, 2013 LAZARTE collected one million two hundred fifty thousand pesos [sic - possible error in original document translated] (USD 1,250,000): on May 28, 2015 LAZARTE collected one million two hundred thousand dollars (USD 1,200,000); on August 18, 2015 LAZARTE collected the money: on September 14, 2015, LAZARTE collected seven hundred fifty thousand dollars (USD 750,000); and on October 2, LAZARTE collected three hundred fifty thousand dollars (USD 350.000).

**D. - Francisco Ruben Valenti and Enrique Pescarmona** made payments to "IMPSA S.A." - "Industrias Metalurgicas Pescarmona S.A.I.C. y F"-. having met with BARATTA at the "Feir's Park" hotel, located at Esmeralda 1366, CABA, on the following days: February 8 and 28, 2008; April, 8 2008: May 29, 2008: July 11, 2008 BARATTA collected a package from "Feir's Park"; on September 2, 2008; on October 28, 2008 BARATTA picked up a box of wine and a bag of money as was the case every month: on December 11, 2008, BARATTA picked up the money: on March 4, 2009 he also collected money; on June 4, 2009 picked up a bag with money; also, on the 20th of August, 2009 BARATTA received a package with money and a box of wines; on September 23, 2009, BARATTA and GOMEZ received approximately one hundred fifty thousand dollars (USD 150,000) and a box of wines, which was then taken to MUÑOZ

to *calle* Uruguay along with other collections; on December 7, 2009, BARATTA received two hundred thousand dollars (USD 200.000) and a box of wines; on January 27, 2010 BARATTA collected two hundred thousand dollars (USD 200.000) and a box of wine; on April 22, 2010, BARATTA and LAZARTE collected a bag with one hundred thirty five thousand

dollars (USD 135,000) and a box of wine. On June 26, 2013, at Libertad 1535, CABA, they received a bag of money, on September 1, 2010, at the hotel "Feir's Park" at Esmeralda 1366, on the second lower level where the driver VALENTI was waiting, and went with them up to their room. then BARATTA went down with VALENTI, and he brought a bag with money, seven hundred thousand dollars (USD 700,000) and a wine box with six bottles; on August 7, 2013 LAZARTE received money at "Feir's Park" from VALENTI.

**E.- Carlos Jose Mundin** ordered for "BTU S. A" to make payments on May 21, 2009 to BARATTA for which the vehicle of the make "Renault", model "Megane", license plate "EBY 711" was used. With Mundin, meetings were held at the restaurant "Croque-Madame". located at Libertador 1902, CABA, on June 1, 2010. in which they talked about projects that had the approval of Nestor Carlos KIRCHNER and Julio Miguel DE VIDO. In the meeting, the participants were Santiago De Vido -son of the Minister-, as well as LAZARTE and BARATTA. after the meeting, the persons named above went to the Residencia de Olivos; on July 7, 2010, BARATTA met with MUNDIN at the same location: on July 28, 2010, BARATTA met early with MUNDIN; on August 5, 2010, in the afternoon, BARATTA went to the residence of the Minister DE VIDO and from there he left with his son, Santiago De Vido. and they went again to meet MUNDIN at the restaurant mentioned above with WAGNER and a person named "Flavio", in which they talked about 4 works projects in the south and two in the north, works involving gas infrastructure; on 13 August 2010, BARATTA, Santiago de Vido, and MUNDIN met at the same location. On September 13, 2010 BARATTA and FAGYAS went to Alem 896 - 5th floor - CABA, to pick up a bag with money inside from that place, where "BTU S.A." operated, on August 30, 2013, BARATTA and LAZARTE went to Alem 896 - CABA to meet with Santiago De Vido and MUNDIN.

**F - Jorge Guillermo Neira, Gerardo Luis Ferreyra, and Osvaldo Antenor Acosta**

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]

ordered, for the "Grupo Eling S.A." - "Electroingenieria S.A.", to make payments, Which were made at Lavalle 462 - 5th floor - CABA, where the headquarters of the company was located: on September 30, 2008, the payment was made to Neira at Reconquista and Florida, CABA and to Baratta, who brought it to Uruguay 1306, CABA; on October 9 and 22, 2008, BARATTA went, on the last day, MUÑOZ took the collection to Uruguay 1306, CABA; on December 2, 2008, BARATTA received money from FERREYRA at Lavalle 462, 5th floor, CABA, and then gave it to MUÑOZ at Uruguay 1306, CABA; on December 15, 2008, BARATTA and LLORENS met with FERREYRA, who gave them a package with money; on January 14, 2009, BARATTA and GARCIA RAMON collected their monthly payment; on October 7, 2010, the payment was made by NEIRA at Callao 1175 - CABA, with the delivery made to BARATTA and LAZARTE of a bag with four million dollars (USD 4,000,000); on October 13, 2010, the payment was made by NEIRA at Azucena Villaflor 450 25th floor office 3 CABA, BARATTA gave three million dollars (USD 3.000.000) together with a summary of what had been provided; on October 21, 2010, the payment was made by another person who replaced NEIRA, at Callao 1175, CABA, for three million five hundred thousand dollars (USD 3,500,000) and then it was taken to MUÑOZ; on November 12, 2010, BARATTA and GOMEZ went twice to Lavalle 462, CABA, to receive money ; on November 26, 2010, BARATTA and LAZARTE went to collect at Lavalle 462, CABA; on September 18, 2013, BARATTA and LAZARTE picked up the money at 25 de Mayo 489 - CABA: on June 18, 2015, LAZARTE picked up two hundred fifty thousand dollars (USD 250,000); on August 3, 2015 LAZARTE picked up two hundred fifty thousand dollars (USD 250,000) and on the 14th of August 2015, LAZARTE picked up the money.

**G. - Oscar Alfredo Thomas** Executive Director of "Entidad Binacional Yacyretá" - made payments at Juncal 1740 - CABA on December 18, 2008 to BARATTA; Thomas gave money on January 28, 2009, to BARATTA; on May 27, 2009,  BARATTA was given a package with money; on July 29, 2009 BARATTA and FAGYAS received a box with money; the on August 5, 2009, BARATTA was given seven hundred thousand dollars (USD 700,000); on August 12, 2009, BARATTA and GOMEZ were given a bag with one million, one hundred thousand dollars (USD 1,100,000); on

September 2, 2009, BARATTA received a package with money inside: on January 15, 2010 BARATTA received a bag of money: on January 21, 2010 THOMAS gave BARATTA approximately two hundred thousand dollars (USD 200,000): on January 26, 2010, BARATTA received a package with money: on February 25, 2010, BARATTA received two bags with approximately three hundred thousand dollars in total (USD 300,000):on March 15, 2010, BARATTA picked up a bag with two hundred and fifty thousand dollars (USD 250,000); on July 20, 2010 BARATTA received a bag with two hundred and fifty thousand dollars (USD 250,000); on August 7, 2013, BARATTA and LAZARTE collected money form offices at Avenida Eduardo Madero 942 - C. A. B. A.; on August 19, 2010, BARATTA and LAZARTE picked up one million two hundred thousand dollars (USD 1,200,000) from Juncal 1740, CABA: on August 13, 2013, Lazarte picked up, from the offices at Avenida Madero 942, C.A.B.A., a bag with money: on September 19, 2013 LAZARTE picked up the money from the offices at Avenida Madero 942, C.A.B.A.

**H. -** In early 2009, after the works project for the "Rio Turbio Thermal Plant" was awarded to the firm "Grupo Isolux Corsan SA", BARATTA met with **Juan Carlos de Goycoeehea** at the Federal Ministry of Planning and asked him to provide an economic collaboration. In response, DE GOYCOECHEA indicated to him that he should communicate with the authorities of the company, with headquarters in the Kingdom of Spain. Finally, in order to guarantee the contract and the payments for the awarded project, at that point, DE GOYCOECHEA was told to make the requested payments, which were made at Maipu 741, CABA. with these being for a grand total of three hundred thousand dollars (USD 300,000) on the following dates: on June 19, 2008, to BARATTA, who then took the money to Uruguay 1306, CABA: on January 5, 2009, they delivered them to BARATTA; on April 7 and 29, 2009, bags with money were delivered to BARATTA: on May 14, 2009, bags with money were given to BARATTA and GARCIA RAMON; on May 15, 2009, BARATTA and GARCIA RAMON received a backpack with money; on April 8, 2010, a meeting was held with LLORENS and BARATTA; from on May 19, 2010, to BARATTA: on May 27, 2010, BARATTA and the engineer Ezequiel GARCIA went to Azucena Villaflor y Aime Paine, linked to "Goycoeehea", during which both of them left with bags with money in them, on September 15,

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]


,

LAZARTE and BARATTA collected money: on November 24, 2010 to BARATTA, on August 1, 2013, BARATTA AND LAZARTE  enter with an empty bag and leave with money; on September 5, 2013, LAZARTE and Hugo Martin LARRABURU picked up the money and then took it to Juan Manuel ABAL MEDINA as ordered by Cristina Elisabet FERNANDEZ; on September 19, 2013, to LAZARTE; on October 23, 2013, to Lazarte; the collection was made at Venezuela 151, CABA; on August 8, 2013 BARATTA and LAZARTE picked up a bag from someone named "Juanca", on June 3, 2015 Lazarte received money from someone named "Cesar". On July 13, 2015, Lazarte collected money, and on October 6, 2015, LAZARTE received a box of cash.

**I. - Nestor Otero.** On June 3, 2015, he ordered the delivery of two hundred and fifty thousand

dollars (USD 250,000) to his office in Retiro, to LAZARTE.

**J.-** During 2009, **Claudio Javier Glazman** asked Roberto BARATTA to provide him with the means so that then-Minister DE VIDO could put up for sale three land parcels located in this city. BARATTA considered the request, requesting from him a payment of one million dollars (USD 1,000,000). introducing him to HERNAN GOMEZ for this end. Consequently, GLAZMAN gave this person various sums of money, totaling to the amount of one million five hundred thousand pesos (USD 500,000 as follows: I) On the days of July 30, 2009,  August 8, 2009, August 20, 2009, September 3, 2009, September 10, 2009, September 17, 2009, September 23, 2009, and September 30, 2009,  He delivered money at *calle* Emma de la Barra 353, in this city; on the day of February 24, 2010, he delivered a bag with money, in the basement of the parking lot at Avenida Cordoba of "Galerias Pacifico", in this city; 3) on the day of March 10, 2010,  He delivered money at Pasaje Levenne 950, in this city: 4) on the day of March 23, 2010, he delivered money,  at the intersection of the Avenida Belgrano and Paseo Colon of this city and Avenida Alem 1050, CABA; 5) On April 28, 2010, He delivered a bag with money at the intersection of the streets Moreno and Balcarce of this city: 6) on August 18, 2010, He delivered money at the intersection of the Anchorena and Juncal of this city. In all cases, on the same dates Daniel MUÑOZ took the collections to *calle* Uruguay 1305 of this city, except on August 20, 2009, when the collection was delivered the following day.     —

**K. -** On January 20, 2010, Roberto BARATTA requested that **Rodolfo Armando Poblete** pay six hundred thousand dollars (USD 600,000) for the signing of the Decree 113/2010 of the P.E.N., ratifying the "Agreement Act signed by the Unit for the Renegotiation and analysis of Public Service Contracts and the Concessionaire Hydrovia Sociedad Anonima". This situation was notified to

**Benjamin Gabriel Romero**, who ordered POBLETE to make the payment, and thus the decree was signed on January 21, 2010. The payments were made partially: I) The first of them was paid on January 20, 2010 at the residence on Avenida Corrientes, 316, of this city, Where POBLETE paid three hundred thousand dollars (USD 300,000) to BARATTA. Then, CENTENO took the party named above to LAZARTE at the Federal Ministry of Planning, and later BARATTA gave money to Daniel MUÑOZ, who was in the vehicle with the license plate "EQL 442" at Calle Uruguay 1306 of this city. 2) The second of the payments took place on 19 March 2010 in the second underground level at the address on Avenida Alvear 1491 of this city, where POBLETE delivered a bag with three hundred thousand dollars (USD 300,000) to BARATTA - in the presence dc LAZARTE. Furthermore, Benjamin Gabriel ROMERO, ordered the delivery of money made on August 9, 2013, to LAZARTE, at Avenida Corrientes, 316, of this city, at which time he transferred it to the vehicle with the license plate number "MNI 589", used by Hugo Martin LARRABURU,     -

**L.- Hector Alberto ZABALETA** made the following deliveries of money from the "Techint group", as indicated by **Luis Maria Cayetano BETNAZA**, who was the Institutional Director of the group, with the consent of **Paolo ROCCA**, Executive Director of the group. In this way, ZABALETA carried out the following deliveries: on May 29, 2008, he delivered a bag with money inside to BARATTA, at the "Grupo Techint" building, located on *calle* Della Paolera 299 of this city. The bag was later handed over to Daniel MUÑOZ, at *calle* Uruguay 1306 of this city; on the day of August 1, 2008, in the lower level of the above-mentioned building, ZABALETA delivered a package with money to BARATTA; on August 27, 2008, ZABALETA delivered a bag with money inside to BARATTA, in the "Grupo Techint" building, a package that was then

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]

delivered to Daniel MUÑOZ at *calle* Uruguay 1306 of this city. On October 30, 2008 [repeated in original], ZABALETA got in the vehicle driven by CENTENO at the-intersection of the streets of Della Paolera and Leandro N. Alem, and they went down to the second underground level of the "Grupo Techint" building, where the person named above provided a package with money, which was ultimately given to Daniel MUÑOZ who was located at *Calle* Uruguay 1306 of this city. On December 3 and 18, 2008, ZABBALETA gave money to BARATTA, in the second underground level of the "Grupo Techint" building mentioned above. On those same dates, such funds were given to Daniel MUÑOZ at *Calle* Uruguay 1306 of this city. The payments were made by order of the Techint Group. the same company which also delivered, on June 30, 2008 a package with money to BARATTA, at the same place, which was also delivered to Daniel MUÑOZ on the same day. And on October 3, 2008, a person from the same group and at the same location, identified as "Ale",

delivered the dividends for the month to BARATTA.

**M.-Aldo Benito Roggio** participated in the illicit association, ordering the following deliveries of money, by persons not identified, in the name of the firm "Benito Roggio e Hijos S.A.": On June 26, 2013, a delivery of a bag with money was made to BARATTA and LAZARTE at the workshop located in the intersection of the Bouchard and Tucuman streets in this city. On August 5 and September 4, 2013, he was made to give money to LAZARTE at Avenida Alem 1050 of this city. In both cases, the money was later given to Martin LARRABURU, who

drove the vehicle MNI 589.

**N. - Sergio Tasselli and Alberto Tasselli** participated in the illicit Association, ordering the following deliveries of money. which were made at *calle* Wernicke 573, Boulogne, Province of Buenos Aires: on July 24, 2013, money was given to LAZARTE; on August 23, 2013, LAZARTE was given the sum of approximately one hundred seventy thousand pesos (ARS 170,000) and two hundred thousand dollars (USD 200,000), all of which was then delivered to Martin LARRABURU. who used the vehicle with the license plate MNI 589, and this person gave it to BARATTA; on September 5, 2013, LAZARTE was given money, which

was then given to Martin LARRABURU; on September 12 and 17, 2013, LAZARTE was given eight hundred thousand dollars (USD 800,000) and two hundred eight thousand dollars (USD 280,000), respectively. In both cases, the money was then delivered to Martin LARRABURU, who used the vehicle with the license plate MNI 589.

**Ñ.- Juan Carlos Lascurain** participated in the illicit association on October 28, 2008, when he delivered money to BARATTA, in a package, near Avenida Coronet Diaz 2355, CABA. at which time he was driving in the vehicle with the license plate "HOP 575", in his name.

**O. - Manuel Santos Uribclarrea:** participated in the illicit association; on June 8, 2015, when he delivered to LAZARTE, at Cerrito 1266, CABA, two hundred fifty thousand dollars (USD 250,000): on August 12 of the same year, he delivered five hundred thousand dollars (USD 500,000), also to LAZARTE at Cerrito 1266, CABA and after that; on September 7, 2015, URIBELARREA, at the door of the Federal Ministry of Planning, Public Investment and Services, located at Avenida Yrigoyen 250 of this city, got in the vehicle driven by CENTENO, and inside, gave Nelson LAZARTE a package with 200,000 dollars (USD 200,000), adding for him to" move a file for payments of a lousy 300,000 USD (three hundred thousand dollars) for the purchase of "blankets and electrodes" for "solar pipes". The amounts charged by LAZARTE on all three occasions was then handed over to BARATTA.

**P. - Alejandro Pedro Ivanissevich** participated in the illicit association on April 29, 2009, when, At Suipacha 782 of this city, he got in the vehicle driven by Centeno and made the delivery to BARATTA of a bag with money. Later, BARATTA delivered the funds collected to Daniel MUÑOZ at Uruguay 1306 of this city.

**Q.   - Hugo Alberto Dragonetti** participated in the illicit association, ordering for deliveries of money to be made: on 3 February 2010, DRAGONETTI and his son delivered a bundle containing eight hundred thousand dollars (USD 800,000) to BARATTA on Calle Suipacha 1111 in this city. Later, the funds collected were handed over by Baratta to Daniel MUÑOZ at the Presidential Residence of Olivos, prior to which the first

Judicial Authority of the Nation

[signatures]                                      C no. 9/608/18

[sidebar: "Official Use"]

of these took a commission. On June 9, 2010, by order of Hugo Alberto DRAGONETTI, a person who has still not been identified, got in the vehicle driven by Centeno, near Santa Fe and Suipacha of this city, and there, delivered a bag of four hundred and fifty thousand dollars (450,000 USD) to BARATTA. Later, the money collected by BARATTA and FAGYAS to Daniel MUNOZ at Uruguay 1306 of this city, after they took their commission, DE VIDO and Ezequiel GARCIA. On July 2013, Hugo Alberto DRAGONETTI delivered money to LAZARTE and BARATTA at Suipacha 1111 of this city, On June 23, 2015, by order of Hugo Alberto DRAGONETTI, a person by the name of "Martin" and his security personnel got into the vehicle driven by CENTENO at the intersection of Avenida Santa Fe and Calle Suipacha in this city, and there, they gave LAZARTE a bag with one million dollars (USD 1,000,000) and a bag with five hundred thousand dollars (USD 500,000). After that, LAZARTE gave the above-mentioned bag to Heman DEL RIO in the basement of the Ministry of Planning and the other money was delivered to BARATTA at his office. On July 21, 2015, Hugo Alberto DRAGONETTI gave a bag with seven hundred fifty thousand dollars (USD 750,000) to LAZARTE at Suipacha 1111 in this city. Later, the last of the persons named gave the money to BARATTA at the latter's office in the Ministry of Planning.

**R.   - Jorge Juan Mauricio Balan** participated in the illicit association, ordering the delivery of money made by **Raimundo Eduardo Peduto,** on September 3, 2013. The latter was done inside a Chevrolet car with license plate "LEY 230", in which he gave LAZARTE a suitcase with approximately one million five hundred thousand dollars (USD 1,500,000). at the intersection of Esmeralda and Juncal streets of this city: also, On July 30, 2015, BALAN gave LAZARTE five hundred thousand dollars (USD 500,000) at the hotel "Feir's Park". The payments were made by order of the company "Industrias Juan F. Secco S.A.".

**S.   - Raul Hector Vertua** participated in the Illicit Association on 9 September 2010 by giving BARATTA a bag with the sum of eight hundred fifty thousand dollars (USD 850,000), in the area near *calle* Quintana 600 of this city. Later, BARATTA gave this bag Daniel MUÑOZ at Uruguay 1306 of this city, before which he took part of the collection.

**T. - Eduardo Hugo Antranik Eurnekian** participated in the illicit association ordering that deliveries of money be made by the group "Corporacion America": on July 29, 2013, he was delivered a bag with money to LAZARTE at Bonpland 1745, CABA. On August 8 and 29, 2013 at Avenida Libertador

4444, floor no. 41, Hugo Britos made a delivery of a bag with money to BARATTA and LAZARTE; on the 17th of September, 2013, at Avenida Libertador 444 [sic], floor no. 41, Hugo Britos delivered them a bag with seven hundred fifty thousand dollars (USD 750,000) to BARATTA and LAZARTE.

-

**U. - Raul Alejandro Ibarra, Santiago Nicolas Moresco, and Miguel Angel Marconi** participated in the illicit Association, ordering the following deliveries of money in the name of the firm "Supercemento S. A. I. C.": on September 7 and October 1, 2015, Lazarte was given the sum of one million two hundred thousand dollars (USD 1,200,000), on both occasions. This occurred at the address of *Calle* Tres de Febrero 2750 of this city. This money was delivered by Lazarte to Baratta, in the first instance, at the Ministry of Planning. On October 22, 2015, Lazarte was given the sum of 800 thousand dollars (USD 800,000). To receive this sum, Lazarte went to the aforementioned address, in the vehicle driven by Centeno, and confirmed a meeting with "Supercemento", which allowed them to enter the residence.

**V. - Other payments of money: a)-** On the other hand, LLORENS delivered money to BARATTA at Ugarteche 3260, CABA, on September 3, 2009; he participated in a meeting in which money was given to BARATTA on September 18, 2008 at the Hotel Hilton. Also, on November 19, 2009, a division of money was made between LLORENS, GARCIA RAMON, FAGYAS, GOMEZ, AND BARATTA,

**b) -** In addition to the persons listed, Fabian Ezekiel GARCIA RAMON received money on September 15 and 16, 2008, February 10, 2009, May 14, 2009. May 15, 2009, June 11, 2009, October 8, 2009, - together with GOMEZ -; and on 21 October 2008, May 29, 2009, and December 10, 2009, he delivered dividends to BARATTA.

**c) -** As regards Rudy Fernando ULLOA IGOR, he made deliveries to BARATTA of dividends at Viamonte 367, 10th floor, CABA. October 14, 2008, December 16, 2008 and February 9, 2009.

**d) -** In addition, Walter FAGYAS gave BARATTA money on June 3, 2009 and December 20, 2010 at his residence, at Malabia 2174, CABA.

**e) -** On July 19 and 25, 2013, LAZARTE received money from Jorge Omar MAYORAL at the Secretary of Mines.

**f) -** On June 9, 2015, German Ariel NIVELLO gave BARATTA one million two hundred fifty thousand dollars (USD 1,250,000) at the Ministry; on June 29, 2015, NIVELLO gave LAZARTE, at the building of the Secretary of Housing, seven hundred thousand dollars (USD 700,000); on July 1, 2015, German Ariel NIVELLO gave one million dollars (USD 1,000,000) to LAZARTE, who then

Judicial Authority of the Nation

[signatures]                                             C no. 9/608/18

[sidebar: "Official Use"]

gave them to Hernan DEL RIO, Secretary of Jose Maria OLAZAGASTI, in the basement of the Ministry of Planning. That money was delivered by order of Jose Francisco LOPEZ.

**g) -** On October 11, 2015, Nelson LAZARTE collected one million dollars (USD 1,000,000) at the Hotel Panamericano.

**VI. - Other facts of the Illegal Association: a -** The public officials who made up the organization,  in addition to merely using the mention of their positions to obtain the undue delivery of funds, used different illicit maneuvers to achieve this end. Among these, it is worth making note of the event that took place with the "Techint Group"  in relation to its company "Sideriugica de Orinoco" SIDOR - which was located in the Bolivarian Republic of Venezuela. In this way, in 2005, the Corporate Director of the group mentioned above, Luis Maria Cayetano BETNAZA, met in Mar del Plata, in the Province of Buenos Aires, during the Ibero-American Summit with the President of Venezuela, Hugo Rafael CHAVEZ FRIAS, Nestor Carlos KIRCHNER, and Cristina Elisabet FERNANDEZ, in order for SIDOR not to be nationalized. At that meeting, the President CHAVEZ FRIAS indicated that the firm was not going to be nationalized, because they were happy with their performance. At the beginning of 2008 BETNAZA met with Rafael RAMIREZ, president of "PDVSA" and the Minister of Energy of Venezuela, who said he was not happy with the performance of SIDOR and was thinking of nationalizing it. Thus, shortly after the presidential decree for its nationalization was issued, and between April and July 2008, it was indicated that it was necessary to regulate the company. Given these circumstances, the directors of the company appeared before the Government of Argentina to request that it take action obtain the collection from the company, since it was quite valuable. At that point, they were heard by Claudio UBERTI (leader of the Control Entity of Roadway Concessions), Julio Miguel DE VIDO, Jose Maria OLAZAGASTI, and Roberto BARATTA. In that context, the officials of the government of Argentina, among which DE VIDO participated in large part, they began to ask the directors of the company for money to be able to work with the Government of Venezuela, with Hector ZABALETA being in charge of agreeing with Roberto BARATTA on the means of making the payments and the amount of such payments. Among other officials, OLAZAGASTI, Nestor Carlos KIRCHNER, and Cristina Elisabet FERNANDEZ traveled to Venezuela to deal with the El issue of the company SIDOR, with OLAZAGASTI being the one who participated in the meetings between the directors of the firm with the Venezuelan officials in which the payment of the firm and the related legal actions were negotiated. OLAZAGASTI's function was to inform the government of what was happening. In such dealings, Cristina Elisabet FERNANDEZ said that the person who was to

oversee the payments from Venezuela was the Minister of Finance, Ali Rodriguez. In an event at the SIDOR plant, and after different meetings with officials from the governments of Argentina and Venezuela, Claudio UBERTI indicated to BETNAZA that KIRCHNER was very angry with Techint, since they did not cooperate with him economically. In response, BETNAZA told UBERTI that they were not going to collaborate, which prompted UBERTI to say something to KIRCHNER in his ear, and they left by helicopter without saying goodbye to anyone. This was taken by the CHAVEZ administration as a lack of support by the Argentine government for the company, so they began to carry out different legal actions against the firm, and all of them with legal consequences. In addition, it was added that the Government of Venezuela threatened not to let any of the executives of SIDOR leave the country.    -

**b. -** The persons who led the firms "Esuco S.A.", Carlos Guillermo WAGNER.- "Perales Aguiar S.A.". "Vial Agro S.A.", "Biancalani S.A", "Luis Losi S.A.",    Luis    Losi-.    "Fontana    Nicasiro    S.A." "Marcalba S.A." "lecsa S.A." - Angel Jorge Antonio Calcaterra". - Jose J. Chediack S.A.I.C.A."- Juan CHEDIACK - ."Equimac S.A.C.I.F.E.I."-Marcela Edith Sztenberg-, "Coarco S.A." -Patricio Gerbi-. "Jose Cartellone Construcciones Civiles S.A.". "Vialco S.A." and "Grupo Eling S.A." - Jorge Guillermo Neira. Gerardo Luis Ferreyra and Osvaldo Antenor Acosta-, among others, participated in the maneuvers through which the companies benefitted in a spurious manner with contracts regulating public works, approximately between the years 2003 and 2015. The leaders of these companies agreed what would be due for each project, and had to deliver approximately between 10% and 20% of the value of the contract to officials of the Ministry of Federal Planning of the Nation, including Ernesto CLARENS, Nelson LAZARTE, Roberto BARATTA and to Jose LOPEZ, who then gave it to Julio Miguel DE VIDO, Nestor Carlos KIRCHNER, and Cristina Elisabet FERNANDEZ.

**c-** Between 2003 and 2007, Claudio UBERTI, as head of the OCCOVI, was responsible for soliciting money from various companies that participated in the meetings for the "roadway corridors". This directive was given by Julio Miguel DE VIDO by order of Nestor Carlos KIRCHNER. Among the companies mentioned above, the following are most noteworthy: "Coarco SA" -Patrick Gerbi- . "Equimac S. A. C. I. F. E. I."-Marcela Edith Sztenberg-. "Grupo TECHINT" - Luis Maria Cayetano Betnaza -. "Vialco S.A." -Luis Mezza-, "DECAVIAL SA" - Miguel Marcelino Aznar- among others. In the case of "Grupo TECHINT", UBERTI was in charge of requesting money from BETNAZA to extend for that firm the concession for "Caminos del Oeste". The money received was given to Julio Miguel DE VIDO, Nestor Carlos KIRCHNER and Cristina Elisabet FERNANDEZ.      -

Judicial Authority of the Nation

[signatures]                                              C no. 9/608/18

[sidebar: "Official Use"]

**d-** The illegal money was also provided to finance activities of an electoral nature, or linked to the political management of the government and its satellite organizations, such as "La Campora". In the elections of the years 2011, 2013, and 2015, Juan Carlos Mazzon, Jose Maria Ottavis Arias, Eduardo de Pedro, Andres Larroque, Julian Alvarez, Maximo Carlos Kirchner, and Sergio Szpolski collected money from this scheme. In the 2013 elections, Hugo Martin Earrabuni and Juan Manuel Abal Medina transferred this money to Juan Carlos Mazzon - General Coordinator for institutional political affairs at the Presidency Unit, and Jose Lopez had put money into different groups, giving Ricardo Ivoskus five million pesos (ARS 5,000,000), funds he requested at a meeting in the House of Enrique Garcia to organize the support for the campaign. In the 2015 elections, Eduardo De Pedro was given funding, from "La Campora", which had a good relationship with the group "Justicia Legitima".

**VII.- Other facts: a) Nestor Otero:** he is accused, on August 21, 2018, at a time when personnel of the Federate Operations Division of the Argentine Federal Police had carried out the raid of his residence on *Calle* Bahia Blanca 420/426, in the municipality of Avellaneda, in the Province of Buenos Aires, of carrying the following weapons: (i) a single and double action revolver of gauge. 22, a long rifle, of the brand Doberman, series number 05761C, and (ii) a pistol, shot by shot, with two parallel barrels, caliber 32 gauge (14mm), of the brand Rexio, model Super, serial number 138752; which were deemed suitable for firing but of abnormal functionality, without the due authorization for such weapons. (b) Furthermore, **Walter Rodolfo Fagyas** is charged with the possession, on August 1, 2018, at a time when personnel of the Federate Operations Division of the Argentine Federal Police had carried out the raid of his residence on Calle 3 de Febrero 1194, 5th floor, apt. "D", of this city, of a caliber .22 revolver, of the brand Taurus, serial number I.D 54,553, determined to be suitable for firing, without due legal authorization  for such weapon.

It is then brought to the attention of the court that the evidence before the court is: I) The testimony declaration by Diego CABOT of sheets 2 / 6vta.; 2) Actuarial certifications of sheets 7vta/9via. 11/13, 15vta'17, 2374, 2375, 2380, 2576, 2716, 2994, 3004/3006, 4207, 4407/440, 4799/4801, 5188 89, 5246, 5388, 5655, 5874/5894, 6734/6735, 6828, 6952, 7100, 7125, 7356, 7416 bis, 7424/26, 7815, 8067/8070, 8357/8358, 8595/8651, 8655/8702, 8713/8746, 8753, 8901, 8987/8991, 90JR 9080, 9601, 10421/32, 1079k, 11006, 11061, 11063, 11065, 11152/53, and 11352/55; 3) Printed copies of the journalistic articles on sheet 18/39; 4) Actions of the Division of Federal Operations of the Federal Police of Argentina on sheets 49/1756, 18032085, 2218/2225, 2233/2243, 2396, 2476/2513, 2554,2575, 2690/2710,  / 2726/2791, 2806/2831, 2857/2897, 2955/2993, 4168/4176, 4227/4399,

4535/4595, and 4655/4798; 5767/5769; 5786/5793, 6376/6574, 6611/6733, 6960/7079, 7263/7355, 8040 8052, 8086/8185, 8320 56, 8402/8412, 8414/8418, 8546/8556, 8983, 9498/9509, 9569/9600, 9654/61, 9713/49, 10529, 10533, 10730/45, 10929/82, 11156, 11340 and 11393/99: 5) Notes from the firm "Telecom Argentina S. A." on sheets 1782/1783. 2100/2101. 2216/2217. 2798/2800. and 5667 and 5677; 6) Note of the firm "NSS S.A. (IPLAN)" on sheet 1785; (7) Notes from the firm "Nextel Communications Argentina S. R. L." on sheets 1787. 2600 and 2721: 8) Notes from the firm "Claro" on sheets 1789/1790vta, 2205/2206vta, 2801/2802 and 2804; 9) Notes from the firm "Telefonica Argentina SA" on the sheets 1791, 1793, 2098'vta, 2598, 2711/2714, 2722, 2835, 2838'2844, 2852 / 2855vta, and 5100: 10 > notes from the firm "Telecentro S. A." on sheets 1795, and 8774; 11) Notes from the firm "Telecom Personal SA" on sheets 1796 / 1799vla; 12) Office of the Department of the Welfare of the Army of Argentina on sheets 1801; 13) Note from the company "Nil Collection Buenos Aires Centro Historico" on sheet 2092; 14) Note from the Register of Automotive Property on sheets 2095/2097 and 6035/6037; 15) copies of case no 14.305 / 15 of the Register of this Court, sheets 2104/2105; (16) Reports of historical domain provided by the Department of regulatory and judicial affairs of the National Directorate of National Automobile and Commercial Property Registers. 2113/2191; 17) Certification of Electronic Mail of Sectional Register No. 2 (San Pedro) of the Register of Automotive Property on sheets 2194; 18) Note from Sectional registration N3 25 of the Registry of Automotive Property of sheets 2195: 19) Note of sectional Registration No 76 of the Register of Automotive Property, sheet 2196; 20) Note of Sectional Registration No. 3 (Lomas dc Zamora) of the Register of the Automotive Property of sheet 2197: 21) Actions of the Department of Judicial Assistance for Complex Crimes and Organized Crime of the Judiciary of the Nation, on sheets 2198, 2547Z2547vta. 2597, 2724/2725vta, 4440/4445, 4610/11, 4967/70, 5156/58, 5194/95, 5247/5250, 5252/5264, 6238, 7171/24, 7362/68, 7377/79, 7720/7721, 9609 10,9665, 10623/24, and 10928: 22) Note of the sectional registration No. 70 of the Register of Automotive Property of sheets 2199: 23) Note of the sectional registration No. 2 (Avellaneda) of the Register of Automotive Property of sheets 2200: 24) Note of sectional Registration No 45 of the Register of Automotive Property, sheet 2201: 25) Note of sectional Registration No. 26 of the Register of Automotive Property, sheet 2204: 26) Note of the sectional register No. 16 (La Plata) of the Register of Automotive Property of sheets 2207: 27) Note of sectional Registration No. 43 of the Register of Automotive Property, sheet 2208/2210 and 2213: 28) Certificate of electronic mail of sheet  2211: 29) Note of the sectional register No. 11 of the Register of Automotive Property of sheets 2211: 30) Note of the sectional register No. 1 (Florencio Varela) of the Register of Automotive Property of sheets 2199: 31) Note of the sectional register No. 1 (Quilmes) of the Register of Automotive Property of sheets 2215: 32) Registry sheet of plate OKI-405 of sheet 2231: 33) Note of sectional Registration No. 5 (Tigre) of the Register of Automotive Property,

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]


sheet 2241: 34) Note of the sectional register No. 3 (San Martin) of the Register of Automotive Property of sheets 2242: 35) Note of the sectional register No. 16 (La Matanza) of the Register of Automotive Property of sheets 2244: 36) Note of the sectional register No. 1 (Esteban Echeverria) of the Register of Automotive Property of sheets 2245: 37) Note of the sectional register No. 1 (Mercedes) of the Register of Automotive Property of sheets 2246: 38) Note of the sectional register No. 2 (San Pedro) of the Register of Automotive Property of sheets 2211: 39) Note of the sectional register No. 4 of the Register of Automotive Property of sheets 2251: 40) copies of the records of income to the presidential residence of Olivos extracted from Case No. 1.614/2016 of the Register of the National Criminal and Correctional Court No. 7. Secretariat No. 13 of sheets 2252/2373; 41) Note of the

Sectional registry of San Vicente of the Register of Automotive Property of sheets 2376; 42) Note from the sectional register No. 8 (Olivos) of the Register of Automotive Property of sheets 2377: 43) Note of the sectional register No. 13 (La Plata) of the Register of Automotive Property of sheets 2391: 44) Note of sectional Registration No. 3 (San Martin) of the Register of Automotive Property, sheet 2392; 45) Acts remitted by the Department of Administration of Human Resources of the General Secretariat of the Presidency of the Nation on sheets 2397/2474- among which include the files of the agents: Hector Daniel MUÑOZ,  Marlin Federico AGUIRRES, and Juan Francisco ALARCGN -; 46) Note of the Sectional Register of Santo Tome of the Register of Automotive Property of sheets 2475: 47) Note of the Sectional Register No. 2 (San Nicolas) of the Register of Automotive Property of sheet 2514: 48) Note by the firm "Ford Argentina S. C. A." of sheet 2515/2518vta and 2580/2594; 49) Note from the firm "BM Centro SA" of sheets 2519/2537vta; 50) Note from the firm "Volkswagen Argentina S. A." of sheets 2538/2544vta; 51) Actions of the Inspector General of Justice on sheets 2551/2552 and 7438/39: 52) note from the sectional Register of Cruz del Eje, Cordoba, Register of the automotive property of sheets 2578: 53) Note of sectional Registration No. 6 (San Isidro) of the Register of Automotive Property, sheet 2579: 54) NOSIS reports of sheets 2595/2596, 28462848, 3026/3032, 3053/3055, 4402/4404, 5388/5391, 6809/6811, 8996/9014, 10447/54; 55) Note from the firm "General Motors de Argentina S. R. L." of sheets 2601/2623: 56) Registers of the National Department of Migration, on sheets 26242671 vta. and 5798/5807; 57) Reports of VERAZ on sheets 2672/2684, 2845, 3052, 5392, 6812, 10446, 10455/60; 58) Note of the firm "Arbitrates SA" of sheets 2682/2685; 59) Actions of the Legal and administrative sub-committee of the General Secretariat of the Presidency of the Nation of sheets  2832 / vta and 2834; 60) note by the General Administration of General services

of the General Secretariat of the Presidency of the Nation of sheets 2833; 61) Note of the Direction of Operations and General Services of the Chief of Staff of Ministers of sheet 2836 / 2837vta: 62) Actuarial reports of sheets 2898. 3017. 4400. 9015 and 9048: 63) Report of the Ministry of the Chief of Staff of Ministers 2945/2946: 64) reports of the Ministry of Energy and Mines 2948/2950, 4132/4134, 5101/5102, 5952 > 7232/33; 65) Testimonial declaration of Hilda Maria HOROVITZ sheet 2951/2953 and appearance of sheet 2997; 66) Testimonial declaration of Diego Heman CABOT on sheet 2999/3003; 67) Testimonial declaration of Candela INI on sheet 3009/3010; 68) Testimonial Declaration of Jorge Jose BACIGALUPO on sheet 3011/3012 and appearance at sheet 3025; 69) reports of the National Register of arms - RENAR - on sheets 3024, 3051; 4153, 6324. 7369, 7417, 7611. 8362/8363 and 11329; 70)

Judicial Authority of the Nation

[signatures]                                        C no. 9/608/18

[sidebar: "Official Use"]

Reports of the Unit of Financial Information - UIF - of sheets 3152: 5405,6321,6873, 9482/83; 72)
newspaper clippings brought by David JABIF to sheets 3560/3181; 73)   ^

Operations of the Division of Federal Operations de la Federal Police of Argentina, regarding the raid
of the property at *Calle* Tres de Febrero 1194, 5th floor,  Apartment "D". of sheet 3191/3220; 74)
action by the Federal Operations Division in relation to the raids carried out on August 1, 2018, of
sheets 3336/4131; 75) Testimonial declaration from Damian Ignacio JEREZ on sheets 4166/4167; 76)
Reports of the firm" Techint Compania Tecnica Internacional " of sheets 4188/4196 and 4959/61; 77)
Report of the Chief of Staff of Ministers on sheets 4211/4215; 78) D.N.R.P.A. license plate requests on
sheets 4401 and 7715/7719; 79) Acts of the Division of Judicial Technical Support of the Federal
Police  of  Argentina  on  sheets  4597/4599,  4915.  5111/5123,  5242/5245.  6189/6204.  6736/6762.
6892/6925,  7152.  7614/7625.  8576/8585,  8779/8799.  8903/8917,  8946/8953.  8982.  9468/74,
10317/10418, 10536/77. 10671/10729 y 11427/54; 80) Actions of Banco de la Ciudad de Buenos Aires
on sheets 4626/31, 5327/5339, 7673/7714. 10531/32 and 11459/60; 81) Actions of the Division of
Federal Operations of the Federal Police of Argentina, regarding the raids carried out on August 6,
2018, on sheets 4802/77; 82) Actions by the Directorate of contentious cases of the head of Cabinet of
Ministers on sheets 4921/26; 83) Reports of "Banco Frances" of sheets 4974 and 5238; 84) Testimonial
declaration  of  Gabriel  Adrian  MARINO  of  sheets  5008;  85)  Testimonial  declaration   by  Jorge
Leonardo FARINA of sheets 5077/96: 86) Report of Banco Santander Rio of sheets 5104; 87) action
taken by the Senate of the Nation of sheets 5146/47 and 6936/37; 88) Testimonial Declaration of Ariel
Cesar Silvio SOLAR GRILLO of sheet 5170/5174; 89) Testimonial Declaration of Maria Soledad
ACCETTA of sheets 5182; 90) Testimonial Declaration of Juan Carlos ECHEVERRIA of sheets 5183:
91) Actions of the firm "Ford Argentina S.A." of sheets 5197/5209: 92) Note of Alejandro PICASSO
ACHAVAL, sheets 5236; 93) Report by the company Mastercard of sheets 5340; 94) Testimonial
declaration of Ramon SPIRITO of sheets 5406/5418; 95) Actions referred by the Technical and
Juridical Directorate General of the National Register of Persons of sheets 5452/5454:96) Report from
the firm 'Prisma Medios de Pago S. A.' of sheets 5472/5475; 97) Actions of the delegation of Posadas
of the Federal Police of Argentina of sheets 5476/5497; 98) Actions of Banco de la Nacion Argentina
of sheets 5498/55 > 7385/93; 99) Report of the Secretary General of 5508/5626; 101) Testimonial
Declaration of Ignacio LAPLACETE of sheets 5657/5661; 102) Journalistic articles of sheets
5671/5678, 5684 and 7114/7117; 103) Actions related to the raid on *Calle* Uruguay 1306, 1st floor apt

3, and 4th floor apt 6, and actuary certification of sheets 5692/5750; 104) Actions of the firm "Perfil" on sheets 5764: 105) testimonial Declarations of Sergio Oscar VELASQUEZ of sheets 5782/5785 and 6801/6803; 106) Testimonial Declaration of Julio Cesar SILVA of sheets 5810/5811: 107) Deed of sheets 5912; 108) Reports of Entidad Binacional Yacyreta of sheets 5934/5947 and 9620/23; 109) Deed with documentation provided on sheets 5954/5964; 110) Office of the Federal Court no 1 of jurisdiction of sheets 6010/6011; 111) Acts referred by the honorable National Electoral Chamber of sheets 6012/6015; 6251/6269. 6366/6372. 6846 6872. 6957 and 7608: 112) Reports of the firm "Telefonica de Argentina" of sheets 6096/6097 and 6105/6146; Report of the firm "Claro" of sheets 6098; 114) Actions of the Division of Analysis and Prospects of Narco-trafficking on sheets 6100/6104, 8771 and 10246: 115) Report of the companies Veraz and Nosis, and of the National Department of Migrations of sheets 6147/6171; 116) Actions of the Anti-corruption office of sheets 6206.6236. 7494/7546, 7584/7592. 8188/8189 and 8367/8369; 117) Report by the firm "First Data" of sheets 6287/6288. 118) Actions by the Registry of Real Property of the CABA,  on sheets 6328 6354; 119) Certifications of the Federal Court No. 5 of sheet 6357/6358; 120) Actions of the National Department of Migration of sheets 6603/6609. 7551/55. 8838 and 10620/21: 121) Report of Banco Columbia of sheets 6765/66; 122) Report of the firm "Iberia" of sheets 6767; 123) Deed with documentation provided by fs. 6814/6827: 124) Actions relating to the raid of the Functional Unit No. 7, floor 5, of the building located on *Calle* Uruguay 1306 of this city, of sheets 7080/7099; 125) Actions of the Register of Civil Status and Capacity of Persons, of sheets 7102/7104: 126) Certification and aggregated copies of sheets 7155/78: 127) Report of Banco Hipotecario, of sheets 7183/84; 128) Report of Bank ICBC of sheets 7185: 129) Actuarial certifications of sheets 7244, 7518. 7722/7723. 8457. 8460. 8755/8756 v-11324: 130) Report of the ballistics division of the Federal Police of Argentina of sheets 7370/73 v 7410/16: 131) Report of the Naval Prefecture of Argentina of sheets 7399/7404 and 7662/7664; 132) Reports of the division Scopometry of the Federal Police of Argentina of sheets 7418/19 y 7566. 133) Report of "Aeropuertos Argentina 2000 SA" of sheets 7432/33: 134) Reports of the Air Force of Argentina of sheets 7434/36, 7561/65 and 8807/8808; 135) Testimonial Declaration of Gustavo Javier CABADA of sheets 7442; 136) Testimonial declaration of Santiago Jorge NASRA of sheets 7549; 137) Actions relating to the raid made in the neighborhood of "El Barranco" on sheets 7569/7578; 138) Actions of the Federal Court No. 7 of sheet 7579: 139) Actions of the Criminal and Correctional Court of Posadas of sheets 7610; 140) actions related to the raids at *Calle* Mascarello 4441, Rio Gallegos, Province of Santa Cruz.  Father of Agostini and the Tehuelches, Calafate, Province of Santa Cruz, and certification of sheets 7816/7970; 141) Actions of the Airport Security Police of sheets 7971/8034; 142) Proceedings of Federal Court No 1 of San Isidro of sheets 8071. 8207/8226 and 8463/8481: 143) Reports of the  ANAC of sheets 8397/8398; 144) Actions

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]


relating to the order of presentations carried out at the "Hotel Panamericano" and actuarial certification of sheets 8419/8429; 145) Reports of the Ministry of security of the Nation of sheets  8536/37 and 8559/61; 146) Testimonial declaration of Danilo Adolfo PENISSI of sheets 8564/65: 147) Certified copy of testimonial declaration of Nestor FARIAS BOUVIER of sheets 8570/71: 148) Testimonial declaration of Yolanda Esther FALCON of sheets 8648; 149) Printed copies of sheets 8837 and 9365/9391; 150) Actions of the Federal Administration of Public Incomes of sheets  8853/8861 > 11330; 151)  Testimonial declaration of Jorge Enrique TESOLIN of sheets 8862; 152) Testimonial declaration of Paul Stephen Ariel GRECO of sheets 8863/8869; 153) Testimonial declaration of Veronica IGLESIAS of sheets 8870; 154) Testimonial declaration of Carlos Alberto STAFFORINI of sheets 8871/8874; 155) Actions of the Secretariat of Coordination of Constitutional Powers of the security Ministry of sheets 8562/64 and 8898/8900; 156) Presentation by the Financial Information Unit of sheets 8964/8978: 157) Actions performed by the National Gendarmery of Argentina of sheets 9022/47 v 11158: 158) Declaration by Juan Carlos GUERRERO of sheets 9392: 159) Presentations of Mariana de Jesus ZUVIC of sheets 9393/9404 and 10903/24; 160) Declaration of Mariana de Jesus ZUVIC and accompanying documentation of sheets 9405/65 and 10867/78: 161) Proceedings of the delegation of Ushuaia of the Federal Police of Argentina of sheets 9553/59; 162) Action by the Ministry of Finance of the Nation of sheets 9612 and 10653; 163) Actions by the Mitre Division of the Federal Police of Argentina of sheet 10241/44: 164) Actions of the Central Bank of sheets 10530; 165) Testimonial declaration by Ciril Miguel COLMAN of sheets 10861/62: 166) Testimonial Declaration of Anibal GLOODTDOFSKY FERNANDEZ of sheets 10864/66: 167) Testimonial declaration by Carlos Fabian Alfredo VIZCAINO of sheets 10879/80; 168) Actions of the Delegation of Rio Gallegos of the Federal Police of Argentina of sheets 11007/60: 169) Actions of the Anti-drug division of Cordoba of the Federal Police of Argentina, sheets 11165/77 and 11183/11323; 170) Testimonial Declaration of Maria Martha CRISCUOLO of sheets 11346/48; 171) Testimonial declaration of Maria Eugenia Matilde LANZA of sheets 11349/50; 172) Presentation of Maria Lucila LEHMANN of sheet 11400/21: 173) Testimonial Declaration of Pedro Alfredo PUYO of sheet 11457/58; and 174) all items and files reserved within the context of this case.

Finally, the appearing party is made aware of the provisions of article 41ter of the Criminal Code of the Nation and Law 27.304.

At this point, the appearing party is reminded that he has the right to refuse to declare, without his silence implying any presumption of guilt against him, and that he has the possibility to have an

interview with his lawyer, to which he says: "I will declare. With reference to this accusation, I was not involved in the payments to which reference has been made in relation to me, nor did I authorize them, nor was I aware of such payment until they were reported in the press over the last few weeks. To put my role in context in the company in the structure of Grupo Techint, I would like to make the following declaration: Grupo Techint consists of the companies controlled by the Holding Company of San Faustin, incorporated in Luxembourg. This company controls six operating companies and the central companies which collect the dividends of the operating companies, and retain them for future dividends to shareholders or for future investments. My main role is as president and Executive Director of one of these companies, the company Tenaris. The second role is the role of President of the company Ternium, also incorporated in Luxembourg. The third role I play is the role of vice president of the company San Faustin, and member of the Executive Committee of the latter of the two, Tenaris, which takes up most of my time,  is a company that employs 22 thousand people with industrial activities in more than twenty countries, from Japan to Colombia, from Italy to Argentina. Ternium is a society that also employs 20 thousand people in Latin America, Mexico, Brazil, Colombia, and in Argentina. Tenaris is the world leader in the production of stitched and unstitched tubes for the oil industry. Ternium is the leader in Latin America in the production of flat and long steel. Both companies are listed on stock exchanges, including, among others, the New York Stock Exchange. The other operating companies of the Techint group are the company Tecpetrol, active in the production of transportation, of oil, gas and production of energy. It is a company controlled at 100% by the Holding company San Faustin. I want to clarify that Ternium and Tenaris are controlled at 60% by the Holding San Faustin. The fourth operating company controlled at 100% by the Holding is Techint Engineering and Construction. It operates worldwide in the construction and execution of projects. The fifth operating company 100% controlled by the holding company is the company Tenova, that produces machinery, equipment for the steel industry, and mining. It is based in Germany and Italy. The sixth is Instituto Clinico Humanitas, that includes six hospitals and a university based in Milan. The Group also has central companies that receive dividends and retain them for later redistribution to investors. Together, the consolidation of the holding company San Faustin employs around 80 thousand persons in 57 companies, which includes more than 400 separate companies. In my role as president and executive director of Tenaris, and President of Ternium, I necessarily have an agenda that requires me to travel to all the countries of the world. For example, in 2007, I was in Argentina for 43 days, In 2008, for around 163 days. I mention the structure of the group and my role to indicate that, in order to be able to manage this activity, a high level of autonomy and delegation is required in all functionaries who carry out the activities of the group. I would also like to add that as a member of the Executive Committee residing in Argentina, I am a reference for the company Tecpetrol

Judicial Authority of the Nation

[signatures]                                                    C no. 9/608/18

[sidebar: "Official Use"]


and Techint, in which I do not hold any formal office, but in which I discuss strategic orientations. On the basis of my workload and my travel schedule, the scope of autonomy and delegation in the whole group has always been very broad. For this reason, I did not authorize, nor have I been informed of the payments that it has been reference that I made, but rather I was informed by the newspapers by the news over the last few weeks. With regard to SIDOR, the investment of the group took place in the year 1998 in the process of privatization carried out by the government of Venezuela, which put 70% of the company up for sale. The company that is currently Ternium entered the project with groups from Brazil, Mexico, and Venezuela, and won the award. After having gone through difficult years, over the course of which it was necessary to raise capital for the company, in which Ternium's share reached 60% of the company, the conflicts began with the Venezuelan government. President Chavez radicalized his government during those years, and conflicts were created with the supply of the ore, the supply of the electric energy, and the availability of the port for that company. In this context, the meeting in Mar del Plata took place, in which President Kirchner, Chavez, Cristina, I myself, and Luis Betnaza. The meeting helped to temporarily diffuse the tension, but after two years, new conflicts arose, and in particular a union conflict that began in November 2007. This conflict went on for several months, and ultimately it was one of the reasons that lead to the nationalization of the company by the Venezuelan government in April 2008. The following months, in which we had to transfer the management of the company to the Venezuelan authorities, were very conflictive. There were constant threats made to our staff over the 6 or 7 months the transfer of the handoff to the state lasted. I was not directly involved in managing this, I informed the president Cristina Kirchner in the same days of April, 2008. I remember that I was in Russia and I called Cristina to explain what was happening and the climate of violence that was being experienced in Guayana, a region of Venezuela, where the union groups not only wanted to see the nationalization, but also to force out the Argentinian and Venezuelan staff that we had incorporated. I also participated in the meeting of February 2008 with Lula Da Silva and Dilma Rouseff, in order them to intercede with President Chavez, since there was also Brazilian staff in the region. This was my involvement throughout that year in the SIDOR issue. In the month of May 2009, a compensation for the nationalization was finally agreed, which, though it only recognized a fraction of the value of the company, allowed us to recover part of the investment. At that time, the president of the Venezuelan government also nationalized three other companies of the Holding Company in Venezuela: the companies TAVAS, Matesi, and Consigua, for which we went to trial in the Court of the CIADI, where we won the case after many years, but we still haven't been able to

collect any money. My involvement in the issue was to maintain the highest level of contact with the countries involved to contain the violence, to ensure the safety of our people, to promote an orderly withdrawal of the company. Considering the situation and climate of aggressiveness between the government and the formal authorities of the company, Luis Betnaza, who had had nothing to do with the management, took charge of the negotiations with the Venezuelan government. With reference to the accusation, we will respond to each of the points. Regarding the case, I would like to clarify that Techint never had anything to do with what might have happened in what is known as the Construction Club, I want to make clear that over the 12 years of the Kirchner governments, Techint held the road concessions of Caminos del Oeste, which it renounced in October of 2003, handed over in December 2003, and never again had a roadway concession. Over those 12 years, it obtained contracts from the national government that were contracts of less than 1% of the total amount invested by the state in infrastructure. Particularly in roads, it invoiced a total of 19 million dollars, representing less than 0,40% of the total revenue of the company Techint Ingenieria y Construccion. Techint Ingenieria y Construccion in itself represents less than 8% of the amount invoiced by the Holding Company San Faustin."

Asked to say if the government asked for any money for the compensation received, the appearing person responded, "No request for money was received from any authority of the state".—-

Asked to state if he knows or is aware of officials in the government of Argentina and officials of Techint managed the negotiations with the Venezuelan government on the question of the indemnity, the appearing person stated: "for Techint, Luis Betnaza directed with the advising of the administrative and legal department of Techint, and from the Argentine government, I will refer to what was indicated by Luis Betnaza, the presence of Julio De Vido and Olazagasti, as related by Betnaza".

Asked to say whether the declaring party was regularly informed of the progress of the negotiations as they were going on, the appearing person replied, "I received periodic but not assiduous notices about the progress of the negotiations, but my agenda during those months was dedicated to containing the impact caused by the bankruptcy of Lehman Brothers and the subsequent economic crisis. Also, during those years, we were incorporating the acquisitions made by the companies Tenaris and Ternium in the US and in Mexico. The information I received was through telephone calls, contacts to report on the situation of the expatriated staff in Venezuela and on the negotiations, but the negotiations for compensation only started in early 2009, before that, the most important issue was to be able to achieve an orderly withdrawal of our people."

Judicial Authority of the Nation

[signatures]                                                  C no. 9/608/18

[sidebar: "Official Use"]


Asked about a declaration by Claudio Uberti, that: "*In 2006, there was a visit by businesspeople from Argentina to Venezuela, approximately 100, since IMSA had signed a contract at Macahuan. The event, in a room in between, Rocca approached Kirchner and spoke to him, pushed him, and I came up*

*to Betnaza to tell Rocca not to choke him. At that moment, I didn't speak directly to Kirchner. In that context, De Vido asked me to tell Betnaza that if he wants to be treated well, he has to make an effort. Betnaza told me Techint wasn't colloquial, then Kirchner asked me to look for Techint and I went to his office at* calle *Paolera. At that time, he gave me 100 thousand dollars and told me it was for Kirchner, this repeated 5 or 6 times. In those instances, Betnaza personally gave it to me, then he asked me to go down one floor, that somebody else would give it to me. These packages with money were delivered directly to Kirchner*", the appearing party responded: "I was aware of the declaration of Uberti and so I reviewed my agenda from the year 2006. I understand that in July 2006 Nestor Kirchner visited Venezuela, but at that time my agenda indicates that I was not in Venezuela, I was in Milan. I was in Venezuela in August of that year, I was visiting the operation, Nestor Kirchner was not there. But in February 2007, I was in Venezuela and met Nestor Kirchner. At that time, we had agreed with Nestor Kirchner and Chavez that after the event for a petroleum well, the two presidents would visit SIDOR. At the time of the visit, it's possible that I might have argued with Nestor Kirchner. While we attended the presidential speeches, Uberti called Betnaza, who was sitting next to me. I saw them arguing between themselves, and when Betnaza came back, he said to me, *"they asked me for money to confirm the visit and I told him there was no way."* This was what Betnaza told me on that occasion. In the end, the visit did not happen. It's possible that what Uberti described was from that occasion. I don't know anything about the payments that Uberti received, I did not authorize nor was I informed of these alleged payments after this time."

Asked to state and having in mind that he indicated "the scope of autonomy and delegation in the whole group has been very wide" if this includes the unconsulted decision of Betnaza to carry forward payments to officials of the Argentinian government to solve the conflict of the company SIDOR in Venezuela, the appearing person referred to "the autonomy to which I obviously apply to operations conducted within the rules of compliance, there is no way I would make undue or illegal payments."


Asked to state that he has been informed in the light of this investigation as he said that these payments will be made, if he knows or is known or is aware of how the money was generated to carry them out,

the appearing party said: "As far we can determine, the funds for those payments were from the central companies where the dividends paid by the operating companies are maintained, and Hector Zabaleta had the capacity and autonomy to have access to these funds at that time. This is what we are finding out. My responsibility is to the operating companies of the group, as I have already mentioned. The central companies are outside the area of my responsibility. The final recipients of those dividends had no knowledge of the destination of those funds. Hector Zabaleta had the autonomy to apply these funds at the request of Luis Betnaza. I'm unaware of which accounting item these payments were made under. We are trying to find that out with greater precision, in a context where the group dimension and the number of groups involved is very broad."

Asked to state whether in the recovery of SIDOR in light of the intervention of Argentinian officials who requested payments, how he considered that such actions had an influence on that, the appearing party responded, "I do not believe that it had induced any direct participation. The courts of Argentina will assess the responsibility of the officials. I don't want to make a value judgement on this. But I believe that in a context in which Venezuela was entering the MERCOSUR, having a friendly relationship with the government of Argentina, having carried out a nationalization without compensation, or expropriation without cause would have been perceived as something very aggressive in the commercial zone that united them. The reason we arrived at a compensation was Chavez's will to stay in the bloc of the MERCOSUR."      -

In this action, the defense requests a copy of this document, which the Judge accepts. Finally, the provisions of articles 300 and 303 of the Code of Criminal Procedure of the nation are read to him, and thus, the reading is made thereof. As there are no other matters, the action is determined to be finalized, upon a reading by the Actuary, with the appearing party ratifying its content, together with his defense attorney, signing in acceptance thereof, then the Judge, and in my presence, I attest.


[signatures]

[stamps]



450 Seventh Ave.
Tenth Floor
New York, NY 10123
(212) 643-8800

# TRANSLATION CERTIFICATION

Date: June 20, 2019

To whom it may concern:

This is to certify that the attached translation from Spanish into English is an accurate representation of the documents received by this office.

The documents are designated as:
- Investigation Statement of Paola Rocca

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Eugene Li

**Global Solutions. Local Expertise.**

www.morningtrans.com  |  info@morningtrans.com

Poder Judicial de la Nación

Cn° 9.608/18

## DECLARACIÓN INDAGATORIA DE PAOLO ROCCA:

/n la Ciudad Autónoma de Buenos Aires, a los 3 días del mes de octubre del año dos mil dieciocho, comparece ante S.S. y Secretaria Autorizante una persona a la que se le hace saber que se procederá a recibir declaración indagatoria, conforme las previsiones contenidas en los artículos 294 del Código Procesal Penal de la Nación. Asimismo, se le enuncia lo dispuesto en el artículo 295 del plexo ritual, en cuanto a que las únicas personas que pueden asistir a esta declaración, son el Sr. Agente Fiscal y los defensores del declarante. Se deja constancia que se encuentra presente en el acto el Sr. Fiscal Dr. Carlos Ernesto Stornelli y el Dr. Carlos Rívolo. Acto seguido, y conforme los artículos 104, 107, 197 y 295 del Código de Rito, se le recuerda que posee el derecho de designar hasta dos abogados defensores de su confianza, o en su defecto, ser asistido por el Defensor Oficial que por turno corresponda, como también asumir su defensa personalmente, siempre que ello no perjudique la eficacia de la misma y no obste a la normal sustanciación del proceso, pudiendo mantener una entrevista con quien designe, en forma previa a comenzar con la recepción de esta declaración indagatoria, a lo que responde que ya ha designado a los Dres. José María Manuel Figueredo y Santiago Ramón Fontan Balestra, quienes se encuentran presentes en este acto.------------------------------------------------------------------------------------------

Finalmente, se le recuerda a la compareciente que puede abstenerse de declarar, y que para el caso de que lo haga, no se le requiere juramento o promesa de decir verdad.-----
Interrogada a tenor de lo dispuesto por el artículo 297 del Código de Forma, e invitada a que manifieste su nombre y demás datos personales, dijo ser y llamarse: **Paolo Rocca**, quien acredita identidad mediante [      ] nacido el día 14 de octubre de 1952 en la ciudad de Milán, Italia, de nacionalidad italiano, de estado civil divorciado, ocupación empresario, hijo de Roberto Rocca (f) y Andreina Rocca, domiciliado en la calle [      ] de esta ciudad, teléfono [      ] que sabe leer y escribir.-------------------------------------------------------------------------------------

Preguntado por si tienen antecedentes penales o causa en trámite o concluidas, contestó que: "no, que yo sepa no". Preguntado por sus condiciones de vida, contestó que: "son buenas". Preguntado para que diga si tiene algún bien mueble o inmueble a

ROLINA LORES ARNAIZ
SECRETARIA FEDERAL

su nombre respondió que: "Si, tengo una propiedad inmobiliaria en Capital Federal,
donde vivo; una propiedad inmobiliaria en la Provincia de Buenos Aires, y una
propiedad inmobiliaria en Chubut. En este momento tengo un automóvil a mi
nombre.".--------------------------------------------------------------------------------

A continuación, de conformidad con el artículo 298 del Código Adjetivo, se pone en
conocimiento de la compareciente que: **I.- De la asociación ilícita:** se le imputa al
compareciente haber integrado una asociación ilícita junto con Roberto BARATTA,
Walter Rodolfo FAGYAS, Nelson Javier LAZARTE, Fabián Ezequiel GARCÍA
RAMÓN, Hernán Camilo GÓMEZ, Rafael Enrique LLORENS, Oscar Bernardo
CENTENO, José María OLAZAGASTI, Jorge Omar MAYORAL, Julio Miguel DE
VIDO, Cristina Elisabet FERNÁNDEZ, Néstor Carlos KIRCHNER, Héctor Daniel
MUÑOZ, Carlos Guillermo Enrique WAGNER, Armando Roberto LOSON, Héctor
Javier SÁNCHEZ CABALLERO, Ángel Jorge Antonio CALCATERRA, Francisco
Rubén VALENTI, Carlos José MUNDIN, Jorge Guillermo NEIRA, Gerardo Luis
FERREYRA, Claudio Javier GLAZMAN, Juan Carlos DE GOYCOECHEA, Héctor
Alberto ZABALETA, Luis María Cayetano BETNAZA, Hernán DEL RÍO –alias
"Hernán / El pelado"-, Jorge Juan Mauricio BALÁN, Rodolfo Armando POBLETE,
Juan CHEDIACK, Eduardo Hugo Antranik EURNEKIAN, Francisco Javier
FERNÁNDEZ, Alejandro Pedro IVANISSEVICH, Juan Carlos LASCURAIN,
German Ariel NIVELLO, Néstor Emilio OTERO, Norberto Mario OYARBIDE, Oscar
Isidro José PARRILLI, Raimundo PEDUTO, Ernesto CLARENS, Carlos Alberto
RODRÍGUEZ, Aldo Benito ROGGIO, Benjamín Gabriel ROMERO, Rudy Fernando
ULLOA IGOR, Claudio UBERTI, Manuel Sartos URIBELARREA, Raúl Víctor
VERTÚA, Hugo Alberto DRAGONETTI, José Francisco LÓPEZ, Jorge Ernesto
RODRÍGUEZ, Sergio TASSELLI, Alberto TASSELLI, Osvaldo Antenor ACOSTA,
Enrique Menotti PESCARMONA, Hugo Martín LARRABURU, Juan Manuel ABAL
MEDINA, Oscar Alfredo THOMAS, Roberto Néstor SOSA, Julio Daniel ALVAREZ,
Víctor Fabián GUTIÉRREZ, Ricardo Fabián BARREIRO, Raúl Horacio COPETTI,
Juan Carlos MAZZON, José María OTTAVIS ARIAS, Eduardo DE PEDRO, Andrés
LARROQUE, Sergio SZPOLSKI y otras personas, la cual desarrolló sus actividades

*Poder Judicial de la Nación*

aproximadamente desde principios del año 2003 hasta noviembre del año 2015, y cuya finalidad fue organizar un sistema de recaudación de fondos para recibir dinero ilegal con el fin de enriquecerse ilegalmente y de utilizar parte de esos fondos en la comisión de otros delitos, todo ello aprovechando su posición como funcionarios del Poder Ejecutivo Nacional. La asociación ilícita fue comandada por Néstor Carlos KIRCHNER y Cristina Elisabet FERNÁNDEZ, quienes detentaron el cargo de Presidente de la República Argentina, entre el 25 de mayo de 2003 y el 9 de diciembre de 2007, y el 10 de diciembre de 2007 hasta el 9 de diciembre de 2015, respectivamente. El dinero era entregado alternativamente a los titulares del Poder Ejecutivo Nacional o sus secretarios privados en Uruguay 1306 y Juncal 1411 CABA –domicilio particular de Néstor Carlos KIRCHNER y Cristina Elisabet FERNÁNDEZ -, en la Residencia Presidencial de Olivos y en la Casa de Gobierno; parte de este dinero fue redistribuido o se realizaron pagos para otros funcionarios públicos. La maniobra fue organizada por Julio Miguel DE VIDO [entonces Ministro de Planificación Federal, Inversión Pública y Servicios] y Roberto BARATTA [ex-Subsecretario de Coordinación y Control de Gestión del Ministerio de Planificación], quienes desde los cargos que ocupaban se encargaban de que se realizaran los cobros comprometidos. Los cobros fueron recaudados principalmente por Roberto BARATTA y Nelson Javier LAZARTE [secretario privado de Baratta]; también participaron activamente de este sistema de recaudación recibiendo pagos: Walter FAGYAS [Asesor de la Subsecretaría de Coordinación del Ministerio de Planificación Federal y Presidente de ENARSA], Rafael Enrique LLORENS [Subsecretario Legal del Ministerio de Planificación], Hernán Camilo GÓMEZ [funcionario de la Subsecretaría de Coordinación y Control de Gestión del Ministerio de Planificación Federal] y Fabián Ezequiel GARCÍA RAMÓN [Director Nacional de Energías Renovables y Eficiencia Energética del Ministerio de Planificación Federal]. Los nombrados en casi todas las oportunidades fueron transportados a los lugares donde se hicieron los pagos/cobros por Oscar Bernardo CENTENO, que recibía órdenes de BARATTA y DE VIDO.-------------------------------------------------------------------------

**II.- Descripción del Sistema de Recaudación:** Determinados que fueron los jefes y

-*1*/ CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

organizadores principales de esta asociación es pertinente realizar una descripción global del sistema de recaudación:------------------------------------------------------------------

a) A modo de ejemplo de lo que se desarrollará en los siguientes párrafos, transcribiremos algunos pasajes de una verdadera "bitácora del delito" que escribiera Oscar Bernardo CENTENO entre 2005 y 2015, a saber: * *cita del 12 de noviembre de 2008 a las 10:30hs.* "... *Ministerio lo lleve al lic a la Residencia Presidencial de Olivos, fue a un acto, luego lo lleve a su bunquer* **esperaba a un señor cuyo contacto es** <u>**Oscar 154085-6111 y 154085-3330**</u>; *al cual le entrego el lic al contacto un bolsita con dinero luego lo lleve al lic al ministerio..." (el resaltado corresponde al tribunal);* * *cita del 5 de enero de 2009 luego de mantener una reunión en la Quinta de Olivos con Néstor, la Presidenta y el Ministro, se dirige al dpto. de este último y luego al ministerio; A las 16.00hs. "... Ministerio lo lleve al licenciado a* <u>*Maipú 741*</u>, *donde se encontró en la puerta con dos personas y luego subieron al* <u>*1° B*</u>, *y luego bajaron del dpto* **el lic y una persona con una valija más o menos de 90 cm de alto por 40 de ancho y 20 cm de espesor, yo la cargué al baúl del auto y pesaría mas o menos 40 kgs, era dinero** *y luego lo lleve al lic a su dpto donde se bajo con la valija y luego lo traje al lic al ministerio.* **Las personas son** <u>**de Isolux- Corsan**</u>, **en la valija había más o menos 6 millones de dólares** *...", (el resaltado corresponde al tribunal);* * *cita del 12 de enero de 2009 a las 20:00hs. "... Ministerio lo lleve al lic a su dpto,* **fue a buscar la valija que llevamos el lunes pasado y la fuimos a entregar a** <u>**Daniel Muñoz**</u> <u>**a Uruguay 1306**</u>; *y luego fuimos a buscarlo a Walter Fagias a su dpto. y los deje en un restaurante en Honduras 5700 ...", (el resaltado corresponde al tribunal);* * *cita del 3° de junio de 2009 a las 19:15hs. "... Ministerio lo fui a buscar al lic y Nelson a Presidencia, a las 20.05 los lleve al ministerio de trabajo a una reunión; luego a las 21.30 salió con* <u>*Walter Fagias*</u> *y los lleve* **al dpto de Walter donde le entregó una mochila con dinero a Baratta; por el peso la mochila tendría 300.000 U$S;** *luego lo lleve al lic a su dpto ..." (el resaltado corresponde al tribunal);* * *cita del 19 de noviembre de 2009 a las 20:05 hs. "... Ministerio lo lleve al lic para buscarlo a* <u>*Hernán Gómez*</u> *y no pudimos por el tránsito que estaba muy congestionado y el* <u>*Lic Baratta*</u> *lo llamo por teléfono y le dijo que se tome un taxi con mucho cuidado y*

*Poder Judicial de la Nación*

Cn° 9.608/18

tranquilidad por el dinero que tenía que traer lo esperamos en la puerta del *edificio de Baratta* a Hernán y **luego subieron al departamento del licenciado, para repartirse lo que a cada uno le corresponde; también sacan la parte del Dr. Llorens Rafael; Ezequiel García y Walter Fagias**; luego bajaron del dpto. y **los lleve a Uruguay 1306 a entregar el grueso del dinero a Daniel Muñoz**. Luego lo lleve al lic a su dpto y a Hernán Gómez hasta el garage(sic) y me fui a casa..." (el resaltado corresponde al tribunal); \* cita del 27 de enero de 2010 a las 13:35hs. "... Ministerio lo llevé al lic Baratta al *Hotel Firs't Park (Esmeralda 1366)*, bajamos al 2° subsuelo con el auto y no lo esperaba nadie y **subió a verlo al Ing Ruben Valenti; luego a los 15´ bajaron con un bolso lleno de dinero (200.000 U$S) y una caja de vino tinto Lagarde** y lo llevé al ministerio ...", (el resaltado corresponde al tribunal); \* cita del 27 de enero de 2010 a las 20:30 "... Ministerio lo lleve al lic a su dpto., **subió con todo el dinero recaudado del día, luego de sacar su parte, bajó y lo lleve a entregarle a Daniel Muñoz en Uruguay 1306** y luego lo lleve al lic a su dpto y me fui a casa ...", (el resaltado corresponde al tribunal);\* cita del miércoles 21 de julio de 2010 a las 14:00hs. "... Del ministerio se fue el Lic *Baratta* *Javier Mosera* y *Nelson Lazarte*; en el auto cuyo chofer es Pablo Avalos y me dice el *Lic Baratta* que 14.45 **tengo que llevarlo a Ezequiel García a un lugar y que vaya con los ojos bien abierto por si nos siguen**. A las 14.45 me llama por celular **el Ing García y me dice que me espera en la puerta de calle; salgo y lo llevo a Alem 454; bajamos al subsuelo y el se comunica con una persona y le dice que ya estamos abajo; luego sale esta persona con una valija color gris y la pone en el baúl de mi auto; hablaban García y este señor de que eran 4.500.000U$S (cuatro millones quinientos mil dólares) que eran "del Comahue y de lo otro"** decían; luego salimos del lugar y este señor se bajo en Alem y Peron; y nosotros seguimos y **me dice García Ezequiel que vayamos para la quinta de Olivos** ; en el camino lo llama el *Lic Baratta* a *Ezequiel García* para decirle que nos esperaba en Alcorta a la altura del museo MALVA; en el lugar se sube al auto y nos dirigimos a la *Quinta de Olivos;* **en Libertador y Melo, el lic lo hace bajar a Ezequiel y que nos espere ahí que hay una estación de servicio YPF, y seguimos; pero el li me dice que tenía que entregar en mano propia al Dr. Nestor Kirchner la plata** y me dice que va

USO OFICIAL

CAROLINA LCRES ARNAIZ
SECRETARIA FEDERAL

*a entrar el solo y manejando el auto y así fue que me quedo afuera de la Quinta y él entra a las 15.55 hs y sale a las 16.30 hs y me levanta a mi y seguimos en busca de Ezequiel García y cambiamos el volante y sigo manejando yo y los llevo al ministerio de planificación*; *y subieron juntos con un boiso personal del lic Baratta donde supuestamente llevaban sus partes década uno ..."*. (el resaltado corresponde al tribunal); * cita del 23 de julio de 2010 a las 12.55hs. "... Del ministerio lleve al *lic Baratta* a *Alem 454*, al subsuelo, donde la *misma persona* nos esperaba, el lic lo llamo por celular también y le dijo *Jorge ya estamos llegando*, este señor subió al auto con una *valija color negra* y le dice al lic Baratta que era lo *de Comahue* y que tratara de que salga el otro proyecto *Comahue Cuyo* son obras de energía eléctrica; le dice que hay en la valija U\$S *2.500.000 (dos millones quinientos mil dólares)*, luego este señor también se bajo en Alem y Peron; el lic me dice *vamos para olivos*, en el camino lo llama a *Hernán Gómez* y le dice que nos espere en la YPF de Libertador (Olivos), pero Hernán se equivoca y nos espera en la Esso de Libertador (Vte Lopez) lo llame por teléfono y vino hacia nosotros y le da al lic un bolso con la *recaudación de la semana* y le dice que hay 1.500.000 U\$S (un millón quinientos mil dólares) y se va; nosotros seguimos; el *Lic Baratta* nuevamente me dice que va a entrar solo y le doy el auto; porque tenía que entregar los 4.000.000 U\$S (cuatro millones de dólares) en mano propia al Dr. Nestor Kirchner en el chalet donde vive el Dr Kirchner con La Presidenta Cristina y que no querían que me vean a mi; entro a las 14.00 hs y salió 14.25 hs, me levanto a mi y fuimos hasta la YPF de Libertador y Melo, donde se bajo de mi auto y se subió a la Meriva de Hernán Gómez chapa IIC 258, y yo los seguí hasta dpto del Lic Baratta; se ve que mientras venían se repartían la parte de dinero que le había dado el Dr. Kirchner, luego de dejarlo al Lic; Hernán se fue y me dice a mi que lo espere a la vuelta de su dpto. a las 15:20 salió y lo lleve a Gorostiaga 2337, estuvo una hora y lo deje en su dpto nuevamente. Durante este viaje me decía irónicamente que quería dejar de hacer las recaudaciones y yo le dije que mientras se lleve algo y me dice: no Oscarcito yo puchereo nomás; le di a entender que yo siempre quedo afuera y me dice esto es así no mas; que el Dr. Kirchner las quiere a todas para él y que además le dijo: no hay más? Cuando*

*Poder Judicial de la Nación*

C№ 9.608/18

llegamos a su dpto. me dice que espere hasta que me avise que me vaya..." (el resaltado corresponde al tribunal). * cita del 7 de octubre de 2010 a las 19:50hs. ".... Del ministerio lo lleve al *Lic Baratta y a Nelson* a **Callao 1175, donde nos esperaba Neyra con una valija con 4.000.000 (cuatro millones dólares)** por orden del Lic Baratta me dice que le abra el baúl sin bajar del auto, **Neyra la subió al baúl** y luego subió él al auto en el asiento de atrás, y le pasa el papel **con las cantidades de diversas obras** por la cantidad por la cantidad(sic) total ya nombrada. Luego *el lic lo llama* a **Hernán Gómez** que ya tenía lo recaudado por otro lado, le dice por teléfono donde entregamos y Hernan se acerca a lugar y el **Lic Baratta se sube a la camioneta** de Hernan una *Meriva chapa IIC 258* y se dirigen a *Uruguay 1306* yo con Nelson en el auto lo seguíamos por detrás, llegamos la lugar y lo tuvimos que esperar a *Daniel Muñoz;* **cuando llego Daniel el lic se baja de la Meriva de Hernan con dos bolsos** que tenían **800.000 U$S (ochocientos mil dólares) cada uno**, los cuales se los da a *Daniel Muñoz* y me dice que abra el baúl y **el lic la baja él a la valija y entran por la puerta de Juncal con todo o sea 5.600.000 U$SS (cinco millones seicientos mil dólares)**: a los 10´ sale el Lic *Baratta* y retira de mi auto su **bolso personal que lo tenía vacío y entra al domicilio nuevamente; a los 30´ sale y sube a la Meriva de Hernán y yo los sigo siempre con Nelson que queda evidente para que custodie a mi, para que no haga ninguna cosa rara; luego llegamos al domicilio del lic, bajan con el bolso personal con la parte que le dio Daniel Muñoz** y luego nos fuimos, cada uno a su casa ...", (el resaltado corresponde al tribunal); * cita del 16 de julio de 2013 a las 12:30hs. "... Llevo al Lic Baratta y Nelson L a Manuela Saenz 323 de Pto Madero retiran un bolso lleno de dinero y regresamos al ministerio; luego a las 20.00 salimos del minist. Baratta y Nelson L y los llevo a Andonaegui 2138 1° B a dejar el dinero, **quiero dejar en claro que siempre usan dos bolsos gemelos que se van recambiando para las operaciones, o sea se vacían o llenan los mismos bolsos negros según fotos** ..." (el resaltado corresponde al tribunal); * cita del 3° de junio de 2015 a las 11:20hs. "... Lo lleve a Nelson a la **oficina de Néstor Otero en Retiro y trajo doscientos cincuenta mil dólares (250.000 U$S)** y lo lleve al ministerio donde Nelson se lo dio al Licenciado Baratta ...", (el

USO OFICIAL

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

*resaltado corresponde al tribunal); * cita del 9 de junio de 2015 a las 10:20hs. "... Lo lleve a Nelson al Edificio de la ex YPF y **un tal Nivello que tenía que darnos el dinero se había confundido el lugar de la entrega y se fue al ministerio**, como nosotros estábamos con problema para regresar por el transito y estaba cortado toda la plaza de Mayo por el paro nacional, **Nivello estaba con el "muerto", decidió entregarle en persona al licenciado Baratta en la oficina, se hablaba de 1.250.000 (un millón doscientos cincuenta mil dólares)** ..." (el resaltado corresponde al tribunal); * cita del 13 de julio de 2015 a las 13:48hs. "... Lo lleve a Nelson al estacionamiento del Hotel Hilton al subsuelo, donde lo esperaba Javier en Audi chapa GZP 687, y le pasó a Nelson un paquete con 250.000U$S (doscientos cincuenta mil dólares) y luego en el ministerio se lo dio al lic Baratta. Acompaño ticket estac ..."; * cita del 4 de agosto de 2015 a las 15:50hs. "... Lo lleve a Nelson al subsuelo del Hotel Hilton que comparte el estacionamiento con el edificio contiguo, donde **nos esperaba el Sr. Sanchez Caballero y le entrego una bolsa que contenía 1.250.000 U$S (un millón doscientos cincuenta mil dólares)** y regresamos al ministerio y se lo dio al Lic Baratta en su oficina, acompaño ticket del estacionamiento ...", (el resaltado corresponde al tribunal);*----------------------------------------------------------

**b)** El sistema estribaba básicamente en una serie de "puntos fijos de recaudación", en los cuales se reunían los funcionarios identificados con los empresarios, de los cuales recibían dinero en efectivo, principalmente en moneda estadounidense; alternativamente esos "puntos fijos" se concretaban en estacionamientos públicos o privados y el "pase" de dinero se hacía directamente de automóvil a automóvil o también en oficinas públicas y privadas. Después de un episodio confuso el 22 de octubre de 2015, en el cual, personas desconocidas intentaron interceptar el automóvil del Ministerio de Planificación que había retirado una recaudación de "Supercemento S.A.I.C.", el sistema cambió, y los empresarios debían concurrir al Ministerio de Planificación, ingresar por el estacionamiento privado y de allí acceder directamente al despacho de Baratta. Con posterioridad sólo esporádicamente autos oficiales pasaban por alguna empresa a retirar la recaudación.--------------------------------------------------------

**c)** En este contexto, se puede afirmar que había un primer círculo de percepción de

*Poder Judicial de la Nación*

9.608/18

fondos conformado por quienes tenían contacto directo con quienes aportaban los fondos involucrados. En un segundo círculo estaban quienes a su vez recolectaban esos fondos ilegales para entregarlos a quienes en definitivas comandaron y organizaron ese sistema. Entre quienes integraban ese primer círculo se encontraban, entre otros, Roberto BARATTA, Walter Rodolfo FAGYAS, Nelson Javier LAZARTE, Fabián Ezequiel GARCÍA RAMÓN, Hernán Camilo GÓMEZ, Rafael Enrique LLORENS y Germán Ariel NIVELLO. En el segundo nivel, quienes recibían los fondos recaudados y los derivaban a los jefes y organizadores o aplicaban esos fondos a otras actividades delictivas eran: José María OLAZAGASTI, Hugo Martín LARRABURU, Juan Manuel ABAL MEDINA y Héctor Daniel MUÑOZ. Finalmente, quienes se beneficiaron de este sistema recaudatorio, que por cierto, no es el único, según el conocimiento que en otras causas tramitan o tramitaron en este tribunal o son de público y notorio, son Néstor Carlos KIRCHNER, Cristina Elisabet FERNÁNDEZ y Julio Miguel DE VIDO.------------------------------------------------------------------------

**III.- Quienes recibían los fondos ilegales – Los hechos:** Entre las personas que recibían el dinero que les llevaban los nombrados se encuentran, entre otros: Rudy Fernando ULLOA IGOR, Ernesto CLARENS, Oscar PARRILLI -Secretario General de la Presidencia y Director de la Agencia Federal de Inteligencia-, Héctor Daniel MUÑOZ -Secretario privado de Presidencia-, Hugo Martín LARRABURU – Coordinador de la Unidad Ministro de la Jefatura de Gabinete de Ministros-, Juan Manuel ABAL MEDINA -Jefe de Cabinete de Ministros-, José María OLAZAGASTI –Secretario Privado de De Vido-, Hernán DEL RÍO -Secretario de José María Olazagasti-, Jorge Omar MAYORAL -Secretario de Minería del Ministerio de Planificación Federal- Germán Ariel NIVELLO -Subsecretario de Desarrollo Urbano y Vivienda dependiente de la Secretaría de Obras Públicas del Ministerio de Planificación Federal- y José Francisco LÓPEZ -Secretario de Obras Públicas de la Nación.--------------------------------------------------------------------------------------------

**a) Néstor Carlos Kirchner y Cristina Elisabet Fernández,** recibieron dinero del siguiente modo: el 8 de octubre de 2009 –BARATTA se lo entrega a MUÑOZ-, 3 y 17 de febrero de 2010 -BARATTA-, el 2 de junio de 2010 -BARATTA y LAZARTE le

**CAROLINA LORES ARNAIZ**
SECRETARIA FEDERAL

entregan a MUÑOZ-, el 21 de julio de 2010 -BARATTA-, el 11 de agosto de 2011 –
BARATTA a MUÑOZ- se deja la recaudación en la Residencia de Olivos; el 20 de
julio de 2010 se reúnen en la Residencia de Olivos con Néstor KIRCHNER por la
recaudación de los miércoles; el 17 de marzo de 2010, 20 de mayo de 2010 y el 27 y
29 de julio de 2010, 6 de octubre de 2010 Néstor Carlos KIRCHNER se reúne con
BARATTA y LAZARTE y les dice cómo hacer la recaudación; el 4 de agosto de 2010
reunión con KIRCHNER y DE VIDO por la recaudación del día; el 22 de abril de
2010 Néstor Carlos KIRCHNER lo llama a BARATTA y le pregunta cómo viene la
recaudación -el llamado lo hace Juan Francisco Alarcón, alías "Tatú"-; el 4 de
noviembre de 2008 BARATTA concurre a Lavalle 462 5° CABA luego de tener una
reunión con Néstor Carlos KIRCHNER en la Residencia de Olivos; el 1° de agosto de
2013 la recaudación se entregó a quien manejaba el automóvil dominio "MNI589",
que luego ingresó en Casa de Gobierno. **b) Julio Miguel De Vido:** recibió dinero el 7
de abril de 2010 de BARATTA en su departamento, el 31 de mayo de 2010 de
BARATTA y LAZARTE, el 3, 16, 23 y 29 de junio de 2015 y 1° de julio de 2015
LAZARTE le entrega el dinero a Hernán DEL RÍO, Secretario de José María
OLAZAGASTI, para que este último se lo dé a DE VIDO y el 18 de junio de 2015
BARATTA lleva dinero a lo de DE VIDO. LAZARTE el 28 de mayo de 2015 lleva el
producido de la recaudación de "Feir's Park" por un millón de dólares y lo entrega a
Hernán DEL RÍO, secretario de José María OLAZAGASTI, para que este último se lo
dé a DE VIDO. Además, el 10 de septiembre de 2013 LAZARTE le dejó a su hijo,
Facundo DE VIDO, en Av. Libertador 4850 8° CABA un sobre con treinta mil dólares
(U$S 30.000).-----------------------------------------------------------------------------------

**c) Héctor Daniel Muñoz**: recibió dinero de BARATTA en Uruguay 1306 CABA: 1)
el 21 de mayo de 2008; 2) el 29 de mayo de 2008, luego de retirar un bolso de "Feir's
Park" proveniente de VALENTI y otro del edificio de Techint; 3) el 30 de junio de
2008; 4) el 23 de julio de 2008; 5) el 27 de agosto de 2008; 6) el 4 de septiembre de
2008; 7) el 11 de septiembre de 2008; 8) el 15 de septiembre de 2008; 9) el 18 de
septiembre de 2008; 10) el 9 de octubre de 2008; 11) el producido de la recaudación de
al menos el 22 de octubre de 2008 es entregado a MUÑOZ en la calle Uruguay; 12) lo

*Poder Judicial de la Nación*

recaudado por BARATTA el 28 de octubre de 2008; 13) el 30 de octubre de 2008; 14) el 11 de noviembre de 2008; 15) el 2 de diciembre de 2008 BARATTA lleva lo recaudado en Lavalle 462 5° CABA de "Electroingeniería S.A." lo entrega a Daniel MUÑOZ en la calle Uruguay; 16) el 3 de diciembre de 2008; 17) Oscar Alfredo THOMAS - El Director Ejecutivo de la "Entidad Binacional Yaciretá - el 18 de diciembre de 2008 pagó a BARATTA quién luego llevó ese paquete y otro de Techint a MUÑOZ a Uruguay; 18) el 15 de diciembre de 2008 BARATTA llevó el producido de lo pagado por "Electroingeniería S.A." a MUÑOZ; 19) el "Grupo Isolux Corsán S.A." paga seis millones de dólares (u\$s 6.000.000) a BARATTA en Maipú 741 - CABA quien se la entrega a MUÑOZ en Uruguay 1306 el 12 de enero de 2009; 20) el 14 de enero de 2009 BARATTA le lleva lo cobrado a NEIRA en Reconquista y Florida a MUÑOZ; 21) al mismo le entrega las recaudaciones del 10 de febrero de 2009; 22) el 25 de febrero de 2009; 23) el 11 de marzo de 2009; 24) el 26 de marzo de 2009 –con GARCÍA RAMÓN-; 25) 7 de abril de 2009; 26) el 29 de abril de 2009; 27) el 14 de mayo de 2009; 28) el 19 y 20 de mayo de 2009; 29) el 26 de mayo de 2009 - en presencia de FAGYAS-; 30) el 4 de junio de 2009 BARATTA lleva el producido de la recaudación en "Feir's Park" a MUÑOZ en la calle Uruguay 1306; 31) el 11 de junio de 2009; 32) el 2 y 19 de junio de 2009 -en presencia de GARCÍA RAMÓN-; 33) el 22 de junio de 2009 -también en presencia de GARCÍA RAMÓN-; 34) el 24 de junio de 2009 -en presencia de GARCÍA RAMÓN-; 35) el 16 de julio de 2009; 36) el 22 de julio de 2009 estaba presente GARCÍA RAMÓN-; 37) el 30 de julio de 2009 -en presencia de GÓMEZ-; 38) 6 de agosto de 2009 -estaban GARCÍA RAMÓN y GÓMEZ-; 39) BARATTA y GÓMEZ entregan el 12 de agosto de 2009 tres bolsos con producidos a Muñoz; 40) el 21 de agosto de 2009; 41) el 3 de septiembre de 2009; 42) 10 de septiembre de 2009 -en presencia de GARCÍA RAMÓN y GÓMEZ-; 43) el 17 de septiembre de 2009 -estaba GÓMEZ-; 44) el 19 y 22 de octubre de 2009; 45) el 28 de octubre de 2009 -estaba GÓMEZ-; 46) 19 de noviembre de 2009; 47) el 3 y 10 de diciembre de 2009; 48) el 20 de enero de 2010; 49) el 27 de enero de 2010; 50) el 10 y 24 de febrero de 2010; 51) el 10 de marzo de 2010; 52) el 17 de marzo de 2010; 53) 15 de abril de 2010; 54) 27 de mayo de 2010 -LAZARTE-; 55) 28 de abril de 2010 -en

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

presencia de GÓMEZ-; 56) el 9 de junio de 2010 -en presencia de FAGYAS-; 57) el 8 de julio de 2010 -frente a LAZARTE-; 58) el 14 y 28 de julio de 2010; 59) el 4, 6 y 25 de agosto de 2010; 60) el 3 y 9 de septiembre de 2010 -con LAZARTE-; 61) 15 y 30 de septiembre de 2010 -con LAZARTE-; 62) el 7 de octubre de 2010 BARATTA y LAZARTE cobran cuatro millones de dólares (u\$s 4.000.000) de NEIRA en Callao 1175 - CABA dicho dinero lo entregaron a GÓMEZ para que se lo dé a MUÑOZ en Uruguay 1306 - CABA.-------------------------------------------------------------------------

**d) Hugo Martín Larraburu**: 1) Los días 1, 5, 6, 8 y 9 de agosto de 2013 y el 2, 4, 5, 10, 12 y 17 de septiembre de 2013 LAZARTE y BARATTA entregan la recaudación a una persona de Presidencia que manejaba el rodado marca "Ford" modelo "Focus" dominio MNI 589, utilizado por Hugo Martín LARRABURU, la del 5 de septiembre se la debía entregar a ABAL MEDINA por orden de Cristina Elisabet FERNÁNDEZ; 2) el 7 de agosto de 2013, LAZARTE recauda en "Feir's Park" de VALENTI y pasa al auto de Presidencia un automóvil marca "Ford" modelo "Focus" dominio MNI 589 utilizado por Hugo Martín LARRABURU; 3) el 29 de agosto de 2013, los trescientos mil dólares (u\$s 300.000) aportados por LOSON a LAZARTE son llevados a la Casa de Gobierno y entregados a Hugo Martín LARRABURU, que se los tenía que entregar a Juan Manuel Abal Medina y el 30 le entregan también a LARRABURU en casa de gobierno; 4) el 19 de septiembre de 2013 Lazarte retira sesenta mil dólares (u\$s 60.000) luego se lo entregan a Hugo Martín LARRABURU; 5) el 18 de septiembre y el 17 de octubre de 2013, el dinero se lo entregan a Hugo Martín LARRABURU, que conducía un automóvil con el dominio MNI 588; 6) el 20, 24 y 25 de septiembre de 2013 le entregan el dinero a Hugo Martín LARRABURU, quien en esa oportunidad conducía un automóvil con el dominio KIM 064; 7) El 1 y 22 de octubre de 2013 le dan el dinero a Hugo Martín LARRABURU que se lo tiene que dar a ABAL MEDINA; 8) el 1, 15 y 24 de octubre de 2013 le entregan el dinero a Hugo Martín LARRABURU.------------------------------------------------------------------------------------

**e)- Participaron**, trasladando u ocultando el dinero ilícito de Néstor Carlos Kirchner y Cristina Elisabet Fernández en el período investigado -2003 y 2015-, entre otras personas **Roberto Néstor Sosa** -Secretario de Presidencia Nacional-, **Julio Daniel**

*Poder Judicial de la Nación*

Álvarez -Secretario de Presidencia Nacional-, **Víctor Fabián Gutiérrez** -Secretario de Presidencia Nacional-, **Ricardo Fabián Barreiro** -empleado del Organismo Regulador del Sistema Nacional de Aeropuertos (ORSNA) en el aeropuerto de Calafate Provincia de Santa Cruz- y **Raúl Horacio Copetti**.--------------------------------

**f) Otros: A.- Norberto Oyarbide**: participó de la asociación ilícita, siendo que el 3 de septiembre de 2013 se reunió a comer con BARATTA y DE VIDO en el restaurante "Sagardi", Humberto 1° 319 – CABA. El 26 de septiembre de 2013 BARATTA y LAZARTE se reúnen con OYARBIDE en Avenida Comodoro Py 2002, piso n° 3 - CABA. El 17 de octubre de 2013, OYARBIDE le da una resolución a LAZARTE en el restaurante "Estilo Campo" en Alicia Moreau de Justo 1840 - CABA. El 22 de junio de 2015, Lazarte concurre a la casa de OYARBIDE, ubicada en Rodríguez Peña 1978 - CABA, y retira papeles, luego de ir varias veces a retirar y entregar dinero. El 14 de octubre de 2015 OYARBIDE le da una resolución a Lazarte en el restaurante "Estilo Campo", sito en Alicia Moreau de Justo 1840 - CABA. Corresponde destacar que durante el período indicado, Norberto Mario OYARBIDE fue el Juez titular a cargo del Juzgado Nacional en lo Criminal y Correccional Federal n° 5 de la Ciudad Autónoma de Buenos Aires. **B.- Javier Fernández**, el 2 de agosto de 2013 y el 7 de agosto de 2013, LAZARTE le llevó dinero a Javier FERNÁNDEZ a su casa, en la calle Andonaegui 2138, piso n° 1, de esta ciudad. El 16 de julio de 2013 BARATTA y LAZARTE le entregaron dinero a Javier FERNÁNDEZ, en el mismo domicilio. **C.- Oscar Isidro José Parrilli:** recibió dinero el 12 de noviembre de 2008, de BARATTA, en Scalabrini Ortiz 3358, piso n° 5, Dpto. "B", C.A.B.A.-----------------

**IV.- Quienes pagaban – Los hechos:** En atención a los elementos de prueba colectados y los distintos descargos efectuados en las presentes actuaciones es posible afirmar que, los recaudadores de la asociación ilícita contaron con la participación de empresarios que pagaron sumas de dinero por un monto aproximado de dólares estadounidenses CINCUENTA Y CINCO MILLONES CUATROCIENTOS SESENTA MIL (u$s 55.460.000), en un sinnúmero de oportunidades entre 2003 y 2015 lo que permite acreditar la permanencia en el tiempo de la organización ilícita. Entre estos empresarios y hasta el momento se determinó, sin excluir futuras personas

CAROLINA LCREB ARRAIZ
SECRETARIA FEDERAL

a vincular a la presente causa, la participación de:-----------------------------------------------

**A.- Carlos Guillermo Enrique Wagner** realizó pagos por "ESUCO S.A.", los cuales se concretaron en San José 151 - CABA, donde tenía sede dicha empresa: el día 2° de junio de 2010, lugar desde el cual BARATTA y LAZARTE retiraron quinientos mil dólares (u$s 500.000), luego se lo llevan a MUÑOZ junto con otra recaudación; los días 14 de mayo de 2013 y el 25 de julio de 2013 los nombrados retiraron un bolso con dinero; el 7 de agosto de 2013 fueron BARATTA y LAZARTE a retirar un bolso con dinero y el 6 de septiembre de 2013 fueron nuevamente BARATTA y LAZARTE a retirar un bolso con dinero; el 27 de julio de 2015 fue sólo LAZARTE. También en una oportunidad, el 22 de septiembre de 2010, fue WAGNER a bordo de un automóvil marca "Honda", modelo "Accord", dominio "ELL 129" y entregó a BARATTA un millón de dólares (u$s 1.000.000).------------------------------------------------------------------

**B.- Armando Roberto Loson** realizó pagos por "Albanesi S.A.", los cuales se concretaron en el edificio ubicado en Leandro N. Alem 855 - CABA, donde tenía sede dicha empresa: el día 18 de julio de 2013 fue LAZARTE y retiró un bolso con dinero, el 25 del mismo mes y año fue BARATTA y LAZARTE a retirar el bolso con dinero, el 29 de agosto de 2013 fue LAZARTE y recibió de LOSON un bolso con trescientos mil dólares (u$s 300.000) quién estaba con una persona de nombre "Marcelo" y le señaló "...decile al lic Baratta que ya alquilo otra máquina para el trabajo..."; el 30 de agosto de 2013 LOSON le entregó a LAZARTE doscientos mil dólares (u$s 200.000); el 10 de septiembre de 2013 LOSON le entregó a LAZARTE una bolsa con trescientos mil dólares (u$s 300.000), el 16 de septiembre de 2013 LAZARTE recibió de LOSON trescientos cincuenta mil dólares (u$s 350.000); el 2 de junio de 2015 LAZARTE recibió dos paquetes con un millón doscientos cincuenta mil dólares (u$s 1.250.000); el 29 de junio de 2015 LAZARTE recibió de LOSON quinientos mil dólares (u$s 500.000); el 21 de julio de 2015 LOSON le entregó a LAZARTE un millón de dólares (u$s 1.000.000) y el 6 de octubre de 2015 LAZARTE retiró cuatrocientos mil dólares (u$s 400.000).-----------------------------------------------------------------------------------------

**C.- Héctor Javier Sánchez Caballero** realizó pagos por "ODS S.A." y "IECSA S.A.", por orden de **Ángel Jorge Antonio Calcaterra,** accionista de las firmas

*Poder Judicial de la Nación*

mencionadas, las cuales se concretaron en el garaje del hotel "Hilton" ubicado en Macacha Güemes 351 CABA: el 1 de octubre de 2013 Lazarte retiró un millón de dólares (u$s 1.000.000) que le entregó SÁNCHEZ CABALLERO, siendo luego entregado a Hugo Martín LARRABURU; el 30 de junio de 2015, LAZARTE retiró un millón quinientos mil dólares (u$s 1.500.000) que le entregó SÁNCHEZ CABALLERO; el 13 de julio de 2015 LAZARTE recibió doscientos cincuenta mil dólares (u$s 250.000) de SÁNCHEZ CABALLERO; el 4 de agosto de 2015 LAZARTE retiró un millón doscientos cincuenta mil dólares (u$s 1.250.000) de manos de SÁNCHEZ CABALLERO; LAZARTE realizó cuatro cobros más en la misma cochera los días 11, 17, 18 y 24 del mes de septiembre de 2013 por un millón quinientos mil dólares (u$s 1.500.000) en cada oportunidad. También hubo retiro de dinero en el edificio de Manuela Sáenz 323/351 CABA, donde funciona "ODS S.A.": el 16 de julio de 2013 y el 1 de agosto de 2013 retiran el dinero BARATTA y LAZARTE; el 9 de agosto de 2013 cobra LAZARTE; el 22 de octubre de 2013 LAZARTE retiró un millón doscientos cincuenta mil pesos (u$s 1.250.000); el 28 de mayo de 2015 LAZARTE retiró un millón doscientos mil dólares (u$s 1.200.000); el 18 de agosto de 2015 LAZARTE retiró el dinero; el 14 de septiembre de 2015 LAZARTE retiró setecientos cincuenta mil dólares (u$s 750.000); y el 21 de octubre de 2015 LAZARTE retiró trescientos cincuenta mil dólares (u$s 350.000).----------------

**D.- Francisco Rubén Valenti y Enrique Pescarmona** realizaron pagos por "IMPSA S.A." -"Industrias Metalúrgicas Pescarmona S.A.I.C. y F"-, habiéndose reunido con BARATTA en el hotel "Feir's Park" ubicado en Esmeralda 1.366 CABA los días: 8 y 28 de febrero de 2008; 8 de abril del 2008; el 29 de mayo de 2008; el 11 de julio de 2008 BARATTA retira de "Feir's Park" un paquete; el 2 de septiembre de 2008; el 28 de octubre de 2008 BARATTA retira caja de vino y bolso de dinero como todos los meses; el 11 de diciembre de 2008 BARATTA retira el dinero; el 4 de marzo de 2009 también retira dinero; el 4 de junio de 2009 retira un bolso con dinero; también el 20 de agosto de 2009 BARATTA recibe un paquete con dinero y una caja de vinos; el 23 de septiembre de 2009 BARATTA y GÓMEZ recibieron aproximadamente ciento cincuenta mil dólares (u$s 150.000) y una caja de vinos, que luego se lleva a MUÑOZ

USO OFICIAL

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

a Uruguay junto con otra recaudación; el 7 de diciembre de 2009 BARATTA recibe doscientos mil dólares (u$s 200.000) y una caja de vinos; el 27 de enero de 2010 BARATTA retira doscientos mil dólares (u$s 200.000) y una caja de vinos; el 22 de abril de 2010 BARATTA y LAZARTE retiran un bolso con ciento treinta y cinco mil dólares (u$s 135.000) y caja con vinos. El 26 de julio de 2013, en Libertad 1535 CABA reciben un bolso de dinero, el 1 de septiembre de 2010, en el Hotel "Feir´s Park" de Esmeralda 1366 al 2° subsuelo, donde lo esperaba el chofer de VALENTI y lo acompaño hasta la habitación, luego bajó BARATTA con VALENTI, y traía un bolso con dinero con setecientos mil dólares (u$s700.000) y una caja de vino con seis botellas; el 7 de agosto de 2013 LAZARTE recibe dinero en "Feir's Park" de VALENTI.------------------------------------------------------------------------------------------

**E.- Carlos José Mundin** ordenó que "BTU S.A." realizara pagos el 21 de mayo de 2009 a BARATTA para lo que se utilizó el rodado marca "Renault" modelo "Megane" dominio "EBY 711". Con Mundin hubo reuniones en el restaurante "Croque-Madame", ubicado en Libertador 1902 CABA el 1° de junio de 2010, en la que se habló de proyectos que tenían el visto bueno de Néstor Carlos KIRCHNER y de Julio Miguel DE VIDO, de la reunión participó Santiago De Vido -hijo del Ministro-, LAZARTE y BARATTA, luego del encuentro los últimos nombrados fueron a la Residencia de Olivos; el 7 de julio de 2010 BARATTA se reúne con MUNDIN en el mismo lugar; el 28 de julio de 2010 BARATTA se reunió temprano con MUNDIN; el 5 de agosto de 2010 por la tarde BARATTA fue al domicilio del Ministro DE VIDO y de ahí salió con su hijo, Santiago De Vido, y fueron nuevamente a reunirse con MUNDIN al restaurante indicado con WAGNER y una persona de nombre "Flavio" en la cual hablaron de 4 obras en el sur y dos obras en el norte, obras de infraestructura de gas; el 13 de agosto de 2010 se reunieron en el mismo lugar BARATTA, Santiago de Vido y MUNDIN. El 13 de septiembre de 2010 BARATTA y FAGYAS van a Alem 896 - 5° piso - CABA a retirar un bolso de dinero de dicho lugar donde funcionaba "BTU S.A."; el 30 de agosto de 2013 BARATTA y LAZARTE van a Alem 896 - CABA a reunirse con Santiago De Vido y MUNDIN.--------------------------

**F- Jorge Guillermo Neira, Gerardo Luís Ferreyra y Osvaldo Antenor Acosta**

*Poder Judicial de la Nación*

Cn° 9.608/18

ordenaron por el "Grupo Eling S.A."- "Electroingeniería S.A." realizar pagos, los cuales se concretaron en Lavalle 462 - 5° - CABA, donde tenía sede la empresa: el 30 de septiembre de 2008 el pago lo realiza Neira en Reconquista y Florida CABA y se lo entrega a Baratta quién luego lo lleva a Uruguay 1306 CABA; el 9 y el 22 de octubre de 2008 fue BARATTA, el último día se lleva la recaudación a MUÑOZ a Uruguay 1306 CABA; el 2 de diciembre de 2008 BARATTA recibe dinero de FERREYRA en Lavalle 462 5° piso CABA y luego se lo entrega a MUÑOZ en Uruguay 1306 CABA; el 15 de diciembre de 2008 BARATTA y LLORENS se encontraron con FERREYRA quien les dio un paquete con dinero; el 14 de enero de 2009 BARATTA y GARCÍA RAMÓN retiran el dinero mensual; el 7 de octubre de 2010 el pago lo hace NEIRA en Callao 1175 - CABA le entrega a BARATTA y LAZARTE una valija con cuatro millones de dólares (u$s 4.000.000); el 13 de octubre de 2010 el pago lo hace NEIRA en Azucena Villaflor 450 25° of. 3 CABA le entregó a BARATTA tres millones de dólares (u$s 3.000.000) junto con un resumen de lo aportado; el 21 de octubre de 2010 el pago lo hace una persona en reemplazo de NEIRA, en Callao 1175 CABA, por tres millones quinientos mil dólares (u$s 3.500.000) y luego se lo llevan a MUÑOZ; el 12 de noviembre de 2010, van dos veces a Lavalle 462 CABA a recibir dinero BARATTA y GÓMEZ; el 26 de noviembre de 2010 van BARATTA y LAZARTE a cobrar a Lavalle 462 CABA; el 18 de septiembre de 2013 BARATTA y LAZARTE retiran el dinero por 25 de mayo 489 - CABA; el 18 de junio de 2015 LAZARTE retiró doscientos cincuenta mil dólares (u$s 250.000); el 3 de agosto de 2015 LAZARTE retiró doscientos cincuenta mil dólares (u$s 250.000) y el 14 de agosto de 2015 también LAZARTE retiró dinero.------------------------------------------------------

**G.- Oscar Alfredo Thomas** -Director Ejecutivo de la "Entidad Binacional Yacyretá"- realizó pagos en Juncal 1740 - CABA el 18 de diciembre de 2008 a BARATTA; Thomas entregó dinero el 28 de enero de 2009 a BARATTA; el 27 de mayo de 2009 a BARATTA le entregó un paquete con dinero; el 29 de julio de 2009 BARATTA y FAGYAS reciben una caja con dinero; el 5 de agosto de 2009 le entrega a BARATTA setecientos mil dólares (u$s 700.000); el 12 de agosto de 2009 le entrega a BARATTA y GÓMEZ un bolso con un millón cien mil dólares (u$s 1.100.000); el 2° de

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

septiembre de 2009 BARATTA recibe un paquete con dinero; el 15 de enero de 2010 BARATTA retira una bolsa con dinero; el 21 de enero de 2010 THOMAS le entrega a BARATTA aproximadamente doscientos mil dólares (u$s 200.000); el 26 de enero de 2010 BARATTA recibe paquete con dinero; el 25 de febrero de 2010 BARATTA recibe dos bolsas con aproximadamente trescientos mil dólares en total (u$s 300.000); el 15 de marzo de 2010 BARATTA retira bolsa con doscientos cincuenta mil dólares (u$s 250.000); el 20 de julio de 2010 BARATTA recibe una bolsa con doscientos cincuenta mil dólares (u$s 250.000); el 7 de agosto de 2013 BARATTA y LAZARTE retiran el dinero de las oficinas de Avenida Eduardo Madero 942 – C.A.B.A.; el 19 de agosto de 2010 retiran BARATTA y LAZARTE un millón doscientos mil dólares (U$S 1.200.000) de Juncal 1740 CABA; el 13 de agosto de 2013 Lazarte retira de las oficinas de Avenida Madero 942, C.A.B.A. un bolso con dinero; el 19 de septiembre de 2013 LAZARTE retira el dinero de las oficinas de avenida Madero 942, C.A.B.A.--

H.- A principios del año 2009, luego de que se adjudicara la obra de la "Central Térmica de Río Turbio" a la firma "Grupo Isolux Corsán S.A.", BARATTA se reunió con **Juan Carlos de Goycoechea** en el Ministerio de Planificación Federal y le solicitó que colaborara económicamente. Ante ello, DE GOYCOECHEA le indicó que debía comunicarse con las autoridades de la empresa, con sede en el Reino de España. Finalmente, a fin de garantizar el contrato y los pagos de la obra adjudicada, desde allí se le indicó a DE GOYCOECHEA que realizara los pagos solicitados, los cuales se concretaron en Maipú 741 CABA, siendo estos por un monto general de trescientos mil dólares (u$s 300.000) en las siguientes fechas: el 19 de junio de 2008 a BARATTA, quién luego llevó el dinero a Uruguay 1306 CABA; el 5 de enero de 2009 le entregan a BARATTA; el 7 de abril y el 29 de abril de 2009 entregan sendas bolsas con dinero a BARATTA; el 14 de mayo de 2009 dos bolsos con dinero a BARATTA y GARCÍA RAMÓN; el 15 de mayo de 2009 BARATTA y GARCÍA RAMÓN una mochila con dinero; 8 de abril de 2010 hay una reunión con LLORENS y BARATTA; el 19 de mayo de 2010 a BARATTA; el 27 de mayo de 2010 BARATTA y el ing. Ezequiel GARCÍA concurren a Azucena Villaflor y Aimé Painé, vinculado a "Goycoechea", retirándose ambos con un bolso que dinero; el 15 de septiembre de

*Poder Judicial de la Nación*

2010, LAZARTE y BARATTA retiran dinero; 24 de noviembre de 2010 a BARATTA; el 1 de agosto de 2013, BARATTA Y LAZARTE llevan un bolso vacío y lo retiran con dinero; el 5 de septiembre de 2013, LAZARTE y Hugo Martín LARRABURU retiran el dinero para luego llevárselo a Juan Manuel ABAL MEDINA por indicación de Cristina Elisabet FERNÁNDEZ; el 19 de septiembre de 2013 a LAZARTE; el 23 de octubre de 2013 a Lazarte; el cobro se realizó en Venezuela 151 CABA; el 8 de agosto de 2013 retiran un bolso BARATTA y LAZARTE de un tal "Juanca", el 3 de junio de 2015 Lazarte recibe de un tal "César" dinero, el 13 de julio de 2015 Lazarte retira dinero y el 6 de octubre de 2015 LAZARTE recibe una caja con dinero.------------------------------------------------------------------------------------------------

**I.- Néstor Otero**, el 3 de junio de 2015, ordenó la entrega de doscientos cincuenta mil dólares (u$s 250.000) en su oficina de Retiro, a LAZARTE.----------------------------------

**J.**- Durante el año 2009, **Claudio Javier Glazman**, le solicitó a Roberto BARATTA que arbitrara los medios para que el entonces Ministro DE VIDO dispusiera la venta por remate de tres terrenos ubicados en esta ciudad. BARATTA accedió a considerar la solicitud, requiriéndole un aporte de un millón de dólares (u$s 1.000.000), presentándole a HERNÁN GÓMEZ a tal fin. Consecuentemente, GLAZMAN le entregó al nombrado distintas sumas de dinero, totalizando el monto de un millón quinientos mil pesos ($1.500.000), del siguiente modo: 1) Los días 30/7/09, 12/8/09, 20/8/09, 3/9/09, 10/9/09, 17/9/09, 23/9/09, 30/9/09, le entregó dinero en la calle Emma de la Barra 353 de esta ciudad; 2) El día 24/2/10, le entregó un bolso con dinero, en el subsuelo del estacionamiento de la Av. Córdoba de "Galerías Pacifico" de esta ciudad; 3) El día 10/3/10, le entregó dinero en Pasaje Levenne al 950 de esta ciudad; 4) El día 23/3/10, le entregó dinero, en la intersección de las Avenidas Belgrano y Paseo Colón de esta ciudad y en la Av. Alem 1050 CABA; 5) El día 28/4/10, le entregó un bolso con dinero, en la intersección de las calles Moreno y Balcarce de esta ciudad; 6) El día 18/8/10, le entregó dinero en la intersección de las calles Anchorena y Juncal de esta ciudad. En todos los casos, en las mismas fechas se llevó la recaudación a Daniel MUÑOZ en la calle Uruguay 1305 de esta ciudad, excepto el día 20/8/09 que la recaudación fue entregada al día siguiente.----------------------------------------------------

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

**K.-** En el día 20 de enero de 2010, Roberto BARATTA le solicitó a **Rodolfo Armando Poblete** seiscientos mil dólares (USD 600.000) para la suscripción del Decreto 113/2010 del P.E.N., que ratificaba el "Acta Acuerdo suscripto por la Unidad de Renegociación y Análisis de Contratos de Servicios Públicos y la Empresa Concesionaria Hidrovia Sociedad Anónima". Esta situación fue transmitida a **Benjamín Gabriel Romero,** quien le ordenó a POBLETE ejecutar el pago, siendo así que el Decreto fue firmado el día 21 de enero de 2010. Los pagos se ejecutaron de forma parcial: 1) el primero de ellos se llevó a cabo el día 20 de enero de 2010 en el domicilio de la Av. Corrientes 316 de esta ciudad, lugar donde POBLETE le entregó trescientos mil dólares (U$S 300.000) a BARATTA. Luego, CENTENO trasladó al nombrado y a LAZARTE al Ministro de Planificación Federal, y más tarde, BARATTA le entregó dinero a Daniel MUÑOZ, quien se encontraba en el vehículo dominio "EQL 442" en la calle Uruguay 1306 de esta ciudad; 2) el segundo de los pagos se llevó a cabo el día 19 de marzo de 2010 en el segundo subsuelo del domicilio de la Av. Alvear 1491 de esta ciudad, lugar donde POBLETE entregó un bolso con trescientos mil dólares (u$s 300.000) a BARATTA –en presencia de LAZARTE. Asimismo, Benjamín Gabriel ROMERO, ordenó la entrega de dinero realizada el día 9 de agosto de 2013, a LAZARTE, en la Av. Corrientes 316 de esta ciudad, oportunidad en la que éste lo pasó al vehículo dominio "MNI 589", utilizado por Hugo Martín LARRABURU.----------------------------------------------------------------------------------------

**L.- Héctor Alberto ZABALETA** realizó las siguientes entregas de dinero del "Grupo Techint", por indicación de **Luís María Cayetano BETNAZA**, quien fuera Director Institucional del grupo, con la anuencia **Paolo ROCCA,** Director Ejecutivo del grupo. De este modo, ZABALETA llevó a cabo las siguientes entregas: el 29 de mayo de 2008, entregó un bolso con dinero a BARATTA, en el edificio del "Grupo Techint", ubicado en la calle Della Paolera 299 de esta ciudad, bolso que luego fue entregado a Daniel MUÑOZ, en la calle Uruguay 1306 de esta ciudad; el día 1 de agosto de 2008, en el subsuelo del edificio mencionado, ZABALETA le entregó un paquete con dinero a BARATTA; el día 27 de agosto de 2008, ZABALETA le entregó un paquete con dinero a BARATTA, en el edificio del "Grupo Techint", paquete que luego fue

*Poder Judicial de la Nación*

Cn° 9.608/1

entregado a Daniel MUÑOZ en la calle Uruguay 1306 de esta ciudad. El día 30 de octubre de octubre de 2008, ZABALETA subió al vehículo conducido por CENTENO en la intersección de las calles Della Paolera y Leandro N. Alem y de este modo descendieron al segundo subsuelo del edificio del "Grupo Techint", allí, el nombrando el entregó un paquete con dinero. el cual fue finalmente dado a Daniel MUÑOZ, quien se encontraba en la calle Uruguay 1306 de esta ciudad. Los díaS 3 y 18 de diciembre de 2008, ZABALETA le entregó dinero a BARATTA, en el segundo subsuelo del edificio del "Grupo Techint" antes mencionado. En esas mismas fechas, dicho dinero fue entregado a Daniel MUÑOZ en la calle Uruguay 1306 de esta ciudad. Los pagos habrían sido realizados por orden del "Grupo Techint", empresa que también habría entregado el 30 de junio de 2008 un paquete con dinero a BARATTA, en el mismo lugar, que también fue entregado a Daniel MUÑOZ el mismo día. Y el 3 de octubre de 2008 una persona de parte del mismo grupo y en igual lugar identificada como "Ale" le entregó los dividendos del mes a BARATTA.----------------------------------------------

**M.- Aldo Benito Roggio** participó de la asociación ilícita ordenando las siguientes entregas de dinero, mediante personas no individualizadas, a nombre de la firma "Benito Roggio e hijos S.A.": El día 26 de junio de 2013 se le hizo entrega de un bolso con dinero a BARATTA y LAZARTE en el obrador ubicado en la intersección de la calle Bouchard y Tucumán de esta ciudad. Los días 5 de agosto y 4 de septiembre de 2013 le hicieron entregas dinero a LAZARTE en la Av. Alem 1050 de esta ciudad. En ambos casos, el dinero fue entregado posteriormente a Martín LARRABURU, quien conducía el vehículo MNI 589.----------------------------------------------------------

**N.- Sergio Tasselli y Alberto Tasselli** participaron de la asociación ilícita ordenando las siguientes entregas de dinero, las cuales se materializaron en el domicilio de la calle Wernicke 573 Boulogne, Provincia de Buenos Aires: El día 24 de julio de 2013 se le entregó dinero a LAZARTE; el día 23 de agosto de 2013, se le entregó a LAZARTE la suma de ciento setenta mil pesos ($170.000) y doscientos mil dólares (U$S 200.000) aproximadamente, todo lo cual luego fue entregado a Martín LARRABURU, quien utilizaba el vehículo dominio MNI 589, y éste se le dio a BARATTA; el día 5 de septiembre de 2013 se le entregó dinero a LAZARTE, el cual

USO OFICIAL

CAROLINA LORES ABNAIZ
SECRETARIA FEDERAL

fue entregado posteriormente a Martín LARRABURU; los días 12 y 17 de septiembre de 2013, se le entregó a LAZARTE ochocientos mil dólares (U$S 800.000) y doscientos ochenta mil dólares (U$S 280.000) respectivamente, en ambos casos luego el dinero fue entregado Martín LARRABURU, quien utilizaba el vehículo dominio MNI 589.------------------------------------------------------------------------------------------

**Ñ.- Juan Carlos Lascurain** participó de la asociación ilícita el 28 de octubre de 2008, cuando le hizo entrega a BARATTA de dinero, en un paquete, en las inmediaciones de Av. Coronel Díaz 2355 CABA, cuando se trasladaba en el vehículo dominio "HGP 575", a su nombre.------------------------------------------------------------------------------------

**O.- Manuel Santos Uribelarrea:** participó de la asociación ilícita: el 8 de junio de 2015, cuando le entregó en Cerrito 1266 CABA a LAZARTE doscientos cincuenta mil dólares (u$s 250.000); el 12 de agosto del mismo año, le entregó quinientos mil dólares (u$s 500.000), también a LAZARTE en Cerrito 1266 CABA y luego de ello; el 7 de septiembre de 2015 URIBELARREA abordó. en la puerta del Ministerio de Planificación Federal, Inversión Pública y Servicios ubicada en Av. Yrigoyen 250 de esta ciudad, el vehículo conducido por CENTENO y allí le hizo entrega a Nelson LAZARTE de un paquete con doscientos mil dólares (u$s 200.000), agregándole que "moviera un expediente por unos pagos de 300.000 U$S pedorros (trescientos mil dólares) para la compra de 'mantas y electrodos' para "solar caños". Lo cobrado por LAZARTE en las tres oportunidades luego fue entregado a BARATTA.------------------

**P.- Alejandro Pedro Ivanissevich** participó de la asociación ilícita el 29 de abril de 2009, cuando se subió, en Suipacha 782 de esta ciudad, al vehículo conducido por Centeno y allí le hizo entrega a BARATTA de un bolso con dinero. Más tarde, BARATTA le entregó lo recaudado a Daniel MUÑOZ en Uruguay 1306 de esta ciudad.--------------------------------------------------------------------------------------------

**Q.- Hugo Alberto Dragonetti** participó de la asociación ilícita ordenando que se realizaran entregas de dinero: el día 3 de febrero de 2010, DRAGONETTI y su hijo, le entregaron un bulto con ochocientos mil dólares (u$s 800.000) a BARATTA en la calle Suipacha 1111 de esta ciudad. Más tarde, lo recaudado fue entregado por Baratta a Daniel MUÑOZ en la Residencia Presidencial de Olivos, previo a lo cual él primero

*Poder Judicial de la Nación*

Cn° 9:608/18

de ellos tomó una comisión. El día 9 de junio de 2010, por orden de Hugo Alberto DRAGONETTI, una persona, quien aún no fue identificada, subió al vehículo conducido por Centeno, en las inmediaciones de la Avenida Santa Fe y Suipacha de esta ciudad, y allí le entregó un bolso con cuatrocientos cincuenta mil dólares (u$s 450.000) a BARATTA. Más tarde lo recaudado fue entregado por BARATTA y FAGYAS a Daniel MUÑOZ en la Uruguay 1306 de esta ciudad, previo tomaron parte de la comisión correspondiente a ellos, DE VIDO y Ezequiel GARCÍA. El día 23 de julio de 2013, Hugo Alberto DRAGONETTI le entregó dinero a LAZARTE y BARATTA en Suipacha 1111 de esta ciudad. El día 23 de junio de 2015, por orden de Hugo Alberto DRAGONETTI, una persona de nombre "Martín" y su custodia, subieron al vehículo conducido por CENTENO, en la intersección de la Av. Santa Fe y la calle Suipacha de esta ciudad, y allí le entregaron a LAZARTE un bolso con un millón de dólares (u$s 1.000.000) y una bolsa con quinientos mil dólares (u$s 500.000). Luego de ello, LAZARTE le entregó el bolso mencionado a Hernán DEL RÍO en el sótano del Ministerio de Planificación y el otro dinero se lo entregó a BARATTA en su oficina. El día 21 de julio de 2015, Hugo Alberto DRAGONETTI le entregó un bolso con setecientos cincuenta mil dólares (u$s 750.000) a LAZARTE en Suipacha 1111 de esta ciudad. Más tarde el último de los nombrados le entregó dicho dinero a BARATTA en la oficina de este último en el Ministerio de Planificación.------

**R.- Jorge Juan Mauricio Balán** participó de la asociación ilícita ordenando la entrega de dinero realizada por **Raimundo Eduardo Peduto**: el 3 de septiembre de 2013. Este último a bordo del vehículo Chevrolet dominio "LUY 230", le entregó a LAZARTE una valija con aproximadamente un millón quinientos mil dólares (u$s 1.500.000), en la intersección de las calles Esmeralda y Juncal de esta ciudad; asimismo, el 30 de julio de 2015, BALAN le entregó a LAZARTE quinientos mil dólares (u$s 500.000) en el hotel "Feir's Park". Los Pagos habrían sido realizados por orden de la empresa "Industrias Juan F. Secco S.A.".-------------------------------------------------------------------

**S.- Raúl Héctor Vertua** participó de la asociación ilícita el 9 de septiembre de 2010 al entregarle a BARATTA un bolso con la suma de ochocientos cincuenta mil dólares (u$s 850.000), en las inmediaciones de la calle Quintana al 600 de esta ciudad. Más

USO OFICIAL

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

tarde BARATTA le entregó dicho bolso a Daniel MUÑOZ en Uruguay 1306 de esta ciudad, previo a lo cual, tomó parte de lo recaudado.------------------------------------------

**T.- Eduardo Hugo Antranik Eurnekian** participó de la asociación ilícita ordenando que se realizaran entregas de dinero por el grupo "Corporación América": el 29 de julio de 2013 se le entregó un bolso con dinero a LAZARTE en Bonpland 1745 CABA. El 8 y 29 de agosto de 2013 en Av. Libertador 4444, piso n° 41 Hugo Britos les hizo entrega de un bolso con dinero a BARATTA y LAZARTE; el 17 de septiembre de 2013 en Av. Libertador 444, piso n° 41 Hugo Britos les hizo entrega de un bolso con setecientos cincuenta mil dólares (U$S 750.000) a BARATTA y LAZARTE.------------------------------------------------------------------------------------------

**U- Raúl Alejandro Ibarra, Santiago Nicolás Moresco y Miguel Ángel Marconi** participaron de la asociación ilícita ordenando las siguientes entregas de dinero a nombre de la firma "Supercemento S.A.I.C.": Los días 7 de septiembre y 1° de octubre de 2015, se le entregó a Lazarte la suma de un millón doscientos mil dólares (u$s 1.200.000), en cada oportunidad. Ello sucedió en el domicilio de la calle Tres de Febrero 2750 de esta ciudad. Dicho dinero fue entregado por Lazarte a Baratta, en el primer caso en el Ministerio de Planificación. El día 22 de octubre de 2015, se le entregó a Lazarte la suma de ochocientos mil dólares (u$s 800.000). Para ello, Lazarte concurrió al domicilio antes mencionado, a bordo del vehículo conducido por Centeno, y confirmó una reunión con "Supercemento", lo que les habilitó el ingreso al domicilio.------------------------------------------------------------------------------------------

**V.- Otras percepciones de dinero: a)**- Por otro lado, LLORENS le hizo entrega de dinero a BARATTA en Ugarteche 3260 CABA el 3 de septiembre de 2009; participó de una reunión en la que le habrían dado dinero a BARATTA el 18 de septiembre de 2008 en el hotel Hilton. Además el 19 de noviembre de 2009 hicieron una división de dinero entre LLORENS, GARCÍA RAMÓN, FAGYAS, GÓMEZ Y BARATTA.------
**b)**- Además de las detalladas, Fabián Ezequiel GARCÍA RAMÓN recibió dinero el 15 y 16 de septiembre de 2008, 10 de febrero de 2009, 14 de mayo de 2009, 15 de mayo de 2009, 11 de junio de 2009, 8 de octubre de 2009 -junto con GÓMEZ-; y el 21 de octubre de 2008, 29 de mayo de 2009, 10 de diciembre de 2009 le entregó dividendos

*Poder Judicial de la Nación*

*Cn° 9.608/18*

a BARATTA.------------------------------------------------------------

c)- Por su parte Rudy Fernando ULLOA IGOR le hizo entrega a BARATTA de dividendos en Viamonte 367 10° CABA, 14 de octubre de 2008, 16 de diciembre de 2008 y el 9 de febrero de 2009.- --------------------------------------------------------------

d)- Además, Walter FAGYAS le entregó a BARATTA dinero el 3 de junio de 2009 y el 20 de diciembre de 2010 en su domicilio, sito en Malabia 2174 CABA.- --------------

e)- El 19 y 25 de julio de 2013, LAZARTE recibe dinero de Jorge Omar MAYORAL en la Secretaría de Minería.-----------------------------------------------------------

f)- El 9 de junio de 2015, Germán Ariel NIVELLO le entregó a BARATTA un millón doscientos cincuenta mil dólares (u$s 1.250.000) en el Ministerio; el 29 de junio de 2015 NIVELLO le entregó a LAZARTE, en el edificio de la Secretaría de Vivienda, setecientos mil dólares (u$s 700.000); el 1 de julio de 2015, Germán Ariel NIVELLO le entregó un millón de dólares (U$S 1.000.000) a LAZARTE, quien luego se los dio a Hernán DEL RÍO, Secretario de José María OLAZAGASTI, en el subsuelo del Ministerio de Planificación. Dicho dinero habría sido entregado por orden de José Francisco LÓPEZ.-----------------------------------------------------------------

g)- El 11 de octubre de 2015, Nelson LAZARTE retiró un millón de dólares (U$S 1.000.000) en el Hotel Panamericano.------------------------------------------------------

VI.- **Otros hechos de la asociación ilícita: a-** Los funcionarios públicos que integraban la organización, además de utilizar la sola mención de sus cargos para obtener la entrega indebida de dinero, utilizaron diferentes maniobras ilícitas para lograrlo. Entre ellas corresponde destacar los sucesos ocurridos con el "Grupo Techint" en relación a su empresa "Siderúrgica de Orinoco" –SIDOR- que se encontraba en la República Bolivariana de Venezuela. Así durante el año 2005 el Director Corporativo del Grupo mencionado, Luis María Cayetano BETNAZA, se reunió en Mar del Plata, Provincia de Buenos Aires, durante la Cumbre Iberoamericana con el Presidente de Venezuela Hugo Rafael CHÁVEZ FRÍAS, Néstor Carlos KIRCHNER y Cristina Elisabet FERNÁNDEZ, para que SIDOR no sea nacionalizada. En dicha reunión el Presidente CHÁVEZ FRÍAS indicó que la firma no iba a ser nacionalizada porque estaban contentos con su desempeño. A comienzos del

USO OFICIAL

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

año 2008 BETNAZA se reunió con Rafael RAMÍREZ, presidente de 'PDVSA' y del Ministerio de Energía de Venezuela, quien le indicó que no estaban contentos con el desempeño de SIDOR y que pensaban nacionalizarla. Fue así que al poco tiempo salió por decreto presidencial su nacionalización y entre abril y julio de 2008 se indicó que debían entregar la sociedad. Ante ello los directivos de la firma acudieron, al Gobierno Argentino a pedir que intercediera para lograr el cobro de la empresa, pues valía mucho. Allí fue que fueron oídos por Claudio UBERTI (ex titular del Órgano de Control de Concesiones Viales), Julio Miguel DE VIDO, José María OLAZAGASTI y Roberto BARATTA. En ese contexto, los funcionarios del Gobierno Argentino, entre los cuales tuvo una participación preponderante DE VIDO, comenzaron a pedirle a los directivos de la empresa dinero para poder gestionar con el Gobierno de Venezuela, siendo Héctor ZABALETA el encargado de acordar con Roberto BARATTA el modo de realizar los pagos y la cantidad de los mismos. A Venezuela viajaban entre otros funcionarios OLAZAGASTI, Néstor Carlos KIRCHNER y Cristina Elisabet FERNÁNDEZ para tratar el tema de la empresa SIDOR. Siendo OLAZAGASTI el que participó de las reuniones entre los directivos de la firma con los funcionarios venezolanos en las que se negociaba el pago de la firma y las acciones legales vinculadas. La función de OLAZAGASTI era informar al gobierno lo que ocurría. En dichas tratativas Cristina Elisabet FERNÁNDEZ indicó que quién se iba a encargar de hacer los pagos de Venezuela era el Ministro de Finanzas Alí Rodríguez. En un acto en la planta de SIDOR y luego de diferentes reuniones con funcionarios del gobierno Argentino y Venezolano, Claudio UBERTI le señaló a BETNAZA que KIRCHNER estaba enojadísimo con Techint pues no colaboraban económicamente con él. Ante ello BETNAZA le señaló a UBERTI que ellos no iban a colaborar lo que desembocó que UBERTI le dijera algo a KIRCHNER al oído y se fueran del lugar en helicóptero sin saludar a nadie. Ello lo tomó el gobierno de CHAVEZ como una falta de apoyo por parte del Gobierno Argentino a la empresa por lo que comenzaron a realizar diferentes planteos legales contra la firma, y todos con consecuencias penales. Además eso se sumaba a que el Gobierno de Venezuela amenazaba con no dejar salir del país a todos los directivos de SIDOR.--------------------------------------------------------------------------

*Poder Judicial de la Nación*

**b-** Las personas que estaban a cargo de las firmas "Esuco S.A." - Carlos Guillermo Enrique WAGNER-, "Perales Aguiar S.A.", "Vial Agro S.A.", "Biancalani S.A.", "Luis Losi S.A." –Luís Losi-, "Fontana Nicastro S.A.", "Marcalba S.A.", "Iecsa S.A." - Ángel Jorge Antonio Calcaterra -, "José J. Chediack S.A.I.C.A."- Juan CHEDIACK - ,"Equimac S.A.C.I.F.E.I."-Marcela Edith Sztenberg-, "Coarco S.A." -Patricio Gerbi-, "José Cartellone Construcciones Civiles S.A.", "Vialco S.A." y "Grupo Eling S.A." - Jorge Guillermo Neira, Gerardo Luís Ferreyra y Osvaldo Antenor Acosta-, entre otras, participaron en las maniobras mediante las cuales las empresas fueron beneficiadas de modo espurio con contratos para realizar obra pública aproximadamente entre los años 2003 y 2015. Los responsables de dichas empresas acordaban a cúal le correspondía cada obra y debían entregar aproximadamente entre el 10 y el 20 porciento del valor de la contratación a funcionarios del Ministerio de Planificación Federal de la Nación, entre los que se encontraban Ernesto CLARENS, Nelson LAZARTE, Roberto BARATTA y a José LÓPEZ, quienes luego se lo daban a Julio Miguel DE VIDO, Néstor Carlos KIRCHNER y Cristina Elisabet FERNÁNDEZ.------------------------------

**c-** Entre 2003 y 2007, Claudio UBERTI, como titular del OCCOVI, se encargó de solicitar dinero a distintas empresas que participaron de las concesiones de los "corredores viales". Esta directiva fue encomendada por Julio Miguel DE VIDO por orden de Néstor Carlos KIRCHNER. Entre las empresas mencionadas se destacan "Coarco S.A." -Patricio Gerbi- . "Equimac S.A.C.I.F.E.I."-Marcela Edith Sztenberg-, "Grupo TECHINT" - Luis Maria Cayetano Betnaza -, "Vialco S.A." –Luís Mezza-, "DECAVIAL SA" – Miguel Marcelino Aznar- entre otras. En el caso del "Grupo TECHINT", UBERTI fue el encargado de solicitarle dinero a BETNAZA para prorrogarle a la firma la concesión de "Caminos del Oeste". El dinero recibido era entregado a Julio Miguel DE VIDO, Néstor Carlos KIRCHNER y Cristina Elisabet FERNÁNDEZ.------------------------------------------------------------------------

**d-** El dinero ilegal también se destinó para solventar actividades de naturaleza electoral, o vinculadas a la gestión política del gobierno y de sus organizaciones satélites como "La Campora". En las elecciones de los años 2011, 2013 y 2015, Juan Carlos Mazzon, José María Ottavis Arias, Eduardo de Pedro, Andrés Larroque, Julián

USO OFICIAL

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

Álvarez, Máximo Carlos Kirchner y Sergio Szpolski habrían recibido dinero que provenía del sistema descripto. En las elecciones del año 2013 parte de dicho dinero se lo habría entregado Hugo Martín Larraburu y Juan Manuel Abal Medina a Juan Carlos Mazzon -Coordinador General de Asuntos Políticos Institucionales de la Unidad Presidencia-, y José López le habría entregado dinero a diferentes agrupaciones, dándole a Ricardo Ivoskus cinco millones de pesos ($ 5.000.000) dinero que le fue solicitado en una reunión en la casa de Enrique García para organizar el apoyo en la campaña. En las elecciones del año 2015 se le dio financiamiento a Eduardo de Pedro, de "La Campora", que tenía buena relación con la agrupación "Justicia Legítima".-----

**VII.- Otros hechos: a) Nestor Otero:** se le imputa el haber tenido, el día 21 de agosto de 2018, en momentos en que personal de la División Operaciones Federales de la Policia Federal Argentina llevaba adelante el allanamiento de su domicilio sito en la calle Bahía Blanca 420/426, de la localidad de Avellaneda, de la Provincia de Buenos Aires, la siguientes armas: (i) revólver de simple y doble acción, calibre .22 Largo Rifle, marca Doberman, numeración serial 05761C y (ii) pistolón, tiro a tiro, de dos caños superpuestos, calibre 32 gauge (14mm), marca Rexio, modelo Super, numeración serial 138752; los cuales resultaron aptos para producir disparo pero de funcionamiento anormal, sin la debida autorización legal para ello. **b)** Asimismo, se le imputa a **Walter Rodolfo Fagyas,** el haber tenido, el día 1 de agosto del año 2018, en momentos en que personal de la División Operaciones Federales de la Policía Federal Argentina llevaba adelante el allanamiento de su domicilio, sito en la calle 3 de febrero 1194, piso 5°, depto. "D", de esta ciudad, el revólver calibre .22, marca Taurus, serie número LD 54.553, que resultó apto para el disparo, sin la debida autorización legal para ello.----------------------------------------------------------------------------------------------

Acto seguido se pone en conocimiento de la compareciente que las pruebas obrantes en autos son: 1) Declaración testimonial de Diego CABOT de fs. 2/6vta.; 2) Certificaciones actuariales de fs. 7vta/9vta, 11/13, 15vta/17, 2374, 2375, 2380, 2576, 2716, 2994, 3004/3006, 4207, 4407/440, 4799/4801, 5188/89, 5246, 5388, 5655, 5874/5894, 6734/6735, 6828, 6952, 7100, 7125, 7356, 7416 bis, 7424/26, 7815, 8067/8070, 8357/8358, 8595/8651, 8655/8702, 8713/8746, 8753, 8901, 8987/8991,

*Poder Judicial de la Nación*

Cn° 9.608/18

9078, 9080, 9601, 10421/32, 10796, 11006, 11061, 11063, 11065, 11152/53 y 11352/55; 3) Impresiones de notas periodísticas de fs. 18/39; 4) Actuaciones de la División Operaciones Federales de la Policía Federal Argentina de fs. 49/1756, 1803/2085, 2218/2225, 2233/2240, 2396, 2476/2513, 2554/2575, 2690/2710, 2726/2791, 2806/2831, 2857/2897, 2955/2993, 4168/4176, 4227/4399, 4535/4595 y 4655/4798; 5767/5769; 5786/5793, 6376/6574, 6611/6733, 6960/7079, 7263/7355, 8040/8052, 8086/8185, 8320/56. 8402/8412, 8414/8418, 8546/8556, 8983, 9498/9509, 9569/9600, 9654/61, 9713/49, 10529, 10533, 10730/45, 10929/82, 11156, 11340 y 11393/99; 5) Notas de la firma "Telecom Argentina S.A." de fs. 1782/1783, 2100/2101, 2216/2217, 2798/2800, y 5667 y 5677; 6) Nota de la firma "NSS S.A. (IPLAN)" de fs. 1785; 7) Notas de la firma "Nextel Communications Argentina S.R.L." de fs. 1787, 2600 y 2721; 8) Notas de la firma "Claro" de fs. 1789/1790vta, 2205/2206vta, 2801/2802 y 2804; 9) Notas de la firma "Telefónica Argentina S.A." de fs. 1791, 1793, 2098/vta, 2598. 2711/2714, 2722, 2835, 2838/2844, 2852/2855vta y 5100; 10) Notas de la firma "Telecentro S.A." de fs. 1795 y 8774; 11) Nota de la firma "Telecom Personal S.A." de fs. 1796/1799vta; 12) Oficio de la Dirección de Bienestar del Ejército Argentino de fs. 1801; 13) Nota de la firma "NH Collection Buenos Aires Centro Histórico" de fs. 2092; 14) Nota del Registro de la Propiedad Automotor de fs. 2095/2097 y 6035/6037; 15) Copias de la causa N° 14.305/15 del registro de este Juzgado de fs. 2104/2105; 16) Informes de Estados de Dominio Históricos aportados por el Departamento de Asuntos Normativos y Judiciales de la Dirección Nacional de los Registros Nacionales de la Propiedad Automotor y de Créditos Prendarios de fs. 2113/2191; 17) Constancia de correo electrónico del Registro Seccional N° 2 (San Pedro) del Registro de la Propiedad Automotor de fs. 2194; 18) Nota del Registro Seccional N° 25 del Registro de la Propiedad Automotor de fs. 2195; 19) Nota del Registro Seccional N° 76 del Registro de la Propiedad Automotor de fs. 2196; 20) Nota del Registro Seccional N° 3 (Lomas de Zamora) del Registro de la Propiedad Automotor de fs. 2197; 21) Actuaciones de la Dirección de Asistencia Judicial en Delitos Complejos y Crimen Organizados del Poder Judicial de la Nación de fs. 2198, 2547/2547vta, 2597, 2724/2725vta, 4440/4445, 4610/11,

USO OFICIAL

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

4967/70, 5156/58, 5194/95, 5247/5250; 5252/5264, 6238, 7171/24, 7362/68, 7377/79, 7720/7721, 9609/10, 9665, 10623/24 y 10928; 22) Nota del Registro Seccional N° 70 del Registro de la Propiedad Automotor de fs. 2199; 23) Nota del Registro Seccional N° 2 (Avellaneda) del Registro de la Propiedad Automotor de fs. 2200; 24) Nota del Registro Seccional N° 45 del Registro de la Propiedad Automotor de fs. 2201; 25) Nota del Registro Seccional N° 26 del Registro de la Propiedad Automotor de fs. 2204; 26) Nota del Registro Seccional N° 16 (La Plata) del Registro de la Propiedad Automotor de fs. 2207; 27) Nota del Registro Seccional N° 43 del Registro de la Propiedad Automotor de fs. 2208/2210 y 2213; 28) Constancia de correo electrónico de fs. 2211; 29) Nota del Registro Seccional N° 11 del Registro de la Propiedad Automotor de fs. 2211; 30) Nota del Registro Seccional N° 1 (Florencio Varela) del Registro de la Propiedad Automotor de fs. 2214; 31) Nota del Registro Seccional N° 1 (Quilmes) del Registro de la Propiedad Automotor de fs. 2215; 32) Hoja de registro dominio GKF-405 de fs. 2231; 33) Nota del Registro Seccional N° 5 (Tigre) del Registro de la Propiedad Automotor de fs. 2241; 34) Nota del Registro Seccional N° 3 (San Martín) del Registro de la Propiedad Automotor de fs. 2242; 35) Nota del Registro Seccional N° 6 (La Matanza) del Registro de la Propiedad Automotor de fs. 2244; 36) Nota del Registro Seccional N° 1 (Esteban Echeverría) del Registro de la Propiedad Automotor de fs. 2245; 37) Nota del Registro Seccional N° 1 (Mercedes) del Registro de la Propiedad Automotor de fs. 2246; 38) Nota del Registro Seccional N° 2 (San Pedro) del Registro de la Propiedad Automotor de fs. 2247; 39) Nota del Registro Seccional N° 4 del Registro de la Propiedad Automotor de fs. 2251; 40) Copias de los registros de ingresos a la Residencia Presidencial de Olivos extraídos de la causa N° 1.614/2016 del registro del Juzgado Nacional en lo Criminal y Correccional Federal N° 7, Secretaría N° 13 de fs. 2252/2373; 41) Nota del Registro Seccional San Vicente del Registro de la Propiedad Automotor de fs. 2376; 42) Nota del Registro Seccional N° 8 (Olivos) del Registro de la Propiedad Automotor de fs. 2377; 43) Nota del Registro Seccional N° 13 (La Plata) del Registro de la Propiedad Automotor de fs. 2391; 44) Nota del Registro Seccional N° 3 (San Miguel) del Registro de la Propiedad Automotor de fs. 2392; 45) Actuaciones remitidas por la

*Poder Judicial de la Nación*

Cn° 9.608/18

Dirección de Administración de Recursos Humanos de la Secretaría General de la Presidencia de la Nación de fs. 2397/2474 -entre los que se encuentran los legajos de los agentes: Héctor Daniel MUÑOZ, Martín Federico AGUIRRES y Juan Francisco ALARCÓN-; 46) Nota del Registro Seccional Santo Tomé del Registro de la Propiedad Automotor de fs. 2475; 47) Nota del Registro Seccional N° 2 (San Nicolás) del Registro de la Propiedad Automotor de fs. 2514; 48) Nota de la firma "Ford Argentina S.C.A." de fs. 2515/2518vta y 2580/2594; 49) Nota de la firma "BM Centro S.A." de fs. 2519/2537vta; 50) Nota de la firma "Volkswagen Argentina S.A." de fs. 2538/2544vta; 51) Actuaciones de la Inspección General de Justicia de fs. 2551/2552 y 7438/39; 52) Nota del Registro Seccional de Cruz del Eje Córdoba del Registro de la Propiedad Automotor de fs. 2578; 53) Nota del Registro Seccional N°6 (San Isidro) del Registro de la Propiedad Automotor de fs. 2579; 54) Informes de NOSIS de fs. 2595/2596, 2846/2848, 3026/3032, 3053/3055, 4402/4404, 5388/5391, 6809/6811, 8996/9014, 10447/54; 55) Nota de la firma "General Motors de Argentina S.R.L." de fs. 2601/2623; 56) Registros de la Dirección Nacional de Migraciones de fs. 2624/2671vta. y 5798/5807; 57) Informes de VERAZ de fs. 2672/2684, 2845, 3052, 5392, 6812, 10446, 10455/60; 58) Nota de la firma "Arbitra S.A." de fs. 2682/2685; 59) Actuaciones de la Subsecretaría Legal y Administrativa de la Secretaría General de la Presidencia de la Nación de fs. 2832/vta y 2834; 60) Nota de la Administración General de Servicios Generales de la Secretaría General de la Presidencia de la Nación de fs. 2833; 61) Nota de la Dirección de Operaciones y Servicios Generales de la Jefatura de Gabinete de Ministros de fs. 2836/2837vta; 62) Informes actuariales de fs. 2898, 3017, 4400, 9015 y 9048; 63) Informe del Ministerio de la Jefatura de Gabinete de Ministros 2945/2946; 64) Informes del Ministerio de Energía y Minería 2948/2950, 4132/4134, 5101/5102, 5952 y 7232/33; 65) Declaración testimonial de Hilda María HOROVITZ fs. 2951/2953 y comparecencia de fs. 2997; 66) Declaración testimonial de Diego Hernán CABOT a fs. 2999/3003; 67) Declaración testimonial de Candela INI a fs. 3009/3010; 68) Declaración testimonial de Jorge José BACIGALUPO a fs. 3011/3012 y comparecencia a fs. 3025; 69) Informes del Registro Nacional de Armas - RENAR-de fs. 3024, 3051; 4153, 6324, 7369, 7417, 7611, 8362/8363 y 11329; 70)

*I* ꓥꓥꓥꓥꓥꓥꓥ. LORES ARNÁIZ
SECRETARIA FEDERAL

Informe de la División Balística de la Policía Federal Argentina de fs. 3150/3151; 71) Informes de la Unidad de Información Financiera –UIF- de fs. 3152; 5405, 6321, 6873 y 9482/83; 72) Recortes periodísticos aportados por David JABIF a fs. 3560/3181; 73) Actuaciones de la División Operaciones Federales de la Policía Federal Argentina, en relación al allanamiento de la finca sita en calle tres de febrero 1194, piso 5to. Departamento "D", de fs. 3191/3220; 74) Actuaciones de la División Operaciones Federales en relación a los allanamientos llevados a cabo el día 1° de agosto de 2018, de fs. 3336/4131; 75) Declaración testimonial de Damián Ignacio JEREZ a fs. 4166/4167; 76) Informes de la firma "Techint Compañía Técnica Internacional" de fs. 4188/4196 y 4959/61; 77) Informe de la Jefatura de Gabinetes de Ministros a fs. 4211/4215; 78) Consultas de dominio del D.N.R.P.A. de fs. 4401 y 7715/7719; 79) Actuaciones de la División Apoyo Tecnológico Judicial de la Policía Federal Argentina de fs. 4597/4599, 4915, 5111/5123, 5242/5245, 6189/6204, 6736/6762, 6892/6925, 7152, 7614/7625, 8576/8585, 8779/8799, 8903/8917, 8946/8953, 8982, 9468/74, 10317/10418, 10536/77, 10671/10729 y 11427/54; 80) Actuaciones del Banco de la Ciudad de Buenos Aires de fs. 4626/31, 5327/5339, 7673/7714, 10531/32 y 11459/60; 81) Actuaciones de la División Operaciones Federales de la Policía Federal Argentina, en relación a los allanamientos realizados el día 6 de agosto de 2018, de fs. 4802/77; 82) Actuaciones de la Dirección de Asuntos Contencioso de la Jefatura de Gabinete de Ministros de fs. 4921/26; 83) Informes del "Banco Francés" de fs. 4974 y 5238; 84) Declaración testimonial de Gabriel Adrián MARINO de fs. 5008; 85) Declaración testimonial de Jorge Leonardo FARIÑA de fs. 5077/96; 86) Informe del Banco Santander Río de fs. 5104; 87) Actuaciones del Senado de la Nación de fs. 5146/47 y 6936/37; 88) Declaración testimonial de Ariel Cesar Silvio SOLAR GRILLO de fs. 5170/5174; 89) Declaración testimonial de María Soledad ACCETTA de fs. 5182; 90) Declaración testimonial de Juan Carlos ECHEVERRÍA de fs. 5183; 91) Actuaciones de la firma "Ford Argentina S.A." de fs. 5197/5209; 92) Nota de Alejandro PICASSO ACHÁVAL de fs. 5236; 93) Informe de la firma "Mastercard" de fs. 5340; 94) Declaración testimonial de Ramón SPIRITO de fs. 5406/5418; 95) Actuaciones remitidas por la Dirección General Técnica Jurídica del Registro Nacional

*Poder Judicial de la Nación*

Cn° 9.608/18

de las Personas de fs. 5452/5454; 96) Informe de la firma "Prisma Medios de Pago S.A." de fs. 5472/5475; 97) Actuaciones de la Delegación Posadas de la Policía Federal Argentina de fs. 5476/5497; 98) Actuaciones del Banco de la Nación Argentina de fs. 5498/5500 y 7385/93; 99) Informes de la Secretaria General de Presidencia de la Nación de fs. 5504/5506, 7665/7672, 8227/8228 y 8440/8456; 100) Actuaciones relativas a los allanamientos realizados el día 10 de agosto de 2018 de fs. 5508/5626; 101) Declaración testimonial de Ignacio LAPLACETE de fs. 5657/5661; 102) Notas periodísticas de fs 5671/5678, 5684 y 7114/7117; 103) Actuaciones relativas al allanamiento de la calle Uruguay 1306 1° "3" y 4° "6" y certificación actuarial de fs. 5692/5750; 104) Actuaciones de la firma "Perfil" de fs. 5764; 105) Declaraciones testimoniales de Sergio Oscar VELÁSQUEZ de fs. 5782/5785 y 6801/6803; 106) Declaración testimonial de Julio César SILVA de fs. 5810/5811; 107) Escrito de fs. 5912; 108) Informes de la Entidad Binacional Yacyretá de fs. 5934/5947 y 9620/23; 109) Escrito con documentación aportada a fs. 5954/5964; 110) Oficio del Juzgado Federal n °1 del fuero de fs. 6010/6011; 111) Actuaciones remitidas por la Excma. Cámara Nacional Electoral de fs. 6012/6015; 6251/6269, 6366/6372, 6846/6872, 6957 y 7608; 112) Informes de la firma "Telefónica de Argentina" de fs. 6096/6097 y 6105/6146; 113) Informe de la firma "Claro" de fs. 6098; 114) Actuaciones de la División Análisis y Prospectiva del Narcotráfico de fs. 6100/6104, 8771 y 10246; 115) Informes de las empresas Veraz y Nosis y de la Dirección Nacional de Migraciones de fs. 6147/6171; 116) Actuaciones de la Oficina Anticorrupción de fs. 6206/6236, 7494/7546, 7584/7592, 8188/8189 y 8367/8369; 117) Informe de la firma "First Data" de fs. 6287/6288; 118) Actuaciones del Registro de la Propiedad Inmueble de la C.A.B.A. de fs. 6328/6354; 119) Certificaciones del Juzgado Federal N° 5 de fs. 6357/6358; 120) Actuaciones de la Dirección Nacional de Migraciones de fs. 6603/6609, 7551/55, 8838 y 10620/21; 121) Informe del Banco Columbia de fs. 6765/66; 122) informe de la firma "Iberia" de fs. 6767; 123) Escrito con documentación aportada de fs. 6814/6827; 124) Actuaciones relativas al allanamiento de la Unidad Funcional N° 7, piso 5°, del edificio sito en la calle Uruguay 1306 de esta ciudad, de fs. 7080/7099; 125) Actuaciones del Registro de

USO OFICIAL

ROLINA LORES ARAIZ
SECRETARIA FEDERAL

Estado Civil y Capacidad de las Personas de fs. 7102/7104; 126) Certificación y copias agregadas de fs. 7155/78; 127) Informe del Banco Hipotecario de fs. 7183/84; 128) Informe del Banco "ICBC" de fs. 7185; 129) Constancias actuariales de fs. 7244, 7518, 7722/7723, 8457, 8460, 8755/8756 y 11324; 130) Informes de la División Balística de la Policía Federal Argentina de fs. 7370/73 y 7410/16;131) Informes de la Prefectura Naval Argentina de fs. 7399/7404 y 7662/7664; 132) Informes de la División Scopometría de la Policía Federal Argentina de fs. 7418/19 y 7566; 133) Informe de "Aeropuertos Argentina 2000 S.A." de fs. 7432/33; 134) Informes de la Fuerza Aérea Argentina de fs. 7434/36, 7561/65 y 8807/8808; 135) Declaración testimonial de Gustavo Javier CABADA de fs. 7442; 136) Declaración testimonial de Santiago Jorge NASRA de fs. 7549; 137) Acuaciones relativas al allanamiento efectuado en el Barrio "El Barranco" de fs. 7569/7578; 138) Actuaciones del Juzgado Federal N° 7 de fs. 7579; 139) Actuaciones del Juzgado Criminal y Correccional de Posadas de fs. 7610; 140) Actuaciones relativas a los allanamientos de la calle Mascarello 4441, Rio Gallegos, Provincia de Santa Cruz y Padre De Agostini y Los Tehuelches, Calafate, Provincia de Santa Cruz y certificación de fs. 7816/7970; 141) Actuaciones de la Policía de Seguridad Aeroportuaria de fs. 7971/8034; 142) Actuaciones del Juzgado Federal N° 1 de San Isidro de fs. 8071, 8207/8226 y 8463/8481; 143) Informes de ANAC de fs. 8397/8398; 144) Actuaciones relativas a la orden de presentación llevada a cabo en el "Hotel Panamericano" y certificación actuarial de fs. 8419/8429; 145) Informes del Ministerio de Seguridad de la Nación de fs. 8536/37 y 8559/61; 146) Declaración testimonial de Danilo Adolfo PENISSI de fs. 8564/65; 147) Copia certificada de la declaración testimonial de Néstor FARIAS BOUVIER de fs. 8570/71; 148) Declaración testimonial de Yolanda Ester FALCON de fs. 8648; 149) impresiones de fs. 8837 y 9365/9391; 150) Actuaciones de la Administración Federal de Ingresos Públicos de fs. 8853/8861 y 11330; 151) Declaración testimonial de Jorge Enrique TESOLIN de fs. 8862; 152) Declaración testimonial de Pablo Esteban Ariel GRECO de fs. 8863/8869; 153) Declaración testimonial de Verónica IGLESIAS de fs. 8870; 154) Declaración testimonial de Carlos Alberto STAFFORINI de fs. 8871/8874; 155) Actuaciones de la Secretaria de

Poder Judicial de la Nación

Cooperación con los Poderes Constitucionales del Ministerio de Seguridad de fs. 8562/64 y 8898/8900; 156) Presentación efectuada por la Unidad de Información Financiera de fs. 8964/8978; 157) Actuaciones labradas por la Gendarmería Nacional Argentina de fs. 9022/47 y 11158; 158) Declaración de Juan Carlos GUERRERO de fs. 9392; 159) Presentaciones de Mariana de Jesús ZUVIC de fs. 9393/9404 y 10903/24; 160) Declaraciones de Mariana de Jesús ZUVIC y documentación acompañada de fs. 9405/65 y 10867/78; 161) Actuaciones de la Delegación Ushuaia de la Policía Federal Argentina de fs. 9553/59; 162) Actuaciones del Ministerio de Hacienda de la Nación de fs. 9612 y 10653; 163) Actuaciones de la División Mitre de la Policía Federal Argentina de fs. 10241/44; 164) Actuaciones del Banco Central de fs. 10530; 165) Declaración testimonial de Cirilo Miguel COLMAN de fs. 10861/62; 166) Declaración testimonial de Anibal GLOODTDOFSKY FERNÁNDEZ de fs. 10864/66; 167) Declaración Testimonial de Carlos Fabián Alfredo VIZCAINO de fs. 10879/80; 168) Actuaciones de la Delegación Rio Gallegos de la Policía Federal Argentina de fs. 11007/60; 169) Actuaciones de la División Antidrogas Córdoba de la Policía Federal Argentina de fs. 11165/77 y 11183/11323; 170) Declaración testimonial de María Marta CRISCUOLO de fs. 11346/48; 171) Declaración testimonial de María Eugenia Matilde LANZA de fs. 11349/50; 172) Presentación de María Lucila LEHMANN de fs. 11400/21; 173) Declaración testimonial de Pedro Alfredo PUYO de fs. 11457/58; y 174) la totalidad de elementos y legajos reservados en el marco de la presente causa.------------------------------------------------------------------

Finalmente, se pone en conocimiento del compareciente las previsiones del artículo 41ter del Código Penal de la Nación y de la Ley 27.304.------------------------------------

En este estado se le recuerda a la compareciente que tiene derecho a negarse a declarar, sin que su silencio implique presunción de culpabilidad alguna en su contra, y que cuenta con la posibilidad de mantener una entrevista con su abogado, frente a lo cual manifiestó que: "Voy a declarar. Con referencia a esta imputación yo no estuve involucrado en los pagos a los cuales se me ha hecho referencia, ni lo autorizé ni estuve en conocimiento de los mismos hasta que surgieron en la prensa en las últimas semanas. Para poner en contexto mi rol en la empresa y la estructura del grupo

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

Techint, quiero decir la siguiente aclaración: el grupo Techint consiste en las sociedades controlada por la Holding San Faustin, incorporada en Luxemburgo. Esta última controla seis sociedades operativas y las sociedades centrales que reciben los dividendos de las sociedades operativas y lo retienen para futuros dividendos a los accionistas o para futuras inversiones. Mi rol principal es el de Presidente y Director Ejecutivo de una de estas sociedades, la sociedad Tenaris. El segundo rol, es el rol de presidente de la sociedad Ternium, igualmente incorporada en Luxemburgo. El tercer rol que yo cubro es el rol de vicepresidente de la sociedad San Faustin, y miembro del comité ejecutivo de esta última. Tenaris, que absorbe la mayor parte de mi tiempo, es una sociedad que ocupa 22 mil personas con actividades industriales en más de veinte países, desde Japón hasta Colombia, desde Italia hasta Argentina. Ternium es una sociedad que también ocupa 20 mil personas en America Latina, México, Brasil, Colombia y en Argentina. Tenaris es líder mundial en la producción de tubos con costura y sin costura para la industria del petróleo Ternium es líder en America latina en la producción de acero planos y largos. Ambas sociedades estan cotizadas, entre otras, en la bolsa de Nueva York. Las otras sociedades operativas del grupo Techint, son la sociedad Tecpetrol, activa en la producción transporte, de oil, gas producción de energía. Es una sociedad poseída al 100% por el Holding San Faustin. Quiero aclarar que Ternium y Tenaris son poseidas en un 60 % por el Holding San Faustin. La cuarta sociedad operativa controlada por el 100% por el Holding es Techint Ingeniería y Construcciones. Opera en todo el mundo en la construcción y realización de proyectos. La quinta sociedad operativa controlada al 100% por el Holding es la sociedad Tenova, que produce maquinaria, equipamiento para la industria del acero y la minería. Esta basada en Alemania y en Italia La sexta es el Instituto Clínico Humanitas que incluye seis hospitales y una universidad basada en Milano. El Grupo tambien tiene sociedades centrales que reciben dividendos y lo retienen para futura retribución o inversiones. En su conjunto el consolidado de la Holding San Faustin, emplea alrededor de 80 mil personas en 57 países e incluye más de 400 sociedades distintas. En mi rol de presidente y director ejecutivo de Tenaris y presidente de Ternium, yo tengo necesariamente una agenda que me hace viajar en todos los paises

*Poder Judicial de la Nación*

del mundo. Estuve, por ejemplo en el año 2007 en Argentina 143 días, en el año 2008 alrededor de 163 días. Menciono la estructura del grupo y mi rol para indicar que para poder conducir esta actividad se requiere un elevado nivel de autonomía y delegación en todos los funcionarios que llevan adelante las actividades del grupo. Quiero agregar también que en calidad del miembro del Comité Ejecutivo residente en la Argentina, yo soy un referente para la sociedad Tecpetrol y Techint, en la cual no poseo ningún cargo formal pero en la cual discuto las orientaciones estratégicas. A raíz de mi carga de trabajo y de mi agenda de viaje, el ambito de autonomía y delegación en todo el grupo ha sido siempre muy amplio. Por esta razón yo no autoricé ni estuve informado de los pagos de los que se me hace referencia sino que me enteré por los diarios por las noticias de las últimas semanas. En lo que se refiere a SIDOR, la inversión del grupo tuvo lugar en el año 1998 en el proceso de privatización lanzado por el gobierno venezolano, que puso a la venta el 70% de la sociedad. La sociedad que hoy es Ternium ingreso al proyecto con grupos brasileros, mexicanos y venezolanos y ganó la licitación. Después de haber atravesado años difíciles en el curso de los cuales fue necesario hacer aumento de capital en la sociedad, en los cuales la participación de Ternium llegó al 60% de la sociedad, empezaron los conflictos con el gobierno venezolano. El presidente Chavez, fue radicalizando su gobierno por aquellos años y se crearon conflictos en el abastecimiento del mineral, abastecimiento de la energía electrica y la disponibilidad del puerto de la misma empresa. En este contexto tuvo lugar la reuniopn en Mar del Plata, en la cual participo el presidente Kirchner, Chavez, Cristina, yo mismo y Luis Betnaza. La reunión ayudó a distender temporaneamente la tensión pero al cabo de dos años surgieron nuevas conflictos y en particular un conflicto gremial que empezó en noviembre de 2007. Este conflicto se extendió por varios meses y al final fue una de las razones que determinaron la nacionalización de la empresa por parte del gobierno venezolano en el mes de abril de 2008. Los meses sucesivos en los cuales teníamos que hacer la transferencia de la gestión de la sociedad a las autoridades venezolanas fueron muy conflictivos, hubo permanente amenaza a nuestro personal a lo largo de los 6 o 7 meses que duró el pasaje de consigna al Estado. Yo no estuve involucrado directamente en esta gestión, informé a la presidente

USO OFICIAL

I CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL

Cristina Kirchner en los mismos días de abril de 2008. Me acuerdo que estaba en Rusia y yo llamé a Cristina para explicarle lo que estaba pasando y el clima de violencia que se estaba viviendo en Guayana, una región de Venezuela, donde las agrupaciones gremiales no sólo querían promover la nacionalización sino también expulsar a la fuerza al personal argentino y al personal venezolano que habíamos incorporado. También mi participación fue la de reunirme en octubre del año 2008 con Lula Da Silva y Dilma Rouseff, para que intercedan con el presidente Chavez dado que tambien había personal brasilero en la región. Esta fue mi involucración a lo largo de ese año en el tema SIDOR. En el mes de mayo de 2009 se acordó al final una compensación por la nacionalización que si bien reconocía una fración del valor de la sociedad, nos permitia recuperar una parte de la inversión. En aquel momento, el presidente del gobierno venezolano nacionalizó tambien otras tres sociedades de la Holding en Venezuela, la sociedad TAVSA, Matesi y Consigua, para las cuales fuimos a juicio en el Tribunal del CIADI donde ganamos después de muchos años el caso pero todavía no logramos cobrar nada. Mi involucración en el tema fue la de mantener el contacto en máximo nivel con los países involucrados para contener la violencia, asegurar la incolumnidad de nuestra gente, promover una retirada ordenada de la sociedad. Considerando la situación y el clima de agresividad entre el gobierno y las autoridades formales de la sociedad, Luis Betnaza, que no habia tenido nada que ver con la gestión, se hizo cargo de la negociación con el gobierno venezolano. Con referencia a la imputación contestamos cada uno de los puntos. Con relación a la causa queria aclarar que Techint nunca tuvo nada que ver con lo que pudo haber pasado en lo que se refiere al Club de la construcción quiero dejar sentado que a lo largo de 12 años de gobierno kirchnerista, Techint tenía la concesión vial de caminos del oeste, a la cual renunció en el Octubre de 2003, la entregó en diciembre de 2003 y nunca más volvió a tener concesión vial. Logró a lo largo de 12 años contratos con el Estado nacional contratos menores al 1% del total invertido por el Estado en infraestructura. En particular en los temas viales, facturó un total de 19 millones de dólares, que representa menos del 0,40% del total de facturación de la sociedad Techint Ingeniería y Construcción. Techint Ingeniería y Construcción en sí representa menos del 8% del

*Poder Judicial de la Nación*

facturado del Holding San Faustin.".------------------------------------------

Preguntado para que diga si el gobierno le exigió algún dinero por la compensación recibida, el compareciente refirió "no se recibió ningún pedido de dinero por parte de alguna autoridad de gobierno".-----------------------------------------------------

Preguntado para que diga si sabe o le consta que funcionarios del gobierno argentino y que funcionarios de Techint se ocuparon de las negociaciones con el gobierno venezolano por la cuestión de la indemnización, el compareciente refirió "del lado de Techint Luis Betnaza dirigió con el asesoramiento de la dirección administrativa y legal de Techint, y por el lado del gobierno argentino me remito a lo que indicó Luis Betnaza, la presencia de Julio De Vido y Olazagasti, según lo relatara Betnaza".--------

Preguntado para que diga si el deponente era informado con asiduidad sobre la marcha de las negociaciones mientras se desarrollaba, el compareciente refirió "yo recibí información periódica pero no asidua sobre el avance de la negociación pero mi agenda en aquellos meses estuvo dedicada a contener el impacto desatado por la quiebra de Lemhann Brothers y por la crisis económica subsecuente. Además en estos años, estuvimos incorporando las adquisiciones hechas por las empresas Tenaris y Ternium en Estados Unidos y en México. La información que recibía eran llamados telefónicos, contactos para informar sobre la situación del personal expatriado en Venezuela y sobre la negociación, Pero realmente la negociación para la compensación solo empezó para principios del año 2009, antes el tema más relevante fue poder lograr una retirada ordenada y de nuestra gente."----------------------------------

Preguntado acerca de una declaración de Claudio Uberti, respecto de "*el año 2006 hubo en Venezuela una visita de empresarios argentinos, 100 aproximadamente, puesto que IMSA había firmado un contrato en Macahuan. El evento en un cuarto intermedio Rocca se le acercó a Kirchner y hablaba, lo tironeaba, y yo me acerqué a Betnaza que le diga a Rocca que no lo atosigue. En ese momento yo no hablaba directamente con Kirchner. En ese contexto me pidió De Vido que le diga a Betnaza que si quiere que lo traten bien tiene que ponerse. Betnaza me dijo que Techint no de un modo coloquial, luego Kirchner me encomendó que busque a Techint y me presenté*

*ANGLINA LORES ARNAIZ*
*SECRETARIA FEDERAL*

*en su oficina de la calle De la Paolera. En esa ocasión me entregó 100 mil dólares y me dijo que era para KIirchner, eso se repitió entre 5 y 6 veces. En esas oportunidades me lo entregó Betnaza personalmente luego me pedía que bajara otro piso, que me lo iba a entregar otra persona. Esos paquetes con dinero se los entregué directamente a Kirchner* ", el compareciente refirió "Yo tuve conocimiento de la declaración de Uberti y entonces revisé mi agenda del año 2006. Entiendo que en el mes de julio del año 2006 Nestor Kirchner visitó Venezuela pero en aquel momento mi agenda indica que yo no estuve en Venezuela, estuve en Milan. Estuve en Venezuela en el mes de agosto de ese año, estuve visitando la operación, no estaba Néstor Kirchner. Pero en febrero del año 2007, sí estuve en Venezuela y encontré a Néstor Kirchner. En aquella ocasión habíamos concordado con Néstor Kirchner y Chavez, que después del evento de un pozo petrolero los dos presidentes visitaran SIDOR. En esta ocasión de la visita, es posible que yo haya estado discutiendo con Nestor Kirchner. Mientras asistiamos a los discursos presidenciales, Uberti llamó a Betnaza, que estaba sentado al lado mío. Yo lo vi discutir entre ellos y cuando Betnaza volvió me dijo: "*me pidieron dinero para confirmar la visita y yo le dije que de ninguna forma*". Esto fue lo que me comunicó Betnaza en aquella ocasión. Al final la visita no se realizó. Es posible que lo relatado por Uberti sea de esa ocasión. Desconozco los pagos que refiere Uberti, yo no autoricé ni estuve informado de esos supuestos pagos después de esta ocasión."

Preguntado para que diga y teniendo en cuenta que indicó "el ámbito de autonomía y delegación en todo el grupo ha sido muy amplio" si ello incluye la decisión inconsulta de Betnaza de llevar adelante pagos a funcionarios del gobierno argentino para solucionar el conflicto de la empresa SIDOR en Venezuela, el compareciente refirió "La autonomia a la cual yo me refiero obviamente sólo se aplica a operaciones conducidas dentro de la regla de compliance, de ninguna manera aplicaría a pagos indebidos o ilegales."-------------------------------------------------------------------------

Preguntado para que diga habiéndose enterado a la luz de esta investigación conforme mencionara que éstos pagos se efectuaran si sabe o le consta cómo se generó el dinero para llevar adelante los mismos, el compareciente refirió: "Por lo que pudimos

*Poder Judicial de la Nación*

Cn° 9.608/18

averiguar, los fondos para estos pagos derivan de la sociedades centrales donde se mantienen los dividendos pagados por las sociedades operativas y Hector Zavaleta tenía la facultad y autonomía para poder disponer de estos fondos en aquella oportunidad. Esto es lo que estamos averiguando. Mi responsabilidad es sobre las sociedades operativas del grupo como ya mencioné. Las sociedades centrales estan fuera de mi ambito de responsabilidad. Los destinatarios finales de esos dividendos no tenían conocimiento sobre el destino de estos fondos. Héctor Zabaleta tenía autonomía para poder aplicar estos fondos a instancia de Luis Betnaza. Desconozco bajo que rubro contable se extendieron estos pagos, estamos averiguando ello con más precisión, en un contexto donde la dimensión del grupo y la cantidad de sociedades involucradas es muy amplia."-------------------------------------------------------

Preguntado para que diga si en el recupero de SIDOR a la luz de la intervención de funcionarios argentinos que requirieron pagos, cómo considera que esa actuación influyó en la misma, el compareciente refirió "yo no creo que haya influido la participación directa. La justicia argentina evaluará la responsabilidad de los funcionarios. No quiero emitir un juicio de valor sobre ello. Pero creo que en el contexto en el que Venezuela estaba ingresando al MERCOSUR, teniendo una relación amigable con el estado argentino, haber realizado una estatización sin compensación, o expropiación sin causa hubiera sido percibido como algo muy agresivo en la zona comercial que los unía. La razón por la cual llegamos a una compensación fue la voluntad de Chavez de mantenerse en el bloque del MERCOSUR." ----------------------------------------------------------------------------------

En este acto la defensa solicita copia de la presente acta y de las actuaciones, a lo cual S.S accede. Finalmente se le enuncian las previsiones del artículo 300 y 303 del Código Procesal Penal de la Nación para lo que se procede a dar lectura del mismo. No siendo para más se da por finalizado el acto, previa lectura por la Actuaria, ratificando la compareciente su contenido, junto con su letrado defensor, firmando para constancia de ello, después de S.S. y por ante mí, que Doy Fe

CAROLINA LORES ARNAIZ
SECRETARIA FEDERAL